## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **XDOOD LLC, derivatively on behalf of ELTEK, LTD** | **Civil Action:** |
| **Plaintiff,** | |
| **v.** | **ORIGINAL COMPLAINT** |
| **INTERACTIVE BROKERS GROUP, INC., MORGAN STANLEY SMITH BARNEY LLC, and JOHN DOES 1-10,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff, XDOOD LLC ("XDOOD" or "Plaintiff"), derivatively on behalf of and in the right of Eltek Ltd. ("Eltek" or the "Company"), and for their Complaint against Interactive Brokers Group Inc. ("IBKR"), Morgan Stanley Smith Barney LLC ("MSSB"), and John Does 1-10, inclusive (collectively the "John Does" and, together with IBKR and MSSB, the "Defendants") brings this shareholder derivative action for actual damages, treble damages, punitive damages, and injunctive relief, and allege upon personal knowledge, information and belief, and investigation, as follows:

## I. <u>SUMMARY OF THE CLAIMS</u>

1.    Plaintiff brings this shareholder derivative action arising from Defendants' sustained efforts to manipulate the market price of Eltek's common stock over the past five years and continuing through the present (the "Relevant Period"). During this time, Defendants IBKR, and certain John Does who were both broker-dealers and shareholders deliberately or recklessly engaged in, or facilitated, recurrent forms of market manipulation that interfered with and distorted the natural forces of supply and demand. These manipulative practices served Defendants' self-interests and, at various points, artificially froze, stagnated, or depressed Eltek's share price. Defendant MSSB's involvement in manipulative practices and its contribution to the broader scheme occurred during a discrete portion of the Relevant Period, as detailed below.

2.    Fraudulent market manipulation of Eltek's securities occurred on or about October 16, 2020, and was formally detected and confirmed by the "Fraud

Operations Unit" of *E\*TRADE Securities LLC,* now operating under the name "E\*TRADE from Morgan Stanley" (hereinafter, "*E\*TRADE*").[1] MSSB furnished the "Fraud Operations Unit" information in connection with out-of-court communications arising during *Michael McGauley v. E-TRADE Securities LLC*, No. 151395/2021, Decision and Order on Motion, N.Y. Sup. Ct. N.Y. Cnty, Oct. 19, 2021, ("*McGauley v. E\*TRADE*")

3.     To address detected manipulation, MSSB's Fraud Operations Unit suspended electronic purchases of Eltek stock for approximately nine months. During this period, customers could only purchase Eltek shares by placing telephone orders with a customer service representative, the phone trade policy ("P-Trade Policy").

4.     In the 4th quarter of 2020, E\*TRADE was the third largest online retail platform with close to 5.8 million accounts.

5.     A. The P-Trade policy that MSSB initiated negatively affected the demand for Eltek stock from these accounts while causing reputational harm to the company.

6.     Throughout the Relevant Period, additional fraudulent trading activities occurred, as detailed in subsequent sections of this Complaint.

7.     Defendants' conduct violated multiple provisions of the Securities Exchange Act of 1934 ("SEA34"), including Section 10(b), Rule 10(b)-5(a) and (c),

---

[1] For clarity and consistency, MSSB is referred to throughout this Complaint as the responsible entity for conduct originally undertaken by E\*TRADE. MSSB assumed full legal responsibility following the acquisition and integration of E\*TRADE.

and Sections 9(a)(1) and 9(a)(2), and it constitutes fraud under New York state common law. IBKR and certain John Does violated Federal securities law by disseminating and/or effecting large quantities of Eltek shares on U.S. stock exchanges, including the Nasdaq, while knowing, recklessly disregarding, concealing, or a combination thereof, that such trading activity was part of a manipulative scheme, device, or course of conduct designed to distort Eltek's common stock market price.

8.      Over the Relevant Period, certain John Doe shareholders conspired to commit fraud upon the marketplace through trading designed to artificially affect the price of Eltek stock. This manipulation distorted market conditions, damaged the integrity of Eltek's trading environment, and caused reputational harm to the Company.

9.      Eltek was directly harmed in several material respects. The Company was compelled to raise capital at artificially suppressed prices, undermining its ability to fund strategic initiatives. This depressed valuation impeded Eltek's ability to pursue acquisitions, expand production capacity through new factories, and invest in opportunities for growth, thereby limiting its competitiveness and market share within a growing industry. At various times during the Relevant Period, Eltek's stock traded below $5 per share, resulting in a market capitalization or market cap, of less than $25 million. This rendered the Company ineligible for investment by numerous institutional investors constrained by prospectus thresholds, covenant restrictions, and

governance requirements related to minimum share price and market cap.

10.    On multiple occasions, Eltek's stock traded near or below its shareholder equity valuation, approaching price levels typically associated with insolvency or liquidation value, despite strong operating performance and financial stability. Such valuation discrepancies were absurd and fundamentally inconsistent with Eltek's financial profile and are only explainable through persistent manipulative activity. The resulting volatility and depressed market cap impaired Eltek's ability to attract growth capital and damaged its operational momentum. Moreover, sustained undervaluation negatively affected employee morale and hindered the Company's ability to recruit and retain qualified personnel essential for continued innovation and execution.

11.    By distorting Eltek's share price through manipulative trading, John Doe shareholders covertly influenced key financial decisions, the strategic direction of the Company, and undermined Eltek's corporate governance structure. This subversion of standard corporate governance principles highlights the significant impact of certain John Doe shareholders' illicit market manipulation tactics on Eltek's operations.

12.    IBKR and certain John Doe brokers failed to prevent and to take corrective actions required for the protection of the market against the abusive manipulation violations done by John Doe shareholders. The Company suffered years of compounding damage as a result.

13.    Eltek's primary listing exchange is the Nasdaq, where it trades

under the ticker symbol "ELTK". While Nasdaq is the primary listing venue for Eltek, the stock also trades across other various trading centers due to the U.S. equity market's fragmented structure.

14.    Eltek is an Israeli-based company that is a leading global provider of complex Printed Circuit Boards ("PCBs"). Eltek services, the space, aerospace, medical, defense, radio frequency and microwave industries. The Company was and still is more than 50% owned by Mr. Yitzhak Nissan through personal shares and his Nistec Golan Ltd. company based in Petach Tikva, Israel. All of Mr. Nissan and Nistec Golan Ltd shares, collectively ("Nistec"), are restricted shares and subject to limits and notification on trading.

15.    Company shares, not held by Nistec, or other Company insiders such as the CEO or CFO, are referred to as (the "Trading Float", "Public Float", or the "Float"); The Float is calculated by subtracting shares owned by insiders such as Nistec from the Company's total outstanding shares. The Float differed in size during the Relevant Period. Only the Float shares were available to be traded openly, without insider restrictions, and a varying portion of these shares combined with trading techniques were used for the manipulation activities.

16.    Plaintiff continuously owned Eltek shares from November 2019 to Today. All its shares were considered part of the Company Float.

17.    At various times, during the Relevant Period, certain John Doe shareholders owned and conspired to manipulate Eltek's trading using a portion of Eltek's Float shares. The Company Float varied between approximately 25%

and 49% of the Company's outstanding shares over the Relevant Period. For this reason, the current legal action is, in part, a shareholder versus shareholder matter whereby one group of minority unlawful John Doe shareholders weaponized the trading of shares against the Company and its law-abiding shareholders.

18.    IBKR and Broker Defendants assumed liabilities arising from market manipulative trading activities conducted both by themselves and by John Doe shareholders through the use of their trading platforms. These liabilities effectively rendered IBKR and Broker Defendants holders of economic exposure to Company shares, entangling them in the manipulative scheme not only as facilitators but as direct participants. In doing so, they engaged in fraudulent market manipulation and operated as controlling entities with respect to the manipulative conduct initiated by certain John Doe shareholders.

19.    To carry out their conspiracy, certain John Doe shareholders utilized IBKR's trading platform, with its deliberately lax oversight and enforcement policies and may also have used certain John Doe trading platforms to similarly carry out fraud upon the Company.

20.    That fraudulent manipulative trading of Eltek stock occurred during the Relevant Period is not in question. Plaintiff alleges that fraudulent actions were committed by multiple Defendants. Due to the complexity of the fraudulent scheme, discovery is necessary to determine the specific contributions and roles of each Defendant in the fraud that occurred.

21.    John Doe Broker-dealers and IBKR are primarily liable for following the directions of certain John Doe shareholders. That includes accepting, canceling, and executing orders when they knew or recklessly ignored that those orders were intended to defraud the market. They also knew or recklessly ignored that those orders were part of a scheme, device, or course of conduct to manipulate the market price of Eltek common shares.

22.    During the period in which MSSB's P-Trade Policy restricted electronic purchases of Eltek shares, MSSB simultaneously permitted Eltek stock to be borrowed for short-side activity. This practice, further detailed later in this Complaint, enabled the creation of temporary fictitious shares and contributed to artificial downward pressure on Eltek's market price.

23.    MSSB's concurrent suppression of legitimate purchase access and facilitation of phantom liquidity materially distorted Eltek's market value. This artificial imbalance and structural asymmetry was inconsistent with MSSB's regulatory obligations and duties as a broker-dealer.

24.    Plaintiff alleges that other brokerage firms, including Fidelity Management & Research (FMR), owned by FMR LLC ("Fidelity"), did not authorize or implement comparable lending practices to those permitted by MSSB during the P-Trade Policy period. While Plaintiff does not possess complete data on all broker-dealer policies, available evidence indicates that MSSB's conduct was materially distinct in its facilitation of such mechanisms.

25.    Defendant MSSB is primarily liable for its own conduct that

disrupted the natural forces of supply and demand and artificially impacted the trading of Eltek shares during the period from October 17, 2020, through approximately July 2021. This timeframe aligns with the implementation and duration of the P-Trade Policy. Although MSSB ultimately rescinded the P-Trade Policy, the Company continued to experience adverse market effects beyond the reversal date. Furthermore, MSSB materially impeded Plaintiffs' investigation into the manipulation scheme perpetrated by other Defendants, including IBKR and John Does. Plaintiff has only recently, less than two years from the date of this filing, discovered—through its own research—the facts and information supporting Defendants' liability for the misconduct complained of herein.

26. In fact, on March 31, 2020, Plaintiff's manager, Michael McGauley ("McGauley") contacted multiple financial institutions, including Fidelity, Charles Schwab & Co., Inc. ("Charles Schwab"), and MSSB, to report concerns about potentially illegal manipulation of Eltek Ltd. stock. Later, on or about October 16, 2020, MSSB Fraud Operations Unit detected and confirmed manipulative trading of Eltek shares, the very misconduct McGauley had flagged six and a half months earlier. Despite follow-up inquiries, MSSB refused to disclose any information about its internal fraud determination or the resulting P-Trade Policy. When McGauley later pursued legal remedies to identify the perpetrators of the manipulation, MSSB terminated his account, effectively retaliating against lawful investigative efforts.

## II.    JURISDICTION AND VENUE

27.    This Court has original jurisdiction over all the claims and subject matter of this action pursuant to Section 27 of SEA34, 15 U.S.C. § 78aa and 28 U.S.C. § 1331. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1332. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

28.    This Court has personal jurisdiction over each John Doe shareholder. Each one directed fraudulent activity into the market by manipulating Eltek stock on Nasdaq, which is located in this District. The unlawful acts committed by John Doe shareholders had a direct and substantial impact on the market price of Eltek shares traded in this District in the United States.

29.    This Court has personal jurisdiction over IBKR, MSSB, and the John Does because each has conducted a substantial part of the unlawful suit-related trading activities being asserted in this District and/or directed fraudulent activity into the market by manipulating Eltek stock on Nasdaq, which is located in this District. Indeed, the conduct of IBKR, MSSB, and John Does were in furtherance of the market manipulation schemes that manipulated the share price of Eltek.

30.    All Defendants conducted continuous activity in New York state, directly related to these claims, by engaging in fraudulent and manipulative

9

trading using electronically routed and executed trades of Eltek shares throughout the U.S., including in New York, on exchanges in the U.S. such as Nasdaq.

31.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and Section 27 of SEA34. Many of the acts, transactions, and occurrences alleged herein took place in this District. All Defendants engaged in the activities and events described herein.

### III.    THE PARTIES

#### A. Plaintiffs

32.    Eltek was organized in Israel in 1970, and its shares have been publicly traded on the Nasdaq, since 1997 (Nasdaq: ELTK). The principal markets for the Company's PCBs are in Israel, India, Europe and North America. Eltek markets its products mainly to medical technology, defense and aerospace, industrial, telecom and networking equipment, as well as to contract electronic manufacturers, among other industries. Some customers of Eltek have included Boeing, Airbus, GE HealthCare, Siemens, Raytheon Technologies, General Dynamics, Tata Group, Philips, ASML, and Abbott Laboratories.

33.    While Eltek is a foreign entity, its shares are solely listed on the Nasdaq stock market, specifically Nasdaq Capital Markets ("Nasdaq"). Eltek paid Nasdaq an All-Inclusive Annual Listing Fee, during the Relevant Period, which enables Eltek stock to be traded by broker-dealers on the Nasdaq.

**34.** XDOOD, derivatively on behalf of Eltek, is a Massachusetts Limited Liability Company with a principal place of business located at 1400 Hancock St. Fl 9 Quincy MA 02169. McGauley is the manager and sole member of XDOOD and is also domiciled in the State of Massachusetts. XDOOD has held between 3,500 and 24,000 shares of the Company since November 2019. XDOOD currently owns over 8,900 shares of Eltek.

**35.** On September 22, 2025, XDOOD made demand upon Eltek, pursuant to Israel Companies Law, 5759-1999 § 194(b), that the Company pursue the legal claims articulated in this Complaint. Eltek declined to do so, but authorized XDOOD to pursue the claims and agreed to aid Plaintiffs in their investigation of Eltek stock manipulation, so far as it did not impact Eltek's business operations, and it is within their abilities.

## B. Defendants

### i. Interactive Brokers Group, Inc. (IBKR)

**36.** Defendant IBKR is a Delaware holding company with principal executive office located at One Pickwick Plaza Greenwich, Connecticut 06830. Together with its affiliates, it serves as an automated global electronic stock broker-dealer.

### ii. Morgan Stanley Smith Barney LLC (MSSB)

**37.** MSSB is a Delaware corporation with its principal executive offices located in New York, New York. Per the E*TRADE from Morgan Stanley

website, the Name under which the service provider does business is, "Morgan Stanley Smith Barney LLC" and "E*TRADE from Morgan Stanley". The legal name listed is Morgan Stanley Smith Barney LLC, 1585 Broadway New York, New York 10036.

**38.**    MSSB is a registered broker-dealer, and a wholly owned subsidiary of Morgan Stanley.

**39.**    On October 2, 2020, Morgan Stanley, the Parent Corporation of MSSB, completed the acquisition of E*TRADE Financial Corporation, of which E*TRADE Securities LLC was a subsidiary, in an all-stock transaction.[2] In 2023, MSSB assumed responsibility for the custody and clearing services previously provided by E*TRADE.

**40.**    On or about September 1, 2023, E*TRADE began the process of transferring accounts, assets and obligations to MSSB. As such, MSSB became the broker-dealer of record and assumed custody of accounts at E*TRADE. Subsequently, the company began operating under the trade name "E*TRADE from Morgan Stanley".

### iii.   John Does

**41.**    Defendant John Does include presently unidentified registered broker-dealers that facilitated securities transactions involving Eltek stock on U.S. trading venues, including national securities exchanges such as Nasdaq

---

[2] October 2, 2020, Morgan Stanely ("MS") press release announcing the completed acquisition of E*TRADE Financial Corporation  https://www.morganstanley.com/press-releases/morgan-stanley-closes-acquisition-of-e-trade

and alternative trading systems ("ATSs"). These Doe brokers may have executed trades for their proprietary accounts and/or for the accounts of their customers. Plaintiffs allege that certain trades executed through these entities played a role in the manipulation of Eltek's market price and reflect conduct that is materially inconsistent with regulatory and industry obligations. Plaintiff reserves the right to amend this Complaint to identify these entities by name upon further discovery.

42.    Defendant John Does also include presently unidentified individuals or entities who participated in the unlawful manipulation of Eltek's securities during the Relevant Period. These John Doe shareholders may include, but are not limited to, individuals acting in concert, omnibus account holders, hedge funds, family offices, market makers, or other institutional investors. While the specific identities and roles of these defendants may vary across different instances of misconduct, each engaged in manipulative trading activity through platforms operated by Defendant John Doe brokers. Plaintiff reserves the right to amend this Complaint to identify these parties by name as discovery progresses.

## IV.    **FACTUAL BACKGROUND**

43.    To frame the misconduct alleged, Plaintiff briefly introduces the equity market structure governing the trading of the Company's stock. This includes the key systems, participants, and regulatory rules essential to understanding how execution, clearing, and reporting operate within the

13

broader National Market System ("NMS").

## A. Registered Nominee of Company Stock, Clearing & Settlement

44.    The DTCC, "through its nominee Cede & Co., is the registered holder of eligible securities, routinely processing dividend and interest payments and managing the electronic "book-entry" transfer of interests in securities among participants."[3]

45.    Plaintiffs believe the John Doe shareholders trade Eltek using shares of record held by the nominee company CEDE & Co. Each of these securities are "eligible securities", meaning they are freely tradable pursuant to U.S. securities laws and are otherwise qualified to be held at DTCC and serviced.

46.    Below is a figure depicting Plaintiff, Defendants, Manipulation and Clearing & Settlement Paths, with the DTCC nominee CEDE & Co. holding ELTK stock shares, on behalf of brokerage firms and their clients.

Figure   *1*   Overview   of   Key   Relationships   and   Trading   Pathways

---

[3] DTCC Learning (DTCCL) https://dtcclearning.com/products-and-services/asset-services/issuer-services.html#overview (last viewed April 8, 2025)



**B. National Market System ("NMS")**

47.   Eltek is considered a national market system ("NMS") security.[4] NMS stocks are exchange-listed stocks, like those traded on Nasdaq or the New York Stock Exchange ("NYSE"), that follow SEC rules for fair and transparent trading.

48.   Regulation NMS ("Reg NMS"), adopted by the SEC in 2005, and enacted into law in 2007, created a framework that allows exchange-listed stocks to be traded on any venue, not just their primary listing exchange. Hence Eltek could trade on other stock exchanges such as NYSE or NYSE Arca and others.

49.   In addition to stock exchanges all NMS stocks can also trade on other venues. The SEC's "Concept Release on Equity Market Structure" ("Concept Release"), published in the Federal Register on January 21, 2010,[5]

---

[4] Under 17 C.F.R. § 242.600(b)(64) (2025), an "NMS security" means any security or class of securities for which transaction reports are collected, processed, and made available pursuant to an effective transaction reporting plan, or an effective national market system plan for reporting transactions in listed options. Available at: https://www.ecfr.gov/current/title-17/part-242/section-242.600#p-242.600(b)(64).

[5] Federal Register, Vol. 75, No. 13, 75 Fed. Reg. 3494 (Jan. 21, 2010), available at:
Continued…

describes the "various types of trading centers that compete for order flow in NMS stocks." It lists other venues as

50.    Concept Release details concern regarding fragmented trading venues.

> "When many trading centers compete for order flow in the same stock … such competition can lead to the fragmentation of order flow in that stock. Fragmentation can inhibit the interaction of investor orders and thereby impair certain efficiencies and the best execution of investors' orders. Competition among trading centers to provide specialized services for investors also can lead to practices that may detract from public price transparency. On the other hand, mandating the consolidation of order flow in a single venue would create a monopoly and thereby lose the important benefits of competition among markets."[6]

51.    The SEC Concept Release goes on to further detail the markets need to enable business growth:

> "The Commission's task has been to facilitate an appropriately balanced market structure that promotes competition among markets, while minimizing the potentially adverse effects of fragmentation on efficiency, price transparency, best execution of investor orders, and order interaction. An appropriately balanced market structure also must provide for strong investor protection and enable businesses to raise the capital they need to grow and to benefit the overall economy."[7]

52.    John Doe shareholders leveraged and used the structure and mechanics of the markets to do what the SEC was concerned about, and they went against the purpose of the market by sabotaging Eltek's growth.

---

https://www.govinfo.gov/content/pkg/FR-2010-01-21/pdf/2010-1045.pdf    see    also    web    version https://www.federalregister.gov/documents/2010/01/21/2010-1045/concept-release-on-equity-market-structure#footnote-5-p3595 (hereinafter Concept Release).

[6] Concept Release, at 3495

[7] Concept Release, at 3495

53.    Customers of broker-dealers who are not members of an exchange, including the Nasdaq, are prohibited from placing orders directly onto that exchange in their own name. The John Doe brokers, acting in their capacity as broker-dealers, place orders and execute trades on their customers' behalf by directly placing their customer's orders on exchanges pursuant to their customer's instructions with Direct Market Access ("DMA") under SEC Rule 15c3-5, the Market Access Rule.[8]

54.    Alternative Trading Systems ("ATS") described under Financial Industry Regulatory Authority ("FINRA") Rule 6279 and covered under 17 C.F.R. § 242.301 - Requirements for alternative trading systems, including Electronic Communication Networks ("ECNs") a type of ATS, enable broker-dealers to allow their customers to directly route trades to specific ATS systems and not direct to the exchange where the company is listed.

55.    As a matter of general business practice, all broker-dealers provide their customers with access to the exchanges through DMA systems. All broker-dealers are paid transaction fees for completed customer trades. When broker-dealer customers use the DMA system, they do not place orders on exchanges under their own names; rather, these orders appear to the world as coming from

_____

[8] Rule 15c3-5 recognizes two types of market access arrangements whereby a broker-dealer allows one of its customers to use its Marketplace Participant Identifier ("MPID") to electronically access and enter orders into a market. In a "direct market access" arrangement, the customer's orders flow though the broker-dealer's trading systems, such that the pre- and post- trade processes are administered and controlled solely by the broker-dealer whose MPID is used. In a "sponsored access" arrangement, the customer routes the orders directly to the market, wholly bypassing the sponsoring broker-dealer's systems. Under either type of market access arrangement, the broker-dealers continue to have Gatekeeper responsibilities.

the broker-dealers because they bear the broker-dealer Market Participant Identifiers (plural "MPIDs", or singular ("MPID").

56.    Venues other than the Nasdaq exchange exist for trading stock listed on the exchange. Alternative Trading Systems (an "ATS" or "ATSs") is a trading platform that enables the buying and selling of financial instruments, including stocks, bonds, and derivatives. Established as a part of the financial market infrastructure, ATSs provide alternatives to formal exchanges.

57.    Some ATSs are owned and controlled by a specific broker-dealer. For example, SIGMA X2 is owned and operated by Goldman Sachs. Others such as IntelligentCross ATS, owned by Imperative Execution, are used by multiple member broker-dealer firms including Morgan Stanley, JP Morgan, and Goldman Sachs. Only registered United States broker-dealers can be members of IntelligentCross.

58.    IBKR owns and controls its own ATS called IATS IBKR ATS.

59.    Not all ATSs are American based. For instance, the UBS ATS is owned by UBS and is headquarter in Zurich, Switzerland. CROSSFINDER, was once owned by Credit Suisse, which, too, was headquartered in Switzerland. Credit Suisse merged with UBS. Both ATSs were among the world's largest.

60.    FINRA collects and reports on the trading activity of all ATSs. This data is called ATS Transparency Data. The data is reported by ATSs to FINRA equity trade reporting facilities. The data consists of both volume and trade counts per ATS. The data has been aggregated on a weekly basis and can be

viewed by either a stock ticker symbol or by a specific reporting ATS.

## C. Methodology and Sources for Analysis

**61.** Identifying manipulative trading requires a detailed analysis of trading data that provides for share volumes, prices, and the date and time of trades.

**62.** Plaintiff's analysis draws on multiple data sources, including but not limited to:

- Nasdaq, ELTK daily historical stock data[9]

- New York Stock Exchange Pricing Data ("NYSE Data")[10]

- Fidelity Active Trader Pro, Level 2, and Time & Sales Data ("Fidelity Data")[11]

- Intraday Tick Data from a subscription service to Kibot.com ("Kibot Data")[12]

---

[9] Unless otherwise specified, all daily trading data referenced in this Complaint—including volume, high, low, open, and close prices—is derived from Nasdaq's historical pricing data for ELTK. A true and correct copy of Nasdaq volume and pricing data for ELTK, including the entire Relevant Period, found at https://www.nasdaq.com/market-activity/stocks/eltk/historical (last viewed August 1, 2025)

[10] A true and correct copy of NYSE Pricing data for ELTK, including the entire Relevant Period, found at https://www.nyse.com/quote/XNCM:ELTK

[11] Fidelity provides the Active Trader Pro platform to its customers. Representative plaintiffs captured trading information from this platform for specific trading activities detailed later in this Complaint.

[12] The intraday tick data used in this analysis was sourced from Kibot.com, a reputable provider of historical market data. While minor discrepancies may exist between Kibot's reported trading volumes and those from other sources, these differences are immaterial to the conclusions drawn in this Complaint. Accordingly, the Kibot data provides a valid and sufficiently granular basis for identifying patterns of manipulative trading activity and supports the factual allegations made in this Complaint. Kibot, ELTK Intraday Historical Tick Data (time and sales, bid and ask) for Jan. 2019 to present obtained via subscription/download from Kibot, https://www.kibot.com/ (last visited July 1, 2025).

- FINRA's weekly ATS OTC Transparency Data ("ATS Data")[13]

Additional data sources and analytical exhibits are referenced throughout this Complaint.

**63.** Plaintiff's analysis mirrored methodologies outlined in the SEC Technical Assistance Program Presentation, *Market Manipulation* by Tom Swiers.[14] Key elements from that presentation relevant to this Complaint include:

(i) Trading manipulation techniques: Arbitrary Quotes, Wash Sales, Matched Orders, Marking the Close, Domination and Control of Market, and Layering;

(ii) Market characteristics: Manipulations often target thinly traded shares of lesser-known or startup companies, where low volume makes price distortion easier;

(iii) - Deceptive trading activity: Executing trades at specific volumes and times to mislead the market about share value;

## V.    <u>DEFENDANTS' MANIPULATIVE SCHEMES</u>

**64.** The John Doe shareholders concealed their fraudulent trading

---

[13] The FINRA ATS OTC Transparency Data provides weekly aggregated information on the number of trades and the number of shares traded for each ATS, offering a crucial window into a subset of broker-dealer activity. A true and correct copy of Alternative Trading System (ATS) data sourced from FINRA's OTC Transparency platform found at https://otctransparency.finra.org/otctransparency/AtsDownload (last viewed August 1, 2025)

[14] *See generally* TOM SWIERS, OFFICE OF INT'L AFFS., U.S. SEC. & EXCH. COMM'N, MARKET                    MANIPULATION,                    Original                    Source: https://www.sec.gov/files/Market%20Manipulations%20and%20Case%20 Studies.pdf [https://perma.cc/FPN6-H79P]

activities by embedding manipulative conduct within legitimate-seeming Company news, public announcements, and broader market sentiment. They exploited news cycles and macroeconomic events to distort the Company's share price, while cloaking their trades in plausible market rationale. Defendant brokers, including IBKR, MSSB, and Doe brokers, had both the capacity and duty to detect and prevent such manipulation. Their failure to do so constitutes a breach of their gatekeeping obligations under federal securities law.

**65.** Securities markets operate on three foundational economic assumptions:

(i) All else being equal, increased supply depresses prices, while increased demand elevates them;

(ii) A security's market price reflects its fair value based on publicly available information; and

(iii) Published quotes and orders represent genuine trading interest.

Thes assumptions are essential to maintaining market integrity and investor confidence.

**66.** The John Doe shareholders engaged in a series of market manipulation schemes aimed at undermining the integrity and stability of the market for Eltek shares by taking advantage of these three economic assumptions to artificially and in violation of federal securities laws move the market price of Eltek upwards, downwards, or keep it stable.

**67.** What follows is a detailed account of the specific manipulative

schemes employed, including time-segmented micro and macro events, the mechanisms by which these activities distorted Eltek's valuation, and the roles played by IBKR, MSSB, and the John Doe brokers in facilitating or failing to prevent the manipulation.

## A. John Doe Shareholders Manipulative Trading Techniques

**68.**    While the public may be familiar with overt schemes such as "pump-and-dump" or "short-and-distort," the manipulation of Eltek shares involved more sophisticated and insidious tactics. Some trading events were conspicuously irregular, raising red flags for market participants. Others were subtle, designed to evade detection while achieving the same illicit ends. As discussed below, the following techniques were among those employed by the Defendants: (1) cornered market; (2) bear raid; (3) freeze-out/ squeeze-out; (4) price-fixing, price-rigging, and collusion; (5) trading on the basis of material non-public information; (6) spoofing (SEA34 Section 9(a)(2)); (7) Wash trading / wash sales / matched orders, SEA34 Section 9(a)(1); and (8) short-selling.

## B. Examples of Manipulative Trading

### i.  October 16, 2020: High-Volume Manipulation and MSSB Fraud Trigger

**69.**    On October 14, 2020, Eltek filed a Rights Offering F-1 Registration Statement. According to Nasdaq data, only 8,231 shares traded that day. On October 15, volume rose modestly to 14,465 shares. Then, on October 16, trading

volume surged to 1,028,170 shares, representing 67.7% of the Float, or 79.1% of the Float excluding McGauley's holdings.

70.    Of that volume, on October 16, 2020, at least 972,000 shares were traded during regular market hours, accounting for 64% of the Float. From 9:30 AM to 10:37 AM, 132,165 shares changed hands across 267 separate trades, a highly remarkable and unusual concentration of activity for Eltek.

71.    This surge triggered a Nasdaq Limit Up–Limit Down ("LULD") price volatility halt automatically imposed upon algorithmic triggers,[15] at 10:37 AM. The halt lasted five minutes, during which no trading was processed. This was one of nine LULD halts for Eltek during the Relevant Period.

72.    A summary of all trading halts for Eltek during the Relevant Period, including the highlighted Oct 16, 2020 LULD halt, are detailed in Table 1 below.[16] Seven of these halts are relevant and analyzed in this Complaint; the two oldest halts are excluded from analysis.

---

[15]    See U.S. Sec. & Exch. Comm'n, *Stock Market Circuit Breakers*, Investor.gov, https://www.investor.gov/introduction-investing/investing-basics/glossary/stock-market-circuit-breakers    (last visited July 1, 2025) (defining the "Limit Up-Limit Down" circuit breaker as a mechanism that "prevents trades in individual securities from occurring outside of a specified price band").

[16]    A true and correct copy of New York Stock Exchange ("NYSE") Historical Trade Halt data for ELTEK Ltd. ("ELTK") found at https://www.nyse.com/trade-halt

*Table 1 All LULD trading halts for Eltek during the Relevant Period*

| Halt Date | Halt Time | Resume Time | Minutes Halted | Manipulative Trading Event |
|---|---|---|---|---|
| 6/23/2025 | 14:07:00 | 14:12:00 | 5 | EKG Event |
| 6/23/2025 | 13:55:53 | 14:05:53 | 10 | EKG Event |
| 6/23/2025 | 13:44:33 | 13:49:33 | 5 | EKG Event |
| 5/18/2023 | 9:41:58 | 9:46:58 | 5 | Coordinated Trading Scheme |
| 5/14/2021 | 9:44:12 | 9:49:12 | 5 | Coordinated Trading Scheme |
| 10/16/2020 | 10:37:23 | 10:42:23 | 5 | MSSB Fraud Detection |
| 3/9/2020 | 11:27:48 | 11:32:48 | 5 | Stocktwits Posts |
| 9/3/2019 | 10:37:56 | 10:42:56 | 5 | Not Analyzed |
| 8/30/2019 | 12:28:54 | 12:33:54 | 5 | Not Analyzed |

"Manipulative Trading Event" and Minutes Halted, added by Plaintiffs for relevant halts. All other data sourced from: https://www.nyse.com/trade-halt

73.    Immediately following the halt, between 10:42 AM and 10:43 AM, 308,000 shares were traded in 1,057 separate transactions, representing 20% of the Float and 7.03% of all outstanding shares.

74.    MSSB flagged the October 16, 2020, trading activity as fraudulent. Plaintiffs are unaware of any other brokerage firm that took similar actions. Because every trade has two sides, namely a buyer and seller, MSSB's alert implies that other brokerages were counterparties to the flagged trades. The data does not support the possibility that all manipulative trades occurred solely within MSSB's systems.

75.    FINRA's ATS Data for the week of October 12–16, 2020, shows multiple MPIDs active in Eltek trading. IBKR's ATS was the most active during that week, both in terms of volume and number of trades.

76.    Plaintiff used weekly ATS Data to detect broker-dealer trading patterns. Preliminary analysis shows that the most active ATS operators were

24

also the most active traders of Eltek stock. This correlation will be further substantiated through discovery.

77.    Approximately 95% of Eltek's total trading volume for the week of October 12–16, 2020 occurred on October 16, 2020. This strongly suggests that the ATSs active during the week were the same systems used during the manipulative trading event on October 16. See table below for ELTK daily trading details, for the week of October 2016, 2020.

*Table 2 NYSE Data for ELTK trading week of October 12-16, 2020*

| Date | Open | High | Low | Close | Volume | Volume Percent of Week |
|------|------|------|-----|-------|--------|------------------------|
| **10/16/2020** | **$4.7500** | **$6.9300** | **$4.7000** | **$5.3100** | **1,028,170** | **95.01%** |
| 10/15/2020 | $4.6300 | $4.7300 | $4.6300 | $4.7040 | 14,465 | 1.34% |
| 10/14/2020 | $4.7410 | $4.8500 | $4.7200 | $4.7200 | 8,231 | 0.76% |
| 10/13/2020 | $4.9001 | $4.9361 | $4.8000 | $4.8000 | 5,348 | 0.49% |
| 10/12/2020 | $4.9498 | $5.1500 | $4.9000 | $4.9700 | 26,000 | 2.40% |
| **Total** | | | | | **1,082,214** | **100.00%** |

78.    Plaintiffs treat ATS Data as a diagnostic tool to detect patterns in broker-dealer trading activity. Much akin to a chemist testing a water sample to infer the composition of a larger body. In this case, the brokers with the most active ATSs were also the most active Eltek traders.

79.    Plaintiff's analysis indicates that Eltek's market was both price-fixed and cornered during this period. This explains how over 20% of the Float

was traded in under two minutes. Discovery is needed to identify which John Doe shareholders held and traded these shares, and which John Doe brokers, including IBKR and MSSB, enabled the scheme. Any broker that permitted such trading is liable for reckless conduct.

80.    While the October 16, 2020, trading event represents the most acute and well-documented instance of manipulation, it did not occur in isolation. A series of significant trading events, some preceding and others following this date, help establish the broader context of market distortion and broker-dealer involvement. The following examples, presented in chronological order, illustrate patterns of anomalous trading activity, manipulative conduct, and broker facilitation that frame the Relevant Period and support the claims herein.

## ii.    May 2019 – Initial Trading Surge and Profitability Milestone

81.    A series of trading events in May and June 2019—innocuous at the time—preceded the October 2020 manipulation. These events help frame the Relevant Period and provide context for market perception, trading behavior, and potential broker-dealer involvement.

82.    On May 16, 2019, McGauley purchased his first shares of Eltek, 20,000 shares at an average price of $2.57, totaling $51,425. That day, Eltek traded 8,788,910 shares, representing approximately 200% of the outstanding shares. Following the purchase, Fidelity contacted McGauley to confirm the trades were intentional. Having traded stocks for years, McGauley had never

received such a call. When he asked why Fidelity was inquiring, the representative responded, "It trades weird."

83.    After McGauley's purchase, Eltek's share price initially rose, then declined to a low of $1.42 on May 21, 2019.

84.    On May 29, 2019, Eltek reported profitability for the first time in several years. The stock surged to a high of $8.72 on volume of 37,792,528 shares, approximately 827% of the outstanding shares. The following day, May 30, Eltek reached a high of $11.56 on volume of 22,915,110 shares, or 523% of the outstanding shares.

85.    Elevated trading activity continued in the weeks that followed, including:

- June 3: 2,167,752 shares traded

- June 7: 1,183,229 shares traded

- June 10: 1,339,100 shares traded

86.    Based on contemporaneous social media activity, particularly on Twitter (now X), Plaintiffs believe coordinated trading teams contributed to the volume and volatility during this period.

87.    Plaintiffs do not seek to identify every individual or entity involved in potential manipulation during this time, as the number may be substantial. However, Plaintiffs reserve the right to name any major entities or Defendants, including IBKR, that are identified through discovery.

88.    Regardless of whether manipulation occurred, these trading events

are relevant for the following reasons:

- They shaped long-term market perception of Eltek's stock

- No known brokerage firm implemented a policy comparable to MSSB's P-Trade Policy in response

- Certain Defendants, including IBKR and John Doe shareholders, may have participated

- Despite trading volumes exceeding those on October 16, 2020, no LULD halts occurred, and no known institutional safeguards, were triggered

### iii.  Time segment November 20, 2019, to March 9, 2020

**89.**   Plaintiff's investigation identified three key events between November 20, 2019, and March 9, 2020:

- Eltek's Q3 2019 earnings release

- Short-side trading activity following the release

- A series of social media posts on Stocktwits that culminated in a LULD halt on March 9, 2020

Each of these events reflects manipulative conduct and is detailed below

### a.  Q3 2019 Eltek earnings release

**90.**   On November 20, 2019, at 7:35 am EST, prior to market open, Eltek released its Q3 2019 earning.[17] The release reported:

---

[17] A true and correct copy of ELTK's 2019 Third Quarter Financial Results found at https://www.nisteceltek.com/wp-content/uploads/2019/11/ELTEK-PR-Q3-2019-FINAL.pdf

- Revenues for third quarter of 2019 were $9.3 million compared to revenues of $8.5 million in the third quarter of 2018.

- Net profit was $391,000, or $0.09 per fully diluted share in the third quarter of 2019 compared to a net loss of $463,000, or ($0.23) per fully diluted share, in the third quarter of 2018.

CEO Eli Yaffe stated: "We are pleased with our growth in revenues and profitability in the third quarter's results. The improved results are a consequence of the implementation of our previously announced turnaround plan."

91.    Initially, Eltek's valuation rose in response to the earnings. However, after the regular trading session market opened, the share price declined sharply. By close, Eltek's market capitalization fell to $14.9 million, a 34.3% drop from the day's high. Trading volume equaled 47.9% of the Float.

92.    This price collapse is consistent with a Bear Raid manipulation strategy; wherein short sellers aggressively sell to drive down the price and profit from the decline. The trading activity artificially suppressed Eltek's valuation below levels justified by market fundamentals.

93.    ATS data for the week of November 18, 2019, shows that IBKR ATS produced the most volume. Additionally, IBKR ATS was tied for the highest trade count, and it was the highest among individual American brokerages.

### b. Shorting Eltek stock for manipulative purposes

94.    Plaintiff alleges that the short-side trading in Eltek shares during the period from November 20, 2019, to January 31, 2020 (the "Short & Distort"

segment), constituted intentional fraud and market manipulation.

95.    Beginning on the settlement date of November 29, 2019, at least 135,734 shares of Eltek were sold short, representing 8.9% of the public Float, or 10.5% when excluding McGauley's holdings.[18] This level of short interest is inconsistent with Eltek's business fundamentals and financial trajectory. The only comparable instance occurred on May 31, 2019, when tens of millions of shares were traded and the stock price multiplied in value, as detailed previously.

96.    The table below presents short interest data for Eltek from May 15, 2019, through February 28, 2020.[19] "Short interest" refers to the number of shares sold short as of each settlement date. To contextualize this data, short interest is compared against three benchmarks: (i) total outstanding shares; (ii) the public Float; (iii) the effective Float. Because only the unrestricted Float is available for active trading, the latter two benchmarks are most relevant for assessing market impact.

---

[18] McGauley's shares were not restricted in the same way as Nistec or Company insiders. However, McGauley did not sell shares during this time segment and his shares were subject to SEC regulations of market notification for any significant change in his Company holdings. Based on this it's reasonable to consider the data as presented with "Effective Float" (meaning, calculating the float as normal and then subtracting McGauley's shares, yielding a smaller float for analysis purposes) being relevant for comparing trading activity to the Company float.

[19] Settlement date and short interest data comes the Nasdaq's short interest report. "Nasdaq short interest is available by issue for a rolling 12 months" period, this limited historical report is found, https://nasdaqtrader.com/Trader.aspx?id=shortinterest
Analysis of the data to calculate the short volume percentages of the Company is provided by the Plaintiffs. FINRA Rule 4560 requires its member firms (broker-dealers) to report their short positions in all equity securities, including those listed on Nasdaq, to FINRA twice a month. FINRA Short Interest Report Dates Schedule: https://www.finra.org/filing-reporting/regulatory-filing-systems/short-interest
FINRA Rule 4560 details: https://www.finra.org/rules-guidance/rulebooks/finra-rules/4560
(All links last visited May 31, 2025, the short interest report dates schedule does not provide historical information presented here)

*Table 3 Short & Distort time segment showing manipulative short share trading*

| Settlement Date | Short Interest | Change (in short interest) | Short Interest Percentage | | |
| | | | Outstanding Shares | Float | Effective Float |
|---|---|---|---|---|---|
| 5/15/2019 | 590 | -85.6% | 0.0% | 0.0% | |
| **5/29/2019** | | **Q1 2019 Earnings Report** | | | |
| 5/31/2019 | **128,020** | 21598.3% | 2.9% | 8.4% | |
| 6/14/2019 | 66,727 | -47.9% | 1.5% | 4.4% | |
| 6/28/2019 | 87,109 | 30.6% | 2.0% | 5.7% | |
| 7/15/2019 | 52,974 | -39.2% | 1.2% | 3.5% | |
| 7/31/2019 | 46,769 | -11.7% | 1.1% | 3.1% | |
| 8/15/2019 | 41,498 | -11.3% | 0.9% | 2.7% | |
| 8/30/2019 | 60,871 | 46.7% | 1.4% | 4.0% | |
| 9/13/2019 | 80,490 | 32.2% | 1.8% | 5.3% | |
| 9/30/2019 | 31,101 | -61.4% | 0.7% | 2.0% | |
| 10/15/2019 | 31,300 | 0.6% | 0.7% | 2.1% | |
| 10/31/2019 | 27,453 | -12.3% | 0.6% | 1.8% | |
| 11/15/2019 | 44,309 | 61.4% | 1.0% | 2.9% | |
| **11/20/2019** | | **Q3 2019 Earnings Report** | | | |
| **11/29/2019** | **135,734** | **206.3%** | **3.1%** | **8.9%** | **10.5%** |
| **12/13/2019** | **142,662** | **5.1%** | **3.3%** | **9.4%** | **11.0%** |
| **12/31/2019** | **115,302** | **-19.2%** | **2.6%** | **7.6%** | **8.9%** |
| **1/15/2020** | **123,431** | **7.1%** | **2.8%** | **8.1%** | **9.5%** |
| **1/31/2020** | **20,906** | **-83.1%** | **0.5%** | **1.4%** | **1.6%** |
| 2/14/2020 | 15,681 | -25.0% | 0.4% | 1.0% | 1.2% |
| 2/28/2020 | 12,000 | -23.5% | 0.3% | 0.8% | 0.9% |

**97.** The short interest spike following Eltek's Q3 2019 earnings release, despite positive financial results, cannot be explained by rational market behavior. The only plausible explanation is a Cornered Market manipulation, designed to profit from a Price Fixed environment. This strategy reflects coordinated short-side trading intended to suppress Eltek's valuation and mislead investors about the Company's true financial condition.

31

### c. Stocktwits Posts - Cornered market trading

**98.**    On March 9, 2020, eight StockTwits.com posts from Dean Chin ("Chin") led up to and caused a Nasdaq 5-minute LULD trading halt of ELTK at 11:27:48 am with resumption of trading starting at 11:32:48 am. (See All LULD Trading Halts, Table 1).

**99.**    Below is a copy of the postings that Chin, who posted under the username Ru_Investor, made to Stocktwits on March 9, 2020, with other relevant trading events interspersed.

7:47 am $ELTK Shorts sold a whole 15 shares in pre-market to paint it red. LOL! I love it!

10:29 am $ELTK Short attack was interesting. Still here.

10:39 am $ELTK Thank you for the 500 @ $2.75! I love it. So when you guys are going to close out?

10:52 am $ELTK Whoever bought those short 1000 shares at 2.945, congrats to them! I hope they hold to $8 like  my team.

10:53 am $ELTK FYI, my team's average in the $3s and we are not selling!

10:55 am $ELTK Testing my team by moving the blocks. You guys are so cute.

10:56 am $ELTK Nice to know you guys stalk this site.

11:01 am Charles Schwab StreetSmart Edge L2 Trading Platform shows 17,921 shares ask from MPID arca

11:08 am $ELTK The set up for another May 2019 is getting there!

11:27:48 am 5 Minute LUDP Halt, Resumption time 11:32:48

11:38 am $ELTK Setting up for May 2019!

**100.** ATS data for the week of March 8, 2020, shows that IBKR ATS produced the most volume, and trading activity, for an American broker-dealer.

### iv.  Pre-Market (4:00-7:00 am) Spoofing and Price Distortion

**101.** At various times throughout the Relevant Period Eltek trading occurred between the hours of 4 and 7 am. These trades occurred with low volume trades and significant price volatility from previous days regular session trading.

**102.** Since 1985, regular trading hours on the Nasdaq are from 9:30 am EST to 4:00 pm EST, Monday through Friday. Additionally, there are extended hours trading divided into pre-market and after-hours trading sessions available, also known as Extended Markets. For Nasdaq, pre-market trading hours are 4:00 am to 9:30 am, EST. After-hours session is from 4:00 pm to 8:00 pm, EST.

**103.** Nasdaq states, "Some online brokers do allow you to trade during those hours; check with your broker to see if you're eligible to make those kinds of trades. Know that Extended Markets carry risks. The volatility tends to be much higher, and there is less liquidity, meaning that fewer people are trading and that prices tend to move much more dramatically."[20]

**104.** Below is a chart showing one example time segment from March 29,

---

[20] Nasdaq.com stock market holidays and trading hours https://www.nasdaq.com/market-activity/stock-market-holiday-schedule (Last visited March 24, 2025)

2019, to October 23, 2020, of trading activity during the earliest pre-market hours between four and seven am.

*Figure 2 - Trading between the hours of 4 and 7 AM, 3/29/2019 to October 23, 2020.*



### v.   March 23, 2021 – Post Market Wash Trading

**105.** On March 18, 2021, Eltek announced its Q4, and fiscal year 2020 earnings release and conference call were scheduled for March 25, 2021. That day 6,971 shares traded. The following days saw 10,047 shares traded on March 19, 2021, and 19,643 shares traded on March 22, 2021.

**106.** Then on March 23, 2021, Eltek traded 167,021 shares. Most significantly, most of this trading only happened immediately after the regular trading session closed at 4:00 pm. Based upon Kibot Data prior to 4:00 pm there were 14,958 shares traded in 150 separate trades. Then after 4:00 pm, there were 1,234 separate trades with a total of 165,061 shares traded.

**107.** There was no news on March 23, 2021, or the day before that could account for this trading activity.

**108.** Below is a table showing the trading activity between March 18,

34

2021, and March 25, 2021, with the highly suspicious activity on March 23, 2021, highlighted.

*Table 4 Trading Activity From 3/18/2021 to 3/26/2021*

| Date | Trading Session | Kibot Data | | Nasdaq Data | | |
| | | Volume | Number of Trades | Trading Volume | Percent of Outstanding | Percent of Float |
|---|---|---|---|---|---|---|
| 3/18/2021 | All | 7,491 | 152 | 6,971 | 0.12% | 0.39% |
| 3/19/2021 | All | 10,822 | 114 | 10,047 | 0.17% | 0.57% |
| 3/22/2021 | All | 21,195 | 136 | 19,643 | 0.34% | 1.11% |
| **3/23/2021** | Pre Market | 1,500 | 10 | | | |
| | Reg Session | 13,458 | 140 | | | |
| | **Post Market** | **165,061** | **1,284** | | | |
| | **All** | **180,019** | **1,434** | **167,021** | **2.86%** | **9.41%** |
| 3/24/2021 | All | 100,926 | 536 | 93,505 | 1.60% | 5.27% |
| 3/25/2021 | All | 99,457 | 752 | 92,234 | 1.58% | 5.20% |
| 3/26/2021 | All | 24,990 | 209 | 23,174 | 0.40% | 1.31% |

## vi.   May 2021 – Coordinated Trading Scheme and Price Distortion

**109.**  May 3,2021 to May 12, 2021. The trading volume of Eltek went from 2,000 shares to 1.6M shares, equating to 92% of the Company Float. The Company stock price went up and down more than $2 per share in minutes. No public news or events explain this trading.

110. MSSB was not a primary market participant at this time as MSSB still had its P-Trade Policy active (P-Trade Policy" refers to MSSB's restriction requiring all purchase orders of Eltek stock to be placed via telephone instead of electronically). Hence, John Doe shareholders using Doe brokers were responsible for the trading activity.

111. Within a minute of the market opening, 5% of the Float traded.

112. Below is a table showing the daily trading in Eltek between April 30, 2021, and May 12, 2021. The table data is based on 5,840,357 outstanding shares and 1,774,445 Float shares. At the time there were 4,065,912 restricted shares.

*Table 5 Trading Activity From 4/30/2021 to 5/12/2021*

| Date | Volume of Shares Traded | | | Price Per Share $ | | | |
|------|---------------|-------------------------|--------------------|------|------|------|-------|
|      | Total Number | Percent of Outstanding | Percent of Float | Open | High | Low | Close |
| 4/30 | 1,980 | 0.034% | 0.11% | 5.80 | 5.80 | 5.70 | 5.79 |
| 5/3 | 5,889 | 0.101% | 0.33% | 5.69 | 5.78 | 5.65 | 5.78 |
| 5/4 | 8,964 | 0.154% | 0.50% | 5.70 | 5.87 | 5.70 | 5.77 |
| 5/5 | 132,187 | 2.263% | 7.45% | 5.70 | 6.45 | 5.67 | 6.00 |
| **5/6** | **1,635,697** | **28.006%** | **92.18%** | **6.03** | **7.92** | **5.87** | **6.93** |
| 5/7 | 85,441 | 1.462% | 4.81% | 6.86 | 7.28 | 6.67 | 7.25 |
| **5/10** | **1,140,764** | **19.515%** | **64.23%** | **7.16** | **8.80** | **6.28** | **6.55** |
| 5/11 | 101,276 | 1.732% | 5.703% | 6.00 | 6.43 | 5.93 | 6.20 |
| 5/12 | 58,649 | 1.004% | 3.305% | 6.07 | 6.14 | 5.80 | 5.86 |

113. Pricing on both day Price changes on both days

114. This data shows there was a Price Fixed and Cornered Market for the Company stock.

115. For the week of May 3, 2021, the ATS Data shows IBKR ATS

reported the greatest volume and trade activity in Eltek's stock, more than double the second-place ATS in both categories.

**116.** For the week of May 10, 2021, the ATS Data shows that the IBKR ATS reported the greatest volume and trade activity in Eltek's stock for any American ATS.

**117.** For the entire month of May 2021, the ATS Data shows IBKR ATS reported the greatest volume and trade activity in Eltek's stock.

**118.** Some of the John Doe shareholders' actions produced this activity using IBKR's trading platform.

### vii.   September 2021 to May 2023 - Fraudulent Devaluation, Sit and Squash

**119.** On Monday September 6th, Labor Day, when the stock market was closed, and Tuesday September 7th, 2021, Karl Birkenfeld ("Birkenfeld"), from American Trust, texted Representative Plaintiff McGauley seeking to purchase McGauley's Company ownership for an institutional client. At this time, Birkenfeld's offer equated to approximately $6.50 per share, yielding a Company market cap of $38.9 million. The text exchange between Birkenfeld and McGauley is below:

Monday Sept 6, 2021, (Stock Market Closed, Labor Day)

| | | |
|---|---|---|
| Birkenfeld | "Mike it's Karl BIRKENFELD from American | 11:41 pm |
| | Trust are you interested in selling your stake in | |
| | ELTK? I have an institutional client with | |

| | interest" |
|---|---|

**Tuesday Sept 7, 2021**

| McGauley | "Hello Karl. Possibly, what price / amount were they thinking?" | 7:37 am |
|---|---|---|
| Birkenfeld | "I am on the west coast will be meeting client later today?" | 7:43 am |
| | "Do you still have your original position?" | 7:44 am |
| | "Was it 250 k I think and it will be near the market slight discount" | 7:47 am |
| | "That is 250k in shares right ?" | 7:51 am |
| McGauley | "About" | 7:58 am |
| | "Would the buyer be interested in more?" | 7:59 am |
| Birkenfeld | "Yes" | 7:59 am |
| | "He does not have a problem filing a 13g" | 8:01 am |
| | "Your original filing 13d was 228 k" | 8:10 am |
| McGauley | "Hey, ELTK is stupidly cheap here. It is simply WAY too undervalued. So, I'm not interested." | 8:01 pm |

**120.** After McGauley's last text reply to Birkenfeld there was no response from Birkenfeld, no acknowledgment of any kind.

**121.** During the text exchange when McGauley asked "Would the buyer be interested in more?" Birkenfeld immediately replied "Yes", see time 7:59 am. The immediate reply implies Birkenfeld had a standing agreement to contact McGauley and to obtain as many shares of the Company from McGauley as he could.

**122.** Birkenfelds text ""He does not have a problem filing a 13g"" refers to 17 C.F.R. § 240.13d-1. Per this regulation an SC 13G filing is required when any person "is directly or indirectly the beneficial owner of more than five percent of the class," hence Birkenfeld's buyer had the intent to purchase five percent or more of the Company from McGauley. Birkenfeld's offer, for the institutional client, equated a purchase attempt of more than 292,000 shares of Eltek.[21]

**123.** Following this text message exchange Eltek's stock value began dropping. By December 31, 2021, Eltek lost 40% of its enterprise value leaving it with a market cap of $21.7 million. This time segment, Sept 7, 2021, until December 31, 2021, was the ("Squeeze-out: - Fraudulent Devaluation Phase").

**124.** During this time segment, the ATS Data shows that the IBKR ATS

---

[21] Eltek had approximately 5,840,357 outstanding shares on September 7, 2021. Five percent of 5,840,357 is 292,017.85 shares. Outstanding share count is based upon: Eltek Ltd., SEC Form 6-K, 2021 Third Quarter Financial Results, issued on November 17, 2021. Available at: https://www.sec.gov/Archives/edgar/data/1024672/000117891321003632/exhibit_99-1.htm

produced the most volume and trade activity in Eltek's stock for any American ATS.

**125.** Following the Squeeze-out: - Fraudulent Devaluation Phase the Company entered a period where the Company market capitalization was fixed close to or even below shareholder equity value from January 3, 2022, until May 17, 2023, the ("Freeze-out: Sit and Squash Time Segment", See Figure 2).

**126.** During the Freeze-out: Sit and Squash Time Segment, Eltek was priced practically at equity value. For 345 consecutive trading days the Company's shareholders' average equity as a percentage of the market cap was 89.5%. On March 3, 2022, and March 8, 2022, the shareholder equity was greater than the closing price. Additionally, there were 53 trading days where equity as a percentage of market cap was greater than 95%. Not even in private equity, which has more conservative valuations than the public markets, would a business such as Eltek be valued so low.

**127.** During this time segment there was a Price Fixed and Cornered Market. John Doe shareholders colluded to minimally trade the Company stock and to set the price near bankruptcy or liquidation value. Other market participants, not John Doe shareholders, could purchase and sell the stock during this time, however those purchases and sales were made within a price band maintained by John Doe shareholders.

### viii.   February 2024 – Trading "on the basis of" material nonpublic information

**128.** On February 12, 2024, Eltek traded 556,992 shares, representing approximately 9.4% of its outstanding shares and 25.5% of the public Float. The stock opened at $19.35, reached a high of $22.80, and closed at $22.395, per Nasdaq data.

**129.** This trading is remarkable for several reasons:

- Eltek hit an all-time high not only for the year, but for the entire Relevant Period, and many years prior.

- The surge occurred immediately prior to two SEC filings made the following morning.

- The Company's share price and volume behavior before and after the filings reflect anomalous trading patterns.

**130.** On February 12, 2024, at 6:37 pm EST, after regular market hours, Eltek issued a press release announcing a $10 million public offering, PR Newswire announcement.[22] This timing marked a significant and calculated deviation from the Company's consistent practice of issuing such announcements during or before regular trading hours. The after-hours release created a window of opportunity for John Doe shareholders to exploit the low-liquidity after-hours market, and the stock declined 10% in after-hours trading

---

[22] A true and correct copy of the February 12, 2024, PR Newswire announcement may be found at https://www.prnewswire.com/news-releases/eltek-announces-pricing-of-public-offering-of-ordinary-shares-302060057.html

following the release allowed John Doe shareholders to initiate selling momentum and facilitate a broader manipulative scheme.

**131.** The first SEC filing on February 13, 2024, was accepted at 08:17:37 am EST and it consisted of four documents.[23]

**132.** The second SEC filing was accepted five minutes later, at 08:22:47 AM EST, and included three documents. [24]

**133.** The timing, volume, and price behavior surrounding the public offering reflect a Cornered Market, wherein John Doe shareholders leveraged material nonpublic information and trading dynamics to distort Eltek's valuation and extract profit through strategic positioning.

### ix.  March 18, 2025 - Trading connected with IBKR

**134.** Plaintiffs identified a direct tie between the questionable trading and IBKR on March 18, 2025. This is the first time Plaintiffs were able to correlate ATS Data, Nasdaq Data, tick-data, and a IBKR's own platform data to directly show IBKR's involvement with manipulative of Eltek.

**135.** The trading of a significant number of short shares via the IBKR platform provided Plaintiffs with enough circumstantial evidence to directly name IBKR as a defendant broker-dealer.

**136.** March 18, 2025, is the first reasonable date Representative

---

[23]    SEC    Form    6-K,    Eltek    Ltd.,    filed    Mar.    27,    2024,    available    at
https://www.sec.gov/Archives/edgar/data/1024672/000117891324000498/0001178913-24-000498-index.htm

[24]    SEC    Form    6-K,    Eltek    Ltd.,    filed    Mar.    27,    2024,    available    at
https://www.sec.gov/Archives/edgar/data/1024672/000117891324000502/0001178913-24-000502-index.htm

Plaintiffs could identify a Defendant complicit with the overall scheme.

### x.  June 2025 - Echocardiogram event (EKG Event)

**137.** Most recently on June 23, 2025, Eltek traded 278,921 shares according to Nasdaq Data.[25] Eltek's stock opened at $10.79, it rose to a high of $12.19, then crashed to $8.42, before rising again to close the day at $10.13.

**138.** Time & Sales Tick Data from Fidelity for the same day shows 278,921 shares traded in 1,508 trades. This detailed data set shows four distinct trading segments during the day. Time segment one from 9:30 am to 1:20 pm had 14,562 shares traded in 78 separate trades, during which Eltek's stock price remained relatively flat. During segment two from 1:40:58 pm to 1:44:20 pm 40,289 shares traded in 312 separate trades, during which Eltek's stock price rose to a high of $12.20. Time segment three from 1:49:33 pm to 2:12:00 pm Eltek traded 152,498 shares in 651 separate trades and its stock price crashed from $11:94 to $8.42. Finally, during segment four Eltek traded 71,448 shares in 450 separate trades between 2:12:00 pm and market close at 4:00 pm, during this time Eltek price rose from its low of the day to the $10.13 closing price.

**139.** During this trading three LULD trading halts occurred. All these halts happened within 27 minutes and 27 seconds. During the Relevant Period there had never been a day with more than a single trading halt.

**140.** Below is a list of each trading halt that occurred on June 23, 2025,

---

[25] https://www.nasdaq.com/market-activity/stocks/eltk/historical

as previously detailed in Table 1.

*Table 6 June 23, 2025, Eltek EKG Event Trading Halts*

| Halt Date | Halt Time | Resume Date | NYSE Resume Time | Minutes Halted |
|-----------|-----------|-------------|------------------|----------------|
| 6/23/2025 | 14:07:00 | 6/23/2025 | 14:12:00 | 5 |
| 6/23/2025 | 13:55:53 | 6/23/2025 | 14:05:53 | 10 |
| 6/23/2025 | 13:44:33 | 6/23/2025 | 13:49:33 | 5 |

**141.** Below is a table summarizing the volume, price changes, and trading halts that occurred.

**142.** The below chart graphically shows Eltek's echocardiogram event ("EKG Event") trading for June 23, 2025.

**143.** There is no rationally consistent explanation for lawful trading activities to exhibit such a trading phenomenon as happened during the EKG Event. This shows a continuation of the manipulation up to the present day.

**144.** The only way to explain the trading patterns seen on June 23, 2025, is that Eltek shares are Price Fixed in a Cornered Market controlled collusively by John Doe shareholders. The initial rise in price to $12.20 was caused by some entity purchasing about 40,000 shares. The subsequent drop to $8.42 and then rise again to a close of $10.13 with three LULD halts was caused by John Doe shareholders intentionally dropping the price of ELTK to trigger any potential stop losses enabling them to collect those shares at lower prices, before again raising the price. By doing this John Doe shareholders can buy low and sell high through Price Fixing the Company shares.

### C. IBKR willfully or recklessly enabled manipulative trading

145. Holistically considering every event, data point, activity, and broker-dealer platform capability detailed below is crucial for showing IBKR's enablement of manipulative Eltek trading. Otherwise, one could easily dismiss each piece of evidence, individually or in isolation, as meaningless or spuriously correlated.

146. Aggregately looking at the preponderance of documentary evidence shows IBKR is unique amongst brokerages in being culpable in the manipulation of Eltek stock. While MSSB is also culpable, and possibly other Doe brokers, without discovery, correlated evidence only shows IBKR has multitudinous and consistent actions, business practices, systems, and capabilities that uniquely match Eltek's recurring stock manipulation events and techniques used throughout the Relevant Period.

### i.  SEC Market Access Rule 15c3-5

147. IBKR has a loose interpretation of Market Access Rule 15c3-5 compared to other brokerage firms such as Fidelity. IBKR's automated technology systems and platform provides its customers with a means and motive to trade differently than other participants in the market.

148. Defendant brokers gamified the public stock markets and altered the purpose of those markets from being about facilitating companies' capital raising activities, providing investment opportunities, and price discovery into a business model dependent on trading shares. IBKR benefits from trading

45

activities which would not be allowed by other brokerage firms such as Fidelity. IBKR's business model irreparably damaged Eltek's business operations and prospects.

149. On March 21, 2025, McGauley attempted to place a series of sell orders for Eltek stock through his Fidelity brokerage account. While his initial trades were executed, subsequent orders were blocked from being placed.

150. Upon contacting Fidelity, a representative informed McGauley that the attempted trades were being blocked due to a potential violation of the Market Access Rule 15c3-5. The representative stated they could not disclose the specific algorithm used by Fidelity to ensure compliance with the rule but explained some of the factors considered. Specifically, the representative stated that the volume of shares McGauley was attempting to sell was a key consideration, especially when compared to the total volume of shares traded for the equity over a given period. The representative suggested that McGauley could attempt to place the trades again later in the day or reduce the size of the sell orders.

151. McGauley then asked if all brokerages applied the same rules, noting he had successfully placed similar trades with another broker. The representative confirmed that each brokerage firm independently determines its own implementation of the Market Access Rule 15c3-5.

152. Subsequently, McGauley placed a similar set of trades with IBKR, which had been blocked by Fidelity. IBKR accepted these orders. Moreover,

IBKR accepted orders far larger in volume than those Fidelity had disallowed. This demonstrates that IBKR's implementation of the Market Access Rule 15c3-5 was not only different from Fidelity's but also significantly more lenient.

### ii. IBKR's Increased Directed Trade Activity Reflects Strategic Alignment with Sophisticated Traders

**153.** SEC Rule 606 requires broker-dealers to disclose the percentage of customer orders that are "directed" versus "non-directed," in quarterly 606 reports,[26] providing insight into the broker's order routing practices and clientele behavior.

**154.** During the Relevant Period, Interactive Brokers LLC ("IBKR") reported a statistically significant increase in the proportion of directed trades submitted through its platform per SEC Rule 606 reports. Before November 2021 approximately 10% or less of trading was directed. However, this steadily increased. After January 2023 between approximately 40 to 50% of trades were direct..

**155.** Directed trades are typically initiated by sophisticated market participants, such as hedge funds and family offices, who seek to control execution venues for strategic, often high-frequency or algorithmic trading purposes.

**156.** The increase in directed trades suggests that IBKR made a

---

[26] A true and correct copy of the SEC 606 reports for each broker-dealers follows. IBKR 606 reports are found at https://www.interactivebrokers.com/en/general/about/brokerDealerReports.php MSSB 606 reports are found at https://us.etrade.com/l/quarterly-order-routing-report

conscious business decision to attract and accommodate these entities by offering systems, routing flexibility, and execution services.

**157.** This strategic alignment is material to the claims herein, as it demonstrates IBKR's awareness of and facilitation of trading behaviors that are more likely to involve complex, coordinated, or manipulative schemes, including those alleged in this Complaint.

**158.** IBKR's role as a platform provider and order router places it in a unique position to detect anomalous trading patterns. Its failure to do so, despite the increased presence of directed trading, constitutes a breach of its gatekeeping responsibilities under federal securities law.

### iii. Extended hours trading

**159.** During the Relevant Period a limited number of broker-dealers provide trading capability during the earliest times, 4 am EST to 7:00 am EST, of the pre-market trading session.

**160.** On June 26, 2023, McGauley spoke with Katrina Santa Maria ("Maria"), Chief Executive Officer, M.S. Howells & Co ("Howells"). and former district 3 representative for FINRA West Region Committee.[27] The discussion was about how M.S. Howells & Co. compared to IBKR.

**161.** When asked why Howells does not offer trading from 4 am to 7 am Maria said that it's not profitable to offer this service, trade volumes are very

---

[27] FINRA Announces SFAC, Regional Committee and NAC Election Results and Appointments (Election Notice – 12/15/21) https://www.finra.org/rules-guidance/notices/election-notice-121521

low. Additionally, she stated that Howells uses Pershing LLC for clearing, which does not offer trading during those time segments, and compliance rules for the routes would need to be in place. The Bank of New York ("BNY",) Pershing extended trading hours do not allow for many brokerage firms to provide trading between 4 am and 7 am.

**162.** During the Relevant Period, extended hours trading outside the regular session (9:30 am to 4:00 pm) have remained relatively identical for most broker-dealers. There are several notable changes. During these trading hours the volume of trading on exchanges increased and some broker-dealers added overnight trading during the weekdays. This is relevant because IBKR is not only one of the brokers which added overnight trading, they are the industry leader in this activity. This shows IBKR is unlike other broker-dealers in that they are always seeking to be at the forefront of the industry.

### iv.  Most active ATS

**163.** IBKR has the most active ATS during the Relevant Period by both volume of trades and number of trades.

**164.** For the examples of manipulative trading activity provided IBKR's ATS was the most active individual platform of all ATS's. Therefore, a portion of John Doe shareholders trading activity utilized IBKR systems.

### v.  Short-side Activity and Failures to Deliver (FTDs)

**165.** During the Relevant Period before May 18, 2023, only two known broker-dealers, IBKR and Robinhood Markets, Inc., that allowed shorting of

ELTK stock. Subsequent to May 18, 2023, other broker-dealers began allowing shorting of ELTK.

166. IBKR permitted John Doe shareholders, to engage in and use their platform to short Eltek stock during the Relevant Period. These short sales, which involved the borrowing of ELTK shares, temporarily increased the number of shares in circulation, creating an artificial supply of ELTK shares. This manipulated and artificially depressed the price of ELTK stock. At this time the liability for those short shares fell on IBKR and IBKR's clearing house. Therefore, IBKR effectively became the party responsible for the short shares in the event their customers, John Doe shareholders, were unable to fulfill their obligation to purchase shares of Eltek they temporarily borrowed.

167. Numerous other brokerages such as Fidelity, TD Ameritrade, and Charles Schwab, did not allow shorting of Eltek stock during much of the Relevant Period. Shorting Eltek stock gradually became available on additional brokerage platforms as Eltek's market capitalization and stock price rose following the Company Q1 2023 earnings report on May 18, 2023.

168. Defendant Brokers artificially affected Eltek's share price by providing short shares, some of which resulted in Failure to Deliver (FTD's) shares. These FTD shares created a false supply of Eltek's shares resulting in a manipulated and artificial downward price for Eltek stock.

169. Short share creation during the Relevant Period was one technique and mechanism used in John Doe shareholders cornering of the market price for

Eltek shares.

### vi.   Interest rates for shorting Eltek stock

**170.**  IBKR assumed financial risk from the short-side trading activity of John Doe shareholders in ELTK. Had these shareholders been financially unable to meet their obligations, IBKR would have been required to fulfill them.

**171.**  IBKR determined the interest rate for borrowing ELTK shares, and this rate varied throughout the Relevant Period. On several dates and for extended time periods, IBKR allowed John Doe shareholders to short ELTK at near-zero interest rates.

**172.**  The near-zero short interest rate implied minimal financial risk in shorting ELTK. However, this was contradicted by the Company's business fundamentals, a market capitalization close to its shareholder equity value, and ELTK's history of price and volume volatility, all of which indicated a substantial risk with shorting ELTK.

**173.**  Below is screen capture table from Fintel.io an aggregation platform for market data across brokerages including IBKR and John Doe brokers. The table shows the bizarre short borrow interest rate and unusual volatility for shorting Eltek. On June 7 and June 8, 2022, the borrow rate was as low as 0.25 percent. During those days the shareholder equity value to market capitalization of Eltek was approximately eighty-nine percent.

*Figure 3 – Table showing Fintel.io short borrow fee rates from May 26, 2022, to June 8, 2022.*

Last update: 4m

| Date | Start | Min | Max | Latest |
|------|-------|-----|-----|--------|
| 2022-06-08 | 0.25 | 0.25 | 0.25 | 0.25 |
| 2022-06-07 | 8.59 | 0.25 | 8.59 | 0.25 |
| 2022-06-06 | 8.59 | 8.59 | 8.59 | 8.59 |
| 2022-06-03 | 12.47 | 8.59 | 12.47 | 8.59 |
| 2022-06-02 | 19.27 | 12.47 | 19.27 | 12.47 |
| 2022-06-01 | 29.17 | 19.27 | 29.17 | 19.27 |
| 2022-05-31 | 29.17 | 29.17 | 29.17 | 29.17 |
| 2022-05-30 | 29.17 | 29.17 | 29.17 | 29.17 |
| 2022-05-27 | 22.07 | 22.07 | 29.17 | 29.17 |
| 2022-05-26 | 28.45 | 22.07 | 28.45 | 22.07 |

**174.** Despite the inherent risks, IBKR allowed the short-side activity of John Doe shareholders because it profited from their trading. Given the risks involved, IBKR recklessly profited from this activity without proper supervision.

**vii.  NOBO and Bank Broker Break Down Reports**

**175.** Since March 29, 2021, McGauley has a personal brokerage account at IBKR. The account holds approximately 5,700 shares of Eltek. All of McGauley's Eltek stock shares held at broker-dealers other than IBKR appear on the NOBO reports obtained by the Company. Only the Eltek shares McGauley holds with IBKR do not show up on the NOBO reports obtained by the Company.

**176.** IBKR defaulted its customers to be Objecting Beneficial Owners

("OBO") rather than Non-Objectionable Beneficial Owners ("NOBO").

**177.** IBKR did not notify McGauley that his shares were set or defaulted to OBO.

**178.** All broker-dealers the Plaintiffs are aware of including Fidelity, TD Ameritrade, and Charles Schwab, default customers to be NOBO shareholders. Only IBKR defaults their customers to OBO.

**179.** A company such as Eltek can identify specific shareholders by obtaining a copy of the NOBO report. However, outside of a court order, companies have no way to obtain an OBO report or the names of shareholders on the OBO report. "Ironically, leaders of public companies in the United States, unlike other countries such as the United Kingdom, have no absolute right to know who their beneficial owners are."[28] Hence, all John Doe shareholders and John Doe brokers on the OBO reports are undiscoverable by the Company.

**180.** Changing a brokerage accounts OBO / NOBO setting is permitted and broker-dealers such as Fidelity and Charles Schwab both let customers modify this setting by calling them. However, IBKR appears to intentionally have defaulted its customers' settings differently than Fidelity and Charles Schwab, thus concealing their identities.

**181.** By IBKR defaulting customers to OBO status, Eltek has no way of identifying John Doe shareholders that use IBKR's trading platform.

---

[28] Alexandra Reed Lajoux, The Art of M&A: A Merger, Acquisition, and Buyout Guide 956 (5th ed. McGraw Hill 2019)

Furthermore, Representative Plaintiffs could not identify IBKR using the NOBO reports as the two reports the Company obtained do not contain the name IBKR. IBKR's default OBO/NOBO configuration status is relevant when combined with all other information.

**182.** IBKR and Doe brokers hid manipulative trading actions by defaulting customers settings to OBO status. While only IBKR is known by the Plaintiffs to configure customer accounts as OBO, other broker-dealers may do likewise. John Doe shareholders trading Eltek stock using either IBKR or John Doe brokers are undiscoverable by Eltek.

**183.** John Doe shareholders hid their manipulative actions and ability for Plaintiffs to discover John Doe shareholders by using broker-dealer trading platforms such as IBKR.

**184.** Not all brokerage firms appear under their own name, for instance Fidelity appears on the NOBO as National Financial Services LLC which is a subsidiary of Fidelity.

**185.** IBKR states on their website: "Finally, IBKR is not affiliated with a bank, which is unlike most comparably capitalized broker-dealers. Not being affiliated with a bank provides IBKR , with a more stable platform for our clients should a marketwide crisis arise."[29] IBKR also states on their website "IBKR is currently integrated with the following Custody Banks: Bank of New York,

---

[29] IBKR "is not affiliated with a bank" , available at  https://www.interactivebrokers.com/en/general/security-investor-protection.php

Brown Brothers Harriman, Citi Bank, Fifth Third Bank, Huntington Bank, Northern Trust, J.P. Morgan, State Street Bank, UMB Bank, US Bank."[30] Plaintiff is unable to identify IBKR or John Does using IBKR from the NOBO reports.

## D. MSSB's Policies and Facilitation of Manipulative Schemes

186.    MSSB implemented and maintained an undisclosed internal P-Trade Policy restricting electronic purchases of Eltek stock, without notifying Eltek's management or Board of Directors, even as the Company achieved three consecutive profitable quarters with public earnings calls. This policy, prompted by a fraud detection event, burdened prospective investors on MSSB's platform, thereby materially hindering access to Eltek shares.

187.    MSSB further concealed the P-Trade Policy's implementation from its retail customer base and broader market participants. This lack of public notification deprived investors of relevant information, exacerbating the policy's suppressive effects on Eltek's market price.

188.    Securities transactions for John Doe Shareholder customers of MSSB, including those initially cleared through DTCC account 0385 (E*TRADE Securities LLC) and subsequently through various Morgan Stanley DTCC account numbers post-acquisition, facilitated trading activity integral to the manipulation scheme.

---

[30] IBKR custody banks, available at https://www.interactivebrokers.com/en/trading/custody-accounts.php

## VI.    KNOWLEDGE OF MANIPULATION AND ENDURING IMPACT

### A.  Independent Corroboration of Manipulative Conduct

189. On August 12, 2025, Representative Plaintiffs became aware that Bank of America ("BofA") and Charles Schwab instituted policies similar to, although not identical, to MSSB's P-Trade Policy. These restrictions remain in effect at both BofA and Charles Schwab as of the date of this filing. In contrast, Plaintiffs have confirmed that IBKR, Fidelity, and MSSB do not currently maintain comparable policies for Eltek stock.

190. Upon information and belief, BofA and Charles Schwab policies were implemented in direct response to the manipulative trading activities orchestrated by the John Doe shareholders through various Doe brokers, including IBKR. These policy changes serve as independent and material corroboration of the pervasive nature of John Doe Shareholder's fraudulent scheme and reflect industry recognition of the underlying manipulation.

191. MSSB's adoption of the P-Trade Policy in the aftermath of the October 16, 2020, trading session marked the first institutional acknowledgment of irregularities in Eltek's market activity. The subsequent implementation of similar restrictions by two additional major brokerage firms further substantiates the ongoing nature of the manipulation. These policies demonstrate that multiple broker-dealers have identified Eltek stock as subject to anomalous trading patterns consistent with manipulation. The selective adoption of such restrictions, by some firms but not others, underscores that the

56

issue lies not with Eltek as a company, but with systemic irregularities in the marketplace itself.

**B. John Doe Shareholders Targeted Eltek for Manipulation**

192.    Throughout the Relevant Period, Eltek was vulnerable to fraudulent stock manipulation due to factors beyond its control. The following outlines key vulnerabilities exploited by John Doe shareholders in furtherance of their conspiracy and manipulative conduct.

**i.  Company ownership structure**

193.    Since November 1, 2013, the Company's been more than 50% owned by Nistec.[31] The large proportional insider holder position of greater than 50% of the Company meant that the Company's value or market capitalization could be influenced, manipulated, and ultimately easily controlled through fraudulent transactions with shares in the Float. This is because only the Company Float shares, a minority of the outstanding shares, are open to trade daily and trading of those shares determines the Company's per share price, which in turn determines the Company's value or market cap.

194.    According to Eltek's latest 20-F annual report ("Eltek 2024 ARS"),[32] filed on April 8, 2025. "Based on the information provided to us [Eltek] by our

---

[31]    Nistec Ltd. acquired 50.5% of Eltek Ltd. on November 1, 2013, per SEC: https://www.sec.gov/Archives/edgar/data/1024672/000117891313003143/zk1313856.htm Nistec Ltd. transferred ownership to Nistec Golan Ltd. on December 27, 2018, per SEC: https://www.sec.gov/Archives/edgar/data/1024672/000117891319000109/zk1922446.htm

[32]    Eltek 20-F annual report for fiscal year ended December 31, 2024. https://www.sec.gov/Archives/edgar/data/1024672/000117891325001230/zk2532968.htm

transfer agent, as of March 11, 2024, there were 8 holders of record of our ordinary shares, of which 5 record holders holding approximately 50.9% of our ordinary shares had registered addresses in the United States. These numbers are not representative of the number of beneficial holders of our shares nor are they representative of where such beneficial holders reside, since many of our ordinary shares were held of record by brokers or other nominees (including one U.S. nominee company, CEDE & Co., which held approximately 50.9% of our outstanding ordinary shares as of such date)."

**195.** To try to identify Defendants, and gain further insight into the Company ownership, Eltek obtained the following nonpublic reports from the Company's stock transfer agent Equiniti: (i) two Non-Objectionable Beneficial Owner reports ("NOBO" reports);[33] (ii) a Bank-Broker Breakdown report; (iii) a Share Range Analysis report; (iv) a Litigation Report / Litigation Search. These reports provided snapshot information per the date of each report, about the Company's stock shares including partial information about the individuals or entities that owned Eltek.

**196.** The NOBO reports showed that the number of non-objectionable shareholders of record accounts for the Float was 1,042 as per record date February 9, 2023, and 1,278 as per record date June 13, 2023. As each Company shareholder may have multiple accounts (positions), these numbers do not

---

[33] SEC document detailing "The OBO/NOBO Distinction in Beneficial Ownership" https://www.sec.gov/comments/s7-14-10/s71410-22.pdf

provide the number of NOBO owners for the Company. For instance, McGauley had five accounts (positions) in each report from brokerage accounts he held ELTK shares in at multiple financial institutions, and Chin and his immediate family members had seven accounts with ELTK shares listed in each NOBO report. Additionally, these numbers do not include accounts categorized as Objectionable Beneficial Owners (OBO), and they do not include each owner who might be part of omnibus-accounts.

197. Despite the limitations the Company has in identifying its owners, through the reports obtained, and all other information gathered, it's likely the number of Company owners was approximately 1,000 prior to June 2023. While this number certainly varied, before and during the Relevant Period, Eltek did not have tens or hundreds of thousands of shareholders. Eltek had in the vicinity of one thousand shareholders, and a subset of those shareholders, the John Doe shareholders, committed the manipulative trading activity using Defendant Brokers trading platforms. Other than the Defendants IBKR and MSSB, who were both identified through means detailed later in this filing, Plaintiffs do not know, and without discovery have no way of knowing, the identities of the John Doe shareholders and the Doe brokers.

198. Due to the small number of owners, Eltek is a great candidate company for manipulation because the John Doe shareholders can set the price of Company shares by conspiring to overwhelm, overpower, and use market mechanics trading techniques to set the valuation of the Company.

### ii. Company market segment

**199.** Eltek is classified as a "microcap" or "nanocap" stock. An SEC Investor Bulletin dated September 30, 2016, defines "microcap stocks" as shares in a company with a market cap of less than $250-$300 million, while the same Investor Bulletin defines "nanocap stock" to be shares in a company with a market cap of less than $50 million. "SEC Investor Bulletin - Microcap Stock Basics – Part 1".[34]

**200.** The SEC states microcap and nanocap stocks are among the riskiest investments for two groups of reasons. The first group of factors are controllable by companies, and the second group are outside of a company's control.

**201.** SEC factors controlled by the company include lack of public information, no minimum listing standards, and fraud (by the Company).

**202.** Eltek properly provided Company information, met minimum listing standards, and has no history of fraud (by the Company), hence none of these factors are applicable to Eltek.

**203.** Listed SEC factors outside a company's control are lack of liquidity, high volatility, and fraudsters who "manipulate the stock price or trading volume." "Red flags" stated are, stock promotions, unexplained increases or decreases in in stock price or trading volume as this may suggest manipulation.

---

[34] SEC "Investor Bulletin: Microcap Stock Basics (Part 1 of 3: General Information)" https://www.sec.gov/resources-investors/investor-alerts-bulletins/microcap-stock-basics

See "SEC Investor Bulletin: Microcap Stock Basics (Part 3 of 3: Risk)".[35]

**204.** Fraud risk as identified by the SEC is stated as: "Reliable publicly-available information about microcap stocks is often limited. Also, the stocks of microcap companies are historically less liquid and more thinly traded (lower volume) than the stocks of larger companies. These factors make it easier for fraudsters to manipulate the stock price or trading volume of microcap stocks."

**205.** Microcap or nanocap stocks, with a low float such as Eltek, may be susceptible to easy manipulation by large shareholders, or shareholders acting in concert, which can affect price stability and trading fairness. Low-float stocks, meaning companies with a small number and market value of shares that are part of the float, can be illegally manipulated by traders or a group of traders who may control a large portion of the available float. This is so for a variety of reasons, including the following:

- Thin daily trading volumes allow relatively small trades to significantly impact prices up or down.

- Limited third-party analyst coverage or investor visibility into company fundamentals means share prices are often traded based more on hype or momentum.

- Small public floats where insiders and affiliates retain

---

[35] SEC "Investor Bulletin: Microcap Stock Basics (Part 3 of 3: Risk)" https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/investor-2

controlling sway enable manipulation by heavy trading in their shares.

- Low nominal per share prices allow influencers to cheaply purchase or exercise substantive options positions capable of moving prices.

### iii.  Company's financial health, SEC filings, outside auditing

206.  Eltek is profitable with a history of operational success throughout the Relevant Period. Eltek is profitable since 2019 by both Generally Accepted Accounting Principles (GAAP) and non-GAAP measures.

207.  Eltek declared a cash dividend of $0.17 per share on November 23, 2022.[36] Eltek declared a second cash dividend of $0.22 per share on November 28, 2023.[37] Eltek declared a third cash dividend of $0.19 per share on April 8, 2025.[38]

208.  Eltek grew shareholder equity from approximately $1.1 million in 2019 to $41.2 million per the Company's fourth quarter 2024 financial results released on March 11, 2025.[39] This shareholder equity increase is relevant in showing the Company is financially healthy and growing.

---

[36]    Eltek    $0.17    cash    dividend    declared    on    November    23,    2022. sec.gov/Archives/edgar/data/1024672/000117891322004141/exhibit_99-1.htm

[37]    Eltek    $0.22    cash    dividend    declared    on    November    28,    2023. https://www.sec.gov/Archives/edgar/data/1024672/000117891323003800/exhibit_99-1.htm

[38]    Eltek    $0.19    cash    dividend    declared    on    April    8,    2025. https://www.sec.gov/Archives/edgar/data/1024672/000117891325001228/exhibit_99-1.htm

[39]    Eltek    fourth    quarter    2024    SEC    financial    results    released    March    11,    2025. https://www.sec.gov/Archives/edgar/data/1024672/000117891325000765/exhibit_99-1.htm

209. Eltek met or exceeded all legal and regulatory requirements. Eltek filed SEC quarterly, yearly, and other reports for the entire Relevant Period and before. Eltek was never suspended from trading by the SEC.

210. Eltek was audited each year by independent auditors. Per Eltek 2024 ARS:

> Brightman Almagor Zohar & Co., a firm in the Deloitte Global Network, who have served as our principal independent registered public accounting firm between December 2020 – December 2023 (inclusive). On July 8, 2024, our shareholders approved the recommendation of the board of directors of the Company to replace the Company's independent registered public accountants and appoint Kost Forer Gabbay & Kasierer, a member of Ernst & Young Global for the year ending December 31, 2024.

211. As a requirement for listing on Nasdaq Capital Markets Eltek met multiple listing standards including stockholders' equity, market value of listed securities, net income from continuing operations, number of publicly held shares, market value of publicly held shares, bid price, public holders, and number of market makers.

212. During the Relevant Period Eltek met the Nasdaq corporate governance requirements including distribution of annual or interim reports, independent directors, audit committee, compensation of executive officers, nomination of directors, code of conduct, annual meetings, solicitation of proxies, quorum, conflict of interest, shareholder approval, and voting rights.

213. The Company's financial strength and good governance limits potential risks to the John Doe shareholders as it minimizes un-knowns.

### iv.  Company's capital raising events

**214.** During the Relevant Period, the Company raised capital through an increase in both the outstanding share count and the Float share count from a combination of a share F-1 Right Offering, insider stock sales, and a $10 million public share offering.

**215.** The F-1 Rights Offering completed on December 3, 2020, provided the opportunity for Company shareholders to purchase additional Eltek stock at a discount. Nistec participated in the F-1 rights offering and purchased additional Eltek shares, increasing ownership from 1.5 million shares to 1.77 million shares. Hence, Nistec increased its insider ownership position from 65.35% to 69.5% of Eltek during the Relative Period segment of December 3, 2020, through June 6, 2023. Nistec's increase in insider ownership shows the most knowledgeable people about the company continued maintaining their confidence in Eltek's future.

**216.** Insider Stock Sales. Nistec and Eltek's CEO made twenty-two separate notices of stock sales, pursuant to Rule 144 under the Securities Exchange Act of 1933, between June 7, 2023, and February 2, 2024 ("Rule 144 Sales"). For all these SEC Form 144 filings Oppenheimer & Co. Inc. 85 Broad St. New York, NY, 10004 was the single "Name and Address of the Broker" listed. Per the SEC Form 144 instructions,[40] the name and address of broker

---

[40] SEC Form 144 instructions: https://www.sec.gov/files/form144.pdf

field is "Name and Address of Each Broker Through Whom the Securities are to be Offered or Each Market Maker who is Acquiring the Securities".

**217.** All these Rule 144 Sales stated the sellers "did not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed."

**218.** These Rule 144 Sales are relevant for three reasons:

- First the Company increased the Float by approximately 850,000 shares over the time segment June 7, 2023, to February 2, 2024, meaning the company sold (or notified the market of sale for) approximately 850,000 shares into the open market while the stock price rose from approximately $10 to a close price of $19.68 on February 2, 2024. When considering that on June 7, 2023, the Float was approximately 1,574,414 shares the additional 850,000 shares is equivalent to increasing the Float by approximately 54% during this time segment.

- Second, the Company raised capital from some of the insider sales as some shares needed to be purchased prior to being sold.

- Third, combining these facts shows interest and recognition to the value of Eltek's shares from somebody or some entities.

**219.** A $10 million public offering for the issuance of an additional 625,000 shares of Company ordinary stock was made on February 13, 2024, via

an SEC 6-K Company filing. The SEC accepted the Company filing and made the offering public knowledge on February 13, 2024, at 08:17:37 am Eastern Standard Time (EST).[41] ThinkEquity LLC, as Representative of Several Underwriters, acted as the sole book-running manager for the $10 million public offering.

**220.** The underwriting agreement between "ELTEK LTD. and THINKEQUITY LLC" filed with the SEC 6-K for the share offering shows the date February 12, 2024.[42] Additionally, the agreement states that ThinkEquity LLC acted "As Representative of the several Underwriters named on Schedule 1 attached hereto." Schedule 1, at the bottom of the underwriting agreement, lists a single entity for the underwriter, namely ThinkEquity LLC, and states 625,000 "Total Number of Firm Shares to be Purchased."

**221.** The Company Float increase from 1.3 million to 2.97 million shares is important in understanding the market manipulations that occurred as it provides a measure for comparing volume of trading activity which helps explain and show the fraud by John Doe shareholders that occurred to the Company.

**222.** For example, on October 16, 2020, at least 972,000 shares of Eltek traded representing approximately 67% of the Company Float, yet during the period April 2022 to May 2023, there were more than a dozen days when trading

---

[41]   February 13, 2024, SEC Filing for public offering of Company shares. https://www.sec.gov/Archives/edgar/data/1024672/000117891324000498/0001178913-24-000498-index.htm

[42]   Underwriting Agreement for public share offering. https://www.sec.gov/Archives/edgar/data/1024672/000117891324000498/exhibit_99-2.htm

volume was less than 100 shares total. Eltek's volume was so low that Nasdaq Historical Quotes recorded N/A for trading volume on those dates.[43] Only manipulative trading fraud can explain these vast discrepancies in trading volume activity.

223. Market capitalization of a company is calculated by multiplying the total number of outstanding shares by the prevailing price per share ("PPS"). During the Relevant Period, Eltek's market cap varied between $3.14 million and $132.4 million, while its share price varied between $1.28 and $22.80. This volatility is ultimately only explainable by manipulation.

224. Even a small number of shares trading at an artificial or manipulated price can materially affect a company's overall market capitalization. Unlike other asset classes, where the price of a single transaction may not influence broader valuations, the securities markets often treat the most recent trade price as representative of the value of all outstanding shares. Accordingly, if the PPS is manipulated, the resulting distortion in market capitalization is magnified across the entire share base.

225. During the Relevant Period the market cap of the Company repeatedly changed by hundreds of thousands or even millions of dollars following trading of several hundred or a few thousand shares, in some cases as small as a single share traded more than twenty-five-cents different than shares

---

[43] Nasdaq, Inc., ELTK Historical Stock Data, Nasdaq.com, https://www.nasdaq.com/market-activity/stocks/eltk/historical (last visited July 1, 2025).

sold immediately before or after.[44] Hence an insignificant number of shares valued at most several hundred or a few thousand dollars, changed the market cap of the entire company by multiples greater than the value of the trade(s) that occurred.

**226.** Below is a chart that shows the Company's daily price per share, the market capitalization and shareholder equity over the Relevant Period. This chart readily shows two effects of the conspiracy.

- The pricing and market capitalization data clearly shows the whipsawed pricing and volatility;

- Shareholder equity equaled the company market capitalization during a period when the Company was financially healthy, and growth was occurring.

Neither one of these would happen in a non-manipulated market when all facts are considered.

---

[44] Trading of fewer than one hundred shares is considered an "odd lot" in securities trading. Typically, these odd lots are excluded from calculations of market-based metrics—including market capitalization, average daily volume, and pricing benchmarks. Hence, one-hundred or more shares must trade for the Company market cap to change.

*Figure 4 Company daily share price, closing market capitalization, and shareholders' equity during the Relevant Period*



**227.** In the chart above, the Closing Price Per Share and Market Capitalization graphs would typically be identical; they would overlap when laid on top of each other. However, because the number of outstanding shares increased during the Relevant Period, previously existing shares represented a smaller percentage of ownership of the Company. Hence, the Closing Price Per Share line does not overlap the Company Market Capitalization throughout the Relevant Period.

### v.  Précis of John Doe Shareholders Manipulation

**228.**  Plaintiffs are informed and believe, and upon such information and belief, allege that John Doe shareholders conspired and targeted Eltek for stock manipulation for self-serving purposes.

**229.**  This summary distills the manipulative trading conduct executed by the John Doe shareholders, as detailed throughout this Complaint.

**230.**  Their activities spanned the Relevant Period and employed multiple disruptive trading techniques, exploiting weaknesses in market mechanics, governance, and system controls. These actions reflect a coordinated complex scheme to distort Eltek's market price, mislead investors, and profit from artificial volatility. The manipulation was executed through many means including extended hours trading, short-side positioning, and high-frequency bursts timed to coincide with earnings releases and corporate actions.

**231.**  Taken together, these events demonstrate that the manipulation was neither isolated nor incidental, but part of a sustained and deliberate strategy. The volume, timing, and structure of trades, combined with the use of broker-dealer platforms such as IBKR, support a strong inference of manipulative intent and enduring market impact.

**232.**  Eltek's low nominal share price, intermittent thin trading volumes, and minimal operational risk, due to the Company's extensive audited financial disclosures, made it an attractive target for price fixing. The John Doe shareholders sought to extract maximum profit from trading activity not

70

connected to them, while suppressing fair market valuation.

**233.** Given that even minor price distortions affect the valuation of all outstanding shares, by manipulating the price using a relatively small number of trades, the John Doe shareholders impacted the Company's overall market capitalization, business opportunities, business planning and hindering the Company's growth prospects throughout the Relevant Period. The John Doe Shareholder were so influential over the trading of Eltek shares that they forced multiple other broker-dealer trading platforms to their respective purchase policies for Eltek stock.

### C. Defendant Brokers Regulatory Knowledge and Obligations

**234.** Numerous broker-dealer regulations are intended to protect the integrity of our public stock markets. John Doe shareholders exploited the lack enforcement of regulatory controls and differences in trading venue and broker-dealer policies to perpetuate their manipulation.

**235.** Broker-dealers in the U.S., are considered by their corresponding self-regulatory organizations ("SROs"),[45] as the "Gatekeepers" of the integrity of trading on the securities exchanges and the stability of the financial system.

**236.** Christian Sabella, DTCC Managing Director and Deputy General Counsel, states:

> A self-regulatory organization (SRO) is an entity which has the power to create and enforce industry regulations that govern the SRO's members. For the securities markets, the Securities

---

[45] The SEC list of SROs for: *Self-Regulatory Organization Rulemaking* https://www.sec.gov/rules-regulations/self-regulatory-organization-rulemaking

Exchange Act gives SROs this limited power to act as quasi-regulatory bodies subject to oversight by the U.S. Securities and Exchange Commission (SEC). Under that oversight, SROs have a special power to create rules for their members that become legally enforceable requirements under the U.S. federal securities laws. But with great power comes great responsibility.[46]

**237.** The list of applicable SROs for Eltek trading includes: FINRA; Nasdaq; NYSE; NYSE Arca, Inc. ("NYSEARCA"), and subsidiaries to the DTCC including both The Depository Trust Company ("DTC") and National Securities Clearing Corporation ("NSCC").

**238.** When broker-dealers such as IBKR provide DMA systems access to customers, it is the broker-dealers' continuing responsibility to ensure that the customers' order-flow which the broker-dealers are disseminating and/or effecting is in compliance with all applicable rules, regulations, and laws.

**239.** Under the SEC Market Access Rule 15c3-5, broker-dealers are required to establish, document, and maintain a system of risk management controls and supervisory procedures that are reasonably designed to manage the financial, regulatory, other risks of the brokerage industry, and prevent the disruption of a fair and orderly market.

**240.** As the interpretation and implementation of controls and systems for the enforcement of The Market Access Rule is different by each broker-dealer the result is non-uniform controls and rules across brokerages. Exploitation of the resulting patchworked implementation and enforcement of the Market

---

[46] Article from Christian Sabella, DTCC Managing Director and Deputy General Counsel, *An Expert's Take on Self-Regulatory Organization Rulemaking,* Dec 12, 2022 https://www.dtcc.com/dtcc-connection/articles/2022/december/12/an-experts-take-on-self-regulatory-organization-rulemaking

Access Rule provided John Doe shareholders with the opportunity to leverage and utilize systems at IBKR and other Doe brokers for their manipulative activities.

**241.** Under FINRA Rule 3110, brokerage firms are also required to "establish and maintain a system to supervise the activity of each associated person (i.e., customer or internal trading desk) that are reasonably designed to achieve compliance with applicable securities laws and regulations[.]"

**242.** As registered broker-dealers, the U.S. Defendant Brokers were also required, pursuant to FINRA Rules 5210, Supplementary Material 01, and Nasdaq Exchange Rule 575, Disruptive Practices Prohibited, to detect and prevent manipulative or fraudulent trading that originated from algorithmic high-speed trading under the supervision and control of their firm.

**243.** During the Relevant Period, IBKR and Doe brokers were required to file an "Annual Certification of Compliance and Supervisory Processes," pursuant to FINRA Report 3130, in which they admitted that they (1) established, maintained and reviewed policies and procedures reasonably designed to achieve compliance with applicable FINRA rules, Municipal Securities Rulemaking Board ("MSRB") rules and federal securities laws and regulations; (2) modified such policies and procedures as business, regulatory and legislative changes and events dictate; and (3) tested the effectiveness of such policies and procedures on a periodic basis, the timing and extent of which is reasonably designed to ensure continuing compliance with FINRA rules,

MSRB rules and federal securities laws and regulations.

244.  The Defendant Brokers are required to act as "Gatekeepers" who are legally obligated to monitor their customers' order flow and prevent— rather than give effect to—any unlawful trading practices, such as spoofing, that their customers attempt to carry out under the shield of broker-dealers MPIDs. In fact, each broker-dealer has compliance procedures which explicitly confirm and commit to honor their monitoring obligations. IBKR and Doe brokers knew what their Gatekeeper responsibilities were and yet they were derelict in their enforcing responsibilities and duties.

245.  Unlike traditional stock exchanges, such as the New York Stock Exchange ("NYSE") or Nasdaq, ATSs are not required to adhere to the same stringent regulatory requirements. They operate under different regulations and typically offer more flexible trading environments. This flexibility can attract different types of investors seeking various trading advantages and can be used for market manipulation.

### D. Brokers' Facilitation of Eltek Short Sales

246.  Defendant Brokers played an active and enabling role in the manipulative short selling of Eltek shares. Their conduct demonstrates both control over the John Doe shareholders and reckless disregard for the risk of market manipulation, as evidenced by the following:

247.  Defendant Brokers played an active and enabling role in the manipulative short selling of Eltek shares. Their conduct demonstrates both

control over the John Doe shareholders and reckless disregard for the risk of
market manipulation, as evidenced by the following:

- **Control over shortable securities**: Defendant Brokers made
  Eltek, a thinly traded, volatile stock, available for shorting to
  high-risk clients, including the John Doe shareholders. This
  decision was not incidental; it reflects a deliberate choice to
  permit short selling in a context where manipulation was
  foreseeable. Had the brokers implemented prudent internal
  policies restricting shorting of such securities or limiting access
  for high-risk accounts, the manipulative trading would have
  been materially constrained.

- **Independent risk assessment and margin/borrow rates**:
  Defendant Brokers set unusually low margin requirements and
  offered excessively favorable borrow rates for Eltek, despite its
  inherent volatility and susceptibility to manipulation. These
  terms incentivized aggressive short selling and deviated from
  standard prudent brokerage practices and the gatekeeper's role
  suggesting a reckless disregard for the potential abuse.

- **Ongoing business relationship and account control**: The
  Defendant Brokers decision to maintain accounts with John Doe
  shareholders and failure to adequately monitor their activity and
  halt suspicious short selling is a failure to exercise their

gatekeeper function and a tacit endorsement of the harmful trading strategy.

- **Knowledge of substantial risk**: The brokers' actions reflect a severe disregard for a known and substantial risk of fraud. Their continued facilitation of short selling under these conditions supports an inference of willful blindness or conscious avoidance.

**248.** Defendant Brokers are liable as Control Persons under 15 U.S.C. § 78t(a) based on the following:

- **Primary Violation**: the manipulative short selling aim was to drive down the price of Eltek thus the short selling activity constituted a primary violation of the securities laws;

- **Control:** Defendant Brokers had the power to directly or indirectly control the specific activities of the John Doe shareholders. The Defendant Brokers had the ability to set margin requirements, restrict trading, and monitor John Doe shareholders' accounts. Their gatekeeping function inherently conferred control over the means and mechanisms of the manipulative conduct.

**249.** The Defendant Brokers' relationship with John Doe shareholders goes beyond a service provision enterprise for the brokers that allowed shorting of Eltek stock during the Relevant Period. These Defendant Brokers actively participated and enabled the transactions by deciding which stocks can be

shorted, assessing risks, and setting the terms including the interest rates incurred from shorting, thereby they had a facilitated venture with aligned, though not identical, interests and risks.

- **Facilitated Venture**: Defendant Brokers provided the platform, access, and infrastructure necessary for the John Doe shareholders to execute their short selling strategy.

- **Aligned Interests**: The brokers and the John Doe shareholders had an interest in the successful execution of the trades. The John Doe shareholders profited from the price decrease in Eltek, the brokers earned fees and maintained a good client relationship.

- **Differing Risks**: While both faced financial risks, the nature and directness of those risks differ (customer faces direct profit/loss on the stock price, broker faces risks related to customer default and regulatory compliance).

250. Therefore, liability for manipulative activities leveraging short share trading techniques shows that there was a facilitated venture between John Doe shareholders and the Defendant Brokers as described.

**E. IBKR's Business Model and Role in Manipulation**

251. IBKR is a public company which trades on Nasdaq Global Select Market under the ticker symbol IBKR.

252. IBKR's business began as a market maker in 1977, and it used this

technology and knowledge of the markets to launch its brokerage business in 1993.

**253.** IBKR's founder Thomas Peterffy:

"has been the Chairman of [the] Board since November 2006 and Chief Executive Officer from November 2006 to September 2019. Mr. Peterffy has been at the forefront of applying computer technology to automate trading and brokerage functions since he emigrated from Hungary to the United States in 1965. In 1977, after purchasing a seat on the American Stock Exchange and trading as an individual market maker in equity options, Mr. Peterffy was among the first to apply a computerized mathematical model to continuously value equity option prices."

### i. IBKR's Regulatory Representations

**254.** IBKR's "securities and derivatives businesses are extensively regulated by U.S. federal and state regulators, foreign regulatory agencies, and numerous exchanges and self-regulatory organizations of which [IBG, Inc] subsidiaries are members."

**255.** As registered U.S. broker-dealers, IBG LLC's subsidiaries ("IBG-SUBS"),

"Interactive Brokers LLC ("IB LLC"), IBKR Securities Services LLC ("IBKRSS") and Interactive Brokers Corp. are subject to the rules and regulations of SEA34, and as members of various exchanges, [IBG-SUBS] are also subject to such exchanges' rules and requirements. Additionally, IB LLC is subject to the Commodity Exchange Act and rules promulgated by the Commodity Futures Trading Commission ("CFTC") and the various commodity exchanges of which it is a member. [IBG-SUBS] are also subject to the requirements of various self-regulatory organizations such as the Financial Industry Regulatory Authority ("FINRA"), the Chicago Mercantile Exchange ("CME") and the National Futures Association ("NFA")."

### ii.  Scale of Operations and Staffing Risks

**256.**  IBKR had 2,998 employees worldwide at the end of 2024 and the company had a market cap of approximately $75 billion.

**257.**  In 2024, IBKR had net revenues of $5.2 billion, with a global reach of 160+ market centers in 36 countries, and 3.3 million client accounts that grew 37 percent versus 2023.

**258.**  IBKR specializes in executing and clearing trades in stocks, options, futures, foreign exchange instruments, bonds, mutual funds, exchange-traded funds ("ETFs"), precious metals, and forecast contracts on more than 160 electronic exchanges and market centers around the world and offering custody, prime brokerage, securities and margin lending services to customers.

### iii.  IBKR's Clearing and Account Structures Enabling Manipulation

**259.**  Securities transactions for John Doe shareholders customers of IBKR are cleared and settled at the DTCC in IBKR's participant account numbered 0017 and named "INTERACTIVE BROKERS LLC," or account number 0534 named "INTERACTIVE BROKERS LLC/RETAIL".[47]

**260.**  IBKR is integrated with the following custody banks: Bank of New York, Brown Brothers Harriman, Fifth Third Bank, Huntington Bank, Northern

---

[47] Source for DTC Member Directories and associated account numbers: https://www.dtcc.com/client-center/dtc-directories

Trust, J.P. Morgan, State Street Bank, UMB Bank, US Bank.[48]

**261.** IBKR provides customers with the ability to establish omnibus broker accounts in which the transactions of multiple individual account holders are combined. The identities of the individual account holders are not revealed to the holding merchant. Hedge funds, family offices, and other entities may use this account structure.

**262.** IBKR states in the second sentence of its business overview in its Annual Report to Shareholders ("ARS"), "We custody and service accounts for hedge and mutual funds, exchange-traded funds ("ETFs"), registered investment advisors, proprietary trading groups, introducing brokers and individual investors."

**263.** Omnibus accounts structures without proper oversight are capable and risky of being used for fraud purposes. The SEC put out a staff bulletin, about risks associated with omnibus accounts transacting in low-priced securities.[49] One key takeaway from the SEC bulletin is "Low-priced securities transactions in omnibus accounts maintained for foreign financial institutions can pose a particularly high risk of illicit activities, including fraud, money laundering, and unregistered securities offerings." Plaintiffs believe it's likely that John Doe shareholders leveraged IBKR's integration with custody banks

---

[48] IBKR Custody Accounts: The Custody Account constitutes a tri-party agreement between IBKR, the custodial bank holding the customer's assets, and the IBKR client. No details of these custody accounts appear in IBKR's recent 10-K or ARS SEC filings despite specific integrated banks being listed on its website. https://www.interactivebrokers.com/en/trading/custody-accounts.php (last accessed March 25, 2025)

[49] SEC staff bulletin about risks with omnibus accounts (last reviewed or updated on Oct. 17, 2023) https://www.sec.gov/tm/risks-omnibus-accounts-transacting-low-priced-securities

and omnibus broker accounts, to layer, disperse, and shield their Eltek transactions.

### iv.  IBKR's Exposure to Manipulative Customers

**264.**  Foreign customers, hedge funds, proprietary trading firms

**265.**  According to IBKR's 2024 ARS:

> Currently, approximately 83% of our customers reside outside the U.S. in over 200 countries and territories, and over 85% of new customers come from outside the U.S. Approximately 55% of our customers' equity is in institutional accounts such as hedge funds, financial advisors, proprietary trading firms and introducing brokers. Specialized products and services that we have developed successfully attract these accounts. For example, we offer prime brokerage services, including financing and securities lending, to hedge funds; our model portfolio technology and automated share allocation and rebalancing tools are particularly attractive to financial advisors; and our trading platform, global access and low pricing attract introducing brokers.

### v.  Automated Systems and Insufficient Oversight

**266.**  IBKR's technology automation and proprietary systems which it developed over decades are relevant because these systems were used and exploited by John Doe shareholders in manipulating Eltek's valuation.

**267.**  IBKR uses its proprietary technology and leading global expertise to offer low cost, seamless global access to multiple types of securities for both institutional and individual investors.

**268.**  IBKR "provide[s] customers with high-speed trade execution at low commission rates, in large part because of [its] proprietary technology. As a result of [its] advanced electronic brokerage platform, [it is] especially attractive

to sophisticated and active investors."

**269.** IBKR mentions "automate", "automated", "automatic", "automatically", or "automation" seventy-three times in its 156-page long 2024 ARS. In contrast, Morgan Stanley's 175-page long 2024 ARS only mentions "automated" a total of nine times in four paragraphs. Each ARS includes the business annual 10-K filing required by the SEC. This 10-K filing contains the following standardized sections, providing a format to ensure consistency across businesses, and making it easier for investors and analysts to compare financial performance. The standardized sections include business overview, risk factors, financial statements, management discussion & analysis, executive compensation, legal proceedings, and market information. Given these are competing businesses for decades, and being compared based upon these public annual filing, the difference between the number of mentions of automation shows a clear distinction in priorities of each business.

**270.** IBKR mentions "proprietary technology", "proprietary trading", "proprietary trading groups", "proprietary pricing", "proprietary securities transactions", "proprietary connectivity", "proprietary systems", "proprietary software", or "proprietary Application Programming Interface" thirty-one times in its ARS.

### vi.  IBKR's Systematic Failures and Reckless Disregard

**271.** IBKR is an industry leading premier hedge fund enterprise. Its extensive foreign business activities make it ripe for fraud activities.

**272.** IBKR has a history of fines, penalties, enforcement actions, and violations from the SEC, CFTC, and FINRA penalties and legal actions

**273.** In September 2023, the SEC and the Commodity Futures Trading Commission (CFTC) both announced settlements with Interactive Brokers for failing to maintain and preserve electronic communications.

**274.** The SEC fined Interactive Brokers Corp. $35 million for "widespread and longstanding failures to maintain and preserve electronic communications," as employees, including senior staff, used unapproved methods like personal text messages and WhatsApp for business-related communication. These communications were generally not retained by the firm.

**275.** The CFTC ordered Interactive Brokers Corp. and Interactive Brokers LLC to pay a $20 million civil monetary penalty for similar recordkeeping and supervision failures related to the use of unapproved communication methods. The CFTC found that from at least 2019, the firm failed to prevent employees from using methods that violated internal policies.

**276.** IBKR in its year ended December 31, 2017, SEC 10-K filing, [50] stated "The philosophy of the Compliance Department, and our company as a whole, is to **build automated systems to try to eliminate manual steps in the compliance process** and then to augment these systems with experienced staff members who apply their judgment where needed." Later, 10-K filings modified

---

[50]    IBKR    year    ended    December    31,    2017,    SEC    10-K    filing
https://www.sec.gov/Archives/edgar/data/1381197/000104746918001166/a2234631z10-k.htm

this statement by replacing the word 'eliminate' with 'minimize'. Plaintiffs believe IBKR was honest and truthful in its year end 2017 and earlier 10-K SEC filings when it claimed to "eliminate manual steps in the compliance process." Changing verbiage to something with a better connotation such as 'minimize' doesn't change corporate culture and it's a tacit admission to the original word 'eliminate' being a problem.

### F. MSSB's Scienter and Knowing or Reckless Conduct

**277.** Representative Plaintiffs believe MSSB was initially an unwitting accomplice to the market manipulation undertaken by John Doe shareholders. However, its involvement materially changed during the implementation and enforcement of the P-Trade Policy, when MSSB began actively obstructing access to Eltek stock and disregarding the impact of its actions on legitimate investors.

**278.** MSSB was aware of Plaintiff McGauley's 5% ownership in Eltek Ltd. stock as early as February 9, 2021, as stated in court records: "McGauley held a 5% plus ownership of ELTK shares as filed with the SEC and a portion of his shares are held with E*TRADE" *(McGauley v. E*TRADE)*. Plaintiff further alleges that MSSB possessed this knowledge earlier, based on phone conversations with MSSB representatives, although no recording is available. MSSB also should have been aware of McGauley's ownership through McGauley Public SEC Filings.

**279.** Despite being aware of McGauley's substantial ownership interest

and his ongoing investigation into irregular trading activity, MSSB refused to restore normal trading access to Eltek stock. In *McGauley v. E\*TRADE*, Plaintiff stated: "McGauley believes that other parties are also responsible for the illicit suspension of online trading… [and] requires documents and the deposition of an organizational representative of E\*TRADE to determine what third parties tortiously interfered with McGauley's Agreement." Yet MSSB continued to obstruct access to Eltek stock despite this request, maintaining restrictions that disproportionately affected legitimate shareholders.

**280.** Plaintiffs allege that MSSB was aware of several key facts: that parties external to MSSB's platform were likely involved in fraudulent trading; that McGauley was actively investigating this trading activity; and that McGauley had previously held a 5% plus ownership interest in Eltek Ltd. These facts were known or should have been known to MSSB by virtue of internal correspondence, external litigation filings, and publicly available ownership declarations.

**281.** Plaintiffs further allege that MSSB's implementation of the P-Trade Policy was likely prompted by concerns related to Know Your Customer ("KYC") compliance or related regulatory issues. The structure and scope of the policy imply systemic concerns, as evidenced by the following:

- MSSB would not have imposed a platform-wide restriction unless it faced regulatory risk involving Eltek or a significant issue within its systems. If concerns had been limited to a single

customer or small subset of accounts, MSSB would have addressed those accounts individually.

- The policy's fundamental alteration of MSSB's business operations—namely, its requirement that customers place phone orders for Eltek stock—suggests an institutional shift to enforce higher levels of customer verification.

- This move away from electronic trading reflects MSSB's need for additional authentication measures, indicating that the platform's standard trade controls may have been insufficient to meet compliance obligations or to contain exposure associated with Eltek stock.

**282.** While Plaintiffs acknowledge that there is no private right of action under KYC regulations, the existence of these compliance concerns reinforces the plausibility that multiple parties were coordinating manipulative activity. The breadth of MSSB's policy change supports Plaintiffs' contention that the manipulation was not isolated to a few individuals, but part of a larger conspiracy targeting Eltek Ltd.

## G. Enduring, Permanent, and Demonstrable Impact

**283.** The enduring price impact of market manipulation is a well-documented phenomenon in market microstructure literature. It is highly unlikely that manipulative trades can be instantly recognized as manipulative and uninformed. Market agents are driven to gather private information and

become informed traders based on the volume of their trades and the size of their positions. The John Doe shareholders, manipulating Eltek share price, have significant incentives to stay well-informed, leading others to regard their trades as potentially informed. This inclination of large traders to be well-informed is a recurring theme in market microstructure studies. Secondly, it is equally improbable that the public will eventually discern which trades were manipulative and uninformed.

**284.** Market microstructure literature widely documents that manipulation can have a lasting impact on prices, as it is improbable that manipulative trading can be instantly identified as such. Large traders, including the John Doe shareholders, are generally perceived as being well-informed, a view reinforced by the volume and size of their positions. This makes it difficult for other market participants to distinguish their manipulative trades from legitimate, information-based trading, and equally unlikely that the public can discern which trades were manipulative.

**285.** The concept of 'permanent price impact' from manipulative trading is well-established in economic literature and extends beyond same-day effects. A prominent peer-reviewed study reveals that both ask and bid prices significantly rise or fall following the arrival of buy or sell limit orders. Furthermore, quotes settle at a new permanent level, and "large volumes [of orders] overbidding [exceeding] the prevailing quote cause a long-term upward

movement of the bid quote."[51]

**286.** Using the academic research to understand the fraud trading and long-term impact to Eltek:

- Enduring price impact of manipulation:

  Given the volatility of Eltek stock caused from manipulation it is difficult for market participants to determine Eltek's value. Confusion of the market lasts longer than the manipulative activity.

- Hard to spot manipulative trades instantly:

  Given that many of Eltek's manipulation events were shielded behind plausible events within the market or related to the Company it makes catching the cheaters difficult as their trading activity appears normal.

- Big traders tend to be well-informed:

  Market participants looking at large trading volumes likely come away with swayed opinions and feelings about the Company because people tent to believe larger volumes means larger well informed traders must know something.

- Manipulators want to look informed:

  By trading large volumes and moving the price of Eltek the

---

[51] Nikolaus Hautsch & Ruihong Huang, *The Market Impact of a Limit Order*, 36 J. ECON. DYN. & CNTRL 501, 511, 5134 (2012).

manipulators can appear to be well informed which may entice other traders to think the manipulated trades are smart. People may then copy the manipulated trades and thereby unknowingly help the manipulators.

- Hard for the public to later figure out who manipulated:

  Once the trading activity is over for any given event it is difficult for people to determine exactly which trades were the sneaky ones because the manipulators hid behind a legitimate event, with many market participants it is hard to determine what might have happened.

**287.** The John Doe shareholders are clever and crafty, hard to spot, and try to appear well informed thereby tricking people.

**288.** The impact of the manipulative trading described in this Complaint is not theoretical. It extends beyond academic models or generalized market analysis. A demonstrable and measurable harm to Eltek is evident when comparing the Company's valuation across multiple financial metrics throughout the Relevant Period.

**289.** As previously shown, comparing Eltek's market capitalization to its shareholder equity reveals extended time segments where the Company's valuation was irrationally depressed.

**290.** Another widely accepted financial metric is the price-to-earnings ("P/E") ratio, which compares a company's share price to its earnings per share.

Eltek's highest P/E ratio during the Relevant Period was 22.6, recorded on February 12, 2024, the day prior to its $10 million public offering. However, this outlier contrasts sharply with extended periods of undervaluation, such as from April 2022 through March 2023, when Eltek's trailing 12-month P/E ratio remained at or below 5. By comparison, the average Nasdaq P/E ratio over the past five years has fluctuated between a low of approximately 22 and a high exceeding 45.[52] This disparity underscores the extent to which Eltek's valuation was artificially suppressed relative to its market peers, and fails to account for the compounded growth the Company would have achieved had the manipulation not occurred at the outset of the Relevant Period..

**291.** These distortions cannot be explained by market fundamentals and instead reflect intentional sabotage.

**292.** The enduring impact of such manipulation, and the industry's longstanding awareness of its dangers, is underscored by remarks from former chairman of the SEC, Mr. James Sinclair Armstrong II ("Armstrong") in his remarks on "The Role of the American Stock Exchange",[53] on June 19, 1956. Mr. Armstrong stated:

> So I urge you, guard the reputation of your American Stock Exchange. If your Exchange is used only for purely speculative activity and the public gets hurt, you will reap the adverse public reaction. I am sure that you all recognize the need for supporting your officials in their efforts to obtain compliance with your

---

[52] Based upon information from Full:Raio https://fullratio.com/stocks/nasdaq-ndaq/pe-ratio and FinanceCharts https://www.financecharts.com/stocks/NDAQ/value/pe-ratio

[53] James Sinclair Armstrong (Chairman Securities and Exchange Commission Washington, D.C. 1955 to 1957), remarks on "The Role of the American Stock Exchange" at the Annual Outing of the American Stock Exchange, June 19, 1956. https://www.sec.gov/news/speech/1956/061956armstrong.pdf

American Stock Exchange rules. I am equally certain that you will all support the Securities and Exchange Commission in our investigations of manipulation, fraud and other violations, our efforts to assure compliance with Our rules under the Federal securities laws, and our efforts to bring malefactors in the public security markets to book, and that you will not knowingly let the Exchange become a medium for illegal distributions or illegal activity.

**293.** Defendant Brokers did precisely what Armstrong cautioned against. Through reckless or knowing conduct, they allowed the Nasdaq Exchange to become a medium for manipulative trading and illegal distributions, facilitated by technology and algorithmic infrastructure.

**294.** Armstrong further emphasized the systemic consequences of market manipulation:

Finally, let me relate the importance of the stock exchanges in the capital markets to the capital markets as a whole. Prices of outstanding securities determined by the buying and selling public in the free, open auction markets of the stock exchanges of this country have an Important bearing on prices that may be arrived at when corporations go to the capital markets to sell new issues of securities for the purpose of raising new capital. The amounts of new capital that will have to be raised by corporations in the years ahead to sustain the needs of our increasing population, our rising living standard, our dynamic expanding economy, and our responsibilities for the defense of our country and the free world, are far larger than anything the capital markets have provided in the past.

**295.** All Defendants recklessly or knowingly distorted Eltek's market price, directly impacting the Company's ability to access capital markets on fair terms. Their conduct had a material bearing on the pricing of securities issued by Eltek, as Armstrong warned nearly seventy years ago.

**296.** The financial damage inflicted upon Eltek is not speculative, it is

demonstrable, enduring, and rooted in an indisputable pattern of market manipulation. The manipulative conduct detailed throughout this Complaint distorted Eltek's share price, suppressed its valuation metrics, and misled the investing public. As a direct and proximate result of the Defendants' manipulative scheme, the stock would have traded at a significantly higher value consistent with the company's financial performance and fundamental market conditions. But for this scheme, Eltek's market value, capital formation, and strategic opportunities would have been materially stronger, as the artificial volatility and price suppression diluted the company's financing leverage and obstructed its ability to capitalize on operational milestones.

## VII.    PLAINTIFF'S DUE DILIGENCE

### A. Initial investigation

297. In November 2019 following McGauley's greater than 5% acquisition of Eltek and the subsequent stock trading, he began their scrutinization of Eltek using all public domain means that he knew about, despite having limited knowledge of the securities industry.

298. Tuesday April 14, 2020, McGauley submitted the initial results of their investigation and suspicious Eltek stock trading events to the SEC whistleblower website, case file number: 15868-542-140.

299. On February 9, 2021, McGauley commenced CPLR action, *McGauley v. E*TRADE,* to try to obtain critical information about the individuals/entities (the John Doe shareholders and Doe brokers) on the "other

side of the trade" from MSSB, but was denied the information.

**300.** March 4, 2021, Mr. Chin contacted the Federal Bureau of Investigation ("FBI"). He provided Special Agent Kim Blackwood with information about the investigation. Agent Blackwood forwarded the information to the SEC.

**301.** Wednesday, May 19, 2021, Mr. McGauley submitted an addendum to the first SEC whistleblower filing, submission number: 16214-720-028-971

**302.** McGauley asked for the SECs help and offered to work with them further to identify and figure out what was happening with Eltek trading. To this date, McGauley never heard back from the SEC.

### B. Uncovering of evidence sufficient to file claims

**303.** Given the limitations of public domain data in seeking Defendants for the wrongdoings committed, the Plaintiff sought non-public information which might aid the investigation. Plaintiff has only recently, through the analysis and study detailed herein been able to elicit enough data and information to support the good faith claims pleaded herein.

**304.** Market opaqueness, and intentional hinderance of discovery again staved off the pursuit of justice against Defendants.

**305.** When McGauley attempted to identify Defendants by filing *McGauley v. E\*TRADE*, McGauley was kicked off MSSB's platform and stonewalled for five months regarding information about the other-side-of-the-trade.

**306.** A compilation and review of all documentary evidence gathered by Plaintiff since November 2019 left a single brokerage firm, IBKR, as the most accountable namable entity for this legal action. Other entities are of interest and Plaintiff believes that discovery will likely provide sufficient information to name additional Defendants.

## VIII.    LEGAL AND PROCEDURAL BASIS FOR DERIVATIVE ACTION STATUS

### A. Common Questions of Law and Fact

**307.** There are questions of law and fact common to Plaintiff and its claims that relate to the manipulative trading, as well as the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

    (i)    whether John Doe shareholders and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, and/or otherwise manipulate Company stock shares and the price of, or cash flows from, manipulated Company stock transactions;

    (ii)    the identity of the participants in the conspiracy;

    (iii)    the duration of the conspiracy;

    (iv)    the nature and character of the acts performed by Defendants and their coconspirators in furtherance of the conspiracy;

94

(v)   whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury and property damages to the Company and Lawful Owners;

(vi)   whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Company and Lawful Owners;

(vii)   whether Defendants have acted or refused to act on grounds generally applicable to the Plaintiffs, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Company and Lawful Owners;

(viii)   the appropriate injunctive and equitable relief for the Plaintiffs and the Company and Lawful Owners;

(ix)   whether Defendants were unjustly enriched at the expense of Plaintiffs and the Company and Lawful Owners;

(x)   whether Defendants breached their duty of good faith and fair dealing with the Plaintiffs and the Company and Lawful Owners; and

(xi)   the appropriate measure of damages sustained by Plaintiffs and Company and Lawful Owners.

308.   The questions of law and fact common to the Company and Lawful Owners predominate over any questions affecting only individual Company

shareholders, including legal and factual issues relating to liability and damages.

## B. Adequacy of Representation

309. During the Relevant Period, Representative Plaintiffs held, purchased, or sold Company stock shares that were valued, executed, had payments (Company dividends) linked to, or were settled using stock prices that were manipulated by Defendants, and their interests are coincident with and not antagonistic to those of the Company and Lawful Owners. Representative Plaintiffs are Company owners and will fairly and adequately protect the interests of the Company. In addition, all Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust, securities, and shareholder derivative litigation.

## C. Superiority and Predominance

310. A shareholder derivative action is superior to other available methods for the fair and efficient adjudication of this controversy. This approach will permit the Company and Lawful Owners to adjudicate their common claims in a single forum simultaneously and efficiently, avoiding the duplication of effort and expense that multiple individual actions would engender. Many individual actions would also be infeasible due to previously noted legal hurdles with filing securities claims.

311. The Company is a readily definable entity for which relevant records should exist in the files of Defendants and their co-conspirators. Prosecuting this

action derivatively will eliminate the possibility of repetitious litigation.

312. Shareholder derivative treatment will also permit the adjudication of relatively small claims by many long-term lawful shareholders who otherwise could not afford to litigate complex antitrust and securities fraud claims like those asserted in this Complaint. The damages asserted are primarily to the Company.

313. Because Defendants defrauded the Company and Lawful Owners by manipulating the stock price, this derivative action, taken on behalf of the Company, ensures that any recovery primarily benefits the Company and, indirectly, its lawful shareholders, thereby restoring value and enabling future growth. This shareholder derivative claim presents no difficulties of management that would preclude its maintenance.

## IX.  CLAIMS FOR RELIEF

### A. First Claim for Relief – SEA34 10(b) and Rule 10b-5

**(Against all Defendants for damaging price manipulation in violation of SEA34 Section 10(b) and Rule 10b-5(a) and (c))**

314. Plaintiffs incorporate by reference each of the foregoing paragraphs as if more fully set forth herein.

315. To state a cognizable claim for "scheme liability," under Rule 10b5(a) and (c) a Plaintiff must allege with specificity that (1) the Defendant committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter; and (4) reliance.

### i. Defendants' Deceptive and Manipulative Scheme

**316.** During the Relevant Period, the Defendants engaged in and employed devices, schemes, illegal acts, practices, and a course of conduct, that were intended to manipulate the market price of Eltek shares which were listed and traded on the Nasdaq, and which operated as a fraud and deceit upon Eltek.

**317.** As a direct and proximate result of Defendants' wrongful conduct, Eltek suffered damages in that its shares were sold at manipulative prices, in reliance on an assumption of an efficient market free of manipulation. Eltek would not have sold shares at the prices sold if the Defendants' recurrent manipulative trading conduct which artificially affected the process and price of Eltek shares was known.

### ii. Defendants acted with scienter

**318.** Scienter is a required element in asserting a claim of market manipulation under Rule 10b of the Exchange Act. To establish scienter, a complaint may allege facts that constitute strong circumstantial evidence of "conscious misbehavior or recklessness."

**319.** As set forth more fully in all of the preceding paragraphs, strong circumstantial evidence exists that Defendants' conduct reflects conscious misbehavior or recklessness of their unlawful scheme and course of conduct to defraud the market in Eltek securities.

### iii.   Eltek's damages were caused by a manipulated market

**320.** Eltek's securities were intended to be traded in an efficient market, where all market participants had access to information that was relevant to the fair and orderly trading of securities. Defendants' manipulation was structured in a manner that concealed Defendants' unlawful intentions and prevented Plaintiffs from discovering the operative facts constituting the market manipulation scheme or the identities of the perpetrators of these schemes. During the Relevant Period, despite Plaintiffs diligence, it did not discover, nor could a reasonably diligent plaintiff have discovered, the facts constituting the market manipulation claims on the U.S. Exchange or the identities of the perpetrators of these market manipulation schemes. Therefore, when Eltek's shares traded on U.S. exchanges, the market prices of Eltek's securities were not being determined by the natural forces of supply and demand but, rather by the false and misleading pricing information injected into the market by the Defendants.

### iv.   Injury in fact and loss causation

**321.** As set forth more fully above in all of the preceding paragraphs, Defendants' fraudulent trading activities had both a temporary and long-term adverse effect on the market price of Eltek's securities.

**322.** Further, when, as here, manipulative events occur recurringly over a protracted period-of-time, the price of a manipulated security will generally not attain a price supported by its fundamentals and industry averages. Thus,

the long-term cumulative effect of manipulation places enormous downward pressure on the price of a security.

**323.** Defendants' manipulation deprived Eltek of its right and ability to have its shares trade on U.S. exchanges that were free of manipulation.

### v.   Defendants' Market Manipulation Scheme

**324.** Defendants manipulated the market for Eltek's securities, employing national securities exchanges and the mails to place, route, fill, and execute their orders.

**325.** In perpetrating their scheme, Defendants each knowingly employed devices, schemes, or artifices to defraud, and engaged in acts, practices, and a course of conduct that operated as a fraud upon Eltek and the market.

### vi.   MSSB's Participation in a Scheme to Defraud (Rule 10b-5(a))

**326.** Defendant MSSB, initially acting as an intermediary platform, transitioned into an active participant in a manipulative scheme in connection with the trading of Eltek Ltd. stock. Plaintiffs allege that MSSB:

- Implemented and maintained restrictive trading policies that disproportionately impeded legitimate purchase activity of Eltek shares;

- Permitted concurrent borrowing for short selling, contributing to downward price pressure and artificial share inflation;

- Became aware of Plaintiff's manager McGauley's substantial

ownership interest and investigative efforts as early as February 9, 2021, or earlier via public disclosures;

- Refused to provide transparency or reinstate normal trading access despite documented fraud confirmation and lawful requests for information;

- Terminated McGauley's trading access following his initiation of legal efforts to uncover manipulation and identify responsible parties.

**327.** This conduct, taken together with all other pleaded facts, constitutes participation in a scheme or artifice to defraud under Rule 10b-5(a) and was executed knowingly or with reckless disregard for its effects on shareholders, market integrity, and Plaintiff's rights.

**328.** MSSB's continuation of the P-Trade Policy—despite possessing knowledge of manipulative trading activity, Plaintiff's ownership interest, and legal investigation into trading irregularities, constitutes conduct in furtherance of a scheme to defraud under Rule 10b-5(a). MSSB's refusal to restore normal trading access or disclose the basis for its restriction allowed artificial market conditions to persist, directly impeding legitimate investor participation and facilitating price-depressive manipulation. This non-verbal conduct formed a structural device that distorted Eltek's market and operated as part of a broader manipulative scheme.

## B. Second Claim for Relief - SEA34 Section 9(a)(1)

### (Against all Defendants for market manipulation)

**329.** Plaintiffs incorporate by reference each of the foregoing paragraphs as if more fully set forth herein.

**330.** Based upon the conduct described above, the John Doe shareholders manipulative scheme violated Section 9(a)(1) of the SEA34, which makes it unlawful to create "a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security."

**331.** By reason of the conduct described above, the John Doe shareholders directly used the mails, or instrumentalities of interstate commerce, or a facility of a national securities exchange, to effect alone or with one or more other persons, a series of transactions in Eltek's securities that created actual or apparent trading in such securities or raising or depressing the price of such securities for the purpose of inducing the purchase or sale of such securities by others, engaged in the market manipulation strategy of which artificially affected the prices of Eltek's securities that Eltek sold.

**332.** The John Doe shareholders' conscious misbehavior or recklessness artificially affected the price of Eltek's shares. Eltek's financial injuries, if any, would not have been as extensive but for the John Doe shareholders conscious misbehavior or recklessness.

**333.** By reason of the foregoing, all Defendants violated Section 9(a)(1) of

the Exchange Act.

### C. Third Claim for Relief - SEA34 Section 9(a)(2)

**(Against all Defendants for market manipulation)**

**334.** Plaintiffs incorporate by reference each of the foregoing paragraphs as if more fully set forth herein.

**335.** Defendant MSSB's continued enforcement of the P-Trade Policy and concurrent authorization of short-side borrowing created structural distortions that depressed Eltek's stock price and fostered apparent trading disconnected from genuine investor demand. These practices operated with the effect, and in context, the reckless intent, of facilitating a manipulation scheme under § 9(a)(2). Plaintiffs allege that MSSB's conduct was designed, or at minimum executed with reckless disregard, to interfere with natural market forces and materially distort the price of Eltek Ltd. securities.

**336.** Based upon the conduct described above, the John Doe shareholders manipulative scheme violated Section 9(a)(2) of the SEA34, which makes it unlawful to engage in a series of manipulative transactions "in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

**337.** By reason of the conduct described above, the John Doe shareholders directly used the mails, or instrumentalities of interstate commerce, or a facility of a national securities exchange, to effect alone or with one or more other

persons, a series of transactions in Eltek's securities that created actual or apparent trading in such securities or raising or depressing the price of such securities for the purpose of inducing the purchase or sale of such securities by others, engaged in the market manipulation strategy of which artificially affected the prices of Eltek's securities that Eltek sold.

**338.** The John Doe shareholders' conscious misbehavior or recklessness artificially affected the price of Eltek's shares. Eltek's financial injuries, if any, would not have been as extensive but for the John Doe shareholders conscious misbehavior or recklessness.

**339.** By reason of the foregoing, all Defendants violated Section 9(a)(2) of the Exchange Act.

### D. Fourth Claim for Relief - New York State Common Law Fraud

**(Against all Defendants)**

**340.** Plaintiff incorporates by reference all of the preceding paragraphs as if more fully set forth herein

**341.** Defendants made material misrepresentations or omissions of fact to the Plaintiff regarding their or their client's activities which artificially manipulated the marketplace for Eltek securities. This fraudulent conduct undermined the trust and market integrity for Eltek securities, creating reputational harm to the Plaintiff and its securities. Defendants concealed activities that controlled the possession, direct or indirect, of the power to artificially influence the management and policies of the Company, whether

through ownership of voting securities, by contract, or otherwise.

342. Defendants knew or recklessly disregarded the truth of its misrepresentations and intended for Plaintiff to rely on them.

343. Plaintiffs reasonably and justifiably relied on Defendant's false statements and omissions.

344. As a direct and proximate result of Defendants' fraudulent and manipulative conduct, Plaintiff suffered damages in an amount to be determined at trial. These damages include, but are not limited to, financial losses from capital raising activities, lost business expansion and growth opportunities, and a compromised ability to execute on business growth in a market-favorable manner. The effects of the Defendants' manipulative activities were compounded over a period of five years, leading to sustained and escalating financial harm to Plaintiff.

345. Defendant's fraudulent actions were willful, wanton, and malicious, warranting punitive damages to deter future misconduct.

346. Plaintiffs assert that Defendants' conduct, while actionable under Section 10(b), also constitutes common law fraud under New York law. Although the federal claims may be subject to a statute of repose, the state law claims remain viable under CPLR 213(8), as the fraudulent conduct was not reasonably discoverable until March 18, 2025, and Defendants actively concealed material facts necessary to uncover the fraud.

## X.  **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:

A. Ordering Defendants to pay compensatory damages, together with prejudgment interest, for their unlawful conduct in an amount to be determined at trial;

B. Ordering Defendants to pay punitive damages for their malicious, oppressive, and/or reckless disregard for Plaintiff's rights, in an amount to be determined at trial;

C. Permanently enjoining and restraining Defendants from continuing and maintaining the unlawful conduct and conspiracies alleged in the Complaint;

D. Awarding Plaintiff reasonable attorneys' fees and costs;

E. Granting such other and further relief as the Court deems just and appropriate.

## XI.    <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.


Dated: October 15, 2025
        New York, New York



                                        Respectfully submitted,


                                        Goldberg Segalla


                                        _____
                                        By: Adam S. Katz, Esq.
                                        711 3rd Avenue, Suite 1900
                                        New York, Newy York 10017-4013
                                        Telephone: (646) 292-8787
                                        Fax: (646) 292-8700
                                        akatz@goldbergsegalla.com

                                        CAMARA & SIBLEY L.L.P.
                                        Joe Sibley, Esq.
                                        (Pro Hac Vice forthcoming)
                                        1108 Lavaca Street, Suite 110263
                                        Austin, Texas 78701
                                        Telephone: (713) 966-6789
                                        Fax:  (713) 583-1131
                                        sibley@camarasibley.com

                                        *Attorneys for Plaintiffs*