UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
XDOOD LLC, derivatively on behalf
of ELTEK, LTD.,                                        Case No.: 1:25-cv-08536 (LAK)

               Plaintiff,            Proposed Second Amended Verified
                                            Complaint

-against-

INTERACTIVE BROKERS GROUP, INC.,
MORGAN STANLEY SMITH BARNEY LLC,
JOHN DOES 1-10

               Defendants.
-----------------------------------------------------------------X

Plaintiff, XDOOD LLC ("XDOOD" or "Plaintiff"), derivatively on behalf of and in the right of Eltek Ltd. ("Eltek" or the "Company"), and for their Complaint against Interactive Brokers Group Inc. ("IBKR"), Morgan Stanley Smith Barney LLC ("MSSB"), and John Does 1-10, inclusive (collectively the "John Does" and, together with IBKR and MSSB, the "Defendants") brings this shareholder derivative action for actual damages, treble damages, punitive damages, and injunctive relief, and allege upon personal knowledge, information and belief, and investigation, as follows:

**NATURE OF THE ACTION**

1.      Plaintiff brings this shareholder derivative action on behalf of Eltek Ltd. to address and remedy the ongoing fraudulent manipulation of the Company's publicly traded stock on Nasdaq during the period beginning in November 2019 and continuing through the present (the "Relevant Period"). The manipulation was perpetrated by unidentified John Does, as well as by Morgan Stanley Smith Barney LLC ("MSSB") and Interactive Brokers LLC ("IBKR"), each acting for their own improper purposes. These actions caused substantial harm to Eltek.

1

2.      Defendant John Does are minority Eltek shareholders ("JDMS"). JDMS, through trading manipulation schemes, committed corporate sabotage and acted as a headwind for the Company's growth initiatives during the Relevant Period. JDMS used broker-dealers such as IBKR, MSSB, and other unidentified brokerages who knew or should have known about their scheme, which is described more fully herein.

3.      Fraudulent market manipulation of Eltek's securities, by JDMS, occurred on or about October 16, 2020, and was later formally detected and confirmed by the MSSB's "Fraud Operations Unit" of E*TRADE Securities LLC, now operating under the name "E*TRADE from Morgan Stanley" (hereinafter, "E*TRADE").[1] The JDMS fraud, however, was known (or should have been detected by the Fraud Operations Unit months earlier.

4.      To address detected manipulation, MSSB's Fraud Operations Unit suspended electronic purchases of Eltek stock for approximately nine months following October 16, 2020. This negatively impacted demand for Eltek stock. During this period, MSSB customers could only purchase Eltek shares by placing telephone orders with a customer service representative, the phone trade policy ("P-Trade Policy"). Customers who held Eltek shares were not notified about the P-Trade Policy, and they were allowed to sell shares electronically with no notification they would not be able to electronically repurchase shares. Had MSSB properly discharged its duties months earlier when the manipulation became known to MSSB, then this would have never happened.

5.      In the 4th quarter of 2020, E*TRADE was the third largest online retail platform with close to 5.8 million accounts. The P-Trade policy that MSSB initiated negatively

---

[1] For clarity and consistency, MSSB is referred to throughout this Complaint as the responsible entity for conduct originally undertaken by E*TRADE. MSSB assumed full legal responsibility following the acquisition and integration of E*TRADE.

affected the demand for Eltek stock from these accounts while causing overall market harm to the value and reputation of the company's securities.

6.      The JDMS underlying manipulation schemes are still ongoing. Other major brokerage firms, including Merryl Lynch of Bank of America, and Charles Schwab, instituted similar trading restrictions due to the unusual trading of Eltek stock. This was observed as recently as August 12, 2025. The stock resumed trading normally in September 2025. These subsequent actions by non-party brokers serve as independent, material corroboration that Eltek was the target of systemic and fraudulent schemes, which the Broker Defendants were complicit in.

7.      This Complaint will show that even after MSSB's own "Fraud Operations Unit" detected manipulation with Eltek stock on October 16, 2020, MSSB did not protect the market. Instead, it engaged in a new, primary fraudulent "Cover-Up Scheme" to hide its own massive, pre-existing "Know Your Customer" ("KYC") compliance failures. This scheme involved implementing the secret, nine-month, one-sided P-Trade Policy that affirmatively blocked all electronic purchases while simultaneously facilitating short sales, thereby creating a deceptive, asymmetrical market to conceal its own liability.

8.      IBKR's affirmative decisions and policies facilitating manipulation ("Facilitative Business Practices" and "Deceptive Business Model Scheme"): IBKR is primarily liable as a key participant in the fraud. It intentionally or with deliberate recklessness, operated a "Deceptive Business Model Scheme" by implementing a constellation of affirmative business decisions and policies, including defaulting accounts to objectional owners ("OBO") anonymity, a permissive interpretation of Rule 15c3-5 laxer than its peers, provision of short shares and borrow rates that were designed and structured to attract, conceal, and monetize

manipulative trading, in violation of its gatekeeping obligations.

9.    The JDMS are liable as the primary violators who executed the underlying manipulation, including (but not limited to) wash trades, matched orders, spoofing, and a multi-year price fixing scheme.

10.    This action is brought under Sections 9(a)(1), 9(a)(2), and 10(b) of the Securities Exchange Act of 1934 ("SEA") and for New York Common Law Fraud.

**JURISDICTION AND VENUE**

11.    This Court has original jurisdiction over all the claims and subject matter of this action pursuant to Section 27 of SEA, 15 U.S.C. § 78aa and 28 U.S.C. § 1331. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1332. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

12.    This Court has personal jurisdiction over each JDMS. Each one directed fraudulent activity into the market by manipulating Eltek stock on Nasdaq, which is located in this District. The unlawful acts committed by JDMS had a direct and substantial impact on the market price of Eltek shares traded in this District in the United States.

13.    This Court has personal jurisdiction over IBKR and MSSB because each has conducted a substantial part of the unlawful suit-related trading activities being asserted in this District and/or directed fraudulent activity into the market by manipulating Eltek stock on Nasdaq, which is located in this District. Indeed, the conduct of IBKR and MSSB were in furtherance of the market manipulation schemes that manipulated the share price of Eltek.

14.    All Defendants conducted continuous activity in New York state, directly

related to these claims, by engaging in fraudulent and manipulative trading using electronically routed and executed trades of Eltek shares throughout the U.S., including in New York, on exchanges in the U.S. such as Nasdaq.

15.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and Section 27 of SEA. Many of the acts, transactions, and occurrences alleged herein took place in this District. All Defendants engaged in the activities and events described herein.

## THE PARTIES

### Plaintiff XDOOD, derivatively on behalf of Eltek Ltd.

16.    Eltek was organized in Israel in 1970, and its shares have been publicly traded on the Nasdaq, since 1997. While Eltek's primary listing exchange is the Nasdaq, where it trades under the ticker symbol "ELTK", the stock also trades across other various trading centers due to the U.S. equity market's fragmented structure.

17.    The principal markets for the Company's printed circuit boards (PCBs) are in Israel, India, Europe and North America. Eltek markets its products mainly to medical technology, defense and aerospace, industrial, telecom and networking equipment, as well as to contract electronic manufacturers, among other industries. Some customers of Eltek have included Boeing, Airbus, GE HealthCare, Siemens, Raytheon Technologies, General Dynamics, Tata Group, Philips, ASML, and Abbott Laboratories.

18.    While Eltek is a foreign entity, its shares are solely listed on the Nasdaq stock market, specifically Nasdaq Capital Markets ("Nasdaq"). Eltek paid Nasdaq an All-Inclusive Annual Listing Fee, during the Relevant Period, which enables Eltek stock to be traded by broker-dealers on the Nasdaq.

19.    XDOOD, derivatively on behalf of Eltek, is a Massachusetts Limited Liability

Company with a principal place of business located at 1400 Hancock St. Fl 9 Quincy MA 02169. Michael McGauley ("McGauley") is the manager and sole member of XDOOD and is also domiciled in the State of Massachusetts. XDOOD has held between 3,500 and 24,000 shares of the Company since November 2019. XDOOD currently owns over 8,900 shares of Eltek.

20.     Plaintiff continuously owned Eltek shares from November 2019 to Today. All its shares were considered part of the Company Float.

21.     McGauley and Dean Chin ("Chin") performed the investigation and fact finding of this action on the behalf of XDOOD LLC.

22.     On September 22, 2025, XDOOD made demand upon Eltek, pursuant to Israel Companies Law, 5759-1999 § 194(b), that the Company pursue the legal claims articulated in this Complaint. Eltek declined to do so, but authorized XDOOD to pursue the claims and agreed to aid Plaintiff in its investigation of Eltek stock manipulation, so far as it did not impact Eltek's business operations, and it is within their abilities.

## Defendants

### i. Interactive Brokers Group, Inc. (IBKR)

23.     Defendant IBKR is a Delaware holding company with principal executive office located at One Pickwick Plaza Greenwich, Connecticut 06830.  Together with its affiliates, it serves as an automated global electronic stockbroker-dealer.

### ii. Morgan Stanley Smith Barney LLC (MSSB)

24.     MSSB is a Delaware corporation with its principal executive offices located in New York, New York. Per the E*TRADE from Morgan Stanley website, the Name under

6

which the service provider does business is, "Morgan Stanley Smith Barney LLC" and "E*TRADE from Morgan Stanley". The legal name listed is Morgan Stanley Smith Barney LLC, 1585 Broadway New York, New York 10036.

25.     MSSB is a registered broker-dealer, and a wholly owned subsidiary of Morgan Stanley.

26.     On October 2, 2020, Morgan Stanley, the Parent Corporation of MSSB, completed the acquisition of E*TRADE Financial Corporation, of which E*TRADE Securities LLC was a subsidiary, in an all-stock transaction.[2] In 2023, MSSB assumed responsibility for the custody and clearing services previously provided by E*TRADE.

27.     On or about September 1, 2023, E*TRADE began the process of transferring accounts, assets and obligations to MSSB. As such, MSSB became the broker-dealer of record and assumed custody of accounts at E*TRADE. Subsequently, the company began operating under the trade name "E*TRADE from Morgan Stanley".

   iii. John Doe Minority Shareholders (JDSM)

   Defendant JDMS consist of business entities and individuals that traded Eltek stock on U.S. trading venues, including national securities exchanges such as Nasdaq and alternative trading systems ("ATSs"). JDMS may include, but are not limited to, individuals acting in concert, omnibus account holders, hedge funds, family offices, market makers, or other institutional investors. Plaintiff reserves the right to amend this Complaint to identify these JDMS by name upon further discovery.

---

[2] October 2, 2020, Morgan Stanely ("MS") press release announcing the completed acquisition of E*TRADE Financial Corporation https://www.morganstanley.com/press-releases/morgan-stanley-closes-acquisition-of-e-trade

**FACTS SUPPORTING THIS DERIVATIVE ACTION**

28.     As early as about the year 2020, McGauley of XDOOD, a shareholder of Eltek, notified Eltek that he and his team were performing significant research into facts which supported their assertion that Eltek shares were being manipulated in violation of U.S. law.

29.     This informal inquiry led to numerous discussions with McGauley and XDOOD over the ensuing years.

30.     It became clear to Eltek that McGauley was intent on Eltek commencing a lawsuit in New York against those that were manipulating the Company's stock price.

31.     The Board of Eltek discussed the proposed lawsuit, and it came to the conclusion that Eltek's time focusing on its core Company mission superseded the Company's interest in bringing the lawsuit contemplated by XDOOD in its own name..

32.     The Board of Eltek informed McGauley and XDOOD that Eltek had decided that it would not commence the lawsuit in its own name, but that his team could sue derivatively, on the Company's behalf. XDOOD continued its work.

33.     During this time period, Eltek referred the notion of the stock manipulation lawsuit in New York to our legal team which communicated with McGauley, XDOOD, and their attorneys.

34.     On September 10, 2025, McGauley as "Owner of XDOOD" corresponded to the Chairman of the Board Yitzhak Nissan, as well as, CEO Eli Yaffe, and CFO Ron Freund, notifying that his team was in the final stages of preparing the stock manipulation lawsuit to be filed in the Southern District of New York to hold the manipulators to account.

35.     The September 10, 2025, letter also sought confirmation that the Company had chosen not to pursue the matter and claims in its own name.

36.    The Board through its counsel informed XDOOD's attorneys of its decision in an email dated September 29, 2025, which stated:

We and Eltek have reviewed the proposed memorandum of agreement that you sent us and do not believe that an agreement like this is necessary or appropriate under these circumstances. Your clients (XDOOD) are free to pursue the derivative claims if they wish to do so and the court would determinate the appropriateness and merits of those claims as well as any claims for damages or attorneys' fees."

37.    The Eltek Board refused to file this lawsuit in New York to protect its stock from being manipulated on the public exchange.

38.    The manipulation of Eltek's stock price on the Nasdaq is a harm to Eltek.

39.    This derivative action is filed on behalf of the Eltek to remedy and prevent the wrong to the corporation that is being caused by the named defendants.

**FACTUAL BACKGROUND**

### Eltek's Trading Venue, Share Overview, Limited Public Float

40.    Eltek's primary listing exchange is the Nasdaq, where it trades under the ticker symbol "ELTK". While Nasdaq is the primary listing venue for Eltek, the stock also trades across other various trading centers due to the U.S. equity market's fragmented structure.

41.    Eltek is an Israeli-based company that is a leading global provider of complex Printed Circuit Boards ("PCBs"). Eltek services, the space, aerospace, medical, defense, radio frequency and microwave industries. The Company was and still is more than 50% owned by Mr. Yitzhak Nissan through personal shares and his Nistec Golan Ltd. company based in Petach Tikva, Israel. All of Mr. Nissan and Nistec Golan Ltd shares, collectively ("Nistec"), are restricted shares and subject to limits and notification on trading.

42.    Company shares, not held by Nistec, or other Company insiders such as the CEO or CFO, are referred to as (the "Trading Float", "Public Float", or the "Float"); The Float

is calculated by subtracting shares owned by insiders such as Nistec from the Company's total outstanding shares. The Float differed in size during the Relevant Period. Only the Float shares were available to be traded openly, without insider restrictions, and a varying portion of these shares combined with trading techniques were used for the manipulation activities.

43.     During the Relevant Period only Nistec and McGauley were declared 5 percent or greater shareholders as filed with SEC.

44.     At various times, during the Relevant Period, JDMS owned and conspired to manipulate Eltek's trading using a portion of Eltek's Float shares. The Company Float varied between approximately 25% and 49% of the Company's outstanding shares over the Relevant Period. For this reason, the current legal action is, in part, a shareholder versus shareholder matter.

45.     The DTCC, "through its nominee Cede & Co., is the registered holder of eligible securities, routinely processing dividend and interest payments and managing the electronic "book-entry" transfer of interests in securities among participants."

46.     Plaintiff believes the JDMS trades Eltek using shares of record held by the nominee company CEDE & Co. Each of these securities are "eligible securities", meaning they are freely tradable pursuant to U.S. securities laws and are otherwise qualified to be held at DTCC and serviced.

47.     The Figure 1 below depicts Plaintiff and Defendants clearing & settlement paths, with the DTCC nominee CEDE & Co. holding ELTK stock shares, on behalf of brokerage firms and their clients.

*Figure 1 Overview of Key Relationships and Trading Pathways*



48.     ELTK is a national market system ("NMS") security listed on Nasdaq but eligible for trading on multiple exchanges and off-exchange venues, including alternative trading systems ("ATS").

49.     IBKR owns and operates its own ATS called IATS IBKR ATS.

## MSSB's Actions

50.     E*TRADE underwent extraordinary growth immediately prior to and after its announced acquisition by MSSB. In the first quarter of 2020 (ending March 31, 2020), amid the onset of the COVID-19 market volatility, E*TRADE added a record ~329,000 net new retail accounts and $18.3 billion in net new retail assets, increasing total retail & advisor services accounts to approximately 5.64 million. In the second quarter of 2020 (ending June 30, 2020), E*TRADE sustained this momentum with ~327,000 additional net new retail accounts (the second-highest quarter ever) and $13.6 billion in net new retail assets, bringing first-half 2020 retail account growth to ~656,000 and asset inflows to $31.9 billion, exceeding any prior full-year totals and demonstrating extraordinary pre-acquisition organic growth.

51.     On July 22, 2021, counsel for MSSB in a formal, out-of-court communication

11

admitted that MSSB's "Fraud Operations Unit" that "made the decision to restrict the trading of ELTK." on or about October 16, 2020.

52. MSSB implemented its "P-Trade Policy" unannounced and undisclosed to the Company, its customers, and the market. The only time an MSSB customer had any notification about the P-Trade Policy was if they attempted to electronically purchase ELTK stock and observed a message.

53. On December 31, 2020, MSSB customer Heins Karam ("Karam") attempted to place an order to buy Eltek shares through the MSSB website on that date and received an error message stating ""Opening order for this security cannot be accepted online at this time" and provided a phone number to call customer service.

54. On May 10, 2021, Karam received in part the following e-mail from MSSB.

Currently, all orders on ELTK require that instructions be provided over a recorded line. Reasons for such a requirement vary but may be due to a reorganization or other corporate action that has not been fully disclosed. To inquire if an if an order can be accepted on this security, please call customer service at your convenience. You can then speak with a licensed broker who will review your order for placement. This is a requirement for which we cannot make exceptions.

55. During the entire Relevant Period there has never been a single corporate action involving Eltek, whereby Eltek was responsible or guilty for something that would cause trading restrictions being imposed upon its shares. Eltek met all SEC and Nasdaq obligations.

56. When McGauley, exercising diligence, tried to discover the reason for this P-Trade Policy (e.g., in a 20-question email sent on Dec 21, 2021), MSSB's counsel affirmatively refused to answer per response on Jan 10, 2022.

57. MSSB responded to McGauley's actions by terminating his account and stonewalled him for five months regarding information about the other-side-of-the-trade.

58. The P-Trade Policy was not just a secret 10b-5(a) deception. The policy

12

affirmatively and simultaneously did two things: a. It suppressed legitimate purchase access by blocking 100% of electronic buy orders from its millions of customers. b. It simultaneously permitted Eltek stock to be borrowed for short-side activity through its share lending program, which actively sourced shares from its clients to lend to short-sellers.

59.    This was a primary manipulative act by MSSB. This intentionally created a downward asymmetrical market for Eltek's stock.

## IBKR's Platform, Policies, and Role in ELTK Trading

60.    IBKR's ATS data shows consistent activity during the Relevant Period. A detailed analysis shows IBKRs platform plays a prominent role in trading ELTK shares.

61.    Eltek obtained the following nonpublic reports from the Company's stock transfer agent Equiniti: (i) two Non-Objectionable Beneficial Owner reports ("NOBO" reports); (ii) a Bank-Broker Breakdown report; (iii) a Share Range Analysis report; (iv) a Litigation Report / Litigation Search.

62.    The NOBO reports showed that the number of non-objectionable shareholders of record accounts for the Float was 1,042 as per record date February 9, 2023, and 1,278 as per record date June 13, 2023. As each Company shareholder may have multiple accounts (positions), these numbers do not provide the number of NOBO owners for the Company.

63.    Since March 29, 2021, McGauley has a personal brokerage account at IBKR. The account holds approximately 5,700 shares of Eltek. All of McGauley's Eltek stock shares held at broker-dealers other than IBKR appear on the NOBO reports obtained by the Company. Only the Eltek shares McGauley holds with IBKR do not show up on the NOBO reports obtained by the Company.

64.    OBO Default: Unlike peers including Fidelity and Charles Schwab, IBKR

13

affirmatively sets its customer accounts to objecting beneficial owner ("OBO") status. This shields shareholder identities from Eltek's management team. Eltek cannot identify OBO owners without subpoena.

65.     IBKR's implementation of the Market Access Rule (15c3-5) is laxer than its peers. Trades that would be blocked by Fidelity's compliance system checks were accepted by IBKR.

66.     IBKR made this thinly traded nanocap stock available for shorting when other brokers, including Fidelity, did not. The ability to short presented an opportunity for JDMS to execute their trading schemes.

67.     During the Relevant Period, IBKR and a limited number of other broker-dealers offered trading capability during the earliest pre-market hours (4:00 a.m. to 7:00 a.m. EST).

68.     On June 26, 2023, Michael McGauley spoke with Katrina Santa Maria, Chief Executive Officer of M.S. Howells & Co. and former District 3 representative for the FINRA West Region Committee. Katrina Santa Maria stated that M.S. Howells & Co. does not offer trading from 4:00 a.m. to 7:00 a.m. because trade volumes are very low and because its clearing firm, Pershing LLC (a subsidiary of BNY Mellon), does not support those hours.

69.     During the Relevant Period trading in ELTK occurred during these earliest extended hours times as seen in Figure 2 below.

*Figure 2 Trading between 4 and 7 am, 3/29/2019 to 10/23/2020*



70.     The SEC put out a staff bulletin, about "Risks Associated with Omnibus Accounts Transacting in Low-Priced Securities" and "U.S. Broker-Dealer's AML Obligations when Engaging in Transactions in Low-Priced Securities through Omnibus Accounts Maintained for Foreign Financial Institutions".[3]

71.     According to IBKR's 2024 Annual Report to Shareholders:

Currently, approximately 83% of our customers reside outside the U.S. in over 200 countries and territories, and over 85% of new customers come from outside the U.S. Approximately 55% of our customers' equity is in institutional accounts such as hedge funds, financial advisors, proprietary trading firms and introducing brokers. Specialized products and services that we have developed successfully attract these accounts. For example, we offer prime brokerage services, including financing and securities lending, to hedge funds; our model portfolio technology and automated share allocation and rebalancing tools are particularly attractive to financial advisors; and our trading platform, global access and low pricing attract introducing brokers.

72.     ATS weekly data for Eltek stock during Relevant Period shows high volume and activity from ATS's outside the U.S.

73.     IBKR in its year ended December 31, 2017, SEC 10-K filing,[4] stated "The

---

[3] SEC staff bulletin about risks with omnibus accounts (last reviewed or updated on Oct. 17, 2023) https://www.sec.gov/tm/risks-omnibus-accounts-transacting-low-priced-securities

[4] IBKR year ended December 31, 2017, SEC 10-K filing https://www.sec.gov/Archives/edgar/data/1381197/000104746918001166/a2234631z10-k.htm

philosophy of the Compliance Department, and our company as a whole, is to build automated systems to try to eliminate manual steps in the compliance process and then to augment these systems with experienced staff members who apply their judgment where needed." Later, 10-K filings modified this statement by replacing the word 'eliminate' with 'minimize'.

74.    On March 18, 2025, Plaintiff identified a direct tie to IBKR and trading of a significant number of short shares using Nasdaq Data, tick-data, and IBKR's own platform data.

75.    During the Relevant Period IBKR faced penalties, notices of deficiencies and other regulatory issues from the SEC, FINRA, FCA (UK), SFC (Hong Kong), and ASIC (Australia).

76.    The constellation of policies and practices described above provided the JDMS with the venue, anonymity, timing flexibility, and mechanics required to execute the trading activity described in Section IV.D ("Trading Activity and Other Events".

77.    IBKR received direct financial benefits from this trading activity, including commissions, payment for order flow, ATS execution fees/rebates, and securities-lending revenue.

## Trading Activity and Other Events

78.    From November 2019 through the present, JDMS operated, through broker-dealer accounts, executed a continuous campaign to artificially suppress, freeze, and distort the price of ELTK shares.

79.    A summary of this underlying manipulation includes but is not limited to each following event. The most acute example of the trading activity occurred on October 16, 2020.

iv. F-3 Rights Offering

80.     8/8/2019 Eltek filed an SEC Form F-3 shelf offering seeking $10,000,000 through the issuance of additional shares. A term in offering stated no securities would be sold with a value of more than one-third of the aggregate market value of our "Ordinary Shares held by non-affiliates in any 12-month period, so long as the aggregate market value of our Ordinary Shares held by non-affiliates is less than $75,000,000."

v. October 16, 2020, High-Volume Event

81.     On October 14, 2020, Eltek filed a Rights Offering F-1 Registration Statement. According to Nasdaq data, only 8,231 shares traded that day. On October 15, volume rose modestly to 14,465 shares. Then, on October 16, trading volume surged to 1,028,170 shares, representing 67.7% of the Float, or 79.1% of the Float excluding McGauley's holdings.

82.     Of that volume, on October 16, 2020, at least 972,000 shares were traded during regular market hours, accounting for 64% of the Float. From 9:30 AM to 10:37 AM, 132,165 shares changed hands across 267 separate trades, a highly remarkable and unusual concentration of activity for Eltek.

83.     This surge triggered a Nasdaq Limit Up–Limit Down ("LULD") price volatility halt automatically imposed upon algorithmic triggers,[5] at 10:37 AM. The halt lasted five minutes, during which no trading was processed. This was one of nine LULD halts for Eltek during the Relevant Period.

---

[5] See U.S. Sec. & Exch. Comm'n, *Stock Market Circuit Breakers*, Investor.gov, https://www.investor.gov/introduction-investing/investing-basics/glossary/stock-market-circuit-breakers (last visited July 1, 2025) (defining the "Limit Up-Limit Down" circuit breaker as a mechanism that "prevents trades in individual securities from occurring outside of a specified price band").

84.    A summary of all trading halts for Eltek including the Relevant Period, with October 16, 2020, highlighted, are detailed in Table 1 below.[6] Seven of these halts are relevant and analyzed in this Complaint; the two oldest halts are excluded from analysis.

### *Table 1 All LULD trading halts for Eltek during the Relevant Period*

| Halt | Date | Time | Resume Time | Minutes Halted | Trading Event |
|---|---|---|---|---|---|
| 1 | 8/30/2019 | 12:28:54 | 12:33:54 | 5 | Not Analyzed |
| 2 | 9/3/2019 | 10:37:56 | 10:42:56 | 5 | Not Analyzed |
| 3 | 3/9/2020 | 11:27:48 | 11:32:48 | 5 | Stocktwits Posts |
| 4 | 10/16/2020 | 10:37:23 | 10:42:23 | 5 | MSSB / High Volume |
| 5 | 5/14/2021 | 9:44:12 | 9:49:12 | 5 | TradingActivity |
| 6 | 5/18/2023 | 9:41:58 | 9:46:58 | 5 | Trading Activity |
| 7 | 6/23/2025 | 13:44:33 | 13:49:33 | 5 | Trading Activity |
| 8 | 6/23/2025 | 13:55:53 | 14:05:53 | 10 | Trading Activity |
| 9 | 6/23/2025 | 14:07:00 | 14:12:00 | 5 | Trading Activity |

Trading Event" and Minutes Halted, added by McGauley and Chin for relevant halts. All other data sourced from: https://www.nyse.com/trade-halt

85.    Immediately following the halt, between 10:42 AM and 10:43 AM, 308,000 shares were traded in 1,057 separate transactions, representing 20% of the Float and 7.03% of all outstanding shares.

86.    MSSB flagged the October 16, 2020, trading activity as fraudulent. Plaintiff is unaware of any other brokerage firm that took similar actions.

87.    FINRA's ATS Data for the week of October 12–16, 2020, shows multiple MPIDs active in Eltek trading. IBKR's ATS was the most active during that week, both in terms of volume and number of trades.

---

[6] A true and correct copy of New York Stock Exchange ("NYSE") Historical Trade Halt data for ELTEK Ltd. ("ELTK") found at https://www.nyse.com/trade-halt

18

*Table 2 Weekley FNRA ATS Data October 12, 2020*

| Market Participant Name | Weekly Share Quantity | Weekly Trade Count |
|---|---|---|
| CODA CODA | 1933 | 20 |
| CROS CROSSFINDER | 6922 | 32 |
| DBAX SUPERX ATS | 2000 | 19 |
| EBXL LEVEL ATS | 2966 | 19 |
| IATS IBKR ATS | 7846 | 114 |
| INCR INTELLIGENT CROSS LLC | 400 | 3 |
| JPMX JPM-X | 700 | 6 |
| KCGM VIRTU MATCHIT ATS | 5375 | 14 |
| LATS THE BARCLAYS ATS | 1094 | 14 |
| MLIX INSTINCT X | 100 | 1 |
| SGMT SIGMA X2 | 1527 | 16 |
| UBSA UBS ATS | 6305 | 64 |
| XSTM CROSSSTREAM | 1000 | 4 |

88.    Approximately 95% of Eltek's total trading volume for the week of October 12–16, 2020 occurred on October 16, 2020. See Table 3 below for ELTK daily trading details, for the week of October 2016, 2020.

*Table 3 NYSE Data for ELTK trading week of October 12-16, 2020*

| Date | Open | High | Low | Close | Volume | Volume % of Week |
|---|---|---|---|---|---|---|
| 10/12/2020 | $4.95 | $5.15 | $4.90 | $4.97 | 26,000 | 2.40% |
| 10/13/2020 | $4.90 | $4.94 | $4.80 | $4.80 | 5,348 | 0.49% |
| 10/14/2020 | $4.74 | $4.85 | $4.72 | $4.72 | 8,231 | 0.76% |
| 10/15/2020 | $4.63 | $4.73 | $4.63 | $4.70 | 14,465 | 1.34% |
| 10/16/2020 | $4.75 | $6.93 | $4.70 | $5.31 | 1,028,170 | 95.01% |
| **Total** | | | | | **1,082,214** | **100.00%** |

89.    The October 16, 2020, event did not occur in isolation. The trading activity in ELTK shares during the Relevant Period included the following additional events, in chronological order:

vi. May 2019 – Initial Trading Surge and Profitability Milestone

90.     On May 16, 2019, McGauley purchased 20,000 shares of ELTK at an average price of $2.57, totaling $51,425. That day, Eltek traded 8,788,910 shares, representing approximately 200% of the outstanding shares. Following the purchase, Fidelity contacted McGauley to confirm the trades were intentional. When he asked why Fidelity was inquiring, the representative responded, "It trades weird."

91.     After McGauley's purchase, Eltek's share price initially rose, then declined to a low of $1.42 on May 21, 2019.

92.     On May 29, 2019, Eltek reported profitability for the first time in several years. The stock surged to a high of $8.72 on volume of 37,792,528 shares, approximately 827% of the outstanding shares. The following day, May 30, Eltek reached a high of $11.56 on volume of 22,915,110 shares, or 523% of the outstanding shares.

93.     Elevated trading activity continued including June 3: 2,167,752 shares traded, June 7: 1,183,229 shares traded, June 10: 1,339,100 shares traded.

94.     No known brokerage firm implemented a policy comparable to MSSB's P-Trade Policy in response to the trading. No LULD halts occurred, and no known institutional safeguards were triggered.

vii. Time segment November 20, 2019, to March 9, 2020

95.     On November 20, 2019, at 7:35 am EST, prior to market open, Eltek released its Q3 2019 earning.[7] The release reported:

---

[7] A true and correct copy of ELTK's 2019 Third Quarter Financial Results found at https://www.nisteceltek.com/wp-content/uploads/2019/11/ELTEK-PR-Q3-2019-FINAL.pdf

- Revenues of $9.3 million versus revenues of $8.5 million in Q3 2018.

- Net profit was $391,000, or $0.09 per fully diluted share in Q3 of 2019 versus a net loss of $463,000, or ($0.23) per fully diluted share, in Q3 2018.

96. Initially, Eltek's valuation rose however, after the regular trading session market opened, the share price declined sharply. By close, Eltek's market capitalization fell to $14.9 million, a 34.3% drop from the day's high. Trading volume equaled 47.9% of the Float.

97. ATS data for the week of November 18, 2019, shows that IBKR ATS produced the most volume. Additionally, IBKR ATS was tied for the highest trade count, and it was the highest among individual American brokerages.

98. Beginning on the settlement date of November 29, 2019, at least 135,734 shares of Eltek were sold short, representing 8.9% of the public float, or 10.5% when excluding McGauley's holdings. Short interest remained near or above 9% until settlement date January 31, 2020.

99. Between 1/15/2020 and 1/31/2020, more than 102,000 short shares reportedly closed out. Yet the closing price of Eltek between 1/15/2020 and 1/31/20 varied by 20 cents, a 6.7% price change; hence, more than 100,000 shares, representing 7.8% of the Effective Float, which would typically need to be purchased in the open market to close out the shorts were traded with minimal price change. This "quiet-close-out" accompanied reported failure to deliver (FTD's) of shares for 7 dates in the time period. See Table 4 below.

*Table 4 Short Interest Report 11/29/2019 to 1/31/2020*

| Settlement Date | Short Interest | Short Interest Change | Short Interest Percentage | | |
| --- | --- | --- | --- | --- | --- |
| | | | Outstanding Shares | Float | Effective Float |
| 11/29/2019 | 135,734 | 206.30% | 3.10% | 8.90% | 10.50% |
| 12/13/2019 | 142,662 | 5.10% | 3.30% | 9.40% | 11.00% |
| 12/31/2019 | 115,302 | -19.20% | 2.60% | 7.60% | 8.90% |
| 1/15/2020 | 123,431 | 7.10% | 2.80% | 8.10% | 9.50% |
| 1/31/2020 | 20,906 | -83.10% | 0.50% | 1.40% | 1.60% |

viii. March 9, 2020, Stocktwits Posts – Stock Halt

100.    On March 9, 2020, eight StockTwits.com posts from Dean Chin led up to and caused a Nasdaq 5-minute LULD trading halt of ELTK at 11:27:48 am with resumption of trading starting at 11:32:48 am. (See All LULD Trading Halts, Table 1).

101.    ATS data for the week of March 8, 2020, shows that IBKR ATS produced the most volume, and trading activity, for an American broker-dealer.

ix. ThinkEquity

102.    December 29, 2020, McGauley exchanged messages on LinkedIn with Giovanni Valdes who was listed as working at ThinkEquity. McGauley stated he was the second-largest shareholder in Eltek and "how much expertise Eltek along with Nistec, has with PCB's and EMS."

103.    McGauley spoke with Giovanni on January 4th, at 2:00 pm. Giovanni agreed the Company was significantly undervalued.

104.    On January 10, 2021, McGauley contacted Alon Mualem Eltek's CFO at that time. Alon stated in e-mail: "Since the time we filed the F-3 in 2019, we have been in contact

22

with several investment banking firms, including with Think Equity [sic] through their rep in Israel."

x. March 23, 2021 – Post Market Trading

105.    On March 23, 2021, Eltek traded 167,021 shares. Prior to 4:00 pm there were 14,958 shares traded in 150 separate trades. After 4:00 pm, there were 1,234 separate trades with a total of 165,061 shares traded.

106.    There was no news on March 23, 2021, or the day before that could account for this trading activity.

xi. May 2021 Trading

107.    May 3,2021 to May 12, 2021. The trading volume of Eltek went from 2,000 shares to 1.6M shares, equating to 92% of the Company Float. The Company stock price went up and down more than $2 per share in minutes. No public news or events explain this trading.

108.    MSSB was not a primary market participant at this time as MSSB due to its P-Trade Policy. Hence, John JDMS shareholders using other brokers were responsible for the trading activity.

109.    The Table 5 below, based on 5,840,357 outstanding shares, and 1,774,445 Float shares. shows Eltek trading between May 6, and May 10, 2021.

*Table 5  Trading between May 6, 2021, and May 10, 2021*

| Date | Volume of Shares Traded | | | Price Per Share $ | | | |
| | Total Number | Percent of Outstanding | Percent of Float | Open | High | Low | Close |
|---|---|---|---|---|---|---|---|
| 6-May | 1,635,697 | 28.01% | 92.18% | 6.03 | 7.92 | 5.87 | 6.93 |
| 7-May | 85,441 | 1.46% | 4.81% | 6.86 | 7.28 | 6.67 | 7.25 |
| 10-May | 1,140,764 | 19.52% | 64.23% | 7.16 | 8.8 | 6.28 | 6.55 |

xii. Offer to purchase McGauley's shares

110.    September 6 and 7, 2021 - Karl Birkenfeld ("Birkenfeld"), from American Trust, texted McGauley seeking to purchase McGauley's Company ownership for an institutional client.

111.    McGauley texted Birkenfeld, "Hey, ELTK is stupidly cheap here. It is simply WAY too undervalued. So, I'm not interested."

112.    Following this text message exchange, Eltek's stock price began to drop. By December 31, 2021, Eltek lost 40% of its enterprise value, leaving it with a market cap of $21.7 million.

xiii. 2022–2023 - Stock priced near equity value

113.    For 345 consecutive trading days between 1/3/2022 and 5/17/2023 the Company's shareholders' average equity as a percentage of the market cap was 89.5%. On March 3, 2022, and March 8, 2022, the shareholder equity was greater than the closing price. Additionally, there were 53 trading days where equity as a percentage of market cap was greater than 95%.

114.    April 4, 2023, Zacks Small-Cap Research ("Zacks SCR") published a report stating Eltek's "valuation target is approximately $9.50 per share. Our target price may be conservative as it does not account for any M&A transactions that would materially increase the company's manufacturing capacity."

115.    Eltek stock volume and price did not materially change following Zacks SCR. Eltek continued to trade near equity value. See Figure 3 below for the share price vs market capitalization, during the Relevant Period. The pricing near equity value is seen in the middle

24

of the chart.

*Figure 3 Company daily share price, closing market capitalization, and shareholders' equity during the Relevant Period.*



116.     Following Zacks SCR, Eltek's website https://www.nisteceltek.com/ was not functioning on April 7, 2023, with a "404 Error" displayed.

xiv. May 18, 2023 – Eltek released Q1 2023 Financial Results

117.     May 18, 2023, Eltek released its Q1 financial results and Eltek stock traded 844,758 shares representing 53.67% of the Float. This is the first day Eltek traded above its 345-day trading near equity pricing. See Figure 4 below.

*Figure 4 May 18, 2023, Eltek Trading*

| Date | Volume | Percent of Float | Open | High | Low | Close |
|------|--------|------------------|------|------|-----|-------|
| 5/17/2023 | 10490 | 0.67% | $3.9100 | $4.0200 | $3.9100 | $3.9500 |
| 5/18/2023 | 844,758 | 53.67% | $4.8500 | $5.6794 | $4.6000 | $5.4100 |
| 5/19/2023 | 135,337 | 8.60% | $5.5900 | $6.1700 | $5.4200 | $6.1700 |
| 5/22/2023 | 292,129 | 18.56% | $7.1500 | $7.8200 | $6.5000 | $7.2000 |

xv.  February 2024 – Trading and $10 million public offering

118.    On February 12, 2024, Eltek traded 556,992 shares, representing approximately 9.4% of its outstanding shares and 25.5% of the public Float. The stock opened at $19.35, reached a high of $22.80, and closed at $22.395, per Nasdaq data.

119.    On February 12, 2024, at 6:37 pm EST, after regular market hours, Eltek issued a press release announcing a $10 million public offering, being offered and sold pursuant the F-3 shelf registration, PR Newswire announcement.[8] The stock declined 10% in after-hours trading following the news release.

120.    February 13, 2024, Eltek made two SEC filings associated with the $10 million public offering. One stated, "ThinkEquity is acting as sole book-running manager for the offering." and "The securities are being offered and sold pursuant to a shelf registration statement on Form F-3 (File No. 333-266346)".

xvi. March 18, 2025 – Shortable Shares at IBKR

121.    On March 18, 2025, 2:18 pm EST, IBKR, via the proprietary IBKR "Mobile – Invest Worldwide, Trade At The Lowest Cost," app on the Apple Store for IOS showed: a.

---

[8] A true and correct copy of the February 12, 2024, PR Newswire is at https://www.prnewswire.com/news-releases/eltek-announces-pricing-of-public-offering-of-ordinary-shares-302060057.html

71,193 "Shortable Shares at IBKR" and b. Between 1:42 PM and 1:45 pm the number of "Today's Shortable Shares" dropped from 100,168 to 71,193, a difference of 28,975 shares. See Figure 5 below.

*Figure 5 March 18, 2025, 2:18 pm Shortable Shares at IBKR decreased by 28,975 shares between 1:42 pm and 1:45 pm*

122.    Tick data for March 18, 2025, between 1:42:28 pm and 1:45:19 pm, a time span of 2 minutes and 51 seconds, shows 34 trades, each between 1 and 10,233 shares, and totaling 33,049 shares traded during the same time segment Shortable Shares at IBKR decreased by 28,975 shares. The price of Eltek before, after, and during these trades During this "quiet-close-out" the price of Eltek varied between $8.355 and $8.443. See Table 6 below.

*Table 6 Selected tick data from short share closeout March 18, 2025*

| Trade Number | Time | Price | Bid | Ask | Size | Total Shares |
|---|---|---|---|---|---|---|
| Prior Trade | 1:32:53 PM | 8.345 | 8.345 | 8.355 | 25 | |
| 1 | 1:42:28 PM | 8.355 | 8.345 | 8.355 | 41 | |
| 2 through 33 (not shown) | | | | | | |
| 34 | 1:45:19 PM | 8.443 | 8.345 | 8.443 | 102 | 33,049 |
| Following Trade | 1:53:08 PM | 8.399 | 8.345 | 8.453 | 33 | |

xvii. June 23, 2025, Trading Activity

123.    On June 23, 2025, Eltek traded 278,921 shares according to Nasdaq Data. Eltek's stock opened at $10.79, it rose to a high of $12.19, then crashed to $8.42, before rising again to close the day at $10.13.

124.    Fidelity Time & Sales Tick Data for the day shows 278,921 shares traded in 1,508 transactions across four time-segments.

- Segment 1 (9:30 am–1:20 pm): 14,562 shares in 78 trades; price remained flat.

- Segment 2 (1:40:58–1:44:20 pm): 40,289 shares in 312 trades; price rose to $12.20.

- Segment 3 (1:49:33–2:12:00 pm): 152,498 shares in 651 trades; price fell from $11.94 to $8.42.

- Segment 4 (2:12 pm–4:00 pm): 71,448 shares in 450 trades; price recovered from the day's low to close at $10.13.

See Table 1 above (summarizing all LULD trading halts)

125.    Three LULD halts happened within 22 minutes and 27 seconds. See Figure 6 below.

*Figure 6 June 23, 2025, Three Halts within 22 Minutes and 27 Seconds*



xviii. Q3 2025 Earning and Subsequent Trading

126.    November 18, 2025, Eltek reported Q3 earnings results. Over the subsequent 4 days of trading the stock lost 29.4% of its value based on 0.82% of the company outstanding shares trading. As of Friday November 21, 2025, Eltek trades at near equity value.

## Capital Raising Events

127.    During the Relevant Period, the Company raised capital from a combination of a rights offering registered on Form F-1, proceeds from insider option exercises, and $10 million from its Form F-3 shelf registration. The outstanding and float share count both increased from these events.

128.    The rights offering registered on Form F-1 completed on December 3, 2020. It provided all Company shareholders with the opportunity to purchase Eltek stock at a discount. Nistec participated in the offer and increased majority ownership from 65.35% to 69.5% of the

29

Company.

129.    Nistec and Eltek's CEO made twenty-two separate notices of stock sales, pursuant to Rule 144 under SEA, between June 7, 2023, and February 2, 2024 ("Rule 144 Sales"). For all these SEC Form 144 filings Oppenheimer & Co. Inc. 85 Broad St. New York, NY, 10004 was the single broker listed.

130.    All these Rule 144 Sales stated the sellers "did not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed."

131.    The Rule 144 Sales increased the Company float by approximately 850,000 shares over the time segment June 7, 2023, to February 2, 2024, meaning these 850,000 shares were sold into the open market during a time segment the stock price rose from approximately $10 to a closing price of $19.68 on February 2, 2024. The additional 850,000 shares increased the Float by approximately 54%.

132.    The Form F-3 shelf registration for the $10 million public offering for the issuance of an additional 625,000 shares of Company ordinary stock was made on February 13, 2024. An SEC 6-K Company filing made the offering public knowledge on February 13, 2024, at 08:17:37 am Eastern Standard Time (EST). ThinkEquity LLC, as Representative of Several Underwriters, acted as the sole book-running manager for the $10 million public offering.

133.    The SEC 6-K underwriting agreement between Eltek and ThinkEquity shows the date February 12, 2024. The agreement states ThinkEquity LLC acted "As Representative of the several Underwriters named on Schedule 1 attached hereto." Schedule 1, lists a single entity for the underwriter, namely ThinkEquity LLC, and states 625,000 "Total Number of

Firm Shares to be Purchased."

## Scienter

134.    MSSB acted with scienter, and at a minimum, deliberate recklessness, during the period of its P-Trade Policy.

135.    MSSB acted with scienter, and at a minimum, willful misconduct when it cancelled McGauley's account, refused to answer any questions, and continued its P-Trade Policy even after being informed about the investigation of trading activity. MSSB's actively facilitated continued manipulation while concealing its own compliance failures.

136.    IBKR acted with scienter, or at a minimum, deliberate recklessness, throughout the Relevant Period. IBKR routed ELTK trading through its ATS and was a lender of shares for shorting purposes, marking the stock as available to borrow at near-zero borrow fees. IBKR supplied short positions despite warning signs.

137.    Both brokers received substantial direct financial benefits from the manipulative trading (borrow fees, interest rebates, order flow profits, and payment for order flow).

138.    The extreme and prolonged nature of the price distortion, including the 345-day period at 89.5% of book value and "quiet close-outs" of massive short positions, was so obvious that the broker-defendants, as the literal gatekeepers of every share traded, must have known, or were deliberately reckless in not knowing, that their platforms were being used to manipulate stocks like Eltek.

139.    JDMS acted with willful misconduct or as masterminds acting with intentional harm toward the company and its investors for their own financial gains or other interests.

140.    These facts, taken collectively, give rise to a cogent and compelling inference

31

of scienter that is far stronger than any opposing inference of mere negligence.

## METHODOLOGY AND SOURCES FOR ANALYSIS

141.    Plaintiff's analysis mirrored methodologies outlined in the SEC Technical Assistance Program Presentation, *Market Manipulation* by Tom Swiers.[9]  Key elements from that presentation relevant to this Complaint include:

(i) Trading manipulation techniques: Arbitrary Quotes, Wash Sales, Matched Orders, Marking the Close, Domination and Control of Market, and Layering;

(ii) Market characteristics: Manipulations often target thinly traded shares of lesser-known or startup companies, where low volume makes price distortion easier;

(iii) Deceptive trading activity: Executing trades at specific volumes and times to mislead the market about share value;

142.    Plaintiff's analysis relied on and drew from multiple data sources, including but not limited to:

- Nasdaq, ELTK daily historical stock data[10]

- New York Stock Exchange Pricing Data ("NYSE Data")[11]

- Fidelity Active Trader Pro, Level 2, and Time & Sales Data ("Fidelity Data")[12]

---

[9] *See generally* TOM SWIERS, OFFICE OF INT'L AFFS., U.S. SEC. & EXCH. COMM'N, MARKET MANIPULATION, Original Source: https://www.sec.gov/files/Market%20Manipulations%20and%20Case%20 Studies.pdf [https://perma.cc/FPN6-H79P]

[10] Unless otherwise specified, all daily trading data referenced in this Complaint—including volume, high, low, open, and close prices—is derived from Nasdaq's historical pricing data for ELTK. A true and correct copy of Nasdaq volume and pricing data for ELTK, including the entire Relevant Period, found at https://www.nasdaq.com/market-activity/stocks/eltk/historical (last viewed August 1, 2025)

[11] A true and correct copy of NYSE Pricing data for ELTK, including the entire Relevant Period, found at https://www.nyse.com/quote/XNCM:ELTK

[12] Fidelity provides the Active Trader Pro platform to its customers. Plaintiff captured trading information from this platform for specific trading activities detailed later in this Complaint.

- Intraday Tick Data from a subscription service to Kibot.com ("Kibot Data")[13]

- FINRA's weekly ATS OTC Transparency Data ("ATS Data")[14]

Additional data sources and analytical exhibits are referenced throughout this Complaint.

## LEGAL AND PROCEDURAL BASIS FOR DERIVATIVE ACTION STATUS

### A.    Adequacy of Representation

143.    During the Relevant Period, Plaintiff held, purchased, or sold Company stock shares that were valued, executed, had payments (Company dividends) linked to, or were settled using stock prices that were manipulated by Defendants, and their interests are coincident with and not antagonistic to those of the Company and Lawful Owners. Plaintiff is a Company owner and will fairly and adequately protect the interests of the Company. In addition, the Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust, securities, and shareholder derivative litigation.

### B.    Fairness to the Corporation.

144.    This derivative action is fair and beneficial to Eltek, as it seeks recovery for harms caused by the Defendants' manipulations, including restoration of stock value, injunctive

---

[13] The intraday tick data used in this analysis was sourced from Kibot.com, a reputable provider of historical market data. While minor discrepancies may exist between Kibot's reported trading volumes and those from other sources, these differences are immaterial to the conclusions drawn in this Complaint. Accordingly, the Kibot data provides a valid and sufficiently granular basis for identifying patterns of manipulative trading activity and supports the factual allegations made in this Complaint. Kibot, ELTK Intraday Historical Tick Data (time and sales, bid and ask) for Jan. 2019 to present obtained via subscription/download from Kibot, https://www.kibot.com/ (last visited July 1, 2025).

[14] The FINRA ATS OTC Transparency Data provides weekly aggregated information on the number of trades and the number of shares traded for each ATS, offering a crucial window into a subset of broker-dealer activity. A true and correct copy of Alternative Trading System (ATS) data sourced from FINRA's OTC Transparency platform found at https://otctransparency.finra.org/otctransparency/AtsDownload (last viewed August 1, 2025)

relief against ongoing fraud, and damages that will primarily benefit the Company. A derivative approach is superior to other available methods for the fair and efficient adjudication of this controversy. This will permit the Company and its lawful shareholders to adjudicate their claims in a single forum simultaneously and efficiently, avoiding the duplication of effort and expense that multiple individual actions would engender or be infeasible due to legal hurdles with filing securities claims.

145.    Prosecuting derivatively eliminates management difficulties, as the claims involve common facts related to the manipulations.

146.    This action poses no undue burden on Eltek, given its cooperation, and is superior to inaction, which would allow the harms and related violations to persist.

147.    The damages asserted primarily affect the Company, ensuring that recovery enhances Eltek's value and enables future growth without diluting shareholder interests.

**PLAINTIFF DUE DILIGENCE**

148.    In November 2019 following McGauley's greater than 5% acquisition of Eltek and the subsequent stock trading, Plaintiff began its scrutinization of Eltek.

149.    Tuesday April 14, 2020, McGauley submitted the initial results of their investigation and suspicious Eltek stock trading events to the SEC whistleblower website, case file number: 15868-542-140.

150.    On February 9, 2021, McGauley commenced CPLR action, *McGauley v. E*TRADE,* to try to obtain critical information about the JDMS on the "other side of the trade" from MSSB.

151.    MSSB, verbally agreed out of court to provide McGauley, with Electronic Blue Sheet ("EBS") data files, pending the filing of a legal case, such as this Shareholder Derivative

34

lawsuit. According to FINRA, the EBS files contain both trading and account holder information and provide regulatory agencies with the ability to analyze a firm's trading activity. The EBS files detail the trading activity which triggered MSSB's "Fraud Operations Unit" into action.

152.    Plaintiff obtained all possible public and non-public information regarding Eltek stock shares possible without subpoenas. Plaintiff seeks to serve subpoenas on Defendants and various nonparties including inter alia, ThinkEquity LLC, Oppenheimer & Co., Nasdaq, DTCC, Cede & Co., and FINRA to obtain further information relevant to this case.

**INJURY TO THE CORPORATION AND CAUSATION**

153.    Damages to Eltek: As a proximate result of the Defendants' concurrent manipulative schemes during the Relevant Period (or subsets thereof for specific COUNTS), Eltek suffered substantial harm, including suppressed stock value, impaired capital raising, and lost growth opportunities. For example, from January 3, 2022, until May 17, 2023, Eltek was priced practically at equity value. For 345 consecutive trading days the Company's shareholders' average equity as a percentage of the market cap was 89.5 percent. During much of this price fixing period the Company P/E ratio remained at or below 5 versus industry averages of 22–45, a disparity caused by artificial price suppression that obstructed capital raising and stunted expansion.

154.    These injuries are conservatively estimated in the tens of millions of dollars and, under a full-growth scenario using peer multiples and management's stated expansion plans, exceed $150 million, to be proven at trial through expert testimony.

155.    Defendants' covert misconduct generated relentless headwinds for Eltek's majority shareholders and management, derailing strategic plans and obstructing growth. By

secretly distorting capital markets, they delayed acquisitions, stalled new facility construction, and postponed factory upgrades vital to competitiveness, projects that could have been completed years earlier in a manipulation-free market.

156.    Defendants' fraudulent trading activities had both a temporary and long-term adverse effect on the market price of Eltek's securities, as evidenced by the manipulation patterns in Section IV.D ("Trading Activity and Other Events" showing price fixing, wash trading, and price and volume spikes). Further, when manipulative events occur recurringly over a protracted period, the price of a manipulated security will generally not attain a price supported by its fundamentals and industry averages. Thus, the long-term cumulative effect of manipulation places enormous downward pressure on the price of the security.

157.    Artificially reduced stock prices resulted in several significant types of harm to Eltek's current and future value.

- Reduced stock prices sent a signal to management to forgo and/or delay investments that otherwise would be productive.

- Reduced stock prices made investments more expensive. Equity financing was more dilutive, and debt seen as riskier and priced accordingly. The equity financings that did occur were substantially more dilutive than they otherwise would have been.

- Forgone and delayed investments by Eltek allowed industry undercapacity to persist even after the opportunity for investment was identified by Eltek, prompting new, non-Eltek capacity to enter the market. This added competition has been identified on earnings calls as leading to reduced pricing power for some Eltek products. Had Eltek grown and had available capacity, new entrants in the market would have been deterred from making investments.

158.    If Eltek had a higher valuation, several things would have been different.

- Eltek would not have been diluted nearly as much during its equity offerings.

- Eltek would have invested in growth earlier and in a less piecemeal manner (possibly an acquisition or a new factory as indicated on earnings calls, rather than the disruptive move it has done recently.) Larger investments would have likely been non-Isreal domiciled acquisitions or factory expansion, likely in the United States. A US manufacturing presence would have insulated Eltek from unfavorable currency shifts and also made the new US tariff system a tailwind rather than a headwind, leading to reduced currency losses, increased sales and increased margins.

- Earlier investments by Eltek would have resulted in sales growth, market share growth, higher margins due to larger operating scale and higher margins due to less non-Eltek capacity being added to the market.

- These factors would have compounded with each other to create substantial value for Eltek. (Increased sales in past, increased sales in the future, increased margins, increased valuation multiple, and increase from reduced dilution)

159.    Loss Causation. The manipulative scheme proximately caused Eltek direct harm each time the artificially suppressed price increased the dilutive impact of equity offerings, raised the cost of capital, and forced management to delay or abandon accretive investments and acquisitions, injuries that materialized and were acknowledged by management when excess industry capacity entered the market in 2024–2025 and reduced Eltek's pricing power.

160.    Under principles of concurrent causation, the conduct of each Defendant was a substantial factor in producing these indivisible injuries to the corporation.

161.    Defendants' manipulation deprived Eltek of its right and ability to have its shares trade on U.S. exchanges that were free of manipulation, causing irreparable harm to corporate integrity and shareholder trust, in addition to quantifiable economic losses.

**CLAIMS FOR RELIEF**

**COUNT I:**

**Violation of Section 10(b) of the SEA and Rule 10b-5(a) and (c) Thereunder (against Defendant MSSB)**

162.    Plaintiff incorporates by reference all preceding paragraphs.

163.    Defendant MSSB is primarily liable as a protagonist in a fraudulent scheme. Its conduct after its "Fraud Operations Unit" detected the "classic pump and dump" on October 16, 2020, constituted a new, independent, and primary "device, scheme, or artifice to defraud" in violation of Rule 10b-5(a) and (c).

164.    The Deceptive and Manipulative Act: The "device" was MSSB's implementation and nine-month maintenance of the secret, one-sided "P-Trade Policy." This policy was an affirmative act that: a. Operated as a fraud on the market by deceptively concealing a material fact (that MSSB, a major broker, was unilaterally barring all electronic purchases of Eltek stock). b. Created a false appearance of weak market demand, artificially suppressing Eltek's share price.

165.    Scienter (Intent): MSSB acted with actual knowledge and fraudulent intent as alleged in Section IV.B ("MSSB Actions". MSSB's motive for this scheme was not to protect the market, but to clean up its institutional KYC failures. MSSB knew its acquisition of E*TRADE had imported massive, undisclosed regulatory liabilities (institutional KYC failures). The Oct 16 fraud was proof of this liability. MSSB implemented the secret "P-Trade

Policy" as a "Cover-Up Scheme" to buy time to quietly investigate and purge its own systems of the toxic accounts and evidence of its prior misconduct, all while deceiving Eltek and the marketplace.

166.    As a direct and proximate result of MSSB's own "Cover-Up Scheme," which actively suppressed Eltek's stock price and deceived the market, the Company was damaged.

**COUNT II:**

**Violation of Section 10(b) SEA and Rule 10b-5(a) and (c) Thereunder (against Defendant IBKR)**

167.    Plaintiff incorporates by reference all preceding paragraphs.

168.    Defendant IBKR is primarily liable as a protagonist in a fraudulent scheme. Its entire business model, as applied to Eltek, constituted a "Deceptive Business Model Scheme" designed to attract, facilitate, and profit from manipulation by JDMS.

169.    The Deceptive and Manipulative Acts: The "device, scheme, or artifice to defraud" was the combination of IBKR's own affirmative business decisions which, taken together, formed a "black box" designed to facilitate fraud: a. Active Concealment: IBKR's affirmative decision to default all customer accounts to "Objecting Beneficial Owner" (OBO) status, an act that affirmatively conceals manipulator identities from Eltek. b. Lax Access: IBKR's affirmative decision to implement a laxer version of the Market Access Rule (15c3-5) than its peers (as evidenced by Fidelity blocking trades that IBKR accepted). c. Providing the means of manipulation: IBKR's affirmative decision to (i) make a thin, volatile microcap stock available for shorting (when reputable brokers refused) and (ii) offer economically illogical, near-zero borrow rates as an incentive.

170.    Scienter (Intent): IBKR acted with Deliberate Recklessness or Willful

39

Blindness. While any one of the acts above (OBO, lax rules, shorting) might be explained away in isolation, their combination makes no legitimate business sense. IBKR intentionally or recklessly created the mechanisms for fraud because it was profitable. IBKR knew or was willfully blind to the fact that this constellation of features was attracting and facilitating the very fraud its compliance department was supposed to prevent.

171.    As a direct and proximate result of IBKR's own "Deceptive Business Model Scheme," which facilitated the suppression of Eltek's stock price, the Company was damaged.

**COUNT III:**

**Violation of Section 10(b) of the SEA and Rule 10b-5(a) and (c) Thereunder (against Defendant JDMS)**

172.    Plaintiff incorporates by reference all preceding paragraphs. JDMS are primarily liable for affirmatively and knowingly participating in a "device, scheme, or artifice to defraud" to manipulate the market for Eltek stock. Their actions, in concert with the named Defendants, constituted deceptive devices or contrivances that manipulated Eltek's stock price during the Relevant Period.

173.    The deceptive acts included as alleged in ¶9 above. These acts created a false appearance of market activity and depressed Eltek's price.

174.    JDMS, as masterminds, are primary violators and liable for conceiving, executing, and orchestrating the underlying fraud, using broker-dealers.

175.    Scienter: JDMS acted with intent, willful blindness, or deliberate recklessness, as the trading patterns deviate from legitimate trading and were designed to profit from distortion.

176.    Based on the foregoing, Plaintiffs have been damaged in an amount to be

determined at trial.

## COUNT IV:

## Violation of Section 9(a)(1) & (2) of the SEA (against Defendant JDMSs)

177.    Plaintiff incorporates by reference all preceding paragraphs.

178.    The JDMS Defendants are primarily liable for market manipulation under Section 9(a)(1) of the SEA, as their actions created a "false or misleading appearance of active trading" (9(a)(1)).

179.    JDMS are primarily liable for violating Section 9(a)(1) by directly effecting wash trades and matched orders, creating a "false or misleading appearance of active trading."

180.    JDMS are primarily liable for violating Section 9(a)(2) by directly affecting a "series of transactions... for the purpose of inducing" others to trade.

181.    JDMS are primarily liable under Section 9(a)(2) as they created actual or apparent active trading- to induce others to buy or sell by misleading them about genuine market demand or supply.

182.    Based on the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

### IN ADDITION AND IN THE ALTERNATIVE COUNT V

### DECLARATORY JUDGMENT

183.    Plaintiff incorporates by reference all preceding paragraphs.

184.    If in the event This Court rules that Sections 197 & 198 of Chapter 3 of the Israel Companies Law apply in this case, then Count V is plead in addition to those claims set forth herein.

185.    Sections 197 and 198, of the Israel Companies Law provide as follows:

Right to bring derivative action

197. A plaintiff may, with the Court's permission, bring a derivative action under the provisions of section 198, if one of the following applies:

(1) In his opinion, the action taken or the decision adopted did not eliminate the grounds for the action;

(2) the company rejected the plaintiff's demand, as said in section 195(2);

(3) the company informed the plaintiff that it decided to bring action, as said in section 195(3), but the action was not brought within 75 days after the notice;

(4) the company did not reply to the demand in accordance with the provisions of section 196.

Approval of derivative action

198. (a) A derivative requires approval by the Court, and it shall approve it if it is satisfied that the action and its conduct are, a priori, to the benefit of the company, and that the plaintiff is not acting otherwise than in good faith.

(b) The Court may approve a derivative action before the times set in sections 196 or 197 have elapsed, if it concluded that bringing action at that time will cause it to be prescribed, and it may make its approval conditional on the fulfillment of conditions set in this Article for bringing a derivative action.

(c) In this Article, "Court" – the Court qualified to hear the action.

186.    Plaintiff's derivative action brought on behalf of Eltek, Ltd. is to the benefit of Eltek.

187.    XDOOD has commenced this derivative action on behalf of Eltek Ltd. in good faith.

188.    XDOOD has not commenced this action in bad faith seeking a quick private settlement for the purpose of maximizing legal fees.

189.    XDOOD has commenced this litigation for the purpose of eliminating stock manipulation of Eltek's share price on the NASDAQ, which benefits the Company, as a whole.

42

190. The U.S. Southern District Court, in and for the State of New York is "the court qualified to hear the action" under subsection "c" of Section 198.

191. The Plaintiff's derivative action brought on behalf of Eltek, Ltd. a priori, to the benefit of Eltek and that the plaintiff is not acting otherwise than in good faith.

192. To the extent these provisions are deemed to govern in this action, then a case and controversy exists as to whether, this derivative action is to the benefit of Eltek and that XDOOD is not acting otherwise than in good faith.

193. The Plaintiff is entitled to declaratory judgement that this action and its conduct are to the benefit of Eltek and that the plaintiff is not acting otherwise than in good faith.

## COUNT VI

## NEW YORK STATE COMMON LAW FRAUD (Against All Defendants)

194. Plaintiff incorporates by reference all preceding paragraphs.

195. Defendants engaged in fraudulent and deceptive schemes to manipulate the market for Eltek stock.

196. This conduct constituted material misrepresentations and omissions of fact to Eltek and the public market, namely, the false representation that the market for Eltek stock was free, fair, and not subject to manipulation.

197. Defendants acted knowingly, with fraudulent intent, and with the intent that Eltek and the market rely upon this false appearance.

198. Eltek justifiably relied on the integrity of the market when making capital-raising and strategic decisions.

199. As a direct and proximate result of Defendants' fraudulent scheme, the

Company was damaged in an amount to be determined at trial.

200.    Defendants' conduct was reckless, willful, intentional, and malicious, warranting punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that This Court enter a judgement:

A.    Declaring that Defendants violated the federal securities laws and New York state laws as alleged in this Complaint;

B.    Ordering Defendants to pay compensatory damages, together with prejudgment interest, for their unlawful conduct in an amount to be determined at trial;

C.    Ordering Defendants to pay punitive damages to Eltek Ltd. for their malicious, oppressive, and/or reckless disregard for Plaintiff's rights, in an amount to be determined at trial;

D.    Permanently enjoining and restraining Defendants from continuing and maintaining the unlawful conduct and conspiracies alleged in the Complaint against Eltek, Ltd.;

E.    In the event required by Israel Law as determined by This Court, declaratory judgment that XDOOD's action and its conduct are to the benefit of Eltek and that XDOOD, is not acting otherwise than in good faith.

F.    Awarding Plaintiff reasonable attorneys' fees and costs;

G.    G. Awarding McGauley, Chin, and XDOOD fees and costs associated with the five-year investigation of manipulative Eltek stock trading; and

H.    Granting such other and further relief as the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff demands

trial by jury in this action of all issues so triable

Dated: April __, 2026
New York, New York

Law Offices of Peter Sverd, PLLC

By: */s/ Peter Sverd*
Peter Sverd, Esq. (0406)
225 Broadway, Ste 613
New York, NY 10007
(646) 751-8743

45

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – X

XDOOD LLC, derivatively on behalf of
ELTEK, LTD                                                          :

                           Plaintiff,                 :          Case No. 25-cv-08536 (LAK)

                                      :

                -against-                       :          **VERIFICATION OF
                                                                                     PROPOSED SECOND
                                                                                     AMENDED COMPLAINT BY
                                                                                     MICHAEL MCGAULEY**

INTERACTIVE BROKERS GROUP, INC.,         .
MORGAN STANLEY SMITH BARNEY LLC, and :
JOHN DOES 1–10

                      Defendants.            :

– – – – – – – – – – – – – – – – – – – – – – – – – X

**MICHAEL MCGAULEY**, being duly sworn, deposes and says as follows:

1.      I am of lawful age and of sound mind, and I supply this Verification pursuant to Fed. R. Civ. P. 23.1(b).

2.      I am the managing member and sole owner of Plaintiff, XDOOD LLC.

3.      I am authorized to speak for and make declarations for XDOOD LLC.

4.      I make this verification based on personal knowledge unless I otherwise state that I make a statement upon information and belief.

5.      I read the read the foregoing Second Amended Complaint before it was filed with this Court.

1

6.    The facts alleged in the foregoing Second Amended Complaint are true and correct to the best of my knowledge, information, and belief.

7.    I make this Verification pursuant to 28 U.S.C. § 1746, and I certify, verify, and declare under pains and penalty of perjury that this Verification is true and correct.

Dated: _/0_ April 2026

_Michael McGauley_
Michael McGauley
As   authorized   agent   and Managing Member for XDOOD LLC

**SWORN TO AND SUBSCRIBED** before me on this _10_ day of April,  2026.

_Brenda J. Fernandez_
Notary Public

BRENDA G. FERNANDEZ
Notary Public
Commonwealth of Massachusetts
My Commission Expires July 20, 2029

2