UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
XDOOD LLC, derivatively on behalf of
ELTEK, LTD,                                                    Case No. 1:25-cv-08536 (LAK)

                    Plaintiff,

v.

INTERACTIVE BROKERS GROUP, INC.,
MORGAN STANLEY SMITH BARNEY
LLC, and JOHN DOES 1-10,

                    Defendants.
--------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO CO-DEFENDANT
MORGAN STANLEY SMITH BARNEY LLC'S
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT......................................................................................................1

BRIEF STATEMENT OF ARGUMENT.....................................................................................1

ARGUMENT.................................................................................................................................2

POINT I.  THE PLAINTIFF HAS NOT FAILED TO STATE A CLAIM UNDER SECTION
10(b) OF THE EXCHANGE ACT OR RULE 10b-5(a) or (c) AND THE MOTION TO
DISMISS SHOULD BE DENIED.......  .......................................................................................2

A.   STRONG INFERENCE OF SCIENTER IS ALLEGED IN THE FIRST
AMENDED COMPLAINT........................................................................................................2

B. THE AMENDED COMPLAINT ALLEGES THAT MSSB ENGAGED IN A
MANIPULATIVE ACT.............................................................................................................6

C.RELIANCE IS PRESUMED IN THIS CASE & IN ANY EVENT IS
SUFFICIENTLY PLED ............................................................................................................8

     1.       PLAINTIFF RELIED ON AN EFFICIENT MARKET THAT MSSB
RUINED BY IMPLEMENTING ITS P-TRADE POLICY .................................8

     2.       RELIANCE IS PRESUMED WHERE OMISSIONS ARE PRIMARILY
INVOLVED.........................................................................................................9

D. THE AC ALLEGES BOTH COGNIZABLE ECONOMIC LOSS AND LOSS
CAUSATION ATTRIBUTABLE TO MSSB.......................................................................10

E. FAILURE TO VERIFY THE COMPLAINT IS A CURABLE DEFECT........................12

POINT II.  PLAINTIFFS's 10(b) FEDERAL CLAIMS ARE TIMELY......................................12

A. PLAINTIFF'S ACTIONS ARE TIMELY UNDER THE FIVE-YEAR STATUTE OF
REPOSE. ..................................................................................................................................14

     1.       MSSB CULPABILITY UNDER THE FIVE YEAR STATUTE OF
REPOSE.............................................................................................................16

     2.       MSSB FEDERAL CLAIMS WERE FILED WITHIN THE STATUTE OF
LIMITATIONS AND ARE  THEREFORE TIMELY.........................................17

POINT III GRANTING XDOOD LEAVE TO INTERPOSE ITS SECOND AMENDED COMPLAINT TO BEEF UP ITS ALLEGATIONS SUPPORTING THE BASIS TO BRING ITS DERIVATIVE CLAIM WOULD NOT BE FUTILE..........................................................22

A.THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES XDOOD'S DERIVATIVE ACTION UNDER THE "SUBSTANTIVE" NEW YORK LAW FEDERAL RULE 23.1 & ISRAEL LAW..............................................................................................23

    1.    THE SUBSTANTIVE LAWS OF NEW YORK & ISRAEL: DEMAND & BOARD RESPONSE......................................................................................24

    2.    THE PROCEDURAL LAWS OF ISRAEL: COURT APPROVAL.....................26

    a.    EVEN IF THESE PROVISIONS ARE DEEMED SUBSTANTIVE, LEAVE TO AMEND IS NOT FUTILE...........................................................................26

POINT IV. THE COMMON LAW FRAUD CLAIMS ARE VALID.........................................27

CONCLUSION....................................................................................................................28

## TABLE OF AUTHORITIES

Affiliated Ute Citizens v. United States 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472 (1972)..........9

Alpha Capital Anstalt v. Oxysure Systems, Inc., 252 F.Supp.3d 332, 343 (S.D.N.Y. 2017)........10

Aronson v. Adv. Cell Tech., Inc., 902 F. Supp. 2d 106, 128 (D. Mass. 2012)..............................15

Ashland Inc. v. Morgan Stanley & Co., Inc. 700 F.Supp2d 453, 471-472 (S.D.N.Y. 2010).......27

ATSI Communications, Inc. V. Shaar Fund, Ltd., 493 F.3d 87, 100-101 (2d Cir. 2007)..............9

California Pub. Employees' Ret. System v. ANZ Securities, Inc., 582 U.S. 497, 505 (2017)......14

City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc., 637 F.3d 169 (2d Cir. 2011).............21

Continental Bank, Nat'l Association v. Ludlow, 777 F.Supp. 92, 102 (D. Mass. 1991)..............15

CompuDyne Corp. v. Shane, 453 F.Supp.2d 807 (2006)............................................................10

CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 107 S. Ct. 1637 (1987) ...................in passim

Davis v. Scottish Re Grp. Ltd., 30 N.Y.3d 247, 66 N.Y.S.3d 447 (2017).....................................23

Dekalb County Pension Fund v. Transocean Ltd., 817 F.3d 393, 398 (2d Cir. 2016)..................14

Dura Pharmaceuticals, Inc. V. Brouda, 544 U.S. 336, 125 S.Ct. 1627 (2005).............................10

ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
     553 F.3d 187, 201 (2nd Cir. 2009)......................................................................................2, 4

In re Dynagas LNG Partners LP Securities Litigation, 504 F.Supp.3d 283,(S.D.N.Y. 2020).........9

Espinoza ex rel. JPMorgan Chase & Co. v. Dimon, 807 F.3d 502, 505 (2d Cir. 2015)................22

Ezrasons, Inc. v. Rudd, 217 A.D.3d 406, 191 N.Y.S.3d 349 (1st Dept. 2023).............................23

Freedman v. magicJack Vocaltec Ltd., No. 9:17-CV-80940, 2018 WL 6110996
     (S.D. Fla. Nov. 21, 2018), aff'd, 963 F.3d 1125 (11th Cir. 2020)...........................................24

Goldenson v. Steffens, 802  F. Supp. 2d 240 (D. Me. 2011)...........................................................15

Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999)... .....................................in passim

In re Barclays Liquidity Cross and High Frequency Trading Litigation,
     390 F.Supp.3d 432, 443-444 (2019).....................................................................................10

In re Beacon Assocs. Litig., 282 F.R.D. 315 (S.D.N.Y. 2012).......................................................15

In re Dynagas LNG Partners LP Securities Litigation,
     504 F.Supp.3d 283, 311 (S.D.N.Y. 2020).. ............................................................................5

In re Dynex Capital, Inc. Securities Litig., No. 05 Civ. 1897(HB), 2009 WL 3380621
     (S.D.N.Y. Oct. 19, 2009)........................................................................................................14

In re Global Crossing, Ltd. 322 F.Supp.2d 319 (S.D.N.Y. 2004). ............................................2, 3

In re Initial Public Offering Sec. Litig., 241 F.Supp.2d 281, 297 (S.D.N.Y.2003)........................8

In re Merck & Co., Inc. Sec., Derivative & ERISA Litig., No. 05-2367 SRC,
     2012 WL 4764589 (D.N.J. Oct. 5, 2012), aff'd sub nom. In re Merck & Co.,
     Inc. Sec., No. CV 05-1151 (SRC), 2012 WL 12904796 (D.N.J. Dec. 12, 2012)..................15

Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. and Inv. Bank,
     924 F. Supp. 2d 528, 536 (S.D.N.Y. 2013).... ......................................................................14

Hugler v. First Bankers Tr. Servs., Inc., No. 12 CV 8649 (VB),
    2017 WL 1194692 (S.D.N.Y. Mar. 30, 2017)........................................................13

Joffee v. Lehman Bros., Inc., 410 F.Supp.2d 187, 192 (S.D.N.Y.2006)........................................11

Jones v. Bock, 549 U.S. 199, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)......................................13

Lentell v. Merill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005).................................................10

Mason-Mahon v. Flint, 166 A.D.3d 754, 756–758 (2d Dep't 2018).............................................23

McKenna v. Wright, 386 F.3d 532, 436 (2d Cir. 2004)................................................................13

Merck & Co. v. Reynolds, 559 U.S. 633, 130 S. Ct. 1784, 176 L. Ed. 2d 582 (2010)..................13

Quaak v. Dexia S.A., 357 F.Supp.2d 330, 338 (D. Mass. 2005)............................ ......................15

S.E.C. v. Kovzan, 807 F. Supp. 2d 1024 (D. Kan. 2011)..............................................................15

Tanges v. Heidelberg North America, Inc.,
    93 N.Y.2d 48, 687 N.Y.S.2d 604, 710 N.E.2d 250 (1999)................................................23

Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity
    Fund, and Apprenticeship, Journeyman Retraining, Educ. and Indus.
    Fund v. Showtime on the Piers, LLC, 19-CV-7755 (VEC), 2020 WL 2749572,
    (S.D.N.Y. May 26, 2020)... .................... ................... ................................................13

Affiliated Ute Citizens v. United States, 406 U.S. 128(1972)........ .............................................9

Waggoner v. Barclays PLC,  875 F.3d 79, 93 (2d Cir. 2017)........................................................9

Weisfeld v. Spartans Indus., Inc., 58 F.R.D. 570 (S.D.N.Y. 1972).... .........................................12

Wilson v. Merrill Lynch & Co., 671 F.3d 120, 130 (2d Cir. 2011)... ...........................................7

Winters v. Stemberg, 529 F. Supp. 2d 237, 246-47 (D. Mass. 2008)............................................15

## PRELIMINARY STATEMENT

Plaintiff XDOOD LLC ("XDOOD" or "Plaintiff") respectfully submits this memorandum of law, along with the Attorney Declaration of Peter Sverd, Esq. dated April 10, 2026 with exhibits attached, in opposition to Defendant Morgan Stanley Smith Barney LLC's ("MSSB") motion to dismiss ("MTD") the Amended Complaint ("AC").

## BRIEF STATEMENT OF ARGUMENT

The Amended Complaint ("AC") sufficiently alleges that Eltek was damaged by MSSB's implementation of its nine-month P-Trade Policy, which unlawfully manipulated Eltek's stock price traded on the Nasdaq. Rather than "cure" the stock manipulation that its own Fraud Operations Unit had discovered, as alleged by MSSB, their creation and implementation of the P-Trade Policy compounded the manipulation of Eltek's stock price. MSSB omitted material facts from its disclosures about Eltek when it was not making misstatements of to the public about Eltek. XDOOD 's claims are timely, and rather than dismiss the amended complaint for failing to verify, and to adequately pleaded standing to commence this Derivative action leave to interpose the proposed Second Amended Complaint should be granted. Leave to interpose the proposed Second Amended Complaint should also be granted to permit Eltek to add allegations to its common law fraud claim to include that: MSSB's intentionally failed to disclose to Eltek that MSSB had instituted the P-Trade Policy against its stock; that Eltek justifiably relied on MSSB's material omission of fact to allow its stock to continue to be traded on the open market by MSSB during the nine-month period that the P-Trade Policy was in effect; and that Eltek was damaged as a result.

1

## ARGUMENT
## POINT I.

### THE PLAINTIFF HAS NOT FAILED TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT OR RULE 10b-5(a) or (c) AND THE MOTION TO DISMISS SHOULD BE DENIED

MSSB's argument that the AC fails to adequately allege scienter is not persuasive. The AC alleges detailed facts that, when taken as true, give rise to a strong inference that MSSB acted recklessly such that MSSB's omission and misrepresentation of material facts contained in its P-Trade scheme was so obvious that MSSB must have been aware that its actions were manipulating and deceiving the market. MSSB's imposition of the P-Trade

### A.

### STRONG INFERENCE OF SCIENTER IS ALLEGED IN THE FIRST AMENDED COMPLAINT

The AC alleges with particularity that MSSB recklessly made material misrepresentations or omissions about Eltek on its platform and there is no basis to dismiss the Amended Complaint on the grounds that a strong inference of scienter was not alleged.

Recklessness is defined as 'at the least, ... an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2nd Cir. 2009)*. The Second Circuit has held that a plaintiff may establish the requisite "strong inference" of scienter either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Global Crossing, Ltd. 322 F.Supp.2d 319 (S.D.N.Y. 2004)*.

The allegations in the AC allege a strong inference that MSSB acted recklessly when their

P-Trade scheme made omissions and misrepresentations of material facts with respect to the security that it should have been obvious to MSSB that its actions were manipulating and deceiving the market as to the true value of Eltek. MSSB's statements and omission of facts were material in as much as they "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re Global Crossing, Ltd. 322 F.Supp.2d 319 (S.D.N.Y. 2004)*.   The AC alleges:

At ¶4, that MSSB's Fraud Operations Unit suspended electronic purchases of Eltek stock for approximately nine months following October 16, 2020. This negatively impacted demand for Eltek stock.

At ¶4, During this period, MSSB customers could only purchase Eltek shares by placing telephone orders with a customer service representative, the phone trade policy ("P-Trade Policy").

At ¶4, Customers who held Eltek shares were not notified about the P-Trade Policy, and they were allowed to sell shares electronically with no notification they would not be able to electronically repurchase shares.

At ¶ 7, that MSSB ...  engaged in a new, primary fraudulent "Cover-Up Scheme" to hide its own massive, pre-existing "Know Your Customer" ("KYC") compliance failures.

At ¶ 7, This scheme involved implementing the secret, nine-month, one-sided P-Trade Policy that affirmatively blocked all electronic purchases while simultaneously facilitating short sales, thereby creating a deceptive, asymmetrical market to conceal its own liability.

At ¶ 41,  MSSB implemented its "P-Trade Policy" unannounced and undisclosed to the Company, its customers, and the market.

At ¶ 41,  The only time an MSSB customer had any notification about the P-Trade Policy was if they attempted to electronically purchase ELTK stock and observed a message.

At ¶ 42, On December 31, 2020, MSSB customer Heins Karam ("Karam") attempted to place an order to buy Eltek shares through the MSSB website on that date and received an error message stating "Opening order for this security cannot be accepted online at this time" and provided a phone number to call customer service.

At ¶ 43, On May 10, 2021, Karam received in part the following e-mail from MSSB.

> Currently, all orders on ELTK require that instructions be provided over a recorded line. Reasons for such a requirement vary but may be due to a reorganization or other corporate action that has not been fully disclosed. To inquire if an if an order can be accepted on this security, please call customer service at your convenience. You can

3

then speak with a licensed broker who will review your order for placement. This is a requirement for which we cannot make exceptions.

At ¶ 46, MSSB responded to McGauley's actions by terminating his account and stonewalled him for five months regarding information about the other-side-of-the-trade.

At ¶ 47, The P-Trade Policy affirmatively and simultaneously: a. suppressed legitimate purchase access by blocking 100% of electronic buy orders from its millions of customers. b. It simultaneously permitted Eltek stock to be borrowed for short-side activity through its share lending program, which actively sourced shares from its clients to lend to short-sellers.

At ¶48,  This was a primary manipulative act by MSSB. This intentionally created a downward asymmetrical market for Eltek's stock.

At ¶ 153,  The "device" was MSSB's implementation and nine-month maintenance of the secret, one-sided "P-Trade Policy."

At ¶ 153,  This policy was an affirmative act that: a. Operated as a fraud on the market by deceptively concealing a material fact (that MSSB, a major broker, was unilaterally barring all electronic purchases of Eltek stock). b. Created a false appearance of weak market demand, artificially suppressing Eltek's share price.

At ¶ 154, MSSB's motive for this scheme was not to protect the market, but to clean up its institutional KYC failures. MSSB knew its acquisition of E*TRADE had imported massive, undisclosed regulatory liabilities (institutional KYC failures).

 At ¶ 154, The Oct 16 fraud was proof of this liability. MSSB implemented the secret "P-Trade Policy" as a "Cover-Up Scheme" to buy time to quietly investigate and purge its own systems of the toxic accounts and evidence of its prior misconduct, all while deceiving Eltek and the marketplace.

At ¶ 155. As a direct and proximate result of MSSB's own "Cover-Up Scheme," which actively suppressed Eltek's stock price and deceived the market, the Company was damaged.

MSSB's motion does not meaningfully address these allegations. Instead, it selectively quotes from the pleading, ignores the context in which the P-Trade Policy was maintained, and asks The Court to weigh MSSB's spin on its own recklessness to negate its conduct.  Respectfully, at bar, a reasonable person would deem the inference of scienter cogent and at least as compelling as MSSB's allegations which oppose the inference. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 201 (2nd Cir. 2009)*.

MSSB's position that it implemented the P-Trade Policy to protect the market from manipulation is undercut by MSSB's repeated reference to "legitimate customers" and "legitimate traders" when describing who could trade Eltek on its platform (MTD at 3, 17). The deliberate use of that qualifier necessarily distinguishes between customers MSSB viewed as legitimate and others it did not, i.e., accounts it could not verify, did not trust, or had flagged for compliance concerns vs. those that it could. MSSB chose that language; Plaintiff did not supply it. This stunning admission supports the strong inference of scienter alleged in the AC that MSSB imposed the P-Trade Policy in response to internal KYC failures and the presence of suspicious or unverified accounts trading Eltek.  At the pleading stage, Plaintiff's inference of scienter on the part of MSSB is at least as compelling as MSSB's alternative explanation, and the motion to dismiss should be denied.

MSSB's argument that "...customers had full ability to purchase Eltek shares by phone at Morgan Stanley or through thousands of other brokers" (MTD at 3, 17) does not overcome the inference of scienter. This argument is an attempt to distract from "the relevant inquiry (which) is whether Plaintiff[] ha[s] adequately pleaded facts to support their argument that Defendants' statements, taken as a whole, were rendered misleading by virtue of what was omitted. *In re Dynagas LNG Partners LP Securities Litigation, 504 F.Supp.3d 283, 311 (S.D.N.Y. 2020)*. MSSB's P-Trade Policy communicated information to the purchasing public, but did not give information to sellersand holders of the stock on its platform. This omission of material fact 'that the stock is manipulated so you have to call us to place an order' was never communicated to any market participant other than purchasers on the MSSB platform.

Further evidence adduced from the pleadings is that MSSB's reckless omission of material fact likely harmed its own investors who might have sold their shares in a downwardly biased

market, completing the trade without fair pricing- without knowing that to purchase more shares in the future, they would have first learned that the a P-Trade Policy was in place. So MSSB's claim they tried to prevent fraud is false as it intentionally concealed material facts from its own sell side clients (and the rest of the market) during a nine-month period employed the P-Trade device, scheme or artifice, and engaged in a practice, and course of business which operated, which operated as a manipulative fraud on the market.  This nine-month campaign also damaged sellers at other brokerages who similarly and unknowingly sold their shares in a downward bias market, as well.

Also, that statement has additional problems with it. First, to even have to call in a purchase order on an electronic platform is a red flag to the potential investor as that might signal that there is something wrong with the Eltek or its stock, harming both reputations. Secondly, even if the same client uses other brokerages, that does not change the market conditions MSSB altered for the rest of the market.

Per AC ¶ 3 and 4, MSSB's "Fraud Operations Unit" detected fraudulent trading occurring on Eltek's stock on October 16, 2020, and initiated the P-Trade Policy on the security. MSSB stated in its MTD it "...acted transparently and with the intention to combat fraud..."  This factually incorrect statement of transparency is refuted in ¶ 41-48 of the AC. It convolutes the difference between initiating an action, which could be the right thing to do, and continuing an action whose consequences evolve into deceptive manipulation of the market under Section 10(b) and Rule 10b-5 of the Security Exchange Act ("SEA").

**B.**

**THE AMENDED COMPLAINT ALLEGES THAT MSSB ENGAGED IN A MANIPULATIVE ACT**

For the reasons stated above, the AC plausibly alleges that MSSB engaged in a

manipulative act when it intentionally misrepresented facts, concealed and omitted material facts from its communications to customers seeking to purchase Eltek shares on its platform.  Contrary to MSSB's argument, the pleadings allege that MSSB misrepresented the reason for the P-Trade policy, did not fully disclose material facts to buyers, and the partial statements of material facts were not fully disclosed to sellers and borrowers against the shares. MSSB's reliance on Wilson v. Merrill Lynch & Co., 671 F.3d 120, 130 (2d Cir. 2011) ("[T]he market is not misled when a transaction's terms are fully disclosed."), is not persuasive.

The AC alleges that MSSB's own Fraud Operations Unit detected the manipulation of Eltek stock on October 16, 2020, which was the reason MSSB put its P-Trade policy in place. AC at Para 40-41. Yet, the communications coming out of E-Trade's P-Trade policy did not disclose that purchases of shares of Eltek are being restricted to remedy, or protect consumers, because MSSB's own Fraud Operations Unit detected the stock was wrought with manipulation; that would have been full disclosure of the transaction terms.

The AC alleges at para. 41-43, (and supported by the Affidavit Heins Karam and the exhibits attached thereto, located at Exhibits 2-5 of the Sverd Dec.) that E-Trade, corresponded to Mr. Karam explaining that:

> "Currently, all orders on ELTK require that instructions be provided over a recorded line. Reasons for such a requirement vary but may be due to a reorganization or other corporate action that has not been fully disclosed. To inquire if an order can be accepted on this security, please call customer service at your convenience. You can then speak with a licensed broker who will review your order for placement. This is a requirement for which we cannot make exceptions. If the order can be accepted, you will not be charged the normal broker assist fee...."

MSSB communicated that the reasons for the restrictions of Eltek shares "vary but may be due to a reorganization (of Eltek) or other corporate action (of Eltek) that has not been fully disclosed." This statement can be interpreted to be a misrepresentation of fact, casting aspersion

on Eltek the company, as being the impetus for MSSB's P-Trade policy. AC. P 44.   The AC plausibly alleges that E-Trade did not fully disclose transaction's terms/ 'communications' to Eltek's purchasing customers, and was a manipulative market activity.

Alternatively, MSSB's statement that "Reasons for such a requirement vary but may be due to a reorganization or other corporate action that has not been fully disclosed" omits the fact that MSSB's own Fraud Operations Unit detected the stock was wrought with manipulation.

Moreover, the AC alleges that the P-Trade policy disclosure was only communicated to MSSB buy-side customer, and not to those that were either selling Eltek shares, or were holding Eltek stock, while simultaneously allowing short-side activity through E-Trades' share lending program. AC para 47.  The AC plausibly alleges that MSSB engaged in a manipulative activity.

### C.

### RELIANCE IS PRESUMED IN THIS CASE & IN ANY EVENT IS SUFFICIENTLY PLED

**1.     PLAINTIFF RELIED ON AN EFFICIENT MARKET THAT MSSB RUINED BY IMPLEMENTING ITS P-TRADE POLICY**

The AC plausibly alleges that Eltek's damages were caused by MSSB's P-Trade Policy which was caused by Eltek's reliance on the assumption that its stock price would be publicly traded and valued in an efficient market free of manipulation.   XDOOD's AC alleges facts showing "reliance on the integrity of the market (i.e., that they believed it was not manipulated.")  (emphasis in original). In re Initial Public Offering Sec. Litig., 241 F.Supp.2d 281, 297 (S.D.N.Y.2003). The AC alleges that Defendants' conduct distorted the market and that Eltek relied on a market free of manipulation. The "Defendants' fraudulent trading activities had both a temporary and long-term adverse effect on the market price of Eltek's securities." (AC ¶ 145); "Defendants' manipulation deprived Eltek of its right and ability to have its shares trade on U.S.

8

exchanges that were free of manipulation." (AC ¶ 150); The AC further alleges that the manipulative acts created an artificial market structure on which Eltek necessarily relied: "This intentionally created a downward asymmetrical market for Eltek's stock." (AC ¶ 48); "The P-Trade Policy… negatively impacted demand for Eltek stock." (AC ¶ 4). These allegations satisfy reliance under the Second Circuit's market manipulation framework, which requires reliance on the assumption of an honest market, not direct reliance on a defendant's statements. *ATSI Communications, Inc. V. Shaar Fund, Ltd., 493 F.3d 87, 100-101 (2d Cir. 2007)*.

## 2. RELIANCE IS PRESUMED WHERE OMISSIONS ARE PRIMARILY INVOLVED

MSSB incorrectly asserts that the Plaintiff did not adequately plead reliance and the argument lacks merit.   The presumption of reliance is met in this case which primarily involves omissions, rather than affirmative misstatements. *Waggoner v. Barclays PLC,  875 F.3d 79, 93 (2d Cir. 2017)* citing, *Affiliated Ute Citizens v. United States, supra, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472 (1972)*. Count II of the AC which alleges market manipulation under Rule 10b5(a) and (c), are not premised on deceptive statements communicated directly to the plaintiff, and the cases relied upon by the Defendant are not controlling.  On the other hand, Plaintiff has plausibly pleaded reliance

Plaintiff's 10(b) claim based upon MSSB's material omission dispenses with the requirement that reliance be plead. Reliance may be inferred upon a showing that the non-disclosed facts are material. *Affiliated Ute Citizens v. United States, supra, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472 (1972)*.  The standard for materiality as a showing of a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available. *In re Dynagas LNG Partners LP*

*Securities Litigation, 504 F.Supp.3d 283, 308-309 (S.D.N.Y. 2020)*. At bar, the alleged factual

omissions of MSSB are material and reliance is inferred.

**D.**

**THE AC ALLEGES BOTH COGNIZABLE ECONOMIC LOSS AND LOSS
CAUSATION ATTRIBUTABLE TO MSSB**

MSSB's claim that the AC "fails to allege cognizable losses or loss causation," ignores

the well pleaded allegations which set forth a short and plain statement of the claim under Rule

8(a)(2) that gave MSSB notice of the loss and its causal connection to their alleged misconduct.

Cf. *Dura Pharmaceuticals, Inc. V. Brouda, 544 U.S. 336, 125 S.Ct. 1627 (2005).Fed. R. Civ.P.
8(a)(2)*.

Courts in This Circuit have consistently held that "pleading loss causation with

particularity is not required on a Rule 10b-5 claim of market manipulation," and that "a short and

plain statement that provides the defendant with notice of the loss and its causal connection to the

alleged misconduct is . . . sufficient to assert loss causation." *Alpha Capital Anstalt v. Oxysure

Systems, Inc., 252 F.Supp.3d 332, 343 (S.D.N.Y. 2017).* At the pleading stage, a plaintiff's

allegations need only "provide a defendant with some indication of the loss and the causal

connection that the plaintiff has in mind." *In re Barclays Liquidity Cross and High Frequency

Trading Litigation, 390 F.Supp.3d 432, 443-444 (2019).* The Second Circuit Court held that a

misstatement or omission is the proximate cause of an investment loss if the risk that caused the

loss was within the zone of risk concealed by the misrepresentation and omissions alleged by the

Plaintiff. *Lentell v. Merill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005).* The Court in

CompuDyne Corp. v. Shane, 453 F.Supp.2d 807 (2006), discusses at length the relatively low

pleading bar set by *Dura* when refusing to dismiss a Rule 10b-5 complaint on the pleadings. In

CompuDyne, the Court reasoned that loss-causation was satisfied where the plaintiff alleged they

10

purchased the stock on a misrepresentation, the trading artificially depressed the stock, and the

trader would have received a higher price than what she sold for. *Id. at 828-829*.

MSSB's argument that the Plaintiff failed to allege any specific economic harm and instead

relied solely on generalized assertions of "suppressed stock value, impaired capital raising, and

lost growth opportunities" fails.    To survive a motion to dismiss, Plaintiffs must "allege facts

indicating the economic loss they claim to have suffered." *Joffee v. Lehman Bros., Inc.,* 410

F.Supp.2d 187, 192 (S.D.N.Y.2006).

The AC satisfies the pleading requirements for loss causation and damages, where it is

alleged:

142. Eltek suffered substantial harm, including suppressed stock value, impaired capital raising, and lost growth opportunities. For example, from January 3, 2022, until May 17, 2023, Eltek was priced practically at equity value. For 345 consecutive trading days the Company's shareholders' average equity as a percentage of the market cap was 89.5 percent. During much of this price fixing period the Company P/E ratio remained at or below 5 versus industry averages of 22–45, a disparity caused by artificial price suppression that obstructed capital raising and stunted expansion.

143. These injuries are conservatively estimated in the tens of millions of dollars and, under a full-growth scenario using peer multiples and management's stated expansion plans, exceed $150 million, to be proven at trial through expert testimony.

144. Defendants' covert misconduct distorted capital markets, delayed acquisitions, stalled new facility construction, and postponed factory upgrades vital to competitiveness, projects that could have been completed years earlier in a manipulation-free market.

145. Defendants' fraudulent trading activities had both a temporary and long-term adverse effect on the market price of Eltek's securities, as evidenced by the manipulation patterns in Section IV.D ("Trading Activity and Other Events" showing price fixing, wash trading, and price and volume spikes). Further, when manipulative events occur recurringly over a protracted period, the price of a manipulated security will generally not attain a price supported by its fundamentals and industry averages. Thus, the long-term cumulative effect of manipulation places enormous downward pressure on the price of the security.

146. Artificially reduced stock prices resulted in several significant types of harm to Eltek's current and future value.  Reduced stock prices sent a signal to management to forgo and/or delay investments that otherwise would be productive.  Reduced stock prices made investments more expensive. Equity financing was more dilutive, and debt seen as riskier and priced accordingly. The equity financings that did occur were substantially more dilutive than they otherwise would

have been.  Forgone and delayed investments by Eltek allowed industry undercapacity to persist even after the opportunity for investment was identified by Eltek, prompting new, non-Eltek capacity to enter the market. This added competition has been identified on earnings calls as leading to reduced pricing power for some Eltek products. Had Eltek grown and had available capacity, new entrants in the market would have been deterred from making investments.

147. If Eltek had a higher valuation, several things would have been different.  Eltek would not have been diluted nearly as much during its equity offerings.  Eltek would have invested in growth earlier and in a less piecemeal manner

148. Loss Causation. The manipulative scheme proximately caused Eltek direct harm each time the artificially suppressed price increased the dilutive impact of equity offerings, raised the cost of capital, and forced management to delay or abandon accretive investments and acquisitions, injuries that materialized and were acknowledged by management when excess industry capacity entered the market in 2024–2025 and reduced Eltek's pricing power.

**E.**

**FAILURE TO VERIFY THE COMPLAINT IS A CURABLE DEFECT**

XDOOD's Failure to verify the Amended complaint in this derivative action was a mere oversight and is a technical defect cured by the filing a verifying affidavit rather than dismissal of the complaint. See Weisfeld v. Spartans Indus., Inc., 58 F.R.D. 570 (S.D.N.Y. 1972) The affidavit of Michael McGauley, attached to the Sverd Dec. satisfies Fed R. Civ. P. 23.1(b), and there is no basis to dismiss the complaint on the grounds asserted. Rather than dismiss the case, it is respectfully requested that leave be granted to Plaintiff to interpose the Verification located at Exhibit 1 of the Sverd Dec.

**POINT II**

**PLAINTIFFS's 10(b) FEDERAL CLAIMS ARE TIMELY**

Claims under Section 10(b) are subject to a Statute of Limitations that requires they be brought no later than "two years after the discovery of the facts constituting the violation" 28 U.S.C. § 1658(b)(1), This has been interpreted to mean two years from "discovery of the facts constituting the violation," which occurs when "the plaintiff actually discovers the facts

12

constituting the violation, or when a reasonably diligent plaintiff would have discovered the facts constituting the violation, whichever comes first" Merck & Co. v. Reynolds, 559 U.S. 633, 130 S. Ct. 1784, 176 L. Ed. 2d 582 (2010). These claims are also subject to a Statute of Repose in that they must be brought no more than "5 years after such violation." Id. § 1658(b)(2). Contrary to MSSB's assertions, Plaintiff's claims are timely under both the Statute of Repose and the Statute of Limitations.

As indicated above, under Rule 12(b)(6), "[a] complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief," including on the grounds that a claim is time-barred. Jones v. Bock, 549 U.S. 199, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007); see also Hugler v. First Bankers Tr. Servs., Inc., No. 12 CV 8649 (VB), 2017 WL 1194692 (S.D.N.Y. Mar. 30, 2017) (considering statute of repose as an affirmative defense on a motion to dismiss). On a motion to dismiss, it is only appropriate to dismiss a complaint as time-barred if the complaint "clearly shows the claim is out of time." Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, and Apprenticeship, Journeyman Retraining, Educ. and Indus. Fund v. Showtime on the Piers, LLC, 19-CV-7755 (VEC), 2020 WL 2749572, at *4 (S.D.N.Y. May 26, 2020) (quoting Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999)). Thus, to survive a motion to dismiss as time-barred, all that is required of a complaint are "allegations consistent with a claim that would not be time-barred." Harris, 186 F.3d at 251; cf. McKenna v. Wright, 386 F.3d 532, 436 (2d Cir. 2004) ("Not only must the facts supporting the [affirmative] defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'")

13

**A.**

**PLAINTIFF'S ACTIONS ARE TIMELY UNDER THE FIVE-YEAR STATUTE OF REPOSE.**

"[L]ike all statutes of repose, the statutes of repose applicable to [securities fraud actions] begin to run on 'the date of the defendant's last culpable act or omission." Dekalb County Pension Fund v. Transocean Ltd., 817 F.3d 393, 398 (2d Cir. 2016) (citing CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 107 S. Ct. 1637, 95 L. Ed. 2d 67 (1987)); see id. at 411 (explaining that "statute[] of repose . . . begin[]s to run on the date of the violation, which we consider to be the date of the defendant's last culpable act or omission"); California Pub. Employees' Ret. System v. ANZ Securities, Inc., 582 U.S. 497, 505 (2017) (finding language in timeliness statute for Securities Act claims indicating the provision "runs from the defendant's last culpable act (the offering of the securities)" to be "close to a dispositive indication that the statute is one of repose") (citing 15 U.S.C. § 77m).

This last-culpable-act principle is rooted in the "distinct purpose" underlying statutes of repose: to provide defendants "a fresh start" and "freedom from liability . . . after the legislatively determined period of time." CTS Corp., 573 U.S. at 9-10; ANZ Securities, Inc., 137 S. Ct. at 2053 ("[T]he purpose of a statute of repose is to give the defendant full protection after a certain time."). To further this purpose, "statutes of repose impose stricter timeliness requirements than statutes of limitation," Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991), and are generally not subject to equitable tolling, Lampf at 350. The last-culpable-act principle, like the statute of repose itself, "embodies the idea that at some point a defendant should be able to put past events behind him." CTS Corp., 573 U.S. at 9. See Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. and Inv. Bank, 924 F. Supp. 2d 528, 536 (S.D.N.Y. 2013); In re Dynex Capital, Inc. Securities Litig., No. 05 Civ. 1897(HB), 2009 WL

3380621, at *18 (S.D.N.Y. Oct. 19, 2009); and *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 324-25 (S.D.N.Y. 2012) (All applying these principles in the context of omission and/or misrepresentation cases).

Courts in other jurisdictions have similarly applied the five-year statute by measuring the repose period from the last-culpable-act. See, e.g., In re Merck & Co., Inc. Sec., Derivative & ERISA Litig., No. 05-2367 SRC, 2012 WL 4764589 (D.N.J. Oct. 5, 2012), aff'd sub nom. In re Merck & Co., Inc. Sec., No. CV 05-1151 (SRC), 2012 WL 12904796 (D.N.J. Dec. 12, 2012) ("[Plaintiffs] and Defendants recognize that the statute of repose begins to run upon the occurrence of [a] specific event, which in the case of a § 10(b) claim based on a violation of Rule 10b–5(b), consists of the occurrence of [the] last alleged fraudulent statement and/or omission."); *Aronson v. Adv. Cell Tech., Inc.*, 902 F. Supp. 2d 106, 128 (D. Mass. 2012) ("Where securities fraud claims are based on affirmative misrepresentations, 'the repose period begins when the last alleged misrepresentation was made by any of the participants.'") (quoting *Winters v. Stemberg*, 529 F. Supp. 2d 237, 246-47 (D. Mass. 2008)); Goldenson v. Steffens, 802 F. Supp. 2d 240 (D. Me. 2011) (all misrepresentations and omissions become actionable, even those outside the five-year period, "none of the misrepresentations is time-barred if any of them occurred within the period of repose."); S.E.C. v. Kovzan, 807 F. Supp. 2d 1024 (D. Kan. 2011) ("[I]f the alleged unlawful practice continues into the limitations period, the complaint is timely if filed within the required limitations period . . . measured from the end of that practice."); *Continental Bank, Nat'l Association v. Ludlow*, 777 F.Supp. 92, 102 (D. Mass. 1991) ("[T]he repose period begins when the last alleged misrepresentation was made by any of the [p]articipants."); *Quaak v. Dexia S.A.*, 357 F.Supp.2d 330, 338 (D. Mass. 2005) (stating that "under Section 10(b), the statute of repose runs from the date of the last fraudulent misrepresentation" and finding actions occurring outside

15

of the repose time-frame timely where they bore a sufficient nexus to the later filed financial statements).

Here, in the present matter, all federal claims are timely under the five-year statute of repose (28 U.S.C. § 1658(b)(2)) because Defendant's committed acts of manipulation within the past five years. As such:

### 1. MSSB CULPABILITY UNDER THE FIVE YEAR STATUTE OF REPOSE

MSSB''s last-culpable-act(s) have occurred well within the five-year repose period. As set forth in Plaintiff's AC, "Plaintiff brings this...action ... to address and remedy the ongoing fraudulent manipulation of [Eltek's] publicly traded stock on Nasdaq during the period beginning in November 2019 and ***continuing through the present***." (AC, Case 1:25-cv-08536-LAK Doc 6 ¶ 1). Fraudulent market manipulation of Eltek's securities occurred on or about October 16, 2020 (AC, ¶ 3) and FINRA's ATS Data for the week of October 12–16, 2020, shows multiple MPIDs active in Eltek trading.

"To address detected manipulation, MSSB's Fraud Operations Unit suspended electronic purchases of Eltek stock for approximately nine months following October 16, 2020." (AC ¶ 4). The suspension occurred until approximately ***June or July of 2021.*** "This negatively impacted demand for Eltek stock" (AC ¶ 4). "Customers who held Eltek shares [through E* Trade] were not notified about the P-Trade Policy, and they were allowed to sell shares electronically with no notification they would not be able to electronically repurchase shares. Had MSSB properly discharged its duties months earlier when the manipulation became known to MSSB, then this would have never happened." (AC ¶ 4)

After MSSB, via its predecessor E-TRADE detected Eltek stock manipulation, MSSB "engaged in a new, primary fraudulent 'Cover-Up Scheme' to hide its own massive, pre-existing

'Know Your Customer' ('KYC') compliance failures." (AC ¶ 7).  MSSB implemented its "secret, nine-month, one-sided P-Trade Policy that affirmatively blocked all electronic purchases while simultaneously facilitating short sales, thereby creating a deceptive, asymmetrical market to conceal its own liability." (AC ¶ 7). Finally on July 22, 2021, counsel for MSSB admitted that the "Fraud Operations Unit" "made the decision to restrict the trading of ELTK." (AC ¶ 40).

Although Eltek stock manipulation schemes are still ongoing and were observed as recently as *August 12, 2025* (AC, ¶ 6), as discussed above, "the date of the defendant's last culpable act or omission" (see *CTS Corp.*, 573 U.S. at 8), is at *its earliest* sometime in June 2021, well within the five-year repose limit

## 2. MSSB Federal Claims Were Filed within the Statute of limitations and Are therefore Timely.

MSSB incorrectly contends Plaintiff's federal claims are time barred by the statute of limitations, 28 U.S.C. § 1658(b)(1) because "the P-Trade Policy was implemented on October 16, 2020, and all of the information that forms the basis of Plaintiff's claims against Morgan Stanley was known to Plaintiff in early 2021." (See *Defendant Morgan Stanley Smith Barney LLC's Memorandum of Law in Support of Its Motion to Dismiss the Amended Complaint ("MSSB Memorandum of Law")*, *Case,* 1:25-cv-08536-LAK Document 37, p. 22). Knowing about, or suspecting suspicious trading, and being able to do anything about it are separate matters. While there are private rights of action for multiple federal and state securities manipulation laws, Plaintiff was unable to utilize those laws earlier due to the need to plead all required elements. For example, Eltek and anyone else looking at its stock price and volume activity could easily point out individual events as being highly suspect. Suspicion alone, however, is insufficient to bring a private securities action.

MSSB's limitations argument relies on a misleading argument that "XDOOD [] knew of

the P-Trade Policy by February 9, 2021, at the latest [because]... on February 9, 2021, McGauley

filed a petition in New York state court against E*TRADE Securities LLC ... for pre-action

discovery" and at that time claimed XDOOD had "viable causes of action against E*TRADE."

*(MSSB Memorandum of Law*, pp 22-23). Thus, according to MSSB, the two-year statute of

limitations began running in February 2021 (even while MSSB was still harming Eltek with its P

trade policy).

What MSSB does not tell this Court is that the February 9, 2021 Petition made no mention

of MSSB culpability for "Securities Fraud." Rather this Petition put forward a breach of contract

claim, as follows:

> "E*TRADE's suspension of online trading of ELTK shares is a violation
> of the Agreement. The Agreement does not permit E*Trade to target
> specific securities for arbitrary and capricious suspension of online trading
> and McGauley fully complied with and performed under the Agreement.
> Moreover, even if the Agreement does not speak to this issue, E*Trade's
> actions constitute a breach of the implied covenant of good faith and fair
> dealing in the Agreement.

See Sverd Dec. Exh 12, *McGauley v E*TRADE Securities LLC*, Index No. 151395/2021

(Sup Ct NY Cnty) Verified Petition, ¶ 5).[1] At the time Michael McGauley brought the action for

---

[1] It should be noted that back in June 2021, MSSB strenuously argued that Plaintiff had no
claims whatsoever, stating:
> The Petition should also be denied because Petitioner has failed to allege a
> meritorious or prima facie cause of action for breach of contract or other
> related claims. Contrary to Petitioner's allegations, the customer agreement
> that controls the relationship allows E*Trade to amend, modify or terminate
> the customer agreement, including the services provided thereunder at any
> time, in its sole discretion. Thus, any allegation that E*Trade breached the
> customer agreement on its face, lacks merit and necessarily fails. Further,
> Petitioner does not allege, and certainly cannot prove, any damages
> whatsoever. ...

See Sverd Dec. Exh 10, *McGauley v E*TRADE Securities LLC*, Index No. 151395/2021 Doc No.
25 (Sup Ct NY Cnty) Respondent E*TRADE Securities LLC'S Memorandum of Law in

18

discovery in state court, he did not have adequate information to support a complaint alleging all elements of a 10(b) violation. This action was an attempt (albeit an unsuccessful attempt) to obtain critical information about the [John Does] on the "other side of the trade" from MSSB. (AC ¶ 139). As the supreme court did not reach the merits of McGauley's Petition in its September 29, 2021 decision and order, but rather dismissed it because the pertinent contract contained an arbitration clause, Plaintiff did not obtain the needed documentation as of September 2021. See Sverd Dec. Exh 11, *McGauley v E\*TRADE Securities LLC*, Index No. 151395/2021 Doc. No. 37 (Sup Ct NY Cnty) September 29, 2021, Decision and Order of the Court).

Thereafter, McGauley's Counsel tried to discover the reason for this P-Trade Policy by sending a 20-question email on Dec 21, 2021, "MSSB's counsel affirmatively refused to answer per response on Jan 10, 2022." (AC ¶ 45)

"MSSB responded to McGauley's actions by terminating his account and stonewalled him for five months regarding information about the other-side-of-the-trade." (AC ¶ 46). By cancelling McGauley's account, and affirmatively refusing to answer questions, while maintaining its P Trade policies, MSSB actively facilitated continued manipulation while concealing its own compliance failures.  (AC ¶ 124). MSSB concealed the existence and nature of its manipulative-activity findings and the resulting nine-month P-Trade Policy restriction. MSSB never disclosed the October 16, 2020, Fraud Operations Unit information or the policy to the market, or Eltek.

As a result of MSSB's stonewalling, the federal securities claims pled herein were not "reasonably discoverable" until Plaintiff, through its own Herculean efforts, finally connected E\*TRADE's "Know Your Customer compliance mess to the "Cover-Up Scheme."

---

Opposition to Petitioner's Petition for an Order pursuant to CPLR §3102(c) p,1).

Although a plaintiff need only allege damages at the pleading stage, the complaint must still articulate a non-speculative causal chain linking the defendant's manipulative conduct to the economic loss. See *Dura*, 544 U.S. at 347; *Lentell*, 396 F.3d at 173. As alleged in the Complaint, the economic harm in this case materialized only when the Eltek successfully raised capital through its February 13, 2024 Form F-3 shelf registration and the stock price and trading prior, during, and following this event. (AC ¶¶ 121-122 )  Prior to that event, Plaintiff could not plausibly allege how MSSB's manipulative conduct caused a concrete economic loss, because the price-impact mechanism had not yet manifested. The statute of limitations does not require plaintiffs to file complaints before the causal chain, and thus the damages element exists.

The Complaint alleges that the stock price was artificially suppressed for years due to persistent manipulative trading by John Doe Minority Shareholders market participants, and that MSSB's independent manipulative acts facilitated and reinforced this suppression. The full trading history during the relevant period was necessary to demonstrate the existence, duration, and effect of the artificial price level. Without this historical context, Plaintiff could not plausibly allege that MSSB's conduct caused an economic loss, as required by *Lentell* and *ATSI*.

Only after the February 2024 capital raise, did the causal chain become sufficiently concrete to satisfy Rule 11 and the PSLRA. Had Plaintiff filed earlier, MSSB would have argued as it previously did in <u>*McGauley v E\*TRADE Securities LLC*</u>, that Plaintiff "cannot prove, any damages whatsoever" hence the Plaintiff could not have alleged a non-speculative loss earlier. Before the February 2024 capital raise, Plaintiff could not show that the suppressed price caused any realized economic harm, nor could Plaintiff allege how MSSB's conduct translated into a quantifiable loss. It was only when the Company finally succeeded in raising capital in February 2024 and the market that Plaintiff could identify and allege a concrete economic loss attributable

to MSSB's manipulative conduct. These allegations demonstrate that Plaintiff did not and could not have discovered the damages element of the claim until 2024. Under *Merck*, the statute of limitations does not begin until the plaintiff discovers the facts constituting the violation, including loss causation. The statute of limitations does not require plaintiffs to file incomplete or implausible complaints before the causal chain exists.

As indicated *supra:*

> "[a]fter MSSB, via its predecessor E*TRADE detected Eltek stock manipulation, Defendant "engaged in a new, primary fraudulent 'Cover-Up Scheme' to hide its own massive, pre-existing 'Know Your Customer' ('KYC') compliance failures." (AC ¶ 7). Defendant implemented its "secret, nine-month, one-sided P-Trade Policy that affirmatively blocked all electronic purchases while simultaneously facilitating short sales, thereby creating a deceptive, asymmetrical market to conceal its own liability." (AC ¶ 7). Finally on July 22, 2021, counsel for Defendant admitted that the "Fraud Operations Unit" that "made the decision to restrict the trading of ELTK." (AC ¶ 40).

Just like its Co-Defendant, IBKR, by complaining about the gargantuan effort and diligence put in by XDOOD affiliated personnel, MSSB is attempting to turn the case law on its head. Since Defendant cannot complain that Plaintiff failed to conduct its investigation with due diligence, see eg. City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc., 637 F.3d 169 (2d Cir. 2011), MSSB like IBKR is arguing that Plaintiff was overly diligent and that MSSB's "guilty mind" should have been obvious from the beginning of the investigation.

The fact that Plaintiff's investigation did not immediately yield facts concerning Defendant's scienter and role in the underlying scheme, which was concealed from the public, does not diminish Plaintiff's reasonable efforts nor does it support Defendant's contention that as a matter of law, a reasonably diligent plaintiff conducting a comparable investigation would have discovered the necessary elements of Plaintiff's 10(b) claims any earlier.

21

Here, the AC alleges that Plaintiff pursued a lengthy investigation involving, an application in the New York supreme court and consultations with individuals in Israel. Based upon the allegations in the AC, there is no reason to conclude that Plaintiff's numerous investigative pursuits were anything but diligent as well as necessary. Once the final investigation was complete, Plaintiff filed the AC well within the two-year statute of limitations.

In sum, Plaintiff plainly brought the within suit within two years of discovering, through exceptional diligence, sufficient facts to plead the essential elements of federal securities fraud. As such, MSSB's Motion should be denied.

## POINT III

### GRANTING XDOOD LEAVE TO INTERPOSE ITS SECOND AMENDED COMPLAINT TO BEEF UP ITS ALLEGATIONS SUPPORTING THE BASIS TO BRING ITS DERIVATIVE CLAIM WOULD NOT BE FUTILE

Failure of XDOOD to adequately allege in the AC that demand was made on Eltek to commence this action, Eltek refusal to do so, and in the alternative it would have been futile to make the demand upon Eltek, are pleading defects that are readily curable by interposing the proposed Second Amended Complaint.  As is discussed below, the proposed Second Amended Complaint satisfies the New York and Israel substantive laws governing derivative claims, and amending the complaint would not be futile. The Defendants' argument that a court in Israel must approve the derivative action is not persuasive as courts in New York have held that these foreign laws are procedural, and are not binding. In any event, should This Court determine that obtaining permission from the court is a 'substantive ' Israel law, leave to amend the complaint is not futile because that the Israel statute, grants This Court the authority to condone the derivative action. The proposed amended complaint meets the pleading requirements of Chapter 3 of the Israel Company Law, to the extent that law governs, and leave to interpose the amended complaint is not futile, and should be granted. *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 807 F.3d 502,

22

505 (2d Cir. 2015)(The adequacy of a complaint alleging wrongful refusal of a stockholder demand is determined under the law of the state of incorporation.); See also, Ezrasons, Inc. v. Rudd, 217 A.D.3d 406, 191 N.Y.S.3d 349 (1st Dept. 2023). The amendment is not caused by undue delay, bad faith, futility, and will not prejudice the Defendants in this action. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**A.**
**THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES XDOOD'S DERIVATIVE ACTION UNDER THE "SUBSTANTIVE" NEW YORK LAW FEDERAL RULE 23.1 & ISRAEL LAW**

Under New York common-law principles, procedural rules are governed by the law of the forum, in this case New York. Tanges v. Heidelberg N. Am., 93 N.Y.2d 48, 53, 687 N.Y.S.2d 604, 710 N.E.2d 250 (N.Y. 1999). Where there is disagreement as to the nature of a law "the law of the forum normally determines for itself whether a given question is one of substance or procedure." Tanges v. Heidelberg North America, Inc., 93 N.Y.2d 48, 54, 687 N.Y.S.2d 604, 606 710 N.E.2d 250, 252 (1999). New York Courts consistently rule that foreign laws that require Plaintiff to obtain permission from a foreign court (Israel in this instance) to commence a derivative action in New York are a "procedural matter" which does not govern New York Plaintiffs.

The Second Department in Mason-Mahon v. Flint, 166 A.D.3d 754, 756–758 (2d Dep't 2018), held that "that the judicial-permission requirement set forth in the UK Companies Act is a procedural rule applicable only in England and Wales, or Northern Ireland" (citing Davis v. Scottish Re Grp. Ltd., 30 N.Y.3d 247, 66 N.Y.S.3d 447 (2017)) rejecting the foreign defendants argument that Mason-Mahon lacked standing to bring the suit because "he failed to seek permission from the English High Court pursuant to the United Kingdom Companies Act 2006 … prior to commencing this shareholder derivative action.

MSSB makes the same arguments that the New York courts dispensed with in Flint and in Davis. Namely, that § 194(b), (c), § 195, § 196, and § 198(a) of the Israel's Companies Act requires that XDOOD must obtain prior court approval from a court in Israel before maintaining this suit. The argument fails because Sections 197 & 198 of Chapter 3 of the Israel Companies Law which requires "approval" of "the Court qualified to hear this (derivative) action" is also a procedural law which the New York Court's will dispense with.

The Defendants' reliance upon Freedman v. magicJack Vocaltec Ltd., No. 9:17-CV-80940, 2018 WL 6110996 (S.D. Fla. Nov. 21, 2018), aff'd, 963 F.3d 1125 (11th Cir. 2020) is silent on the matter. The magicJack Plaintiff did not plead a corporate derivative claim and the court "did not address Plaintiff's ability to bring a derivative action on behalf of the Israeli company." Thereby, dispensing with the Israel Company-Defendant's argument that dismissal was required because the Florida Plaintiff did not comply with Sections 197 & 198 Chapter 3 of the Israel Company Law.

## 1. THE SUBSTANTIVE LAWS OF NEW YORK & ISRAEL: DEMAND & BOARD RESPONSE

The proposed amended complaint states with particularity the effort by XDOOD to obtain the desired action from Eltek's directors, Eltek's refusal to file this action in its own name, meeting the substantive derivative action law requirements under New York's and Sections 194 – 196 of Chapter 3 of the Israel Company Law (located at Sverd Dec.) These sections read:

Prior conditions for bringing action

194. (a) Any shareholder and any Director of a company (in the Chapter: plaintiff) may bring a derivative action if the provisions of this Article apply.
(b) If a person wishes to bring a derivative action, then he shall write to the company and demand that it exercise its rights fully by bringing action (in this Chapter: demand).
(c) Demands shall be addressed to the Chairman of the company's Board of Directors, and they shall specify the facts that create the grounds for the action and the reasons for bringing it.

24

Company's reaction
195. If a company received a demand, then it may act in one of the following ways:
(1) perform the act or adopt the decision by which the grounds for the demand are eliminated;
(2) reject the plaintiff's demand for reasons that shall be specified in the decision;
(3) decide to bring action.

Company's reply to plaintiff
196. The company shall inform the plaintiff within 45 days after the demand was received of the way it acted, as said in section 195, giving particulars of the action taken and of the factor that decided to do so, including the names of people who participated in adopting the decision; if a participant or an officer in the company has a personal interest in the decision, then that shall be stated in the decision and in the notification to the plaintiff.

The proposed Second Amended Complaint pleads with particularity at ¶¶'s 28-37, that as early as about the year 2000, Michael McGauley ("McGauley") of XDOOD LLC ("XDOOD"), a shareholder of Eltek, notified Eltek that he and his team were performing significant research into facts which supported their assertion that Eltek shares were being manipulated on the Nasdaq exchange in violation of U.S. law. The Board of Eltek discussed the proposed lawsuit and came to the conclusion that Eltek's time focusing on its core Company mission superseded the Company's interest in bringing the lawsuit contemplated by XDOOD in its own name. The Board of Eltek informed McGauley and XDOOD that Eltek had decided that it would not commence the lawsuit in its own name, but that his team could sue derivatively, on the Companies behalf. XDOOD continued its work. On September 10, 2025, McGauley as "Owner of XDOOD" corresponded to the Chairman of the Board Yitzhak Nissan, as well as, Board Members Eli Yaffe, and Ron Freund, notifying that his team was in the final stages of preparing the stock manipulation lawsuit to be filed in the Southern District of New York to hold the manipulators to account. The September 10, 2025, letter also sought confirmation that the Company had chosen not to pursue the matter and claims in its own name. The Board through its counsel informed XDOOD's attorneys of its decision in an email dated September 29, 2025, which stated:

 "We and Eltek have reviewed the proposed memorandum of agreement that you sent us and do

not believe that an agreement like this is necessary or appropriate under these circumstances. Your clients (XDOOD) are free to pursue the derivative claims if they wish to do so and the court would determinate the appropriateness and merits of those claims as well as any claims for damages or attorneys' fees."

The Eltek Board refused to file this lawsuit in New York to protect its stock from being manipulated on the public exchange. This derivative action is filed on behalf of the Eltek to remedy and prevent the wrong to the corporation that is being caused by the named defendants.

## 2. THE PROCEDURAL LAWS OF ISRAEL: COURT APPROVAL

Sections 197 and 198 of the Israel Company Law which call for "court permission" to commence a derivative action are 'procedural.' Sections 197 and 198 read as follows:

Right to bring derivative action
197. A plaintiff may, with the Court's permission, bring a derivative action under the provisions of section 198, if one of the following applies:
(1) In his opinion, the action taken or the decision adopted did not eliminate the grounds for the action;
(2) the company rejected the plaintiff's demand, as said in section 195(2);
(3) the company informed the plaintiff that it decided to bring action, as said in section 195(3), but the action was not brought within 75 days after the notice;
(4) the company did not reply to the demand in accordance with the provisions of section 196.

Approval of derivative action
198. (a) A derivative requires approval by the Court, and it shall approve it if it is satisfied that the action and its conduct are, a priori, to the benefit of the company, and that the plaintiff is not acting otherwise than in good faith.
(b) The Court may approve a derivative action before the times set in sections 196 or 197 have elapsed, if it concluded that bringing action at that time will cause it to be prescribed, and it may make its approval conditional on the fulfillment of conditions set in this Article for bringing a derivative action.
(c) In this Article, "Court" – the Court qualified to hear the action.

These procedural provisions are dispensed with by the New York Courts and are not a basis to dismiss this action.

## a. EVEN IF THESE PROVISIONS ARE DEEMED SUBSTANTIVE, LEAVE TO AMEND IS NOT FUTILE

The definition of "Court" under Chapter 3 is defined as the "District Court" in Isreal. See Exh 6 of the Sverd Dec. Subsection "c" of Section 198 changes the definition of Court to be "the

26

Court qualified to hear the action." Under the New York law and the Federal Rules of Civil Procedure,  the U.S. Southern District Court, in and for the State of New York is "the court qualified to hear the action" as is contemplated under the Israel law.

The Proposed Second Amended Complaint adds a Fifth Cause of Action which, to the extent required by Israel law (as determined by This Court), seeks Declaratory Judgment that this action and its conduct are, a priori, to the benefit of Eltek and that the plaintiff is not acting otherwise than in good faith.

Leave to interpose the Second Amended Complaint should be granted to cure defects in the amended complaint to adequately plead XDOOD's standing to bring this derivative action.

## POINT IV.

## THE COMMON LAW FRAUD CLAIMS ARE VALID

Rule 9(b) is satisfied. The AC pled the "who, what, when, where, and how" with precision and the motion to dismiss the common law fraud claim should be denied.  The four elements of common law fraud in New York are: (1) a factual misrepresentation or an omission that is factual; (2) defendant's knowledge that the statement or omission was false; (3) defendant's intent to defraud; (4) plaintiff's reasonable reliance; and (5) causation of loss to the plaintiff. The elements of common law fraud are much the same as the elements of a claim of securities fraud in violation of Section 10(b) of the Securities Exchange Act. In particular, the element of reasonable reliance is much the same in New York common law as in federal securities law.  Ashland Inc. v. Morgan Stanley & Co., Inc. 700 F.Supp2d 453, 471-472 (S.D.N.Y. 2010).(internal citations omitted).

The AC alleges that MSSB did not notify Eltek that its stock was being placed under the P-Trade Policy, at AC ¶ 41, which reads:  "MSSB implemented its 'P-Trade Policy' unannounced and undisclosed to the Company, its customers, and the market."    The AC identifies who acted,

27

MSSB's "Fraud Operations Unit" (AC ¶ 40); what they did, the nine-month P-Trade Policy (AC ¶4, ¶¶ 47–48); when it occurred, "following October 16, 2020" and lasting approximately nine months (AC ¶ 4); where it was implemented, on MSSB's platform, including specific customer notifications (AC ¶¶ 41–43); and how the scheme operated, by "blocking 100% of electronic buy orders" while "permitting Eltek stock to be borrowed for short-side activity" (AC ¶¶ 47–48).

The proposed Second Amended Complaint, adds additional factual allegations at ¶¶'s 197-206, to include the allegations that: Eltek MSSB did not notify Eltek that it had put the P-Trade Policy in effect on its publicly traded stock; this conduct constituted material misrepresentations and omissions of fact that MSSB did not communicate to Eltek; Eltek justifiably relied on MSSB's material omission of fact to allow its stock to continue to be traded on the open market by MSSB during the nine-month period that the P-Trade Policy was in effect. It is submitted that these minor amendments to the pleadings successfully allege the common law fraud claim.

## CONCLUSION

For the foregoing reasons, the motion of Co-Defendant Morgan Stanley Smith Barney LLC's motion to dismiss the amended complaint should be denied in all respects entirety. The Plaintiff should be granted leave to interpose its Second Amended Complaint, along with any other further relief that This Court deems just and proper.

Dated: New York, New York
      April 10, 2026

                                          */s/ Peter Sverd*     .
                                      PETER SVERD, ESQ. (PS0406)

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2026, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Peter Sverd
Peter Sverd, Esq.

*Co-Counsel for Plaintiff*
*XDOOD LLC, derivatively on behalf of*
*ELTEK, LTD.*