**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – – – – – – –   X

XDOOD LLC, derivatively on behalf of
ELTEK, LTD                                                               :

                          Plaintiff,                     :            Case No. 25-cv-08536 (LAK)

                                           :

                    -against-                          :

INTERACTIVE BROKERS GROUP, INC.,                       :
MORGAN STANLEY SMITH BARNEY LLC, and
JOHN DOES 1–10

                     Defendants.               :

– – – – – – – – – – – – – – – – – – – – – – – – –   X

## MEMORANDUM OF LAW IN OPPOSITION
## TO IBKR'S MOTION TO DISMISS

Dated:      New York, New York
             10 April 2026

*/s/ T. Edward Williams, Esq.*
WILLIAMS LLP
420 Lexington Avenue Suite 875
New York, New York 10170
212.417.0430
212.417.0433 (Fax)
edward@williamsllp.com

i

21701.10

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................i

TABLE OF AUTHORITIES .........................................................................................................i

I.      PRELIMINARY STATEMENT ...................................................................................... 1

II.     FACTUAL BACKGROUND ........................................................................................... 3

III.    PROCEDURAL HISTORY ............................................................................................. 4

IV.     LEGAL STANDARD....................................................................................................... 5

    A.  Rule 12(b)(6) Standard ............................................................................................... 5

    B.  Rule 9(b) Standard ..................................................................................................... 6

    C.  PSLRA PLEADING STANDARD IN MANIPULATION CASES. ........................................ 7

V.      ARGUMENTS AND AUTHORITIES ............................................................................ 8

    A.  XDOOD States A Claim Under Rule 10b and Under Rule 10b–5. ............................ 8

        1.   The Amended Complaint Properly Alleges Manipulative Acts by IBKR. ...................................... 9

        2.   The Amended Complaint Properly Alleges Loss Causation. ....................................................... 14

        3.   Reliance is Presumed in a Manipulation Case Like the One XDOOD Pleaded. ........................... 16

        4.   The Amended Complaint Properly Alleges Scienter ................................................................... 17

            i. The Elements of Scienter Are Relaxed When a Plaintiff Pleads Manipulation Like XDOOD Has. 17

            ii.  A Plaintiff May Impute Scienter Among Corporate Entities.................................................... 19

            iii. The Amended Properly Alleges Scienter Circumstantially, And, If Needed, the Amended Complaint Imputes Scienter to IBKR................................................................................................ 19

    B.  XDOOD States a Common Law Fraud Claim Under New York Law............................................ 20

        1. XDOOD's Common Law Fraud Claims Survives Because XDOOD States a § 10b Claim. ... 21

        As set forth in Section V, above, XDOOD states a claim under § 10 ............................................ 21

        2. The Amended Complaint States a Common Law Fraud Claim Against IBKR. ....................... 21

    C.  IBKR's Procedural Arguments Do Not Require Dismissal of XDOOD's Complaint. ...................... 22

        2. XDOOD's Claim Is Timely.................................................................................................... 22

21701.10

VI.    BECAUSE IBKR FAILED TO GIVE NOTICE THAT IT INTENDED TO RELY ON FOREIGN LAW AND BECAUSE NEW YORK'S CHOICE OF LAW DOCTRINE OUSTS ISRAELI LAW, XDOOD DID NOT NEED TO COMPLY WITH ISRAELI COMPANY LAW IN BRINGING IT DERIVATIVE SUIT. ................... 23

    A.    Israel's Companies Law is Procedural, Not Substantive, And So, New York Need Not Apply Israel Companies Law. .............................................................................................. 25

    B.    Alternatively, And as Demonstrated by Proposed Second Amended Complaint, XDOOD Can Meet the Demand Futility Standard Under New York Law and Israeli Law. ................................... 26

V.    REQUEST FOR LEAVE TO AMEND ...................................................................... 26

VI.    CONCLUSION .................................................................................................... 26

21701.10

# TABLE OF AUTHORITIES

Page(s)

Cases

Anderson News, LLC v. Am. Media, Inc.,
    680 F.3d 162, (2d Cir. 2012) ........................................................................................... 11
Arduni/Messina P'ship v. Nat'l Med. Fin. Serv. Corp.,
    74 F. Supp. 2d 352 (S.D.N.Y. 1999) ................................................................................ 16
Arkansas Pub. Employees Retirement Sys. v. Bristol-Myers Squibb Co.,
    28 F.4th 343 (2d Cir. 2022) .............................................................................................. 5
Ashcroft v. Iqbal,
    556 U.S. 662, 129 S. Ct. 1937 (2009) .............................................................................. 5
ATSI Communications Inc. v. Shaar Fund Ltd.,
    493 F.3d 87 (2007) ................................................................................................. passim
Bats Global Markets, Inc.,
    878 F.3d ...........................................................................................................1, 2, 10, 11
Bell Atlantic v. Twombly,
    550 U.S. 544, 27 S. Ct. 1955 (2007) ................................................................................ 5
Bryan v. W. 81 St. Owners Corp.,
    186 A.D.2d 514, 589 N.Y.S.2d 323 (1st Dept 1992) ....................................................... 23
California Pub. Employees' Ret. System v. ANZ Securities, Inc.,
    582 U.S. 497 (2017)......................................................................................................... 23
Canaccord Genuity LLC,
    2025 WL 368717 (S.D.N.Y. 2025) ................................................................................... 14
Century Pacific, Inc. v. Hilton Hotels Corp.,
    528 F. Supp. 2d 206 (S.D.N.Y. 2007) .............................................................................. 21
Chadbourne & Parke LLP v. Troice,
    571 U.S. 377 (2014)......................................................................................................... 20
City of Mount Vernon v. Davis,
    2019 WL 1367685 (S.D.N.Y. Mar. 26, 2019) ................................................................... 12
CompuDyne Corp. v. Shane,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006) .............................................................................. 19
Connaughton v. Chipotle Mexican Grill, Inc.,
    75 N.E.3d 1159 (NY 2017)............................................................................................... 20
CTS Corp. v. Waldburger,
    573 U.S. 1 (2014) ............................................................................................................. 23

i

Davis v. Scottish Re Grp. Ltd.,
    30 N.Y.3d 247, 66 N.Y.S.3d 447 (2017) ................................................................24, 25, 26
Dekalb County Pension Fund v. Transocean Ltd.,
    817 F.3d 393 (2d Cir. 2016) ..................................................................................... 22, 23
DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.,
    2025 WL 1951864 (S.D.N.Y. Jul 16, 2025) ...................................................................... 20
Dura Pharms. Inc. v. Broudo,
    544 U.S. 336, 125 S. Ct. 1627 (2005) ............................................................................ 15
Elfenbein v. Gulf & W. Indus. Inc.,
    454 F. Supp. 6 (S.D.N.Y. 1978) ..................................................................................... 26
Ellul v. Congregation of Christian Bros.,
    774 F.3d 791 (2d Cir. 2014) .......................................................................................... 22
Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,
    343 F.3d 189 (2d Cir. 2003) .......................................................................................... 20
Espinoza ex rel. JPMorgan Chase & Co. v. Dimon,
    797 F.3d 229 (2d Cir. 2015) .......................................................................................... 23
Fezzani v. Bear, Stearns & Co. Inc.,
    777 F.3d 566 (2d Cir. 2015) ..................................................................................... 16, 17
Fezzani v. Bear, Stearns & Co.,
    716 F.3d 18 (2d Cir. 2013) ....................................................................................... 16, 17
Flint,
    166 A.D. .................................................................................................................. 25, 26
Gamma Traders I LLC v. Merrill Lynch Commodities, Inc.,
    41 F.4th 71 (2d Cir. 2022) ....................................................................................... 14, 16
Gurary v. Winehouse,
    190 F.3d 37 (2d Cir. 1999) ......................................................................................... 9, 11
Harrington Global Opportunity Fund, Limited v. BofA Sec. Inc.,
    2023 WL 6316252 ......................................................................................................... 7
Horowitz v. 148 S. Emerson Assocs. LLC,
    888 F.3d 13 (2d Cir. 2018) ............................................................................................ 23
In re Ann Taylor Stores Securities Litig.,
    807 F. Supp. 990 (S.D.N.Y. 1992) ................................................................................. 20
In re Banco Bradesco S.A. Securities Litigation,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................................................................ 19
In re Barclay Liquidity Cross and High Frequency Litigation,
    126 F. Supp. 3d 342 (S.D.N.Y. 2015) .............................................................................. 1
In re Barclay Liquidity Cross and High Frequency Trading,
    390 F. Supp. 3d 432 (S.D.N.Y. 2019) ....................................................................1, 7, 11
In re Facebook, Inc., Initial Pub. Offering Derivative Litig.,
    797 F.3d 148 (2d Cir. 2015) .......................................................................................... 22
In re Farfetch Limited Sec. Litig.,
    802 F. Supp. 3d 652 (2025) ............................................................................................ 5

In re Initial Public Offering Securities Litig.,
   383 F. Supp. 2d 566 (S.D.N.Y. 2015) ................................................................ 14, 15
In re Initial Public Offering Securities Litigation,
   241 F. Supp.2d .......................................................................................... passim
In re Kingate Mgmt. Ltd. Litig.,
   784 F.3d 128 (2d Cir. 2015) ...................................................................................... 20
In re Natural Gas Commodity Litig.,
   358 F. Supp. 2d 336 (S.D.N.Y. 2005) ...................................................................... 6
In re Parmalat Sec. Litig.,
   376 F. Supp. 2d ....................................................................................... 2, 3, 10
In re Tether & Bitfinex Crypto Asset Litigation,
   2024 WL 3520363 ....................................................................................................... 7
Kramer v. Time Warner Inc.,
   937 F.2d 767 (2d Cir. 1991) ....................................................................................... 5
Kuczynski v. Ragen Corp.,
   1989 WL 34055 (S.D.N.Y. 1989) ............................................................................. 20
Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec. LLC,
   797 F.3d 160 (2d Cir. 2015) ..................................................................................... 14
*MAG Portfolio Consult GMBH v. Merlin Biomed Group LLC*,
   268 F.3d 58 (2d Cir. 2001) ....................................................................................... 12
Mallis v. Banker's Trust Co.,
   615 F.2d 68 (2d Cir. 1980) ....................................................................................... 20
Marx v. Akers,
   88 N.Y.2d 189, 644 N.Y.S.2d 121 (1996) ............................................................ 23, 26
Mason-Mahon v. Flint,
   166 A.D.3d 754 (2d Dep't 2018) .......................................................................... 24, 25
Michelle v. Opthotech Corp.,
   2019 WL 4464802 (S.D.N.Y. Sept. 18, 2019) ...................................................... 14
Pension Committee of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006) ..................................................................... 24
Polar Int'l Brokerage Corp. v. Reeve,
   108 F. Supp. 2d 225 (S.D.N.Y. 2000) ....................................................................... 5
Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.,
   68 F.3d 1478 (2d Cir. 1995) ..................................................................................... 21
Rombach v. Chang,
   355 F.3d 164 (2d Cir. 2004) ..................................................................................... 21
Ruotolo v. City of New York,
   514 F.3d 184 (2d Cir. 2008) ....................................................................................... 5
Santa Fe Indus. Inc. v. Green,
   430 U.S. 462, 97 S. Ct. 1292 (1977) ......................................................................... 9
Securities and Exchange Commission v. Lek Sec. Corp.,
   276 F. Supp. 3d 49 (S.D.N.Y. 2017) ......................................................................... 6

Set Capital LLC,
    996 F.3d ............................................................................................................................. 18
Sharette v. Credit Suisse Int'l,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) .......................................................................6, 15, 16, 18
Spartans Indus.,
    58 F.R.D. 570 (S.D.N.Y. 1972) .......................................................................................... 3, 22
Speakes v. Taro Pharm Indus.,
    2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018) ....................................................................... 14
Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.,
    262 F.3d 134 (2d Cir. 2001) .................................................................................................. 21
Tyco International Ltd. v. Kozlowski,
    756 F. Supp.2d 553 (S.D.N.Y. 2010) (applying New York law instead of Bermuda law) ........ 24
U.S. v. Vilar,
    729 F.3d 62 (2d Cir. 2013) .................................................................................................... 25
United Mine Workers v. Gibbs,
    383 U.S. 715, 86 S. Ct. 1130 (1966) ..................................................................................... 20
Wm. Passalacqua Builders, Inc. v. Resnick Dev. South, Inc.,
    933 F.2d 131 (2d Cir. 1991) ............................................................................................... 3, 12
Zornberg v. NAPCO Sec. Tech. Inc.,
    778 F. Supp. 3d 516 (E.D.N.Y. 2025) ............................................................................. 10, 11

Statutes

15 U.S.C. § 77m ............................................................................................................................ 23
15 U.S.C. § 78bb(a) ....................................................................................................................... 20
15 U.S.C. § 78bb(f) ........................................................................................................................ 20
15 U.S.C. § 78u–4(b)(2) ........................................................................................................... 17, 18
15 U.S.C.A. § 78j(b) ......................................................................................................................... 8
New York Business Corporation Law ("BCL") § 626 ..................................................................... 23

Rules

Fed. R. Civ. P. 9(b) ....................................................................................................................... 6, 7
Fed. R. Civ. P. 15(a) ...................................................................................................................... 26
Fed. R. Civ. P. 23.1 ........................................................................................................... 2, 3, 22, 23
Fed. R. Civ. P. 23.1(a)–(b)(1)–(3)(A)–(B) ...................................................................................... 22
Rule 8 of the Federal Rules of Civil Procedure .............................................................................. 14

Regulations

17 CFR § 240.10b–5 ........................................................................................................................ 9

Other Authorities

Access to Justice or Justice Not Accessed: Is There a Case for Public Funding of Derivative Claims, 37 Brook. J. Int'l L. 1021 (2012) ................................................................................................. 25

## I.    PRELIMINARY STATEMENT

IBKR's procedural arguments for dismissal are as empty as its substantive arguments. None of IBKR's procedural arguments warrants dismissal of the Amended Complaint, so XDOOD addresses IBKR's substantive arguments first.

IBKR's Motion to Dismiss invites this Court to commit the same reversible error Judge Furman committed in In re Barclay Liquidity Cross and High Frequency Litigation, 126 F. Supp. 3d 342 (S.D.N.Y. 2015) ("Barclay I"). This Court should reject IBKR's invitation because the Second Circuit reversed Judge Furman. City of Providence, Rhode Island v. Bats Global Markets, Inc., 878 F.3d 36, 48–52 (2d Cir. 2017). In Barclay I, Judge Furman dismissed the plaintiffs' claims against certain Exchanges for providing traders alternative and faster trading venues that allowed traders to engage in manipulative trades. Barclay I,126 F. Supp. 3d at 347–348; see also, In re Barclay Liquidity Cross and High Frequency Trading, 390 F. Supp. 3d 432, 440–442 (S.D.N.Y. 2019) ("Barclay II"). Judge Furman concluded that the Exchanges could not be held liable because they had quasi-governmental immunity, because their conduct did not rise to the "level of unlawfully manipulative acts" under Section 10b or under Rule 10b–5, and because they did not commit primary violation of § 10b. Id. The Second Circuit reversed.

The Second Circuit found primary liability because the Exchanges created "products and services" that they sold to so-called high-frequency trading (or HFT) firms and that allowed the firms to illicitly rig the market in their favor and distort stock prices. Bats Global Markets, Inc., 878 F.3d at 49. On primary liability, the Second Circuit found that the plaintiffs had alleged sufficient facts that the Exchanges were primarily liable because the Exchanges sold the products and services to the HFT firms in exchange for large amounts of fees. Id. at 51–52.

1

IBKR makes the same arguments to this Court that the Second Circuit rejected in Bats Global Market, Inc., and in other cases. IBKR's substantive arguments may be summarized as follows: (i) the Amended Complaint does not allege unlawful manipulative acts because IBKR merely executes trades; (ii) XDOOD did not (and cannot) plead that IBKR is primarily liable under § 10b and Rule 10b–5; and (iii) that XDOOD has not supplied sufficient facts to prove the remaining elements of a manipulation claim in violation of § 10b and Rule 10b–5. MTD 14–23. IBKR's arguments alternate between asserting that XDOOD does not state a cognizable theory of recovery because short sales and other types of trades are legal and saying that XDOOD has not supplied sufficient facts to make its § 10b theory of recovery plausible. Id. IBKR is wrong.

As explained in Section V(A)(1)–(4) below, XDOOD's theory of liability under § 10b is straightforward and this Court and other courts have recognized similar claims premised on manipulation. See e.g., In re Parmalat Sec. Litig., 376 F. Supp. 2d at 492 (explaining that subsections (a) and (c) of Rule 10b–5 are broad and apply "to at least some deceptive acts as much as to certain technical forms of market manipulation," and noting that the broad purpose of Section 10b is to "prevent practices that impair the function of the stock markets enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the Securities traded.").

IBKR's procedural arguments fail, too. IBKR says that XDOOD sued the wrong entity (MTD 7–9), that XDOOD does not properly plead a derivative action under Fed. R. Civ. P. 23.1 because XDOOD's complaint is not verified, that XDOOD's claims are late, and that XDOOD failed to comply with Israel's Companies Law because XDOOD does not have an order from a competent court in Israel authorizing this suit. IBKR is wrong.

XDOOD sued IBKR because XDOOD alleges that IBKR designed and implemented the policies and practices that its subsidiaries used and implemented. The wrongdoing is at the level of IBKR, not at the level of subsidiaries made to carry out those policies and practices. In any case, as set out in IBKR's SEC Filings, XDOOD can meet nearly all of the ten-factor test set out in Wm. Passalacqua Builders, Inc. v. Resnick Dev. South, Inc., 933 F.2d 131 (2d Cir. 1991) and show that IBKR dominates its subsidiaries and should be liable for acts of its subsidiaries.  Likewise, failure to comply with Fed. R. Civ. P. 23.1 is not fatal to XDOOD's Amended Complaint, and the oversight may be cured by submitting the Proposed Second Amended Complaint, which XDOOD has done. Accord, Westfield v. Spartans Indus., 58 F.R.D. 570, 577–578 (S.D.N.Y. 1972) ("noncompliance with formal verification requirements of the federal rules applicable to stockholder actions will not be grounds for dismissal of the complaint where counsel for plaintiff has diligently investigated the possible charges prior to filing the complaint.").

## II.    FACTUAL BACKGROUND

The facts are taken from XDOOD's Amended Complaint, and this Court (and IBKR) must accept all well pleaded facts as true  at this stage. See ECF Doc. No. 6, Passim; Parmalat I, 376 F. Supp.2d at 490 (S.D.N.Y. 2005).

Plaintiff is a shareholder of Eltek, a company organized under the laws of Israel. ECF Doc. No. 6, ¶ 18–20, 32. Plaintiff sued IBKR (and others) for violating Rule 10b, Rule 10b–5, and for common law fraud because IBKR, acting with others, facilitated (and continues to facilitate) a scheme that artificially affected market activity as to Eltek's stock. ECF Doc. No. 6, at ¶¶ 1–2, 8–9, 16, 19, 22. Yitzhak Nissan owns more than 50% of Eltek's shares either personally or through an entity. Id. at ¶ 30. Michael McGauley, who owns and controls Plaintiff XDOOD, has owned between 3,500 and 24,000 shares of Eltek at times relevant to

this suit, and, as of the filing of the Amended Complaint, owned more than 8,900 shares of Eltek. Id. at ¶ 22, 32. The remainder of Eltek's shares, which are not owned by insiders, and which are not subject to Rule 144 restrictions, i.e., the float, trade only on the NASDAQ. Id. at ¶ 30–31, 33. At all relevant times, XDOOD's shares were float shares. Id. at ¶ 20.

IBKR began facilitating the manipulation of Eltek's stock at least as early as 16 October 2020. Id. at ¶ 1. XDOOD alleges that even though IBKR knew, as other brokerage houses knew, that Eltek's stocks were being shorted to drive down the price of Eltek's shares, IBKR did not want to halt trading in Eltek's stock, and, in fact, had to make Eltek stock available, because failing to do so would have negatively impacted IBKR's margin loans to traders. See e.g., ECF Doc. No. 6, ¶ 54–55. XDOOD alleges further that IBKR established policies and practices that encouraged short sales and other manipulation of Eltek shares in exchange for receiving "ATS execution fees/rebates, and securities-lending revenue." Id. at ¶¶ 49–53, 56–66. In short, XDOOD alleges that IBKR's policies and practices, as applied specifically to Eltek's shares, allowed Eltek's share price to be manipulated. Id.

## III.    PROCEDURAL HISTORY

XDOOD initially filed this suit on 15 October 2025, but on 28 October 2025, this Court, *sua sponte*, dismissed the Original Complaint because it was too lengthy at 107 pages and 346 paragraphs and because it devoted "substantial space to allegations of evidence," instead of pleading a "short and plain statement of the claim showing that the pleader is entitled to relief." See ECF Doc. No. 5. XDOOD then filed an Amended Complaint on 24 November 2025, alleging the same claims and facts as it had alleged in its Original Complaint. Compare ECF Doc. No. 1 with ECF Doc. No. 6. This court did not hold that Plaintiff could not

reassert claims that arose out of the same occurrence and transaction as asserted in Plaintiff's Original Complaint.  On 5 January 2026, XDOOD's former counsel moved to withdraw.

## IV.    LEGAL STANDARD

### A.    Rule 12(b)(6) Standard

Under Iqbal and Twombly, a complaint must contain sufficient factual material that, when accepted as true, states a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); Bell Atlantic v. Twombly, 550 U.S. 544, 570, 27 S. Ct. 1955 (2007); Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008). A claim for securities fraud is plausible when the sufficient factual allegations disclose that it is more likely possible than not that a securities violation occurred. See ATSI Communications Inc. v. Shaar Fund Ltd., 493 F.3d 87, 101–102 (2007). The factual allegations cannot be speculative, and mere labels and conclusions will not suffice to state a plausible claim. Id.

On a motion to dismiss, courts in the Second Circuit may consider filings made with the Securities and Exchange Commission ("SEC"). Kramer v. Time Warner Inc., 937 F.2d 767 (2d Cir. 1991) (explaining why courts consider SEC filings); Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 236 (S.D.N.Y. 2000) (considering filings such as Forms 10-k, 10-Q, 8-K, proxy statements and other required public disclosures); Arkansas Pub. Employees Retirement Sys. v. Bristol-Myers Squibb Co., 28 F.4th 343, 352–353 (2d Cir. 2022) ("it is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents."); In re Farfetch Limited Sec. Litig., 802 F. Supp. 3d 652, 673–674 (2025) (holding that the court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference,

5

legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

### B.    Rule 9(b) Standard

Rule 9(b) requires a plaintiff to allege fraud with particularity the circumstances that constitute fraud. Fed. R. Civ. P. 9(b) (quotation marks omitted). Thus, to meet the heightened standard of Rule 9(b), the plaintiff must plead the who, the what, the when, and the how of the fraud or mistake. ATSI Communications Inc., 493 F.3d at 99, 102. However, where, as here, the plaintiff pleads manipulation, the Second Circuit has made clear that the Rule 9(b) standard is relaxed because a manipulation claim "can involve facts solely within the defendant's knowledge." Id.; Sharette v. Credit Suisse Int'l, 127 F. Supp. 3d 60, 78–79 (S.D.N.Y. 2015); Securities and Exchange Commission v. Lek Sec. Corp., 276 F. Supp. 3d 49, 57–58 (S.D.N.Y. 2017) ("Because market manipulation claims can involve facts that are 'solely within the defendant's knowledge," the Second Circuit has recognized that the plaintiff "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.'").

This relaxed standard reflects the reality that "the private communications between the [defendants] and their clients as they allegedly collaborated [to] carry out an unlawful scheme to manipulate" markets "fall squarely in the purview of information that is likely to be in the exclusive control of the [defendants] and their clients, and that may be resolved only through discovery." Sharette, 127 F. Supp. 3d at 83. This relaxed standard also makes sense because manipulation claims do not necessarily involve misrepresentations, and so, to require "slavish satisfaction of the judicially-fashioned elements" of misrepresentation claims "would make plaintiff's tasks impossible in many cases." In re Natural Gas Commodity Litig., 358 F. Supp. 2d 336, 343–344 (S.D.N.Y. 2005).

Application of the relaxed standard often militates in favor of denying a motion to dismiss a manipulation claim. See e.g., Harrington Global Opportunity Fund, Limited v. BofA Sec. Inc., 2023 WL 6316252, at *6 (denying the defendant's motion to dismiss and stating that "[t]he SAC alleges that Defendants "injected false and misleading information into the marketplace" by placing baiting orders of at least 138,678,121 Concordia shares that "had no legitimate financial purpose and were never intended to be executed" and were intended to "drive Concordia's share price downward in order to permit Defendants and/or their customers to purchase Concordia shares at lower prices."); see also, In re Tether & Bitfinex Crypto Asset Litigation, 2024 WL 3520363, at * (S.D.N.Y. Jul. 24, 2024) (denying the defendants motion to dismiss where the plaintiff alleged defendants "debased USDT by issuing tokens backed not by the promised one-to-one U.S. dollar reserve, but instead by a less-valuable receivable," concealed the debasement while providing the debased tokens to a trader at scale, and demonstrated correlation between transfers of debased USDT and Bitcoin price inflation. The court held that these allegations adequately pleaded "the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."); In re Barclays Liquidity Cross and High Frequency Trading Litig., 390 F. Supp. 3d 432, 450 (S.D.N.Y. 2019) (denying motion to dismiss where the plaintiff alleged that the exchanges "developed certain specialized services that they knew would be useful to HFT firms," "marketed those services to HFT firms at prices other investors could not afford," and "selectively disclosed the existence and nature of those services in order to conceal their true nature from Plaintiffs.").

## C.    PSLRA PLEADING STANDARD IN MANIPULATION CASES.

As IBKR's Motion to Dismiss shows, the interaction among the PSLRA standard, the Rule 12(b)(6) standard, and Rule 9(b) has been subject to some confusion. In re Initial Public Offering Securities Litigation,

241 F. Supp.2d at 384. As further detailed below, where the allegation involves a manipulation claim, PSLRA

does not require a plaintiff to plead the defendant's actual knowledge of the market manipulation scheme

with particularity because a plaintiff cannot realistically be expected to plead a defendant's actual knowledge.

Id. (quotation marks omitted).

## V.    ARGUMENTS AND AUTHORITIES

### A.    XDOOD States A Claim Under Rule 10b and Under Rule 10b–5.

Section 10b of the Securities and Exchange Act of 1934 ("34 Act") provides, in relevant part, as

follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> **(b)** To use or employ, in connection with the **purchase or sale** of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement **any manipulative or deceptive device** or **contrivance** in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Securities and Exchange Act of 1934, 15 U.S.C.A. § 78j(b) (emphasis added).

The SEC's Rule implementing Section 10b states that:

> It shall be unlawful for any person, directly **or indirectly**, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
>
> (a) to **employ any device**, **scheme**, or **artifice** to defraud,
>
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, **practice**, or **course of business** which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b–5 (emphasis added).

A plaintiff states a claim for manipulation where it alleges: (1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of a market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; and (6) use of the mails or a national securities exchange facility.[1] ATSI Communications Inc., 493 F.3d at 101–102.

### 1.    The Amended Complaint Properly Alleges Manipulative Acts by IBKR.

The gravamen of a claim for stock manipulation is that a defendant—acting alone or with others—deceived investors into believing that the prices at which investors purchased and sold stocks were determined by the natural interplay of supply and demand, not by the scheme created or facilitated by the defendant. At the motion to dismiss stage, the question is whether the plaintiff has alleged sufficient facts showing that the defendant's activities sent "false pricing signal into the market." Gurary v. Winehouse, 190 F.3d 37, 45 (2d Cir. 1999).

As the Supreme Court put it, manipulation "generally refers to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Santa Fe Indus. Inc. v. Green, 430 U.S. 462, 476, 97 S. Ct. 1292 (1977). The fundamental purpose of enforcing the securities laws is to ensure that courts prevent practices that "impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily

---

[1] The fifth and sixth elements are not subject to dispute, and so, XDOOD does not address those elements. In fact, IBKR does not argue the fifth and sixth elements, and so, XDOOD assumes any arguments on those elements have been waived.

accurate) estimates of the underlying economic value of the securities traded." In re Initial Public Offering Securities Litigation, 241 F. Supp.2d at 384–385 (internal quotation marks omitted).

The Amended Complaint alleges that IBKR made purposeful business decisions that directly facilitated and enabled the manipulative trading at issue. The allegations describe IBKR's own conduct, not the conduct of John Doe Minority Shareholders defendants. IBKR did not merely clear and execute trades, but IBKR designed, implemented, and maintained a set of policies and systems that: (i) created anonymity; (ii) lowered compliance thresholds; (iii) expanded access to high-risk trading windows; (iv) enabled shorting in a fragile market; and (v) attracted foreign and institutional accounts known to pose heightened Anti Money Laundering (AML) and manipulation risks to its platform in exchange for generating additional fees. See ECF Doc. No. 6, ¶¶ 49–122.

This Court (and the District Courts for the Southern and Eastern Districts) have all recognized similar acts as manipulative when committed by broker dealers. See In re Parmalat Securities Litigation, 376 F. Supp. 2d 472 (S.D.N.Y. 2006) (Parmalat I) (Kaplan, J.) (holding that securitizing worthless invoices comes within the prohibition of § 10b and Rule 10b–5); See e.g., Zornberg v. NAPCO Sec. Tech. Inc., 778 F. Supp. 3d 516 (E.D.N.Y. 2025) (denying the defendants' motion to dismiss and finding that filing and then restating the financials of a company comes within the prohibition of Rule 10b, for which a claim can be maintained); In re Initial Public Offering Securities Litigation, 241 F. Supp.2d at 384–389 (the plaintiff properly pleaded manipulation when tie-up agreement designed ostensibly to stabilize stock prices instead had the effect of rising the price of stock that benefited certain traders); Bats Global Markets, Inc., 878 F.3d 36, 48–52 (platform sold to so called high frequency traders distorted the price of stocks in that the high frequency traders were allowed to purchase stock as price unknown to the market).

10

The Amended Complaint also sufficiently pleads primary liability. XDOOD alleges that IBKR, just like the Exchanges in Bats Global Markets, Inc., sold product and services in exchange for fees and other benefits. Zornberg, 778 F. Supp. 3d 516 at 531; Barclay II, 390 F. Supp. 3d at 440–442.

IBKR says it did not engage in manipulative acts because all of its acts and omissions were legal. Thus, like the unsuccessful defendants in In re Initial Public Offering Securities Litigation, IBKR says where it engaged in legal actions, it cannot be said to have engaged in manipulative acts. MTD 15–18. IBKR also says that it cannot be primarily liable because it is merely the parent company of the entity that oversaw trades and performed acts related to its platform. IBKR is wrong—twice over.

As the Second Circuit and the Southern District have held, it is not whether the act is legal or illegal— that sort of blinkered view of § 10b need not distract courts. Rather, it is the "***nature, purpose, and <u>effect</u>, of the conduct alleged***" that guides courts in determining whether manipulation exists. In re Initial Public Offering Securities Litigation, 241 F. Supp.2d at 389 (emphasis added); accord, Gurary, 190 F.3d at 45. The Amended Complaint points to a scheme put into motion by IBKR that—regardless of whether the scheme is theoretically pure or legally sound in isolation—has the ***<u>effect</u>*** of causing manipulative trading in Eltek's shares. The Amended Complaint alleges, using ATS data, that IBKR was largely responsible for manipulative trading in Eltek's shares in the Relevant Period. At this stage of this case, XDOOD has alleged sufficient facts to advance its case to discovery. In re Initial Public Offering Securities Litigation, 241 F. Supp.2d at 389.

IBKR next argument—the XDOOD sued the wrong party—is not even appropriate for determination at the motion to dismiss stage because it seeks resolution of a factual issue. Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, (2d Cir. 2012) ("The choice between or among plausible inferences or scenarios

is one for the fact finder . . . ."); see e.g., City of Mount Vernon v. Davis, 2019 WL 1367685, at *4–5 (S.D.N.Y. Mar. 26, 2019) ("Capacity, on the other hand, is "a party's personal right to come into court" and "is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate and typically is determined without regard to the particular claim or defense being asserted."). In any case, IBKR misunderstands XDOOD's theory in its Amended Complaint: ***XDOOD does not seek to impose liability on IBKR as the parent company of subsidiaries***, rather, ***XDOOD alleges that the policies, practices, and procedures emanate from IBKR as the parent of its subsidiaries and the subsidiaries are left to carry out these policies, practices, and procedures that IBKR has put forth***. ECF Doc. No. 6, *passim*.

IBKR also recites a number of truisms that a parent company is not liable for the acts of its subsidiaries, but this general rule, like all general rules, admits of a number of exceptions. MTD 7–9. One exception, applied in the Second Circuit, holds that when a parent company controls and dominates a subsidiary, the parent company is liable for the acts and omissions of the subsidiary. Wm. Passalacqua Builders, Inc. v. Resnick Dev. South, Inc., 933 F.2d 131, 138 (2d Cir. 1991).

The ten Passalacqua factors are nearly all met here based on a review of IBKR's filings with the SEC. IBKR and its subsidiaries have one controlling individual, and so, there is overlap of ownership. There is also common office space, IBKR has a great deal of discretion in how it operates its subsidiaries, some transactions are structured as arms-length transactions but are nevertheless controlled by a single common owner, IBKR appears to pay or guarantee the debt of its subsidiaries, and properties, at least at this stage in the litigation, appears to be intermingled or used freely by IBKR and its subsidiaries. Passalacqua, 933 F.2d at 139; *MAG Portfolio Consult GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (reciting and applying the same factors). As detailed in its SEC filings, IBKR exercises substantial control

over its subsidiaries, they all share the same offices around the world, and they have a common owner. For example, IBKR's 31 March 2025 Form 10-Q says this:

> Interactive Brokers Group, Inc. *("IBG, Inc.") is a Delaware holding company whose primary asset is its ownership of approximately 25.8% of the membership interests of IBG LLC, which, in turn, owns operating subsidiaries (collectively, "IBG LLC")*. IBG, Inc. together with IBG LLC and its consolidated subsidiaries (collectively, "the Company"), *is an automated global electronic broker specializing in executing and clearing trades in stocks, options, futures, foreign exchange instruments, bonds, mutual funds, exchange-traded funds ("ETFs"), precious metals, and forecast contracts on more than 160 electronic exchanges and market centers around the world and offering custody, prime brokerage, securities and margin lending services to customers*. In addition, the Company's customers can use its trading platform to trade certain cryptocurrencies through third-party cryptocurrency service providers that execute, clear and custody the cryptocurrencies. In the United States of America ("U.S."), the *Company conducts its business primarily from its headquarters in Greenwich, Connecticut and from Chicago, Illinois. Abroad, the Company conducts its business through offices located in Canada, the United Kingdom, Ireland, Switzerland, Hungary, India, China (Hong Kong and Shanghai), Japan, Singapore, and Australia. As of March 31, 2025, the Company had 3,027 employees worldwide*.
>
> IBG LLC is a Connecticut limited liability company that conducts its business through its significant operating subsidiaries: Interactive Brokers LLC ("IB LLC"); IBKR Securities Services LLC ("IBKRSS"); Interactive Brokers Canada Inc. ("IBC"); Interactive Brokers (U.K.) Limited ("IBUK"); Interactive Brokers Ireland Limited ("IBIE"); IBKR Financial Services AG ("IBKRFS"); Interactive Brokers (India) Private Limited ("IBI"); Interactive Brokers Hong Kong Limited ("IBHK"); Interactive Brokers Securities Japan, Inc. ("IBSJ"); Interactive Brokers Singapore Private Limited ("IBSG"); and Interactive Brokers Australia Pty Limited ("IBA").
>
> Certain operating subsidiaries are members of various securities and commodities exchanges in North America, Europe and the Asia/Pacific region and are subject to regulatory capital and other requirements (see Note 15). IB LLC, IBKRSS, IBC, IBUK, IBIE, IBI, IBHK, IBSJ, IBSG and IBA carry securities accounts for customers or perform custodial functions relating to customer securities.

See Exhibit 2 (emphasis added).

For all the foregoing reasons, and at this stage of the litigation, Amended Complaint pleads manipulative acts for which IBKR is primarily responsible. ATSI Communications Inc., 493 F.3d at 99, 102.

13

### 2.    The Amended Complaint Properly Alleges Loss Causation.

Loss causation is a relatively light burden, and it "need not be pleaded with particularity." Speakes v. Taro Pharm Indus., 2018 WL 4572987, at *10 (S.D.N.Y. Sept. 24, 2018); Northwest Biotherapeutics, Inc. Canaccord Genuity LLC, 2025 WL 368717, at *4–6 (S.D.N.Y. 2025) (citing ATSI Commc'ns, Inc. v. Shaar Fund Ltd., 493 F.3d at 106)). "A short and plain statement in accordance with Rule 8 of the Federal Rules of Civil Procedure is sufficient." Michelle v. Opthotech Corp., 2019 WL 4464802, at *18 (S.D.N.Y. Sept. 18, 2019) ("The question of whether Rule 9(b) applies to loss causation has not yet been definitively addressed by the Second Circuit, but the vast majority of court in this district have required that loss causation only meet the notice requirements of Rule 8.'"). The plaintiff must "simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec. LLC, 797 F.3d 160, 187 (2d Cir. 2015).

In deciding a spoofing case, the Second Circuit stated this: "[e]ven without a factual pleading about how long the effects of spoofing last, [the plaintiff], might still be able to state a claim if it pleaded that its trades occurred so close in time to Defendants' spoofing as to permit us to infer as a matter of common sense that the market prices were artificial when [the plaintiff] traded." Gamma Traders I LLC v. Merrill Lynch Commodities, Inc., 41 F.4th 71, 80–81 (2d Cir. 2022).

The Southern District distinguished between what a complaint must allege as it relates to manipulation cases and what a complaint must alleged in misrepresentation cases. See In re Initial Public Offering Securities Litig., 383 F. Supp. 2d 566, 577 (S.D.N.Y. 2015). The Second Circuit provided the following example of how manipulation differs from misrepresentation and how that difference affects the pleading standard:

14

In market manipulation cases, however, ***the plaintiff's burden is somewhat different***, because of the nature of the artificial inflation caused by manipulative conduct.

[M]arket manipulation is a discrete act that influences stock price. Once the manipulation ceases, however, ***the information available to the market is the same as before, and the stock price gradually returns to its true value***. For example, suppose that a bank manipulates the market for a stock by engaging in 'wash sales,' fictitious trading for the purpose of creating a false appearance of activity. By creating an appearance of increased trading volume, wash sales may drive up the price of a security. Once the wash sales cease, ordinary trading resumes. The spectre of wash sales may continue to affect the stock price for some time as investors recall the recent increased activity and observe the higher price; over time, however, the security will fall back to its true investment value.... In market manipulation cases, therefore, it may be permissible to infer that the artificial inflation will inevitably dissipate.

Id. at 577–578 (referencing Dura Pharms. Inc. v. Broudo, 544 U.S. 336, 346, 125 S. Ct. 1627 (2005)[2], which was being decided at the time).

In the end, all that the plaintiff must plead at the motion to dismiss stage to show loss causation is that the "***securities prices were artificially inflated*** . . . ." In re Initial Public Offering Securities Litig., 383 F. Supp. 2d at 578–579 (S.D.N.Y. 2015) (emphasis added). The plaintiffs in Sharette properly pleaded loss causation when they alleged that "***the concealed conditions and events materialized through dramatically increased short sales following the offerings, causing stock price declines***." Sharette, 127 F. Supp. 3d at 104.

This is exactly what the Amended Complaint pleads, if not more. The Amended Complaint details IBKR's practices and policies that led to the targeting of Eltek's shares by the John Doe defendants. For example, IBKR allows trading earlier than most broker dealers; it has a considerable number of foreign traders that it funnels onto the United States market through its platform; through its alternative trading

---

[2] XDOOD notes that Brouda analyzes the loss causation standard in the context of a misrepresentation claim not a manipulation claim. Broudo, 544 U.S. 336, 341–347.

platform, it accounted for the large amount of trading in Eltek's shares throughout the Relevant Period. See e.g., ECF Doc. No. 6, ¶¶ 28, 61, 66, 76, 86, 90, 125. XDOOD also detailed the decrease in Eltek's share price during the Relevant Period because of the kinds of manipulative trading IBKR allowed on its platform. Id. at ¶¶ 79–82. XDOOD has done what the law requires it to do. Sharette, 127 F. Supp. 3d at 104.

IBKR inexplicably argues that at this early stage of the litigation, the Amended Complaint had to plead that but for the manipulative trade practices IBKR facilitated, Eltek's shares would not have suffered any declines. MTD 21–23. IBKR relies on Arduni/Messina P'ship v. Nat'l Med. Fin. Serv. Corp., 74 F. Supp. 2d 352, 360 (S.D.N.Y. 1999) for this argument. That case is inapt. Arduni/Messina P'ship is about misrepresentation, not manipulation. Arduni/Messina P'ship, 74 F. Supp. 2d 352 at 355. To the extent Arduni/Messina P'ship pretends to articulate the loss causation standard in the manipulation context, Arduni/Messina P'ship is overruled by Gamma Traders I LLC, a case decided in 2022 by the Court of Appeals of the Second Circuit. See Gamma Traders I, 41 F.4th at 80–81 (loss causation may be established by *timing*). See also, Sharette, 127 F. Supp. 3d at 104.

### 3. Reliance is Presumed in a Manipulation Case Like the One XDOOD Pleaded.

For at least 10 years, the Second Circuit has clarified that its prior decision in Fezzani v. Bear, Stearns & Co., 716 F.3d 18 (2d Cir. 2013) (Fezzani I) "did not require that reliance by a victim on direct oral or written communications by a defendant must be shown in every manipulation case." Fezzani v. Bear, Stearns & Co. Inc., 777 F.3d 566, 571–572 (2d Cir. 2015) (Fezzani II). The Second Circuit stated:

> We write only to state the obvious: our opinion did not require that reliance by a victim on direct oral or written communications by a defendant must be shown in every manipulation case. Indeed, we agree with the propositions of law asserted by the SEC that, in a manipulation claim, a showing of reliance may be based on *"market activity" intended to*

16

> ***mislead investors by sending "a false pricing signal to the market," upon which victims of the manipulation rely***.

Fezzani II,, 777 F.3d at 571–572 (emphasis added).

IBKR argues that the Amended Complaint did not plead reliance because XDOOD does not allege anywhere in the Amended Complaint that it relied on IBKR's entire business model. MTD 20–21. IBKR relies on cases discussing claims that involve fraud on the market and other dissimilar claims. Id. at 21. IBKR is wrong. Either IBKR did not research the relevant cases or IBKR researched the relevant cases but declined to bring them to this Court's attention. Whatever IBKR's motive, the law is clear that reliance is presumed in the manipulation context.

### 4.    The Amended Complaint Properly Alleges Scienter

#### i.    The Elements of Scienter Are Relaxed When a Plaintiff Pleads Manipulation Like XDOOD Has.

The scienter element of a manipulation claim is relaxed because of the nature of a manipulation claim. See In re Initial Public Offering Securities Litig., 241 F. Supp. 2d at 384. To plead scienter, the plaintiff must plead facts that give rise to a strong inference that the defendant acted with the required mental state. 15 U.S.C. § 78u–4(b)(2). Scienter is established by demonstrating that the defendant had motive and opportunity to engage in the manipulative act or by demonstrating the existence of strong circumstantial evidence of conscious misbehavior or recklessness.

A plaintiff need not "plead the defendant's actual knowledge of the market manipulation scheme with particularity." Id. PSLRA requires only that plaintiffs "plead facts that give rise to a 'strong inference' that the defendant acted with the required state of mind, and it is those facts that must be stated with particularity."

Id. at 384–385. A plaintiff may plead the "deceptive or manipulative conduct" element "with less specificity than that required in claims alleging material misstatements or omissions" because "the mechanism of the scheme is likely to be unknown to the plaintiffs." Id.

A plaintiff may establish scienter through "strong circumstantial evidence of conscious misbehavior or recklessness"—conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Sharette, 127 F. Supp. 3d at 71. In Set Capital LLC, the circumstances provided guidance to the lower courts on how a plaintiff may allege scienter through circumstantial evidence. The Second Circuit held that the complaint adequately alleged scienter when it alleged that defendants knew their hedging trades would cause illiquidity in VIX futures and destroy the value of the notes, based on three prior volatility spikes that demonstrated this impact. Set Capital LLC, 996 F.3d at 71. The Second Circuit emphasized that defendants' actions—issuing millions of additional notes despite knowing this would exacerbate illiquidity risks—supported a reasonable inference that defendants "sold millions of these notes either knowing or recklessly disregarding a substantial risk" of market harm. Id. at 71.

The Second Circuit further emphasized that "scienter is the only factor that distinguishes legitimate trading from improper manipulation" where defendants' transactions are otherwise legal and visible to the market. Id. at 76. Open-market transactions "may constitute manipulative activity when accompanied by manipulative intent," even when the transactions themselves are lawful. Id. at 76.

18

### ii.    A Plaintiff May Impute Scienter Among Corporate Entities

Corporate defendants may be held liable for scienter by imputing the intent of officers and directors acting within the scope of their authority. In re Banco Bradesco S.A. Securities Litigation, 277 F. Supp. 3d 600, 665 (S.D.N.Y. 2017). Where individual defendants are senior officers who made statements with scienter, and plaintiffs do not allege they acted outside the scope of their authority, their scienter should be imputed to the corporate entity. Id. at 665.

This imputation principle extends further through agency law. Under agency principles, "knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it." CompuDyne Corp. v. Shane, 453 F. Supp. 2d 807 (S.D.N.Y. 2006). "[E]ven if the [principal] never participated or even knew about [their agent's] acts, they are strictly liable for them as long as he served as their agent." CompuDyne Corp., 453 F. Supp. 2d 807, 824–825. This means that where an individual manager conducts unlawful short sales and manipulative trading on behalf of corporate entities, those corporate defendants may be held liable for the manager's scienter even without direct participation. Id.

### iii.    The Amended Complaint Properly Alleges Scienter Circumstantially, And, If Needed, the Amended Complaint Imputes Scienter to IBKR.

Beginning at Paragraph 123, the Amended Complaint alleges deliberate recklessness throughout the relevant period. XDOOD specifically alleges the timing of the transactions, the prolonged nature of the transaction, and that given the transactions, IBKR deliberately or recklessly ignored the risks related to the trading on Eltek shares. Id. at ¶¶ 123–129. In addition, to the extent IBKR claims that its subsidiaries were acting without its knowledge, IBKR's subsidiaries are its agents, and their actions are imputed to IBKR. CompuDyne Corp., 453 F. Supp. 2d at 824–825.

19

**B.      XDOOD States a Common Law Fraud Claim Under New York Law.**

Litigants may plead common law fraud claims alongside claims under § 10b and Rule 10b–5.[3] In re Ann Taylor Stores Securities Litig., 807 F. Supp. 990, 1002 (S.D.N.Y. 1992). Courts in this district have long held that where a plaintiff states a § 10b, the plaintiff also states a claim for common law fraud. Id ("***Because the court has found that plaintiffs have sufficiently pled all of the elements of their federal securities law claims under Section 10(b) and Rule 10b–5, plaintiffs' pendant state law claim of fraud and deceit is properly before this court***."); Kuczynski v. Ragen Corp., 1989 WL 34055 (S.D.N.Y. 1989); Mallis v. Banker's Trust Co., 615 F.2d 68, 80 (2d Cir. 1980) cert denied, 449 U.S. 1123, 101 S. Ct. 938 (1981); United Mine Workers v. Gibbs, 383 U.S. 715, 725–727, 86 S. Ct. 1130, 1138–39 (1966). In fact, state common law fraud claims are not preempted by the federal securities laws. See Securities Exchange Act § 28(a), 15 U.S.C. § 78bb(a) ("[T]he rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity.").

The elements of a securities fraud claim are like the elements of a claim for common law fraud. Under New York law, to prove common law fraud, a plaintiff must establish five elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 196 (2d Cir. 2003). DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A., 2025 WL 1951864, at *14–15 (S.D.N.Y. Jul 16, 2025) (granting plaintiffs' motion for summary judgment on their common law fraud claim and on their § 10b and Rule 10b–5 claim); Connaughton v. Chipotle Mexican

---

[3] The well-known bar to pleading common law fraud claims alongside securities fraud claims do not apply in this case. See Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 78bb(f); see also, Chadbourne & Parke LLP v. Troice, 571 U.S. 377 (2014); In re Kingate Mgmt. Ltd. Litig., 784 F.3d 128 (2d Cir. 2015).

Grill, Inc., 75 N.E.3d 1159 (NY 2017). Each element must be proven by clear and convincing evidence. Century Pacific, Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206 (S.D.N.Y. 2007). The PSLRA heightened pleading standards apply to claims that sound in fraud under the federal securities laws, but not to state common law fraud claims. Rombach v. Chang, 355 F.3d 164, 170–175 (2d Cir. 2004).

IBKR contends that XDOOD's common law fraud claim cannot survive a Rule 12(b)(6) dismissal because IBKR did not make any representations to XDOOD, and do, XDOOD could not have possibly relied on any representations made by IBKR. MTD 23–24. As discussed in depth below, IBKR is wrong because the Second Circuit has long recognized that a common law claim for fraud that is not premised on misrepresentation but instead on concealment and omission. Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1483 (2d Cir. 1995) (holding that "[a] concealment of facts supports a cause of action for fraud . . .").

### 1. XDOOD's Common Law Fraud Claims Survives Because XDOOD States a § 10b Claim.

As set forth in Section V, above, XDOOD states a claim under § 10b. Accordingly, XDOOD's common law fraud claim also survives IBKR's Motion to Dismiss.

### 2. The Amended Complaint States a Common Law Fraud Claim Against IBKR.

That scheme had an impact on the market in that Eltek's shares were impacted. Investors, including XDOOD, were operating under the assumption that the market was functioning without a fraudulent scheme, and relied on that assumption moving forward. Indeed, as to pleading reliance element of a common law fraud claim, the law appears unsettled, which militates against dismissing XDOOD's common law fraud claim. See e.g., Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262 F.3d 134, 142 (2d Cir. 2001).

21

**C.    IBKR's Procedural Arguments Do Not Require Dismissal of XDOOD's Complaint.**

**1.    XDOOD Can Cure (And Has Cured) Its Oversight on Verifying the Amended Complaint.**

Rule 23.1 of the Federal Rules of Civil Procedure requires verification of complaints in which one or more shareholders or members of a corporation bring a derivative claim. Fed. R. Civ. P. 23.1(a)–(b)(1)–(3)(A)–(B); see In re Facebook, Inc., Initial Pub. Offering Derivative Litig., 797 F.3d 148, 157 (2d Cir. 2015) (construing Rule 23.1); Westfield, 58 F.R.D. at 577–578 ("noncompliance with formal verification requirements of the federal rules applicable to stockholder actions will not be grounds for dismissal of the complaint where counsel for plaintiff has diligently investigated the possible charges prior to filing the complaint."). XDOOD is submitting a verification to its Proposed Second Amended. See Exhibit 1. Dismissal is therefore not appropriate on this ground because Plaintiff has cured this oversight. Westfield, 58 F.R.D. at 577–578.

**2.    XDOOD's Claim Is Timely.**

Statute of limitations is an affirmative defense, and a plaintiff has no obligation to anticipate or plead affirmative defenses as part of its claims. Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 n.12 (2d Cir. 2014). A narrow exception to this rule exists where the statute of limitations affirmative defense clearly appears on the face of the complaint. Id. It is hard to take this argument seriously because the Amended Complaint makes clear that at least as to IBKR, XDOOD was still gathering information between 2023 and 2025. The Amended Complaint does not demonstrate that XDOOD has pleaded itself out of Court. In addition, the timeline supplied, which was created based on allegations in the Amended Complaint, shows that XDOOD's knowledge about its claim was not complete. See Exhibit 3; see also Dekalb County Pension

22

Fund v. Transocean Ltd., 817 F.3d 393, 398 (2d Cir. 2016) (citing CTS Corp. v. Waldburger, 573 U.S. 1, 8 (2014)); see id. at 411 (explaining that "statute[] of repose . . . begin[]s to run on the date of the violation, which we consider to be the date of the defendant's last culpable act or omission"); California Pub. Employees' Ret. System v. ANZ Securities, Inc., 582 U.S. 497, 505 (2017) (finding language in timeliness statute for Securities Act claims indicating the provision "runs from the defendant's last culpable act (the offering of the securities)" to be "close to a dispositive indication that the statute is one of repose") (citing 15 U.S.C. § 77m).

## VI.    BECAUSE IBKR FAILED TO GIVE NOTICE THAT IT INTENDED TO RELY ON FOREIGN LAW AND BECAUSE NEW YORK'S CHOICE OF LAW DOCTRINE OUSTS ISRAELI LAW, XDOOD DID NOT NEED TO COMPLY WITH ISRAELI COMPANY LAW IN BRINGING ITS DERIVATIVE SUIT.

New York law has long recognized that, as a general matter, a shareholder has no "general right to litigate on behalf of a corporation." Horowitz v. 148 S. Emerson Assocs. LLC, 888 F.3d 13, 20 (2d Cir. 2018). As one New York court has put it, the right "to bring a shareholder's derivative action is secondary and contingent and arises only in the event that the directors do not comply with a demand that the claims be brought directly." Bryan v. W. 81 St. Owners Corp., 186 A.D.2d 514, 515, 589 N.Y.S.2d 323 (1st Dept 1992). A derivative action must meet the general pleading standard but must also meet the requirements of Fed. R. Civ. P. 23.1. Espinoza ex rel. JPMorgan Chase & Co. v. Dimon, 797 F.3d 229, 233 (2d Cir. 2015). "Although Rule 23.1 sets forth the pleading standard for federal court, the substance of the demand requirement is a function of state law." Id. at 234; New York Business Corporation Law ("BCL") § 626 (2026). Under New York Law, a plaintiff who brings a derivative suit must have made a demand on the corporation unless such a demand is futile. Marx v. Akers, 88 N.Y.2d 189, 193, 644 N.Y.S.2d 121 (1996).

The foregoing rule does not change even when the corporation on whose behalf a derivative suit has been initiated has some connections to a foreign country. Mason-Mahon v. Flint, 166 A.D.3d 754, 756–758 (2d Dep't 2018). In Flint, a shareholder of HSBC Holdings, Mason-Mahon, brought a derivative action against HSBC Holdings and HSBC Bank, seeking recovery because shareholders had been injured based on HSBC Holdings and HSBC Bank's involvement in money laundering schemes in several countries. Id. at 754–756. The defendants moved to dismiss the suit arguing the internal affairs doctrine barred the suit and that Mason-Mahon lacked standing to bring the suit because "***he failed to seek permission from the English High Court pursuant to the United Kingdom Companies Act 2006 … prior to commencing this shareholder derivative action***. Id. at 755 (emphasis added).

The Supreme Court Nassau County granted the motion to dismiss, but the Second Department reversed. The Second Department found "***that the judicial-permission requirement set forth in the UK Companies Act is a procedural rule applicable only in England and Wales, or Northern Ireland***." Id. at 756 (citing Davis v. Scottish Re Grp. Ltd., 30 N.Y.3d 247, 66 N.Y.S.3d 447 (2017)) (emphasis added). The District Court for the Southern District agrees, as it must, with the pronouncements in Davis and Flint. See, e.g., Pension Committee of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC, 446 F. Supp. 2d 163, 194 (S.D.N.Y. 2006) ("Because occurrences in New York and the parties' contacts with that forum bear the most relation to the torts at issue here, New York has the greatest interest in applying its law."); see also, Tyco International Ltd. v. Kozlowski, 756 F. Supp.2d 553, 560 (S.D.N.Y. 2010) (applying New York law instead of Bermuda law).

24

IBKR makes the same arguments as the Defendants in  in <u>Flint</u> and in <u>Davis</u>. Relying on § 194(b), (c), § 195, § 196, and § 198(a)  of the Israel's Companies Act, IBKR says that XDOOD must obtain prior court approval before maintaining this suit. MTD 11. IBKR is wrong—again.

> **B.    Israel's Companies Law is Procedural, Not Substantive, And So, New York Need Not Apply Israel Companies Law.**

Under New York's choice of law principles, New York common-law principles, and procedural rules "are governed by the law of the forum." <u>Flint</u>, 166 A.D. at 756; <u>Davis</u>, 30 N.Y.3d at 252. "The Law of the forum normally determines for itself whether a given question is one of substance or procedure, and a foreign jurisdiction's designation of the rule as procedural or substantive, while instructive, is not dispositive." <u>Davis</u>, 30 N.Y.3d at 253.

The derivative provisions of Israel's Companies Law are modeled on the derivative provisions of the United Kingdom's Companies' Act. <u>See</u> Arad Reisberg, Access to Justice or Justice Not Accessed: Is There a Case for Public Funding of Derivative Claims, 37 Brook. J. Int'l L. 1021, 10 (2012) (citing <u>Neve-Yam of Arsuf Beach Hotels Ltd. v. Cohen</u>, 30 PD 517, 528–529 [1976] (Isr.); <u>Gil v. Discount Bank Le-Israel Ltd.</u>, PM(2) 294 [1988] (Isr)). The portion of the Israeli Companies Law cited by IBKR does not lubricate thought on it should be applied outside of Israel. <u>U.S. v. Vilar</u>, 729 F.3d 62, 74–75 (2d Cir. 2013) ("Presumption against extraterritoriality is not a rule to be applied to the specific facts of each case; a statute either applies extraterritorially or it does not, and once it is determined that a statute does not apply extraterritorially, the only question court must answer in the individual case is whether the relevant conduct occurred in the territory of a foreign sovereign."). The analyses applied in <u>Flint</u> and <u>Davis</u> apply here with equal force, if only because Israel modeled its derivative action statute of the British derivative action statute.

Moreover, there is no debate that New York has the more dominant connection to this litigation. The parties are in (or close to) New York. The acts and omissions nearly all occurred in New York. The Israeli Companies act is a procedural safeguard as it relates to derivative actions, and New York has its own rules on derivative actions. Flint, 166 A.D. at 756; Davis, 30 N.Y.3d at 252; Akers, 88 N.Y.2d at 193.

### C. Alternatively, And as Demonstrated by Proposed Second Amended Complaint, XDOOD Can Meet the Demand Futility Standard Under New York Law and Israeli Law.

This Court has long allowed plaintiffs to demonstrate demand futility either at the motion to dismiss stage or through an amended complaint. See e.g., Elfenbein v. Gulf & W. Indus. Inc., 454 F. Supp. 6, 7 (S.D.N.Y. 1978) ("For the reasons hereafter stated, defendants' motions to dismiss the amended complaint for failure to make a demand upon the board of directors of Bulova are granted, and the amended complaint is dismissed *without prejudice to its renewal*."), aff'd, 590 F.2d 445, 454 (2d Cir. 1978)) (emphasis added). XDOOD has attached its Proposed Second Amended Complaint in which it has set forth allegations that meet the demand futility standards under Israeli and New York laws. See Exh. 1, at ¶¶ 28–39.

## V. REQUEST FOR LEAVE TO AMEND

XDOOD seeks leave to amend its Complaint under Fed. R. Civ. P. 15(a). The Proposed Second Amended Complaint is attached for this Court's consideration. See Exhibit 1, attached.

## VI. CONCLUSION

Based on the foregoing, XDOOD respectfully requests that IBKR's Motion to Dismiss be denied in total and that the parties should proceed to discovery.

Dated:    New York, New York
          10 April 2026

Respectfully submitted,

WILLIAMS LLP


By: */s/ T. Edward Williams, Esq.*
420 Lexington Avenue Suite 875
New York, New York 10170
212.417.0430
212.417.0431 (Fax)
Edward@williamsllp.com

27