**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – – – – – – – – – X

| | | |
|---|---|---|
| XDOOD LLC, derivatively on behalf of ELTEK, LTD | : | |
| Plaintiff, | : | Case No. 25-cv-08536 (LAK) |
| | : | |
| -against- | : | **AMENDED COMPLAINT AND JURY DEMAND** |
| INTERACTIVE BROKERS GROUP, INC., MORGAN STANLEY SMITH BARNEY LLC, and JOHN DOES 1–10 | : | |
| Defendants. | : | |

– – – – – – – – – – – – – – – – – – – – – – – – – – – X

Plaintiff, XDOOD LLC ("XDOOD" or "Plaintiff"), derivatively on behalf of and in the right of Eltek Ltd. ("Eltek"), sues Interactive Brokers Group, Inc., IBG LLC, Interactive Brokers LLC (collectively, "IBKR"), Morgan Stanley Smith Barney LLC ("MSSB"), and John Does 1-10 (the "John Doe Defendants," referred to in this Complaint as "JDMS"), and alleges the following:

## NATURE OF THE ACTION

1. This suit arises from Defendants manipulating the stock of Eltek (ticker symbol ELTK) from October 22, 2019, through the present (the "Damages Period"). The John Doe Defendants, agreed and conspired to manipulate the stock price of Eltek, and looked for and traded on platforms that allowed manipulation. The John Doe Defendants are minority shareholders, the composition of these John Doe Minority Shareholder's ("JDMS") may vary throughout the Damages Period and across different brokers.

2. IBKR is a broker that, through its trading platform, including its Alternative Trading System ("ATS"), allows the manipulation of stocks, especially microcap stocks, and charges do so. As alleged in more detail below, since at least 2013, IBKR has been repeatedly found by U.S. regulators and a national securities exchange to lack supervisory and surveillance systems reasonably designed to detect and prevent manipulative trading in microcap securities.[1] But IBKR has not sufficiently fixed manipulation of microcap stocks because it reaps vast amounts of profits from allowing manipulation through its platform and trading systems. IBKR's conduct falls squarely within Rule 10(b)(5) prohibition and Plaintiff seeks damages against IBKR and the other Defendants.

[1] IBKR's brokerage platform runs on proprietary technology that IBKR developed for the options market-making business conducted through its Timber Hill subsidiaries. IBKR exited market making in 2017 but kept the technology, which it still describes in its SEC filings as the basis for its trade execution.

3. Defendant Morgan Stanley is no better. Although it does not have a technological product that it sells to third parties, Morgan Stanley implemented a publicly undisclosed and an unreasonably lengthy P-Trade Policy which in and of itself is manipulative. Morgan Stanley's P-Trade Policy corrupted the market's price-formation mechanisms for Eltek's shares, misrepresented the natural forces of supply and demand, and generated artificial prices, artificial liquidity, and false market signals.

4. Defendants' conduct further distorted and suppressed legitimate demand for Eltek's shares hindered Eltek's ability to raise and form capital on fair and efficient terms. In short, Eltek seeks to recover the substantial damages caused to its capital formation because of the Defendants' manipulations.

## SATISFACTION OF CONDITIONS PRECEDENT

5. Plaintiff brings this as a derivative action under Fed. R. Civ. P. 23.1. Plaintiff has attached the Affidavit of Michael McGauley in compliance with Rule 23.1, with Israeli Law, and, alternatively, with New York law. Michael McGauley's Affidavit is incorporated by this reference.

## JURISDICTION AND VENUE

6. This Court has original jurisdiction over all the claims and subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over the state law fraud claim. See 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over each Defendant, including each JDMS, because each conducted a substantial part of the unlawful suit-related trading activities asserted in this District or directed fraudulent activity into the market by manipulating Eltek stock on Nasdaq,

which is located in this District, and the unlawful acts of JDMS had a direct and substantial impact on the market price of Eltek shares traded in this District.

8. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act because the acts, transactions, and occurrences alleged herein took place in this District.

## THE PARTIES

### Plaintiff XDOOD, derivatively on behalf of Eltek Ltd.

9. Eltek Ltd. ("Eltek") is an Israeli corporation organized in 1970. Its shares have been publicly listed on The Nasdaq Stock Market since 1997 under the ticker symbol ELTK and are listed solely on Nasdaq, on the Nasdaq Capital Market tier. During the Damages Period, Eltek paid Nasdaq's All-Inclusive Annual Listing Fee, which permits its shares to be listed on Nasdaq and traded across U.S. markets as a National Market System ("NMS") security.

10. XDOOD LLC ("XDOOD") is a Massachusetts Limited Liability Company with a principal place of business at 1400 Hancock St. Fl. 9 Quincy, MA 02169. Michael McGauley ("McGauley") is the manager and sole member of XDOOD. XDOOD has held between 3,500 and 24,000 shares of the Company since November 2019. XDOOD owns over 8,900 shares of Eltek as of the filing of this Amended Complaint.

11. Plaintiff has owned Eltek Float shares from October 22, 2019, to today without interruption.

12. XDOOD made two demands on Eltek pursuant to Israel Companies Law, 5759-1999 § 194(b), in May 2023 and in September 2025, that Eltek pursue the claims alleged in this Complaint,

but Eltek declined to prosecute the claims in its own name and instead authorized XDOOD to bring the claim in its own name.

**Defendants**

**Interactive Brokers Group, Inc. ("IBG, Inc.")**

13. Defendant Interactive Brokers Group, Inc. is a publicly traded corporation listed on the Nasdaq Global Select Market under the ticker symbol "IBKR" with its principal executive offices located at One Pickwick Plaza, Greenwich, Connecticut 06830.

14. Interactive Brokers Group, Inc. "is a Delaware holding company whose primary asset is its ownership of approximately 26.3% of the membership interests of IBG LLC." It is the sole managing member of IBG LLC and, as it states in its SEC filings, "operate[s] and control[s] all of the business and affairs of IBG LLC and its subsidiaries."

*IBG LLC*

15. Defendant IBG LLC is a Connecticut limited liability company with its principal executive offices located at One Pickwick Plaza, Greenwich, Connecticut 06830.

16. IBG LLC is the direct Managing Member of the domestic operating broker-dealer, Interactive Brokers LLC, holding a 99.9% ownership interest.

*Interactive Brokers LLC ("IB LLC")*

17. Defendant Interactive Brokers LLC ("IB LLC") is a Connecticut limited liability company with its principal place of business located at One Pickwick Plaza, Greenwich, Connecticut 06830. IB LLC is a registered broker-dealer regulated by the SEC (SEC No. 8-47257) and FINRA under CRD No. 36418. Per the 2025 SEC Form 10-K Exhibit 21.1 (Subsidiaries of the Registrant),

IB LLC is a direct operating subsidiary wherein "IBG LLC owns 99.9% and Mr. Thomas Peterffy owns 0.1%".

18. IB LLC serves as the primary domestic broker-dealer and clearing broker through which the enterprise routes, custodies, and executes customer transactions, which are cleared and settled at the Depository Trust & Clearing Corporation ("DTCC") in IBKR participant accounts, including account number 0017 named "INTERACTIVE BROKERS LLC" and account number 0534 named "INTERACTIVE BROKERS LLC/RETAIL".

**Collective reference IBKR or IBKR Enterprise**

19. Defendants IBG, Inc., IBG LLC, and IB LLC are collectively referred to throughout this Amended Complaint as "IBKR" or the "IBKR Enterprise." These entities function as a singular, vertically integrated electronic financial unified enterprise under centralized management, a common technology infrastructure, and a shared public identity.

20. Where this Complaint alleges operational conduct, order routing, execution, clearing, settlement, securities lending, customer account settings, market-access controls, and operation of the IBKR trading platform, that conduct was performed by IB LLC. Where this Complaint alleges the design, mandating, or control of the policies, systems, and parameters governing that conduct, those decisions were made by the shared executive management of IBG, Inc. and IBG LLC.

21. Complete Overlap of Executive Management: During the Damages Period, the executive leadership, and ultimate decision-making authorities, including the Chief Executive Officer, Chairman, and Board of Directors, have been completely identical and shared across IBG, Inc., IBG LLC, and IB LLC.

22. Actual, Imputed, and Constructive Notice: IBG, Inc., IBG LLC, and IB LLC share the same principal offices, the same executive officers, and the same centralized legal, regulatory, and risk-management infrastructure, and are represented by the same counsel, which appeared in this action for IBG, Inc. in December 2025. Because IBG, Inc. is the sole managing member of IBG LLC, which in turn owns and operates IB LLC, service and notice of the claims upon IBG, Inc. constituted simultaneous notice to both IBG LLC and IB LLC: each had actual notice of this action and of the claims asserted in it from its commencement, and neither is prejudiced in defending those claims on the merits.

**Morgan Stanley Smith Barney LLC ("MSSB")**

23. MSSB is a Delaware limited liability company, a registered broker-dealer, and a wholly owned subsidiary of Morgan Stanley, with its principal executive offices located in New York, New York. It lists its address as 1585 Broadway, New York, New York 10036, and does business as "Morgan Stanley Smith Barney LLC" and "E*TRADE from Morgan Stanley."

24. On October 2, 2020, Morgan Stanley, the parent of MSSB, completed its acquisition of E*TRADE Financial Corporation, of which E*TRADE Securities LLC was a subsidiary, in an all-stock transaction. Beginning on or about September 1, 2023, E*TRADE transferred accounts, assets, and obligations to MSSB, which became the broker of record, assumed custody of those accounts and the custody and clearing services previously provided by E*TRADE, and now operates under the trade name "E*TRADE from Morgan Stanley."

**John Doe Minority Shareholders ("JDMS")**

25. Defendant JDMS consist of business entities and individuals that traded ELTK stock on multiple U.S. market centers, including national securities exchanges such as Nasdaq as well as

various off-exchange ATS's and electronic market makers. JDMS may include, but are not limited to, individuals acting in concert, omnibus account holders, hedge funds, family offices, market makers, other institutional investors, or brokers.

## ALLEGATIONS

## IBKR'S UNIFIED ENTERPRISE STRUCTURE & CENTRALIZED TECHNOLOGY

26. The IBKR ATS ('IATS') is an alternative trading system used by Interactive Brokers LLC, a registered broker-dealer, pursuant to a Form ATS-N on file with the SEC.

## MARKET STRUCTURE AND FLOAT COMPOSITION

### Eltek's Trading Venue, Share Overview, Limited Public Float

27. Eltek's shares trade primarily on the Nasdaq under the ticker symbol "ELTK," and also across other trading centers due to the U.S. equity market's fragmented structure under NMS.

28. Eltek is an Israeli-based company that is a leading global provider of complex Printed Circuit Boards ("PCBs"). Eltek was and still is more than 50% owned by Mr. Yitzhak Nissan through personal shares and his Nistec Golan Ltd. company based in Petach Tikva, Israel. Mr. Nissan and Nistec Golan Ltd. shares, collectively ("Nistec"), are restricted shares and subject to limits and notification on trading.

29. The "Float" consists of the Eltek shares not held by Nistec or other Company insiders such as the CEO or CFO and is calculated by subtracting insider-held shares from the Company's total outstanding shares.

30. At various times during the Damages Period, the JDMS executed trades in ELTK using a portion of Eltek's Float shares.

31. IBKR's Rule 606(a) routing reports identify IBKR ATS, UBS ATS, and other ATS venues order-routs for transparency reporting. ELTK's weekly ATS Transparency data reflects executions on several of these venues during the Damages Period.

**Form F-3 Eligibility and Market-Capitalization Threshold**

32. Eltek's ability to raise capital efficiently depends, in part, on its eligibility to use Form F-3, the streamlined shelf-registration form available to certain foreign private issuers. Under General Instruction I.B.5 of Form F-3, an issuer may use the form only if the "aggregate market value worldwide of the voting and non-voting common equity held by non-affiliates" equals $75 million or more.

**Market-Wide LULD Pauses vs. Unilateral Broker Restrictions for ELTK**

33. A LULD trading pause halts all trading in the security, **both buying and selling**, on every U.S. exchange and over the counter, and the pause is disseminated to the entire market through the Nasdaq Unlisted Trading Privileges ("UTP") data feed (Tape C).

34. ELTK has had nine issuer-specific halts, all of which were LULD Pauses, and they are summarized in Table 1 – ELTK Halts.

*Table 1 – ELTK Halts*
*(All entries in this table are Nasdaq LULD Pauses, the issuer-specific halt type applicable to ELTK.)*

| # | Halt Date | Halt Time | Resume Time | Minutes Halted | Damages Period |
|---|---|---|---|---|---|
| 1 | 8/30/2019 | 12:28:54 | 12:33:54 | 5 | Pre |
| 2 | 9/3/2019 | 10:37:56 | 10:42:56 | 5 | Pre |
| 3 | 3/9/2020 | 11:27:48 | 11:32:48 | 5 | During |
| 4 | 10/16/2020 | 10:37:23 | 10:42:23 | 5 | During |
| 5 | 5/14/2021 | 9:44:12 | 9:49:12 | 5 | During |
| 6 | 5/18/2023 | 9:41:58 | 9:46:58 | 5 | During |
| 7 | 6/23/2025 | 13:44:33 | 13:49:33 | 5 | During |
| 8 | 6/23/2025 | 13:55:53 | 14:05:53 | 10 | During |
| 9 | 6/23/2025 | 14:07:00 | 14:12:00 | 5 | During |

35. The P-Trade Policies were discretionary prohibitions on electronic purchases of ELTK that existed only on specific brokerage platforms, without any exchange-level halt, without any regulatory trigger, and without any disclosure to the market.

36. Because the P-Trade Policies operated solely within each broker's internal routing infrastructure rather than at the exchange level, they were never disseminated to Tape C, which continued to disseminate a National Best Bid and Offer ("NBBO") and consolidated volume metrics that appeared unimpeded, masking the absence of broker-originated buy-side access from the broader market.

37. Brokers operated these restrictions without public disclosure, despite the SEC's Regulation Best Interest ("Reg BI") requiring full compliance as of June 30, 2020.[2] Under Reg BI's Disclosure Obligation, broker-dealers must provide retail customers with full and fair written disclosure of all material facts relating to the scope and terms of the relationship, including any material limitations on the securities that may be recommended.

38. MSSB's broker-specific P-Trade Policy restricting electronic purchases of ELTK was maintained for approximately nine months without any public announcements, advance customer notifications, or notice to the issuer or competing market centers.

[2] Regulation Best Interest does not provide a private right of action and is not asserted as an independent basis for liability. It is referenced solely to describe the regulatory context governing brokers' disclosure of material limitations on customer access to securities during the Damages Period.

## CHRONOLOGICAL FACTUAL TIMELINE

### Timeline Prior to the Damages Period (Relevant Foundational Facts)

39. On May 16, 2019, McGauley purchased shares of ELTK, and a Fidelity representative who contacted him to confirm the purchase told him, "It trades weird."

### Timeline During the Damages Period

### Start of XDOOD Standing / Damages Period (October 22, 2019)

40. On October 22, 2019, XDOOD purchased 2,500 shares of ELTK on the open market.

41. FINRA Rule 4560 short-interest reporting from November 15, 2019, through February 14, 2020, is summarized in Table 2, including a reported short position of 135,734 shares (approximately 8.9 percent of the public Float) on November 29, 2019.

*Table 2 – Market-Structure Snapshot (Nov 15, 2019 – Feb 14, 2020)*

| Date | Event | Short Interest | Short Interest Change | Short Interest Percentage of Float | Effective Float |
|---|---|---|---|---|---|
| 11/15/2019 | | 44,309 | 16,856 | 2.90% | N/A |
| 11/20/2019 | Eltek Q3 2019 Earnings | | | | |
| 11/29/2019 | | 135,734 | 91,425 | 8.90% | 10.50% |
| 12/6/2019 | McGauley Filed 13D | | | | |
| 12/13/2019 | | 142,662 | 6,928 | 9.40% | 11.00% |
| 12/31/2019 | | 115,302 | -27,360 | 7.60% | 8.90% |
| 1/15/2020 | | 123,431 | 8,129 | 8.10% | 9.50% |
| 1/31/2020 | | 20,906 | -102,525 | 1.40% | 1.60% |
| 2/14/2020 | | 15,681 | -5,225 | 1.00% | 1.20% |

*Source Note: FINRA market-structure data is publicly disseminated on a delayed basis under FINRA Rule 4560.*

**Rights-offering & P-Trade-Policy start, October 14, 2020, through February 8, 2021**

42. On October 14, 2020, after its previous attempt to raise capital directly through the capital markets was conditionally denied, Eltek filed SEC Form F-1 describing its intent to initiate a subscription rights offering.

43. The results of this offering were announced on December 7, 2020, through a press release stating, "Our shareholders purchased 1,460,089 ordinary shares in this offering providing gross proceeds of $5.7 million to the Company."

44. On October 16, daily trading volume surged to 1,072,374 shares, representing 70.65% of the Float, or 82.57% of the Float excluding McGauley's minimum 5% of outstanding shares declared holdings.

45. MSSB's Fraud Operations Unit flagged Eltek trading on October 16, 2020, and instituted the P-Trade Policy. Plaintiff is unaware of any other brokerage firm that took similar action during this time period.

46. Approximately 95% of Eltek's total trading volume for the week of October 12–16, 2020 occurred on October 16, 2020, see Table 3 for ELTK daily trading details.

*Table 3 - NYSE Data for ELTK trading week of October 12-16, 2020*

| Date | Volume | Volume % of Week |
|---|---|---|
| 10/12/2020 | 27,118 | 2.40% |
| 10/13/2020 | 5,578 | 0.49% |
| 10/14/2020 | 8,585 | 0.76% |
| 10/15/2020 | 15,087 | 1.34% |
| 10/16/2020 | 1,072,374 | 95.01% |
| Total | 1,128,742 | 100.00% |

47. On or about October 26, 2020, Stocker attempted to purchase ELTK shares through MSSB's online platform, and MSSB displayed an error message stating: "Opening orders for this security cannot be accepted online at this time."

48. On March 23, 2021, ELTK traded 167,021 shares, 165,061 of them in 1,234 separate trades after 4:00 p.m. No news on March 23, 2021, or the day before, could account for this trading activity.

49. On March 24, 2021, Sert confirmed to McGauley that his ELTK shares held at MSSB were configured to allow borrowing for short selling, and MSSB's Fully Paid Lending report for February 2021 showed that his ELTK shares were borrowed short during that month.

50. MSSB only offered a global account-level setting for enabling or disabling share lending, and it did not allow disabling lending for individual stocks such as ELTK.

**P-Trade policy disclosure period, April 12-August 29, 2021**

51. Between May 3, 2021, and May 12, 2021, ELTK trading volume went from 2,000 shares to 1.6M shares, equating to 92% of the Company Float, and the share price moved up and down more than $2 per share within minutes.

52. No public news or events explain this trading. MSSB was not a primary market participant at this time, due to its P-Trade Policy.

53. Table 4 shows ELTK trading volume, percentage of outstanding and Float shares the volume represents, and the daily open, high, low, and closing price per share between May 6, and May 10, 2021.

*Table 4 - Trading between May 6, 2021, and May 10, 2021*

| | Volume of Shares Traded | | | | Price Per Share $ | | |
|---|---|---|---|---|---|---|---|
| **Date** | **Total Number** | **Percent of Outstanding** | **Percent of Float** | **Open** | **High** | **Low** | **Close** |
| 6-May | 1,635,697 | 28.01% | 92.18% | 6.03 | 7.92 | 5.87 | 6.93 |
| 7-May | 85,441 | 1.46% | 4.81% | 6.86 | 7.28 | 6.67 | 7.25 |
| 10-May | 1,140,764 | 19.52% | 64.23% | 7.16 | 8.8 | 6.28 | 6.55 |

*Note: The table is based on 5,840,357 outstanding shares, and 1,774,445 Float shares during this period.*

54. On May 10, 2021, Stocker called MSSB and asked whether he could purchase shares electronically. MSSB responded, "no, it has to be done over the phone." The phone process took over one hour while MSSB obtained internal approvals, and the stock price changed in the interim.

**Deep mispricing, August 30, 2021-May 17, 2023**

55. On or about August 31, 2021, Stocker purchased one share of ELTK during pre-market hours and another during regular trading hours; for the first time since October 26, 2020, no error message appeared, leading him to conclude that MSSB had removed its P-Trade Policy for ELTK sometime before August 31, 2021.

56. Beginning in September 2021, Eltek's stock price began to drop.

57. Between September 7, 2021, and December 31, 2021, Eltek lost 40% of its enterprise value, leaving it with a market cap of $21.7 million.

58. For the following 345 consecutive trading days between January 3, 2022, and May 17, 2023, the Eltek's shareholders' average equity as a percentage of the market cap was 89.5%.

59. On or about March 15, 2023, Eltek obtained a Non-Objectionable Beneficial Owners ("NOBO") report showing that the number of non-objectionable shareholders of record accounts for the Float was 1,042 as per record date February 9, 2023.

60. The remaining 749,251 shares, approximately 42 percent of the Float, were held in positions concealed from the Company.

61. Since March 29, 2021, McGauley has had a personal brokerage account at IBKR holding approximately 5,700 shares of Eltek. All of McGauley's Eltek shares held at broker-dealers other than IBKR appear on the NOBO reports obtained by the Company; only the shares he held with IBKR do not.

62. Eltek's stock price and volume remained stable near equity value after an April 4, 2023, analyst report valued the company at ~$9.50/share (see Figure 1 for share price vs. market capitalization during the Damages Period).

*Figure 1 - Company daily share price, closing market capitalization, and shareholders' equity during the Damages Period*




*Source Note: Plaintiff generated chart based on Eltek SEC filings and ELTK daily price.*

**Repricing Period, Beginning May 18, 2023**

63. On May 18, 2023, Eltek released its Q1 financial results, and its stock traded 844,758 shares, representing 53.67% of the Float. The closing price rose from $3.95 the day before to $5.41, the first day Eltek traded above its 345-day near-equity pricing, and continued climbing to $6.17 on May 19, 2023, and $7.20 on May 22, 2023 (Table 5).

*Table 5 - May 17-22, 2023, Eltek Trading*

| Date | Volume of Shares Traded | | Price Per Share $ | | | |
|---|---|---|---|---|---|---|
| | **Volume** | **Percent of Float** | **Open** | **High** | **Low** | **Close** |
| 5/17/2023 | 10,490 | 0.67% | 3.91 | 4.02 | 3.91 | 3.95 |
| 5/18/2023 | 844,758 | 53.67% | 4.85 | 5.6794 | 4.6 | 5.41 |
| 5/19/2023 | 135,337 | 8.60% | 5.59 | 6.17 | 5.42 | 6.17 |
| 5/22/2023 | 292,129 | 18.56% | 7.15 | 7.82 | 6.5 | 7.2 |

64. On or about June 18, 2023, Eltek obtained a second NOBO report, on which 674,892 shares, approximately 35 percent of the Float, remained concealed from the Company. Like the first NOBO report obtained by Eltek, McGauley's shares at IBKR do not show on this second NOBO report.

65. During the Damages Period, only IBKR and a limited number of other brokers offered trading during the earliest pre-market hours (4:00 to 7:00 a.m.), and trading in ELTK occurred during those hours.

66. On June 26, 2023, the Chief Executive Officer of broker-dealer M.S. Howells & Co. explained to McGauley that her firm does not offer 4:00-to-7:00 a.m. trading because volumes are very low and its clearing firm does not support those hours.

**Public-offering disclosure period, February 12-13, 2024**

67. On February 12, 2024, at 6:37 p.m., after regular market hours, Eltek issued a press release, distributed via PR Newswire, announcing a $10 million public offering, offered and sold pursuant to the F-3 shelf registration. The press release stated: "ThinkEquity is acting as sole book-running manager for the offering."

68. The Underwriting Agreement states ThinkEquity LLC will act "As Representative of the several Underwriters named on Schedule 1 attached hereto." According to Schedule 1, only a single underwriter is listed, not several. ThinkEquity LLC is the only underwriter named. The document also shows 625,000 "Total Number of Firm Shares to be Purchased" by ThinkEquity LLC.[3]

**Multi-broker restriction & trading distortion, March 18-November 2025**

69. On March 18, 2025, at 2:18 p.m., screen captures of the proprietary IBKR mobile application listed in the Apple App Store as "Mobile – Invest Worldwide, Trade at the Lowest Cost" (the "IBKR Mobile App") showed 71,193 "Shortable Shares at IBKR".

70. Between 1:42 and 1:45 p.m., the number of "Today's Shortable Shares" dropped from 100,168 to 71,193, a difference of 28,975 shares.

71. Tick-by-tick data for March 18, 2025, between 1:42:28 and 1:45:19 p.m., a span of 2 minutes and 51 seconds, shows 34 trades ranging from 1 to 10,233 shares, for a total of 33,049 shares executed.

72. During this same interval, Shortable Shares at IBKR declined by 28,975 shares, even though the price of Eltek remained confined to a narrow range between $8.355 and $8.443. Table 6 summarizes selected trades from this sequence.

[3] ThinkEquity's FINRA BrokerCheck Report states under Clearing Arrangements "This firm does not hold or maintain funds or securities or provide clearing services for other broker-dealer(s)," and under Introducing Arrangements, the report shows Axos Clearing LLC (CRD# 117176) as being the only entity listed during the Damages Period until January 9, 2026. Therefore, Axos Clearing LLC, most likely acted as the clearing agent for Eltek's $10 million public offering and was one side of the ledger for trading activities during and after February 12, 2024.

*Table 6 - Selected tick data from short share closeout March 18, 2025*

| | | Price Per Share $ | | | | |
|---|---|---|---|---|---|---|
| **Trade Number** | **Time** | **Price** | **Bid** | **Ask** | **Size** | **Total Shares** |
| Prior Trade | 1:32:53 PM | 8.345 | 8.345 | 8.355 | 25 | |
| 1 | 1:42:28 PM | 8.355 | 8.345 | 8.355 | 41 | |
| 2 through 33 (not shown) | | | | | | |
| 34 | 1:45:19 PM | 8.443 | 8.345 | 8.443 | 102 | 33,049 |
| Following Trade | 1:53:08 PM | 8.399 | 8.345 | 8.453 | 33 | |

73. On March 21, 2025, McGauley attempted to place a series of sell orders for ELTK through his Fidelity brokerage account. McGauley submitted a substantially similar set of sell orders through IBKR, including orders larger in size than those Fidelity had blocked.

74. IBKR accepted these orders without restriction.

75. Other Brokerage firms did not accept the same order from McGauley.

76. On June 23, 2025, Eltek traded 278,921 shares according to Nasdaq Data. 'Eltek's stock opened at $10.79, rose to a high of $12.19, then declined to $8.42, before rising again to close the day at $10.13.

77. On that same day, 278,921 shares traded in 1,508 transactions. Three LULD halts occurred, see Table 1.

78. On or about August 12, 2025, Charles Schwab had initiated its own P-Trade Policy, the start date and duration of which are unknown, although XDOOD investigators were again able to trade the stock electronically by approximately October 2025. That same day, XDOOD investigators observed that Merrill Lynch also had a P-Trade policy for ELTK, displaying the

message: "The order you have entered cannot be placed online. Standard web trading rates still apply."

### Schwab Undisclosed P-Trade Policy

79. On a December 31, 2025, call, a Schwab representative, Calvin, explained that Schwab's policy blocked new electronic purchases of ELTK while allowing sales ("If you sell it, you've got no problem doing that… It's just opening new, purchasing new shares of that security."), and that securities are added to Schwab's list because of "potential risks," including "outside activity" and people "trying to trade this in a manner that is manipulative" who "own a big enough portion of the shares" to move the price. Schwab did not disclose the policy or its list to customers.

### Summary tables of chronological timeline facts

### Eltek capital raising initiatives

80. Table 7 summarizes Eltek's capital-raising initiatives during the Damages Period, each of which was materially affected by the artificial market conditions described in this Complaint.

*Table 7 – Capital-Raising Initiatives During the Damages Period*

| **Date Sought** | **Date Completed** | **SEC Form** | **Amount Sought** | **Outcome** |
|---|---|---|---|---|
| Feb. 19, 2019 | Apr. 9, 2019 | F-1 | $5,000,000 | Completed (Rights Offering) |
| Aug. 8, 2019 | Not Completed | F-3 | $10,000,000 | Failed to meet eligibility requirements |
| Oct. 14, 2020 | Dec. 7, 2020 | F-1 | $10,000,000 | Completed (Rights Offering) |
| Jul. 27, 2022 | Feb. 15, 2024 | F-3 | $20,000,000 | $10,000,000 raised |

*Source Note: F-1 offerings are subscription rights offerings made to shareholders of record. F-3 offerings are direct offerings made to the capital markets.*

## DEFENDANTS' ROLES AND MANIPULATIVE SCHEMES

### Interactive Brokers (IBKR) - Enterprise-Level Scheme Liability

81. IBKR engaged in a course of conduct, operating its proprietary trading system's as a recurring execution venue for ELTK order flow throughout periods of manipulative trading, defaulting customer accounts to OBO status so that the beneficial owners trading ELTK were concealed from the issuer, and implementing and applying the Market Access Rule, 17 C.F.R. § 240.15c3-5, more permissively than its peers.

82. IBKR made these choices in service of its own objectives per its SEC filings describing: maximizing account growth, automation, and transaction volume, and building and maintaining a dominant market position by replacing manual compliance steps with proprietary automated code.

### Relevant regulatory civil fines and penalties during the Damages Period

83. During the Damages Period, IBKR was willfully blind or deliberately reckless in both its business decision-making and its operational execution.

84. Since 2013, IBKR has been repeatedly sanctioned by U.S. and foreign regulators and a national securities exchange for deficiencies in its trading, surveillance, and supervisory systems yet still chose to permit the manipulation of microcap shares. On July 15, 2025, Office of Foreign Assets Control ("OFAC") announced that IBKR agreed to pay $11,832,136 to settle its potential civil liability for apparent violations of multiple OFAC sanctions programs.

85. From at least April 12, 2021, through August 2023, Nasdaq found that IBKR's surveillance system "frequently detected potentially manipulative activity" from the omnibus accounts of certain foreign introducing brokers, but that IBKR's "supervisory system was not reasonably

designed to prevent all additional potentially manipulative activity from the ultimate beneficial owners responsible for the activity," in violation of Nasdaq Rules General 9 Section 20(A) and 1(A). Nasdaq also stated:

> IBKR did not impose adequate restrictions on trading of microcap securities through the omnibus accounts of one foreign introducing broker until May 2023 (And never imposed similar restrictions on omnibus accounts of a second foreign introducing broker that eventually stopped routing U.S. equity orders to IBKR).

86. IBKR was censured and fined $900,000 in civil and administrative penalties, imposed by The Nasdaq Stock Market LLC, with a resolution date of December 3, 2025.

**IBKR's Manipulation of Eltek's Shares**

87. IBKR ATS appears throughout the Damages Period and consistently reports ELTK executions during weeks in which JDMS engaged in concentrated trading. While ATS Data is aggregated on a weekly basis and does not identify specific trading days or order-level detail, the repeated presence of IBKR ATS activity across the Damages Period corroborates IBKR's role as a primary execution venue through which the manipulative ELTK trading was executed. For example, ATS Data shows that IBKR ATS executed the highest share volume and the highest number of ELTK trades during the weeks of October 12–16, 2020 and May 3–7, 2021.

88. Unlike other brokers, IBKR affirmatively sets its customer accounts to objecting beneficial owner ("OBO") status.

89. This OBO status shields shareholder identities from Eltek's management team: roughly 35 to 42 percent of the Float was concealed from the Company on its two NOBO reports,

and the ELTK shares McGauley held at IBKR were the only portion of his holdings that did not appear on either report.

90. IBKR also made ELTK available to be sold short when other brokers did not.

91. IBKR, in its SEC 10-K filing for the year ended December 31, 2017, stated, "The philosophy of the Compliance Department, and our company as a whole, is to build automated systems to try to eliminate manual steps in the compliance process and then to augment these systems with experienced staff members who apply their judgment where needed." Later 10-K filings modified this statement by replacing the word 'eliminate' with 'minimize.'

92. Through the constellation of policies and practices described above, IBKR created and maintained the conditions, concealed beneficial ownership, reduced transparency, and off-exchange execution, which characterized the artificial market for ELTK during the trading activity described above.

93. IBKR received direct financial benefits from this trading activity, including commissions, payment for order flow, ATS execution fees/rebates, and securities-lending revenue.

**Scienter as to IBKR**

94. IBKR operated its own electronic pipelines, trading platform including its ATS, and surveillance systems, had real-time visibility into the order flow they carried, and could see on those systems the signatures of the manipulative trading in ELTK: substantial volume executing within narrow price bands in concentrated, coordinated bursts, such as the ones on October 16, 2020, and March 18, 2025.

95. IBKR continued to clear microcap trades through accounts its own surveillance had flagged, and disregarded warnings from its compliance personnel that the group responsible for reviewing those alerts was chronically understaffed.

96. IBKR nevertheless continued to route ELTK order flow through its systems, to default accounts to OBO status, and to apply its market-access controls more permissively than its peers, and its knowledge of the manipulative activity visible on its own platform, combined with its decision to continue that conduct, establishes that IBKR acted with scienter in committing its own primary violation of Section 10(b) and Rule 10b-5.

**MSSB's Policy, Actions and Role in Manipulation**

**Overview of MSSB's Role in the Manipulative Scheme**

97. In contrast to transparent, market-wide LULD pauses, MSSB engaged in a unilateral, broker-specific intervention: for approximately nine months, MSSB altered its internal routing systems to restrict ELTK to a "sell-only" or "position closing only" status on its respective platform.

**The P-Trade Policy: Design, Asymmetry, and Concealment**

98. Eltek is not a party to MSSB's retail customer agreements. Whatever discretion those agreements gave MSSB over individual customer accounts, the P-Trade Policy was not an individual account action: it structurally blocked electronic purchasing demand for a fully compliant NMS security across MSSB's entire platform, without notice to the issuer, and no contract between MSSB and its customers purported to authorize MSSB to alter the market for Eltek's stock.

99. MSSB applied the restriction uniformly to self-directed accounts that had received no individual investment recommendation.

100. MSSB implemented its P-Trade Policy unannounced and undisclosed to the Company, its customers, and the market. The only time an MSSB customer had any notification about the P-Trade Policy was if they attempted to electronically purchase ELTK stock and observed a message.

101. When McGauley, exercising diligence, tried to discover the reason for this P-Trade Policy (e.g., in a 20-question email sent on December 21, 2021), MSSB's counsel affirmatively refused to answer per response on January 10, 2022.

102. The P-Trade Policy was not just a 10b-5(a) deception. The policy affirmatively and simultaneously did two things: a. It suppressed legitimate purchase access by blocking 100% of electronic buy orders from its millions of customers. b. It simultaneously permitted Eltek stock to be borrowed for short-side activity through its share lending program, which actively sourced shares from its clients to lend to short-sellers. c. MSSB simultaneously affected the entire market for ELTK securities for all market participants including customers at other brokerage firms who were unaware of the secretively skewed market created by MSSB. This was a primary manipulative act by MSSB. This intentionally created a downward asymmetrical market for Eltek's stock.

**MSSB's Scienter**

103. MSSB's conduct was not accidental or the result of routine risk controls. MSSB knowingly implemented and maintained its P-Trade Policy, a non-public, asymmetric trading restriction on ELTK for approximately nine months, despite understanding that the restriction would distort market activity, suppress natural demand, and create an artificial price for the security.

104. MSSB required a phone call for purchases even after the customer's identity had already been verified and they had previously approved the same customer to buy Eltek shares. This

was not a one-time verification measure. It was a continuing, repetitive, and intentionally burdensome barrier to purchasing ELTK, designed and implemented by MSSB's Fraud Operations Unit. No other known brokerage firm in the United States imposed any comparable restriction on ELTK during this period.

105. The timing of the policy also demonstrates MSSB's scienter. MSSB instituted the restriction immediately following the volatile trading in ELTK on October 16, 2020, and its Fraud Operations Unit implemented a policy that directly interfered with price discovery during a period of heightened market sensitivity. MSSB then kept the restriction in place for approximately nine months, long after any plausible short-term risk justification could have existed, which shows that its conduct was knowing, intentional, and sustained.

106. A broker confronting perceived risk in a security has standard, less market-distorting tools available: requiring all transactions to be 100% cash, making the security non-marginable, imposing position or order-size limits, or restricting the security symmetrically on both the buy side and the sell side.

107. MSSB instead selected the one configuration that blocked every electronic purchase while leaving electronic sales unrestricted and its share-lending program active, and it maintained that configuration for approximately nine months. Whatever gatekeeping justification may have existed on October 16, 2020, the selection and prolonged maintenance of a demand-suppressive tool supports the inference that the restriction functioned as a manipulative device rather than a risk control.

108. MSSB understood that the broader market would interpret ELTK's trading activity as the product of natural supply and demand, when in fact MSSB was restricting demand on its own

platform without disclosure. By withholding this information, MSSB knowingly created a false appearance of market conditions, which is the essence of market manipulation under Section 10(b) and Section 9(a)(2).

109. On information and belief, MSSB's continuing phone-call requirement served an identification function.

**JDMS Actions and Role in Manipulation**

110. JDMS acted with scienter, conceiving, orchestrating, and executing the manipulative scheme for their own financial gain through brokers as instruments of execution.

111. The manipulative character of the trading itself supports the inference: repeated episodes of unexplained volume spikes representing a significant portion of the Company's Float during the Damages Period; concentrated bursts of coordinated executions within minutes; trading concentrated at moments critical to Eltek's capital formation, including the surge two days after Eltek filed its rights-offering registration statement; the sustained suppression that held a profitable company at near book value for 345 consecutive trading days; and the use of OBO status and omnibus account structures to conceal the traders' identities.

112. Independent third parties corroborate that the trading in ELTK was not organic: a Fidelity representative remarked, that the stock "trades weird"; MSSB's Fraud Operations Unit flagged the October 16, 2020, trading and restricted the stock; and Charles Schwab and Merrill Lynch later imposed their own purchase restrictions, with Schwab's representative attributing the restriction to possible manipulative trading by persons who "own a big enough portion of the shares" to move the price. The inference that JDMS acted with intent to manipulate is cogent and at least as compelling as any opposing inference of legitimate trading.

## TIMELINESS: ACCRUAL, REPOSE, AND DISCOVERY

113. Plaintiff incorporates by reference all preceding paragraphs.

114. Each Defendant committed acts within the five-year repose period of 28 U.S.C. § 1658(b)(2).

115. MSSB maintained and enforced its P-Trade Policy through approximately July 2021 within five years of the October 15, 2025, filing, and each day of that continued enforcement was a discrete, independently actionable act. IBKR's platform conduct within the repose period includes the March 18, 2025, platform activity and the June 23, 2025, trading activity described herein. The JDMS trading that distorted ELTK's market likewise continued throughout the Damages Period and within the repose period.

116. The two-year period of § 1658(b)(1) is satisfied by accrual. Eltek did not sell shares into the open market until February 2024, when it completed an underwritten public offering of 625,000 ordinary shares at $16.00 per share for gross proceeds of $10 million, as a takedown off its Form F-3 shelf registration. That sale was the first occasion on which Eltek sold its shares at a market-determined price, and thus the first occasion on which it suffered a Section 10(b) injury as a seller in a market distorted by the manipulative and deceptive conduct alleged herein, so no limitations period could run before that claim existed.

*Fraudulent Concealment by IBKR*

117. IBKR concealed material facts necessary for Plaintiff to discover its role in the violation, including:

- its own decision to default customer accounts to OBO status, which IBKR selected and controlled, and which prevented issuers from identifying the beneficial owners whose trading affected ELTK's market;
- non-public, platform-specific trading information, including real-time metrics observable only through IBKR's proprietary systems;
- supervisory and compliance deficiencies, later corroborated by the United States Department of the Treasury's July 15, 2025, settlement.
- The publicly available market-structure data available to Plaintiff before 2025 did not supply particularized facts tying IBKR's own conduct to the manipulation of ELTK, as distinct from lawful venue activity.

*Market Opacity and the Inability to Identify JDMS*

118. The market opacity described above, including OBO status and omnibus account structures that conceal the traders' identities, has prevented Plaintiff from identifying the JDMS, whose identities remain undiscoverable now.

**Timeliness of New York Common Law Fraud Claims (Counts VI and VII)**

119. The New York common-law fraud claims are timely under CPLR § 213(8), which provides a limitations period of six years from the fraud or two years from discovery of the fraud, whichever is later. As to MSSB (Count VII), the six-year period alone establishes timeliness: the P-Trade Policy was implemented in October 2020 and maintained into 2021, and this action was filed on October 15, 2025. As to IBKR (Count VI), the claim is timely under both prongs: Plaintiff discovered the concealed facts constituting IBKR's fraud between March 2025 and July 2025 and filed suit within two years of that discovery.

**CPLR § 202 - Borrowing Statute**

120. Although Plaintiff is domiciled in Massachusetts, CPLR § 202 does not shorten the limitations period because the injury occurred in New York, where ELTK's stock is listed on Nasdaq, the manipulative trading was directed, the market distortion occurred, and Eltek's capital-formation injury was realized. Accordingly, New York's six-year limitations period applies.

## LEGAL AND PROCEDURAL BASIS FOR DERIVATIVE ACTION STATUS

### Facts Supporting this Derivative Action

121. This action is properly maintained as a derivative action. Plaintiff satisfies the requirements of Federal Rule of Civil Procedure 23.1 and, to the extent the substantive law of Eltek's place of incorporation governs derivative capacity under the internal-affairs doctrine, the requirements of Israel Companies Law, 5759-1999 §§ 194–198.

122. Israel Companies Law § 194(b) requires a shareholder to demand that the company itself pursue the claim before proceeding derivatively. Plaintiff made that demand. Section 197 permits a shareholder to bring the derivative action, with the court's permission, where the company has declined the demand or its decision has not eliminated the grounds for the action. Both conditions are satisfied here. Section 198(a) provides that the court shall approve the derivative action where it is satisfied that the action is, a priori, to the benefit of the company and that the plaintiff is not acting otherwise than in good faith, findings the facts below compel. And Section 198(c) defines the approving "Court" as "the Court qualified to hear the action." Because no Israeli court is qualified to adjudicate a claim arising under Section 10(b) of the Securities Exchange Act concerning securities listed and traded on Nasdaq, this Court is the court qualified to hear the action, and this Court may make the Section 198 findings.

123. In the week of May 22, 2023, McGauley discussed the investigation and the claims with Eltek's Chairman, Yitzhak Nissan, by telephone. On May 26, 2023, McGauley wrote to Chairman Nissan, CEO Yaffe, and CFO Freund, attaching an executive summary of the investigation that specified the facts discovered, the laws and regulations violated, the entities responsible, and the group's assessment of the substantial damages to the Company, and requested that Eltek act on the claims, including by pursuing recovery from the brokerage firms involved.

124. The Company declined. On May 29, 2023, following a further call with Chairman Nissan, McGauley confirmed the Company's position in a written communication addressed to the Chairman, CEO, and CFO: "We understand the company prefers not to sue. The company wants to focus on running the primary business of making circuit boards." On May 30, 2023, CFO Freund responded in writing, copying the Company's outside counsel, that the Company preferred that XDOOD "talk directly with our legal advisors — Steven J. Glusband, Esq." The Company simultaneously agreed to request the NOBO and OBO reports XDOOD sought.

125. On September 22, 2025, Plaintiff's counsel sent the Company's counsel a written memorandum expressly invoking Israel Companies Law, 5759-1999 § 194(b), recounting the May 2023 demand and declination, and renewing the demand that Eltek pursue the claims or confirm its authorization of their derivative pursuit. On September 29, 2025, the Board, through its counsel, responded in writing that it did not believe the proposed memorandum of agreement was "necessary or appropriate" and that "[y]our clients (XDOOD) are free to pursue the derivative claims if they wish to do so and the court would determine the appropriateness and merits of those claims as well as any claims for damages or attorneys' fees."

126. Eltek thus twice declined to prosecute the claims in its own name, in May 2023 and again in September 2025, while cooperating with the investigation and not opposing XDOOD's derivative pursuit. XDOOD proceeded derivatively and bears the full cost and risk of the action. The Company's decision did not eliminate the grounds for the action, the manipulation of ELTK being ongoing. The conditions of Israel Companies Law §§ 197(1) and 197(2) are therefore satisfied.

127. This Court may approve the action under Israel Companies Law § 198(a), and the facts compel approval: the action is, a priori, to the benefit of Eltek, and XDOOD acts in good faith. Eltek's controlling shareholder, Nistec, through Yitzhak Nissan, has held a majority of Eltek's shares continuously since 2013 and throughout the Damages Period, and the Company, so informed, did not oppose this action.

**Adequacy of Representation for Eltek**

128. During the Damages Period, Plaintiff held, purchased, or sold Company stock shares that were valued, executed, had payments (Company dividends) linked to, or were settled using stock prices that were manipulated by Defendants, and their interests are coincident with and not antagonistic to those of the Company and Lawful Owners. Plaintiff is a Company owner and will fairly and adequately protect the interests of the Company.

129. The Plaintiff is represented by counsel who are competent and experienced in the prosecution of securities, and shareholder derivative litigation.

**Fairness to the Corporation**

130. This derivative action is fair and beneficial to Eltek. It seeks recovery for harms caused by Defendants' manipulation, including restoration of stock value, injunctive relief against

ongoing fraud, and damages that will primarily benefit the Company, and it permits the Company's claims, which arise from common facts, to be adjudicated in a single action.

## INJURY TO THE CORPORATION, CAUSATION AND DAMAGES

### Overview of Indivisible Corporate Harm

131. As a proximate result of the Defendants' concurrent manipulative schemes during the Damages Period, Eltek suffered substantial, quantifiable harm to the corporation. The manipulation suppressed the market price of Eltek's stock below the price a fair and efficient market would have produced and did so continuously over a period of years. Because Eltek is a public company whose only currency for raising equity capital is its own stock, the sustained suppression of that stock's value directly harmed the corporation when it was compelled to access the capital markets.

132. The magnitude and persistence of the suppression are demonstrated by Eltek's own market metrics. From January 3, 2022, through May 17, 2023, (345 consecutive trading days) Eltek's shareholders' equity averaged 89.5% of its market capitalization, and its price-to-earnings ratio remained anchored at or below 5 against an industry average of 22 to 45. A profitable, growing manufacturer does not trade at these levels in an unmanipulated market.

### Damages Under Federal Claims: Sections 10(b) and 9 of the Exchange Act

133. Transactional injury and forced dilution. Eltek's cognizable injury under Section 10(b) was realized when it sold shares into the manipulated market. On February 13, 2024, Eltek completed a $10 million Form F-3 offering, selling 625,000 shares at $16.00 per share through a book-running underwriter. Because the Defendants' manipulation had suppressed Eltek's stock below the value a fair and efficient market would have produced, Eltek was compelled to sell more shares, and to relinquish a greater portion of the Company, than it would have had to in an honest

market to raise the same $10 million. That excess dilution is a direct, quantifiable transactional loss to the corporation, actionable under Section 10(b) and Rule 10b-5.

134. The measure of that loss is the difference between the price at which Eltek was forced to sell and the price its shares would have commanded in a market free of the Defendants' manipulation, a but-for value established by the years of documented suppression described above and provable at trial through expert testimony.

135. Eltek's status as an issuer sharpens this injury rather than attenuating it. Unlike an investor, who may decline to transact and wait for a fairer price, Eltek, a public company since 1997, with no alternative venue through which to raise equity capital, had no practical choice but to access the only market available to it. The Defendants' manipulation thus forced Eltek to spend an artificially cheapened currency, and the resulting dilution was compelled, not chosen. This same structural reality underlies Eltek's reliance: as an issuer bound to the market for its own securities, Eltek necessarily transacted at the price the Defendants' manipulation produced.

136. Continuing suppression and loss causation. The manipulation was a continuous course of conduct that suppressed Eltek's price throughout the Damages Period and did not abate before the 2024 sale. Each manipulative act flowed into the consolidated Tape C feed that sets the reference price for ELTK, so the suppressed baseline persisted through the February 2024 offering; but for that sustained suppression, Eltek would have raised the same capital at a higher price and with materially less dilution.

137. Eltek's injuries are substantial and, to be proven at trial through expert economic testimony and but-for valuation modeling, are estimated in the tens of millions of dollars.

## Damages Under State Claims: New York Common Law Fraud

138. Out-of-Pocket Losses: Separate and apart from the dilution of its equity, the Defendants' manipulation inflicted actual, out-of-pocket pecuniary losses on Eltek actionable under New York Common Law Fraud. Eltek continuously paid an All-Inclusive Annual Listing Fee to Nasdaq and incurred significant compliance costs to maintain its status as an NMS stock. Eltek paid these tangible financial premiums in justifiable, actual reliance on the integrity of the market metrics provided by the NMS and broker-dealers, including IBKR and MSSB. Eltek suffered a direct out-of-pocket loss when the Defendants fraudulently delivered a corrupted, manipulated market ecosystem instead of a reliable, non-manipulated market baseline.

139. Punitive Damages: Because the Defendants' common-law fraud was aimed directly at corrupting Tape C, the single consolidated data feed relied upon by the investing public and the institutional market, their conduct demonstrated a high degree of moral culpability aimed at the public generally, entitling Plaintiff to seek punitive damages on behalf of Eltek.

## Causation and Proportionate Liability

140. Concurrent causation. Under principles of concurrent causation, the conduct of each Defendant was a substantial factor in producing these indivisible injuries to the corporation.

## CLAIMS FOR RELIEF

## COUNT I

## Violation of Section 10(b) and Rule 10b-5(a) and (c) (against Defendant IBKR)

141. Plaintiff incorporates by reference all preceding paragraphs.

142. Defendant IBKR is primarily liable as a protagonist in a manipulative scheme. Its own course of conduct, as applied to Eltek, created and maintained artificial conditions in the market for ELTK, constituting IBKR's own primary violation.

143. In the alternative, and independent of the enterprise allegations, Defendant IB LLC is primarily liable for the course of conduct alleged in this Count. IB LLC is the registered broker-dealer that executed and cleared the ELTK order flow described herein under its Market Participant Identifiers and DTCC participant accounts 0017 and 0534, operated the IBKR ATS on which ELTK executions recurred throughout the Damages Period, set customer accounts to Objecting Beneficial Owner status by default, and designed and applied the market-access controls described herein.

144. The Deceptive and Manipulative Acts: IBKR engaged in a course of manipulative conduct consisting of its own affirmative business decisions, no single one of which need be independently unlawful, but which in combination created and maintained artificial conditions in the market for ELTK, an effect IBKR knew of or consciously disregarded:

- Concealment of manipulator identities. IBKR affirmatively defaulted all customer accounts to Objecting Beneficial Owner (OBO) status, a default IBKR itself selected and controlled, obscuring from Eltek the identities of the beneficial owners whose trading affected ELTK's market.
- Permissive market access. IBKR affirmatively implemented and applied the Market Access Rule, 17 C.F.R. § 240.15c3-5, more permissively than its peers, as evidenced by a comparison in which Fidelity blocked orders that IBKR accepted. The allocation of risk-control functions permitted by SEC Rule 15c3-5(d)(1) does not immunize the manipulative use to which IBKR put its own controls.

- Early-hours trading window. IBKR offered trading in ELTK during the earliest pre-market hours (4:00 to 7:00 a.m.), a window most brokers decline to support because volumes are very low.
- Recurring execution venue. IBKR operated its alternative trading system as a recurring venue for ELTK executions throughout the Damages Period, including during periods of concentrated manipulative trading, as shown by multi-year ATS data.

145. Undertaken together and with knowledge of their combined effect, these decisions constitute IBKR's own participation in the manipulation of ELTK, a primary violation, distinct from and additional to the trading of the JDMS, and not the provision of assistance to any other person.

146. Scienter (Intent): IBKR acted with deliberate recklessness or, at a minimum, willful blindness. While any one of its acts above, the OBO default, the permissive Market Access controls, and its role as a recurring ATS execution venue during manipulative periods, might be explained in isolation, whatever business purposes those decisions served did not require maintaining their combination unchanged after its effect on the market for ELTK was visible on IBKR's own systems. IBKR knew, or was reckless in not knowing, that its own course of conduct created and sustained the artificial market conditions alleged, and it continued that conduct because it was profitable to IBKR.

147. As a direct and proximate result of IBKR's own manipulative course of conduct, which created and sustained artificial conditions in the market for ELTK, Eltek was damaged.

## COUNT II

## Violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (Against Defendants IBG, Inc. and IBG LLC, in the Alternative to Count I)

148. Plaintiff incorporates by reference all preceding paragraphs. This Count is pleaded in the alternative pursuant to Fed. R. Civ. P. 8(d)(2): to the extent the Court determines that the primary violation alleged in Count I was committed by IB LLC rather than by the IBKR Enterprise collectively, Defendants IBG, Inc. and IBG LLC are liable as controlling persons of IB LLC under Section 20(a).

149. Primary violation. As alleged in Count I, IB LLC committed a primary violation of Section 10(b) and Rule 10b-5(a) and (c).

150. Control. IBG LLC is the direct managing member and 99.9% owner of IB LLC. IBG, Inc. is the sole managing member of IBG LLC and states in its SEC filings that it "operate[s] and control[s] all of the business and affairs of IBG LLC and its subsidiaries." The same individuals serve as executive officers across all three entities: Milan Galik as Chief Executive Officer of both IBG, Inc. and IB LLC; Paul Jonathan Brody as CFO, Treasurer, and Secretary of IBG, Inc. and Secretary and Principal Operations Officer of IB LLC. IBG, Inc. and IBG LLC accordingly possessed, and exercised, actual power to direct the management and policies of IB LLC, including the specific policies at issue in Count I.

151. Culpable participation. The policies constituting the course of conduct alleged in Count I, the OBO default, the design and calibration of IB LLC's market-access controls, the operation of the IBKR ATS, and the compliance-automation philosophy applied to each, were designed, mandated, and coded at the direction of the shared executive management of IBG, Inc. and IBG LLC, whose "management team participate[s] in algorithm design and supervise[s] the

creation of detailed specifications for new applications," and whose "risk management policies are developed and implemented by [a] Steering Committee ... chaired by [the] Chief Executive Officer." IBG, Inc. and IBG LLC participated in the conduct alleged with the knowledge and state of mind alleged, which are incorporated here.

152. By reason of the foregoing, IBG, Inc. and IBG LLC are jointly and severally liable with, and to the same extent as, IB LLC pursuant to 15 U.S.C. § 78t(a), and bear the burden of establishing that they acted in good faith and did not directly or indirectly induce the acts constituting the violation. Eltek was damaged as alleged herein.

**COUNT III**

**Violation of Section 10(b) and Rule 10b-5(a) and (c) (against Defendant MSSB)**

153. Plaintiff incorporates by reference all preceding paragraphs.

154. Defendant MSSB is primarily liable as a protagonist in a fraudulent scheme. Its conduct after its "Fraud Operations Unit" flagged manipulative trading in ELTK on October 16, 2020, constituted a new, independent, and primary "device, scheme, or artifice to defraud" in violation of Rule 10b-5(a) and (c).

155. The Deceptive and Manipulative Act: The "device" was MSSB's implementation and nine-month maintenance of the one-sided non-publicly disclosed "P-Trade Policy." This policy was an affirmative act that: a. Operated as a fraud on the market by deceptively concealing a material fact (that MSSB, a major broker, was unilaterally barring all electronic purchases of Eltek stock). b. Created a false appearance of weak market demand, artificially suppressing Eltek's share price.

156. Scienter (Intent): MSSB acted with actual knowledge and fraudulent intent as alleged above. The strong inference of scienter rests on the allegations of that Section, including the

deliberate, undisclosed, and asymmetric design of the P-Trade Policy, its maintenance for approximately nine months, and MSSB's refusal to provide any explanation.

157. As a direct and proximate result of MSSB's own scheme, which actively suppressed Eltek's stock price and deceived the market, the Company was damaged.

**COUNT IV**

**Violation of Section 10(b) and Rule 10b-5(a) and (c) (against Defendant JDMS)**

158. Plaintiff incorporates by reference all preceding paragraphs.

159. JDMS are primarily liable for affirmatively and knowingly participating in a "device, scheme, or artifice to defraud" to manipulate the market for Eltek stock. Their actions, in concert with the named Defendants, constituted deceptive devices or contrivances that manipulated Eltek's stock price during the Damages Period.

160. The deceptive acts included the alleged manipulative trading detailed above. These acts created a false appearance of market activity and artificially manipulated Eltek's price and market metrics.

161. Scienter: JDMS acted with intent, willful blindness, or deliberate recklessness, as the trading patterns deviate from legitimate trading and were designed to profit from distortion.

162. Eltek has suffered damages in an amount to be determined at trial.

**COUNT V**

**Violation of Section 9(a)(1) & (2) of the Exchange Act (against Defendant JDMS)**

163. Plaintiff incorporates by reference all preceding paragraphs.

164. JDMS are primarily liable for violating Section 9(a)(1) by directly effecting wash trades and matched orders, creating a "false or misleading appearance of active trading," and Section 9(a)(2) by directly effecting a "series of transactions... for the purpose of inducing" others to trade.

165. Based on the foregoing, Eltek has been damaged in an amount to be determined at trial.

## STATE LAW CLAIMS

### Non-Preemption and Timeliness of New York Common-Law Fraud Claims

166. The New York common-law fraud claims asserted in Counts VI and VII rest on independent state-law duties and distinct injuries, as alleged in those Counts, and are not preempted by federal securities law. Each Defendant's conduct is alleged independently; no inter-broker coordination or conspiracy is alleged.

## COUNT VI

### Common Law Fraud (Against IBKR)

167. Plaintiff incorporates by reference all preceding paragraphs.

*Overview of Fraud Theory*

168. Defendant Interactive Brokers Group, Inc., IBG LLC, and Interactive Brokers LLC (collectively, "IBKR") engaged in intentional concealment and deceptive business practices that misrepresented and omitted material facts concerning IBKR's internal policies, compliance controls, and market-access mechanisms. These concealed facts created a false appearance of a fair and properly functioning market for Eltek's stock, upon which Eltek reasonably relied in planning and executing capital-formation initiatives.

*Material Misrepresentations and Omissions*

169. IBKR knowingly and intentionally concealed material facts, including:

- Default OBO Status: IBKR defaulted all customer accounts to "Objecting Beneficial Owner" status, concealing the identities of traders whose activity materially affected ELTK's market.
- Non-Public Platform-Specific Trading Information: IBKR concealed real-time trading metrics and platform-specific information observable only through its proprietary systems, preventing issuers from understanding market behavior affecting ELTK.
- Supervisory and Compliance Deficiencies: IBKR concealed supervisory failures and compliance weaknesses later corroborated by the United States Department of the Treasury's July 15, 2025, settlement.
- Enterprise-Level Opacity: IBKR concealed that its vertically integrated enterprise structure allowed trading activity to flow through affiliated entities without proper oversight or review.

These omissions were material because they directly affected the integrity of the market for Eltek's stock and its ability to raise capital.

*Duty*

170. Under New York law, IBKR owed a duty not to conceal internal policies and practices that it knew would distort market integrity, mislead issuers, or create false market signals. This duty arises independently of federal securities law.

*Scienter*

171. IBKR acted with actual knowledge, deliberate recklessness, or willful blindness. IBKR knew the facts it concealed and intentionally concealed them because its business model profited from trading activity that harmed Eltek.

*Reliance*

172. Eltek actually and justifiably relied on the integrity of the market for its own shares. As an NMS issuer, Eltek paid Nasdaq's All-Inclusive Annual Listing Fee and incurred continuing compliance costs in each year of the Damages Period in reliance on the market for ELTK operating free of undisclosed broker interventions. Eltek's board and management timed, priced, and sized the Company's capital-formation decisions, including the October 2020 rights offering and the February 2024 underwritten offering, on the basis of the price, volume, and demand signals disseminated through Tape C. Those signals were corrupted by IBKR's concealed conduct: its OBO default, its permissive market-access settings, and the off-exchange execution of ELTK order flow on its ATS, facts exclusively within IBKR's knowledge and undiscoverable by Eltek. Given IBKR's superior knowledge of these undisclosed practices, Eltek's reliance on those market signals was justifiable.

*Causation and Damages*

173. As a direct and proximate result of IBKR's fraudulent concealment and deceptive business practices, Eltek suffered distorted stock prices, artificial suppression of demand, distorted market signals, an impaired ability to raise capital on fair terms, and delayed financing and strategic losses.

**COUNT VII**

**Common Law Fraud (Against MSSB)**

174. Plaintiff incorporates by reference all preceding paragraphs.

*Overview of Fraud Theory*

175. Defendant Morgan Stanley Smith Barney LLC ("MSSB") engaged in intentional concealment and deceptive conduct by implementing and maintaining a unilateral non-publicly

disclosed "P-Trade Policy" that barred electronic purchases of ELTK stock for approximately nine months. MSSB concealed this policy from its customers, Eltek, and the market, creating a false appearance of weak demand and artificially suppressing ELTK's stock price.

*Material Misrepresentations and Omissions*

176. MSSB knowingly and intentionally concealed:

- Existence of the P-Trade Policy: MSSB barred electronic purchases of ELTK, requiring customers to place purchase orders by telephone.
- Market-Wide Impact: MSSB concealed that its policy materially distorted market demand for ELTK's stock, creating false signals affecting all market participants.
- Undisclosed Purpose: MSSB concealed the purpose of the restriction, including the identification function as alleged here.

These omissions were material because they directly affected market demand and Eltek's ability to raise capital.

*Duty*

177. Under New York law, MSSB owed a duty to not distort market access and not to conceal internal policies that materially affect public market demand. This duty arises independently of federal securities law.

*Scienter*

178. MSSB acted with actual knowledge and fraudulent intent. MSSB knew its P-Trade Policy suppressed demand, knew its customers were unaware of the restriction, and knew the market would interpret the suppressed demand as genuine, and it maintained the policy while concealing its own compliance failures.

*Reliance*

179. Eltek actually and justifiably relied on the false appearance of organic market demand that MSSB's concealed restriction created. Eltek paid Nasdaq's All-Inclusive Annual Listing Fee and incurred continuing NMS compliance costs in reliance on a market free of non-publicly disclosed broker-imposed purchase restrictions. Eltek's board and management planned, timed, and priced the Company's capital raises, including the October 2020 rights offering conducted while the undisclosed P-Trade Policy was suppressing electronic purchases of ELTK, on the basis of the price, volume, and demand signals disseminated through Tape C. MSSB alone knew that it had severed electronic buy-side access for its millions of customers while leaving sales unrestricted and share lending active, and it never disclosed that fact to Eltek, its customers, or the market. Given MSSB's exclusive knowledge of the restriction, Eltek's reliance on the apparent state of demand for its shares was justifiable.

*Causation and Damages*

180. As a direct and proximate result of MSSB's fraudulent concealment, Eltek suffered an artificially depressed stock price, distorted market demand, an impaired ability to raise capital, delayed financing, and strategic losses.

**COUNT VIII**

**Declaratory Judgment**

181. Plaintiff incorporates by reference all preceding paragraphs.

182. Plaintiff has satisfied the requirements of Israel Companies Law §§ 194–198, as set forth in Section VII. Under § 198(c), this Court is the court qualified to hear the action and is empowered to make the § 198(a) findings. Plaintiff seeks a declaration that this derivative action and

its conduct are, a priori, to the benefit of Eltek and that Plaintiff is not acting otherwise than in good faith. In the alternative, and only to the extent any question is raised as to whether §§ 197–198 govern or are satisfied, a case and controversy exists warranting declaratory relief.

183. XDOOD has commenced this derivative action on behalf of Eltek in good faith, not in bad faith seeking a quick private settlement for the purpose of maximizing legal fees, but to eliminate stock manipulation of Eltek shares, which benefits the Company as a whole.

184. The U.S. Southern District Court, in and for the State of New York is "the court qualified to hear the action" under Israel Companies Law § 198(c).

185. The Plaintiff is entitled to a declaratory judgment that this action and its conduct are to the benefit of Eltek and that the Plaintiff is not acting otherwise than in good faith.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:

A. Declaring that IBKR and MSSB defendants violated the federal securities laws and New York state laws as alleged in this Complaint;

B. Ordering Defendants to pay compensatory damages, together with prejudgment interest, for their unlawful conduct in an amount to be determined at trial;

C. Ordering Defendants to pay punitive damages to Eltek on Counts VI and VII for their malicious, oppressive, and/or reckless disregard for Eltek's rights, in an amount to be determined at trial;

D. Permanently enjoining and restraining Defendants, pursuant to the Court's equitable powers and New York law (Counts VI and VII), from continuing the unlawful conduct alleged in this Complaint;

E. To the extent required by Israel Companies Law, as determined by this Court, declaratory judgment that XDOOD's action and its conduct are to the benefit of Eltek and that XDOOD, is not acting otherwise than in good faith.

F. Awarding Plaintiff reasonable attorneys' fees and costs;

G. Granting such other and further relief as the Court deems just and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff Demands a jury trial on all claims.

Dated: 23 November 2026
New York, New York

Respectfully submitted,

*<u>/s/ T. Edward Williams, Esq.</u>*
WILLIAMS LLP
420 Lexington Avenue Suite 875
New York, New York 10170
212.417.0430
212.417.0433 (Fax)
edward@williamsllp.com
Attorneys for Plaintiff, XDOOD

## VERIFICATION OF COMPLAINT

**MICHAEL MCGAULEY**, being duly sworn, deposes and says as follows:

1. I am of lawful age and of sound mind, and I supply this Verification pursuant to Fed. R. Civ. P. 23.1(b).
2. I am the managing member and sole owner of Plaintiff, XDOOD LLC.
3. I am authorized to speak for and make declarations for XDOOD LLC.
4. I make this verification based on personal knowledge unless I otherwise state that I make a statement upon information and belief.
5. I read the foregoing Second Amended Complaint before it was filed with this Court.
6. The facts alleged in the foregoing Second Amended Complaint are true and correct to the best of my knowledge, information, and belief.
7. I make this Verification pursuant to 28 U.S.C. § 1746, and I certify, verify, and declare under pains and penalty of perjury that this Verification is true and correct.

Dated: 23 November 2026

*/s/ Michael McGauley*
Michael McGauley
As authorized agent and Managing
Member for XDOOD LLC