WILLIAMS LLP

420 Lexington Avenue Suite 875
New York, New York 10170
Direct Dial: 212.417.0430
edward@williamsllp.com

23 November 2026

**BY CM/ECF**
Hon. Lewis A. Kaplan
United States District Court Judge
500 Pearl Street
New York, New York 10007-1312

Re: *XDOOD v. Interactive Brokers Grp. Inc. et al.*, 25 Civ. 08536 (LAK)
Subject: Letter Request for Leave to File Second[1] Amended Complaint

Dear Judge Kaplan:

We represent Plaintiff XDOOD LLC, which is suing derivatively for Eltek Ltd. ("Eltek"). XDOOD respectfully requests leave to file the proposed Second Amended Complaint (the "SAC") (Dkt. 57), which is a clean copy of the Second Amended Complaint. A redline against the Amended Complaint (Dkt. 6) is **Exhibit A**. In its rulings on Defendants' Motions to Dismiss, the Court explained that "the better course of action is to decide the motion before the Court and then see what, if anything, the future holds" (Dkt. 55 at 8). In its second order, the Court wrote: "Nor will the Court now address plaintiff's request for leave to amend in the event the current amended complaint is found wanting" (Dkt. 56 at 8). XDOOD drafted the SAC with the benefit of both rulings and responds to each ground the Court identified, as the table in Part 3 shows.

### 1. Rule 15(a)(2) Governs Because No Judgment Has Been Entered.

Leave should be freely granted when justice so requires. Fed. R. Civ. P. 15(a)(2). Foman v. Davis, 371 U.S. 178, 182 (1962);Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 189-91 (2d Cir. 2015) (construing Rule 15(a)(2) after dismissal of common-law fraud claims).

The Rule 15(a)(2) standard applies here without the post-judgment overlay. Neither order directed entry of judgment, and the John Doe defendants remain parties (Dkt. 55 at 9; Dkt. 56 at 8). An order that adjudicates fewer than all claims, or the rights and liabilities of fewer than all parties, does not end the action and may be revised before final judgment. Fed. R. Civ. P. 54(b). The post-judgment rule therefore does not apply: "A party seeking to file an amended complaint postjudgment must first have the judgment vacated or set aside pursuant to Fed.R.Civ.P. 59(e) or 60(b)." Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008). The finality concerns that apply after judgment, under which "Rule 15's liberality must be tempered by considerations of finality," are not present. Williams v. Citigroup Inc., 659 F.3d 208, 213 (2d Cir. 2011).

### 2. There Is No Undue Delay, Prejudice, or Repeated Failure to Cure.

**This is Plaintiff's first pleading prepared after a merits ruling.** The Court dismissed the original complaint under Rule 8(a) for length. It set a 50-page limit and provided that, if a shorter

---

[1] The designation as a Second Amended Complaint is a technicality because the Amended Complaint that was previously filed has not been considered by this Court. This is the first Amended Complaint filed after this Court's ruling on Defendants' Motion to Dismiss.

complaint proved insufficient under Rule 9(b), "it could seek leave to amend again at such a time" (Dkt 5). The Amended Complaint (Dkt 6) was the shortened pleading that order required. It was filed before any defendant moved. It was not an amendment made in response to an identified substantive deficiency. The SAC is therefore not a "repeated failure to cure." It is the first opportunity to address the substantive grounds stated in Dkt. 55 and Dkt. 56. The SAC remains within the Court's 50-page limit. It supersedes the proposed pleadings at Dkt. 47-9 and Dkt. 49-1, which predated the Court's rulings.

**Defendants will not be unduly prejudiced.** The case remains at the pleading stage. The PSLRA discovery stay remains in place, and no discovery has occurred (Dkt. 41). In April, IBKR argued that Plaintiff "should not be rewarded with a third bite at the apple" (Dkt. 53 at 5). MSSB argued that a request embedded in opposition papers was procedurally improper (Dkt. 54 at 12). Both arguments preceded the Court's decision to defer the question. This freestanding request, with a single proposed pleading, addresses MSSB's procedural objection. As to timing since the May 27, 2026, order Plaintiff have conducted additional investigation and research on its claims.

**Plaintiff specifies the cure.** Leave to amend is not warranted if the amendment does not cure the defects the court identified. TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 505-06 (2d Cir. 2014).

**3. The SAC Responds to Each Ground of Dismissal.**

The SAC is not futile. The futility standard is the same standard that governs a motion to dismiss. Carroll v. Trump, 590 F. Supp.3d 575, 578–579 (S.D.N.Y. 2022) (Kaplan, J.). Rule 9(b) is satisfied when the complaint sets out "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 102 (2d Cir. 2007) (quotation omitted). The SAC adds these facts after additional and substantial investigation:

| Ground of Dismissal | SAC ¶¶ | What the SAC Adds |
|---|---|---|
| MSSB manipulative act; policy disclosed and avoidable (Dkt. 55 at 6) | 35-38, 54, 97-102, 107 | Restriction never reached Tape C; no notice to issuer, customers, or market centers; electronic buying blocked while sales and share lending stayed active; telephone route required internal approvals and took over an hour |
| MSSB scienter; remedial motive (Dkt. 55 at 7) | 45, 101, 103-107 | Asymmetric configuration chosen over less distortive tools and kept for nine months; repeated calls |

| | | |
|---|---|---|
| | | required of verified customers; refusal to explain |
| Reliance (Dkt. 55 at 7; Dkt. 56 at 7) | 36, 135, 172, 179 | Issuer selling its own shares at the market price; concealed restriction masked in consolidated data |
| Loss and loss causation (Dkt. 55 at 7; Dkt. 56 at 7) | 116, 131-137, 140 | Specific transaction: February 13, 2024, sale of 625,000 shares at $16.00; measure of loss; continuing suppression through the offering |
| Limitations as to MSSB (Dkt. 55 at 7-8) | 114-116, 120 | First sale at a market price and first injury in February 2024; entire policy period within the five-year repose period |
| IBKR primary manipulative act (Dkt. 56 at 5-6) | 17-18, 59-77, 81-93, 143-145 | IB LLC pleaded as the operating broker-dealer; March 18 and 21, 2025 platform events; IBKR ATS volume weeks; NOBO exclusion; pre-market trading window |
| IBKR scienter (Dkt. 56 at 6-7) | 20-21, 84-86, 94-96, 146, 150-151 | Named officers and a Steering Committee that designed the policies; real-time surveillance; flagged accounts cleared; staffing warnings disregarded; Nasdaq findings and censure |
| Common-law fraud, Rule 9(b) (Dkt. 55 at 8; Dkt. 56 at 7) | 119, 167-180 | For each defendant: specific omissions, scienter, the decisions made in reliance, damages, and timeliness |
| Demand and Rule 23.1 (Dkt 55 at 8; Dkt. 56 at 7-8) | 5, 12, 121-130; Verification | Verified pleading; written demands in May 2023 and September 2025 and the refusals; allegations under |

| | | |
|---|---|---|
| | | Israel Companies Law §§ 194-198 |
| Proper IBKR entity (Dkt. 56 at 5; Dkt. 53 at 2-4) | 13-22, 143, 148-152 | IBG LLC and IB LLC added; Section 20(a) count pleaded in the alternative; notice allegations |

**A. MSSB**

**Manipulative act.** The Court found that the P-Trade Policy was "disclosed (albeit not publicized)" and that customers could buy by telephone or through other brokers (Dkt 55 at 6). The SAC pleads facts directed at that finding:

- The restriction operated inside MSSB's routing and was never disseminated to Tape C. Tape C continued to publish an NBBO and volume metrics that "appeared unimpeded, masking the absence of broker-originated buy-side access from the broader market" (SAC ¶ 36).
- The only notice was an error message shown to a customer who attempted an electronic purchase. MSSB gave no notice to the issuer, its customers, or competing market centers (SAC ¶¶ 38, 100).
- The telephone route took over an hour while MSSB obtained internal approvals, and the price moved in the interim (SAC ¶ 54).
- MSSB moved ELTK to sell-only status across its platform. It blocked every electronic purchase while leaving sales unrestricted and share lending active (SAC ¶¶ 97-98, 102, 107).

The SAC does not plead the July 22, 2021, communication from MSSB's counsel that the Court noted (Dkt. 55 at 4). Even crediting that communication, a statement by counsel at the end of the nine-month period did not disclose the restriction to the market whose prices it affected (SAC ¶¶ 36, 38, 100). As alleged, the policy was market conduct, a platform-wide change to order routing, and not merely an omission. "Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." Set Cap. LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 77 (2d Cir. 2021).

**Scienter.** The Court relied on the Amended Complaint's statement that MSSB acted "[t]o address detected manipulation." On that basis it held that "there is no way to squint hard enough to see that conceded motive as scienter" (Dkt 55 at 7). The SAC still pleads that MSSB's Fraud Operations Unit flagged the October 16, 2020, trading before MSSB instituted the policy (SAC ¶ 45), and Plaintiff does not retreat from that fact. The new allegations address what the trigger does not explain:

- Less distortive tools were available: symmetric restrictions, cash-only trading, non-marginability, and position limits. MSSB chose the one configuration that blocked electronic buying while leaving selling and lending active (SAC ¶¶ 106-107).
- MSSB kept that configuration for nine months, long after any short-term risk justification (SAC ¶ 105).
- MSSB required repeated telephone calls from customers it had already verified and approved (SAC ¶ 104).
- MSSB refused to explain the policy when asked (SAC ¶ 101).

The SAC pleads that "the selection and prolonged maintenance of a demand-suppressive tool supports the inference that the restriction functioned as a manipulative device rather than a risk control" (SAC ¶ 107). These are facts for the Court to weigh against competing inferences. They replace the statement of motive the Court found dispositive.

**Reliance and loss causation.** The SAC also responds to these rulings.

- **Reliance.** The Court reasoned that reliance on a market free of manipulation was unreasonable when Plaintiff alleged ongoing manipulation (Dkt 55 at 7). The SAC's theory is narrower. Eltek, an issuer selling its own securities, necessarily transacted at the market-set price (SAC ¶ 135). Whatever Eltek may have suspected about trading in its stock, it could not account for the concealed shutdown of a major broker's electronic buy side, which the consolidated tape masked (SAC ¶¶ 36, 100, 179).
- **Loss causation.** The SAC replaces the general allegation of "growth opportunities" with a specific transaction. On February 13, 2024, Eltek sold 625,000 shares at $16.00 per share (SAC ¶ 133). The SAC pleads how the loss is measured (SAC ¶ 134) and pleads continuing suppression through the offering. For 345 consecutive trading days, shareholders' equity averaged 89.5% of market capitalization, and the price-to-earnings ratio stayed at or below 5 against an industry average of 22 to 45 (SAC ¶¶ 132, 136).

Plaintiff recognizes that the policy ended around July 2021 (SAC ¶ 115) and the offering occurred in February 2024. The SAC addresses that interval through its continuing-suppression and concurrent-causation allegations (SAC ¶¶ 136, 140).

**Limitations.** The Court held the claim untimely because Plaintiff knew the facts by February 2021 (Dkt. 55 at 7-8). The SAC pleads that Eltek first sold shares at a market-determined price in February 2024. The October 2020 rights offering was a subscription offering to existing shareholders of record (SAC ¶¶ 42, 116 & Table 7 note). Several authorities bear on accrual:

- The two-year period runs from "2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1).
- Merck held that facts showing scienter are among those facts. It did not decide whether loss and loss causation are. Merck & Co. v. Reynolds, 559 U.S. 633, 648–53 (2010).
- The Second Circuit treats a fact as discovered only when a reasonably diligent plaintiff has "sufficient information about that fact to adequately plead it in a complaint." The

discovery period cannot begin before the plaintiff's purchase. City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175-76 (2d Cir. 2011).

- Applying those principles to issuers, Judge Preska held that the issuers' "securities fraud claims therefore could not have accrued before that time," meaning before their first economic loss. In re Merrill Lynch Auction Rate Sec. Litig., 758 F. Supp. 2d 264, 275-76 (S.D.N.Y. 2010).

Knowing about the restriction in 2021 is not knowing about a Section 10(b) injury that had not yet occurred. XDOOD sued on October 15, 2025, within two years of the February 2024 offering. The entire policy period, from October 16, 2020, through approximately July 2021, falls within the five-year repose period (SAC ¶¶ 45, 115). Limitations is an affirmative defense. Dismissal on timeliness grounds is only appropriate where untimeliness is clear from the face of the pleading and matters subject to judicial notice. Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).

**B. IBKR**

**Manipulative act.** The Court found that the Amended Complaint alleged no more than routine facilitation of short sales. It relied on Plaintiff's acknowledgment that each act could be explained in isolation (Dkt 56 at 5-6). The SAC keeps that acknowledgment: each act "might be explained in isolation" (SAC ¶ 146). It then pleads what the Court said was missing. The SAC alleges that IBKR kept the combination of practices unchanged "after its effect on the market for ELTK was visible on IBKR's own systems" (SAC ¶ 146). It supports that allegation with platform-specific facts:

- On March 18, 2025, IBKR's own application showed "Shortable Shares" falling by 28,975 in under three minutes. In the same window, 33,049 shares executed within a price band of $8.355 to $8.443 (SAC ¶¶ 69-72).
- On March 21, 2025, IBKR accepted sell orders larger than orders Fidelity had blocked (SAC ¶¶ 73-75).
- IBKR ATS executed the highest share volume and number of ELTK trades during the weeks of October 12-16, 2020, and May 3-7, 2021 (SAC ¶ 87).
- Eltek's two NOBO reports left 35 to 42 percent of the float concealed. McGauley's IBKR-held shares were the only portion of his holdings absent from either report (SAC ¶¶ 59-61, 64, 89).
- IBKR offered 4:00 to 7:00 a.m. trading in ELTK, a window most brokers decline to support (SAC ¶¶ 65-66).

The Court also questioned whether the named defendant was a broker-dealer at all, "if indeed IBKR was a broker-dealer" (Dkt. 56 at 5). The SAC names Interactive Brokers LLC as the registered broker-dealer that executed and cleared ELTK order flow through DTCC accounts 0017 and 0534 and operated the IBKR ATS (SAC ¶¶ 17-18, 143).

**Scienter.** The Court found that the Amended Complaint identified no individual whose scienter could be imputed to IBKR, did not plead collective corporate scienter, and relied on a profit motive (Dkt 56 at 6-7). The SAC adds the following:

- It identifies the officers and the CEO-chaired Steering Committee responsible for designing the challenged policies, and it pleads that shared executive management mandated them across IBG, Inc., IBG LLC, and IB LLC (SAC ¶¶ 20-21, 150-151).
- It pleads that IBKR's surveillance gave it real-time visibility into ELTK order flow (SAC ¶ 94).
- It pleads that IBKR continued clearing through accounts its own surveillance had flagged, and disregarded warnings that the group reviewing those alerts was chronically understaffed (SAC ¶ 95).
- It pleads Nasdaq's finding that, from April 2021 through August 2023, IBKR's surveillance "frequently detected potentially manipulative activity," yet its supervisory system was not reasonably designed to prevent it. Nasdaq censured IBKR and fined it $900,000 (SAC ¶¶ 85-86).

Under Set Capital, manipulative intent can distinguish manipulation from otherwise lawful conduct. 996 F.3d at 77. The Court relied on that same principle (Dkt 56 at 6). IBKR's conduct also continued through the February 2024 offering and into 2025 (SAC ¶¶ 87, 115, 136). The reliance and causation responses discussed above apply to IBKR as well.

**C. Common-Law Fraud (Counts VI and VII)**

The Court held that the Amended Complaint "utterly fails even to attempt to comply with" Rule 9(b) (Dkt 55 at 8; *see* Dkt 56 at 7). The SAC now pleads the following:

- the specific facts concealed (SAC ¶¶ 169, 176);
- the source of the claimed duty (SAC ¶¶ 170, 177);
- scienter (SAC ¶¶ 171, 178);
- the decisions Eltek made in reliance, including payment of Nasdaq listing fees and the timing, pricing, and sizing of the October 2020 and February 2024 offerings (SAC ¶¶ 172, 179);
- damages (SAC ¶¶ 173, 180); and
- timeliness under CPLR 213(8) (SAC ¶ 119).

These counts now satisfy the particularity requirement.

**D. Demand and Rule 23.1**

MSSB argued that the Amended Complaint did not adequately plead demand (Dkt 55 at 8). The Court said IBKR's Rule 23.1 and derivative-standing arguments "appear to have merit" (Dkt 56 at 8). Rule 23.1(b)(3) requires the complaint to state with particularity any effort to obtain the desired action from the directors. Fed. R. Civ. P. 23.1(b)(3). The Rule "does not create a demand requirement of any particular dimension." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96-97

(1991). "Although Rule 23.1 sets forth the pleading standard for federal court, the substance of the demand requirement is a function of state law." Espinoza v. Dimon, 797 F.3d 229, 234 (2d Cir. 2015). Here, the governing law is the law of Eltek's place of incorporation.

The SAC is verified (SAC, Verification), and it pleads the following:

- **First demand.** On May 26, 2023, McGauley sent a written demand to Chairman Nissan, the CEO, and the CFO. It attached an executive summary identifying the facts, the laws violated, the responsible entities, and the damages, and asked Eltek to pursue recovery from the brokerage firms (SAC ¶ 123).
- **First refusal.** The refusal was confirmed in writing on May 29, 2023: "We understand the company prefers not to sue." (SAC ¶ 124).
- **Second demand and response.** On September 22, 2025, Plaintiff renewed the demand, expressly invoking Israel Companies Law § 194(b). The Board responded through counsel that "[y]our clients (XDOOD) are free to pursue the derivative claims if they wish to do so" (SAC ¶ 125).
- **Israeli law.** The SAC pleads the conditions of §§ 197(1) and 197(2) and asks this Court, as the court qualified to hear the action, to make the § 198(a) findings (SAC ¶¶ 122, 126-127).

These allegations respond to the specific elements IBKR identified in its April opposition (Dkt. 53 at 4-6).

**4. The Claims Against IBG LLC and Interactive Brokers LLC Are Timely.**

IBKR argued that Plaintiff sued the wrong entity (Dkt. 53 at 2–4). The SAC adds IBG LLC and Interactive Brokers LLC (SAC ¶¶ 15-20, 143). It pleads Section 20(a) liability against IBG, Inc. and IBG LLC in the alternative (SAC ¶¶ 148-152).

**Timely on their own terms.** The claims against the new entities are timely without relation back. The SAC pleads that market data available before 2025 did not supply particularized facts tying IBKR's own conduct to the manipulation of ELTK, and that those facts emerged between March and July 2025 (SAC ¶¶ 117, 119). Under Merck and City of Pontiac, the two-year period does not begin before a plaintiff can adequately plead the facts constituting the violation, including scienter. IBKR's alleged conduct continued within the repose period, including the March 18, 2025, and June 23, 2025, events (SAC ¶ 115). That answers IBKR's argument that its practices predated October 2020 (Dkt. 53 at 7).

**Relation back, in the alternative.** Rule 15(c)(1)(C) permits relation back where the added party received notice within the Rule 4(m) period and knew or should have known that it would have been sued but for a mistake about the proper party's identity. Fed. R. Civ. P. 15(c)(1)(C). That inquiry turns on what the added party knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend. Krupski v. Costa Crociere S.p.A., 560 U.S. 538, 541–47, 548–50 (2010). The SAC pleads that the three entities share offices, executive officers, and centralized legal and risk-management functions. It also pleads that they share counsel, who

appeared for IBG, Inc. in December 2025 (SAC ¶¶ 21–22). IBKR's own wrong-entity argument shows the new entities knew they were the parties Plaintiff meant to sue.

**5. Local Civil Rule 15.1 and Relief Requested.**

Plaintiff submits the clean SAC, at Dkt 57, and a redline against Dkt 6 as Exhibit A. S.D.N.Y. Local Civ. R. 15.1(a).

Plaintiff respectfully requests that the Court (1) grant leave to file the Second Amended Complaint (Dkt 57), and (2) direct that the Amended Complaint at Dkt 57 controls. Alternatively, Plaintiff requests that the Court set a briefing schedule on this request.

Sincerely,

T. Edward Williams, Esq.

WILLIAMS LLP