EXHIBIT

A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------X

XDOOD LLC, derivatively on behalf of :
ELTEK, LTD,

Plaintiff, : Case No. 25-cv-08536 (LAK) :

-against- : **AMENDED COMPLAINT AND JURY DEMAND**

INTERACTIVE BROKERS GROUP, INC., : MORGAN STANLEY SMITH BARNEY LLC, and JOHN DOES 1–10

Defendants. :

-------------------------------X

23695.10

Case 1:25-cv-08536-LAK Document 2 Filed 11/24/25 Page 2 of 76

Plaintiff, v.

Civil Action: 1:25-cv-08536 (LAK)

INTERACTIVE BROKERS GROUP, INC.,
MORGAN STANLEY SMITH BARNEY LLC,
JOHN DOES 1-10

AMENDED COMPLAINT

JURY TRIAL DEMANDED

Defendants.

Plaintiff, XDOOD LLC ("XDOOD" or "Plaintiff"), derivatively on behalf of and in the right of Eltek Ltd. ("Eltek" or the "Company"), and for their Complaint against), sues Interactive Brokers Group, Inc. (, IBG LLC, Interactive Brokers LLC (collectively, "IBKR"), Morgan Stanley Smith Barney LLC ("MSSB"), and John Does 1-10, inclusive (collectively (the "John Does" and, together with IBKR and MSSB, the "Defendants") brings this shareholder derivative action for actual damages, treble damages, punitive damages, and injunctive relief, and allege upon personal knowledge, information and belief, and investigation, as followsDoe Defendants," referred to in this Complaint as "JDMS"), and alleges the following:

## NATURE OF THE ACTION

– Plaintiff brings this shareholder derivative action on behalf of Eltek Ltd. to address and remedy the ongoing fraudulent manipulation of the Company's publicly traded stock on Nasdaq during the period beginning in November 2019 and continuing through the present (the "Relevant Period"). The manipulation was perpetrated by unidentified John Does, as well as by Morgan Stanley Smith Barney LLC ("MSSB") and Interactive Brokers LLC ("IBKR"), each acting for their own improper purposes. These actions caused substantial harm to Eltek.

1. Defendant John Does are minority Eltek shareholders ("JDMS").

JDMS, through trading manipulation schemes, committed corporate sabotage and acted as a headwind for the Company's growth initiatives during the Relevant Period. JDMS used broker-dealers such as IBKR, MSSB, and other unidentified brokerages who knew or should have known about their scheme, which is described more fully herein.

2. Fraudulent market manipulation of Eltek's securities, by JDMS, occurred on or about October 16, 2020, and was later formally detected and confirmed by the MSSB's "Fraud Operations Unit" of E*TRADE Securities LLC, now operating under the name "E*TRADE

from Morgan Stanley" (hereinafter, "E*TRADE").[1] The JDMS fraud, however, was known (or should have been detected by the Fraud Operations Unit months earlier.

3. To address detected manipulation, MSSB's Fraud Operations Unit suspended electronic purchases of Eltek stock for approximately nine months following October 16, 2020. This negatively impacted demand for Eltek stock. During this period, MSSB customers could only purchase Eltek shares by placing telephone orders with a customer service representative, the phone trade policy ("P-Trade Policy"). Customers who held Eltek shares were not notified about the P-Trade Policy, and they were allowed to sell shares electronically with no notification they would not be able to electronically repurchase shares. Had MSSB properly discharged its duties months earlier when the manipulation became known to MSSB, then this would have never happened.

4. In the 4th quarter of 2020, E*TRADE was the third largest online retail platform with close to 5.8 million accounts. The P-Trade policy that MSSB initiated negatively affected the demand for Eltek stock from these accounts while causing overall market harm to the value and reputation of the company's securities.

5. The JDMS underlying manipulation schemes are still ongoing.

Other major brokerage firms, including Merryl Lynch of Bank of America, and Charles Schwab, instituted similar trading restrictions due to the unusual trading of Eltek stock. This was observed as recently as August 12, 2025. The stock resumed trading normally in September 2025. These subsequent actions by non-party brokers serve as independent, material corroboration that Eltek was the target of systemic and fraudulent schemes, which the Broker Defendants were complicit in.

6. This Complaint will show that even after MSSB's own "Fraud Operations Unit" detected manipulation with Eltek stock on October 16, 2020, MSSB did not protect the market. Instead, it engaged in a new, primary fraudulent "Cover-Up Scheme" to hide its own massive, pre-existing "Know Your Customer" ("KYC") compliance failures. This scheme involved implementing the secret, nine-month, one-sided P-Trade Policy that affirmatively blocked all electronic purchases while simultaneously facilitating short sales, thereby creating a deceptive, asymmetrical market to conceal its own liability.

[1] For clarity and consistency, MSSB is referred to throughout this Complaint as the responsible entity for conduct originally undertaken by E*TRADE. MSSB assumed full legal responsibility following the acquisition and integration of E*TRADE.

7. IBKR's affirmative decisions and policies facilitating manipulation ("Facilitative Business Practices" and "Deceptive Business Model Scheme"): IBKR is primarily liable as a key participant in the fraud. It intentionally or with deliberate recklessness, operated a "Deceptive Business Model Scheme" by implementing a constellation of affirmative business decisions and policies, including defaulting accounts to objectional owners ("OBO") anonymity, a permissive interpretation of Rule 15c3-5 laxer than its peers, provision of short shares and borrow rates that were designed and structured to attract, conceal, and monetize manipulative trading, in violation of its gatekeeping obligations.

8. The JDMS are liable as the primary violators who executed the underlying manipulation, including (but not limited to) wash trades, matched orders, spoofing, and a multi-year price fixing scheme.

1. This action is brought under Sections 9(a)(1), 9(a)(2), and 10(b) of the Securities Exchange Act of 1934 ("SEA") and for New York Common Law FraudThis suit arises from Defendants manipulating the stock of Eltek (ticker symbol ELTK) from October 22, 2019, through the present (the "Damages Period"). The John Doe Defendants, agreed and conspired to manipulate the stock price of Eltek, and looked for and traded on platforms that allowed manipulation. The John Doe Defendants are minority shareholders, the composition of these John Doe Minority Shareholder's ("JDMS") may vary throughout the Damages Period and across different brokers.

2. IBKR is a broker that, through its trading platform, including its Alternative Trading System ("ATS"), allows the manipulation of stocks, especially microcap stocks, and charges do so. As alleged in more detail below, since at least 2013, IBKR has been repeatedly found by U.S. regulators and a national securities exchange to lack supervisory and surveillance systems reasonably designed to detect and prevent manipulative trading in microcap securities.[2] But IBKR has not sufficiently fixed manipulation of microcap stocks because it reaps vast amounts of profits from allowing manipulation through its platform and trading systems. IBKR's conduct falls squarely within Rule 10(b)(5) prohibition and Plaintiff seeks damages against IBKR and the other Defendants.

3. Defendant Morgan Stanley is no better. Although it does not have a technological product that it sells to third parties, Morgan Stanley implemented a publicly undisclosed and an unreasonably lengthy P-Trade Policy which in and of itself is manipulative. Morgan Stanley's P-Trade Policy corrupted the market's price-formation mechanisms for Eltek's shares, misrepresented the natural forces of supply and demand, and generated artificial prices, artificial liquidity, and false market signals.

[2] IBKR's brokerage platform runs on proprietary technology that IBKR developed for the options market- making business conducted through its Timber Hill subsidiaries. IBKR exited market making in 2017 but kept the technology, which it still describes in its SEC filings as the basis for its trade execution.

4. Defendants' conduct further distorted and suppressed legitimate demand for Eltek's shares hindered Eltek's ability to raise and form capital on fair and efficient terms. In short, Eltek seeks to recover the substantial damages caused to its capital formation because of the Defendants' manipulations.

## SATISFACTION OF CONDITIONS PRECEDENT

~~6.~~5. Plaintiff brings this as a derivative action under Fed. R. Civ. P. 23.1. Plaintiff has attached the Affidavit of Michael McGauley in compliance with Rule 23.1, with Israeli Law, and, alternatively, with New York law. Michael McGauley's Affidavit is incorporated by this reference.

## JURISDICTION AND VENUE

~~7.~~6. This Court has original jurisdiction over all the claims and subject matter of this action pursuant to Section 27 of ~~SEA~~the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. This Court ~~has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1332. This Court~~ also has supplemental jurisdiction over the state law ~~claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy~~fraud claim. See 28 U.S.C. § 1367.

~~12.~~ This Court has personal jurisdiction over each ~~JDMS. Each one directed fraudulent activity into the market by manipulating Eltek stock on Nasdaq, which is located in this District. The unlawful acts committed by JDMS had a direct and substantial impact on the market price of Eltek shares traded in this District in the United States.~~

~~13. This Court has personal jurisdiction over IBKR and MSSB~~Defendant, including each JDMS, because each ~~has~~ conducted a substantial part of the unlawful suit-related trading activities ~~being~~ asserted in this District ~~and~~/or directed fraudulent activity into the market by manipulating Eltek stock on Nasdaq, which is located in this District~~. Indeed, the conduct of IBKR and MSSB were in furtherance of the market manipulation schemes that manipulated the share price of Eltek.~~

~~8.~~7. ~~All Defendants conducted continuous activity in New York state, directly related to these claims, by engaging in fraudulent and manipulative trading using electronically routed and executed trades of Eltek shares throughout the United States, including in New York, on exchanges in the United States, such as Nasdaq~~, and the unlawful acts of JDMS had a direct and substantial impact on the market price of Eltek shares traded in this District.

~~9.~~8. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and Section 27 of ~~SEA. Many of~~the Exchange Act because the acts, transactions, and occurrences alleged herein took place in this District. ~~All Defendants engaged in the activities and events described herein.~~

## THE PARTIES

### Plaintiff XDOOD, derivatively on behalf of Eltek Ltd.

~~18.~~ Eltek ~~was organized in Israel in 1970, and its~~Ltd. (“Eltek”) is an Israeli corporation organized in 1970. Its shares have been publicly ~~traded~~listed on ~~the~~The Nasdaq~~,~~ Stock Market since 1997~~. While Eltek’s primary listing exchange is the Nasdaq, where it trades~~ under the ticker symbol ~~“~~ELTK~~”, the stock also trades across other various trading centers due to the U.S. equity market’s fragmented structure.~~

~~19. The principal markets for the Company’s printed circuit boards (PCBs) are in Israel, India, Europe and North America. Eltek markets its products mainly to medical technology, defense and aerospace, industrial, telecom and networking equipment, as well as to contract electronic manufacturers, among other industries. Some customers of Eltek have included Boeing, Airbus, GE HealthCare, Siemens, Raytheon Technologies, General Dynamics, Tata Group, Philips, ASML, and Abbott Laboratories.~~

~~10.~~9. ~~While Eltek is a foreign entity, its shares are solely listed on the Nasdaq stock market, specifically Nasdaq Capital Markets (“Nasdaq”). Eltek paid Nasdaq an All-Inclusive Annual Listing Fee, during the Relevant Period, which enables Eltek stock to be traded by broker-dealers on the Nasdaq~~ and are listed solely on Nasdaq, on the Nasdaq Capital Market tier. During the Damages Period, Eltek paid Nasdaq’s All-Inclusive Annual Listing Fee, which permits its shares to be listed on Nasdaq and traded across U.S. markets as a National Market System (“NMS”) security.

~~21.~~ XDOOD~~, derivatively on behalf of Eltek,~~ LLC (“XDOOD”) is a Massachusetts Limited Liability Company with a principal place of business ~~located~~ at 1400 Hancock St. Fl. 9 Quincy, MA 02169. Michael McGauley (“McGauley”) is the manager and sole member of XDOOD ~~and is also domiciled in the State of Massachusetts~~. XDOOD has held between 3,500 and 24,000 shares of the Company since November 2019. XDOOD ~~currently~~ owns over 8,900 shares of Eltek~~.~~

~~22. Plaintiff continuously owned Eltek shares from November 2019 to Today. All its shares were considered part of the Company Float.~~

~~23. McGauley and Dean Chin (“Chin”) performed the investigation and fact finding of this action on the behalf of XDOOD LLC.~~

10. ~~On September 22, 2025, XDOOD made demand upon Eltek,~~ as of the filing of this Amended Complaint.

11. Plaintiff has owned Eltek Float shares from October 22, 2019, to today without interruption.

13.12. XDOOD made two demands on Eltek pursuant to Israel Companies Law, 5759-1999 § 194(b), that the Company pursue the legal claims articulated in this Complaint. Eltek declined to do so, but authorized XDOOD to pursue the claims and agreed to aid Plaintiff in its investigation of Eltek stock manipulation, so far as it did not impact Eltek's business operations, and it is within their abilitiesin May 2023 and in September 2025, that Eltek pursue the claims alleged in this Complaint, but Eltek declined to prosecute the claims in its own name and instead authorized XDOOD to bring the claim in its own name.

**Defendants**

**Interactive Brokers Group, Inc. (IBKR"IBG, Inc.")**

13. Defendant IBKR is a Delaware holding company with principal executive office located at One Pickwick Plaza Greenwich, Connecticut 06830. Together with its affiliates, it serves as an automated global electronic stockbroker-dealerInteractive Brokers Group, Inc. is a publicly traded corporation listed on the Nasdaq Global Select Market under the ticker symbol "IBKR" with its principal executive offices located at One Pickwick Plaza, Greenwich, Connecticut 06830.

14. Interactive Brokers Group, Inc. "is a Delaware holding company whose primary asset is its ownership of approximately 26.3% of the membership interests of IBG LLC." It is the sole managing member of IBG LLC and, as it states in its SEC filings, "operate[s] and control[s] all of the business and affairs of IBG LLC and its subsidiaries."

*IBG LLC*

15. Defendant IBG LLC is a Connecticut limited liability company with its principal executive offices located at One Pickwick Plaza, Greenwich, Connecticut 06830.

III.16. IBG LLC is the direct Managing Member of the domestic operating broker-dealer, Interactive Brokers LLC, holding a 99.9% ownership interest.

28. Morgan Stanley Smith Barney LLC (MSSB)

29. MSSB is a Delaware corporation with its principal executive offices located in New York, New York. Per the E*TRADE from Morgan Stanley website, the Name under which the service provider does business is, "Morgan Stanley Smith Barney LLC" and "E*TRADE from Morgan Stanley." The legal name listed is Morgan Stanley Smith Barney LLC, 1585 Broadway New York, New York 10036.

MSSB is a registered broker-dealer, and a wholly owned subsidiary of Morgan Stanley.*Interactive Brokers LLC ("IB LLC")*

17. Defendant Interactive Brokers LLC ("IB LLC") is a Connecticut limited liability company with its principal place of business located at One Pickwick Plaza, Greenwich, Connecticut 06830. IB LLC is a registered broker-dealer regulated by the SEC (SEC No. 8-47257) and FINRA under CRD No. 36418. Per the 2025 SEC Form 10-K Exhibit 21.1 (Subsidiaries of the Registrant), IB LLC is a direct operating subsidiary wherein "IBG LLC owns 99.9% and Mr. Thomas Peterffy owns 0.1%".

18. IB LLC serves as the primary domestic broker-dealer and clearing broker through which the enterprise routes, custodies, and executes customer transactions, which are cleared and settled at the Depository Trust & Clearing Corporation ("DTCC") in IBKR participant accounts, including account number 0017 named "INTERACTIVE BROKERS LLC" and account number 0534 named "INTERACTIVE BROKERS LLC/RETAIL".

**Collective reference IBKR or IBKR Enterprise**

19. Defendants IBG, Inc., IBG LLC, and IB LLC are collectively referred to throughout this Amended Complaint as "IBKR" or the "IBKR Enterprise." These entities function as a singular, vertically integrated electronic financial unified enterprise under centralized management, a common technology infrastructure, and a shared public identity.

20. Where this Complaint alleges operational conduct, order routing, execution, clearing, settlement, securities lending, customer account settings, market-access controls, and operation of the IBKR trading platform, that conduct was performed by IB LLC. Where this Complaint alleges the design, mandating, or control of the policies, systems, and parameters governing that conduct, those decisions were made by the shared executive management of IBG, Inc. and IBG LLC.

21. Complete Overlap of Executive Management: During the Damages Period, the executive leadership, and ultimate decision-making authorities, including the Chief Executive Officer, Chairman, and Board of Directors, have been completely identical and shared across IBG, Inc., IBG LLC, and IB LLC.

22. Actual, Imputed, and Constructive Notice: IBG, Inc., IBG LLC, and IB LLC share the same principal offices, the same executive officers, and the same centralized legal, regulatory, and risk-management infrastructure, and are represented by the same counsel, which appeared in this action for IBG, Inc. in December 2025. Because IBG, Inc. is the sole managing member of IBG LLC, which in turn owns and operates IB LLC, service and notice of the claims upon IBG, Inc. constituted simultaneous notice to both IBG LLC and IB LLC: each had actual notice of this action and of the claims asserted in it from its commencement, and neither is prejudiced in defending those claims on the merits.

**Morgan Stanley Smith Barney LLC ("MSSB")**

21.23. MSSB is a Delaware limited liability company, a registered broker-dealer, and a wholly owned subsidiary of Morgan Stanley, with its principal executive offices located in New York, New York. It lists its address as 1585 Broadway, New York, New York 10036, and does business as "Morgan Stanley Smith Barney LLC" and "E*TRADE from Morgan Stanley."

31. On October 2, 2020, Morgan Stanley, the Parent Corporationparent of MSSB, completed theits acquisition of E*TRADE Financial Corporation, of which E*TRADE Securities LLC was a subsidiary, in an all- stock transaction.[3] In 2023, MSSB assumed responsibility for the custody and clearing services previously provided by E*TRADE.

22.24. On Beginning on or about September 1, 2023, E*TRADE began the process of transferringtransferred accounts, assets, and obligations to MSSB. As such, MSSB, which became the broker-dealer of record, and assumed custody of those accounts at E*TRADE. Subsequently, the company began operatingand the custody and clearing services previously provided by E*TRADE, and now operates under the trade name "E*TRADE from Morgan Stanley"."

**John Doe Minority Shareholders (JDSM"JDMS")**

25. Defendant JDMS consist of business entities and individuals that traded EltekELTK stock on multiple U.S. trading venuesmarket centers, including national securities exchanges such as Nasdaq and alternative trading systems ("ATSs")as well as various off-exchange ATS's and electronic market makers. JDMS may include, but are not limited to, individuals acting in concert, omnibus account holders, hedge funds, family offices, market makers, or other institutional investors. Plaintiff reserves the right to amend this Complaint to identify these JDMS by name upon further discovery, or brokers.

## ALLEGATIONS

## IBKR'S UNIFIED ENTERPRISE STRUCTURE & CENTRALIZED TECHNOLOGY

i.26. The IBKR ATS ('IATS') is an alternative trading system used by Interactive Brokers LLC, a registered broker-dealer, pursuant to a Form ATS-N on file with the SEC.

[3][2] October , 2020, Morgan Stanely ("MS") press release announcing the completed acquisition of E*TRADE Financial Corporation https://www.morganstanley.com/press-releases/morgan-stanley-closes-acquisition-of-e-trade

## ~~35. FACTUAL BACKGROUND~~

## ~~Eltek's~~MARKET STRUCTURE AND FLOAT COMPOSITION

### Eltek's Trading Venue, Share Overview, Limited Public Float

~~23.~~27. Eltek's ~~primary listing exchange is~~shares trade primarily on the Nasdaq~~, where it trades~~ under the ticker symbol "ELTK~~.~~," ~~While Nasdaq is the primary listing venue for Eltek, the stock also trades~~and also across other ~~various~~ trading centers due to the U.S. equity market's fragmented structure under NMS.

~~ii.~~28. Eltek is an Israeli-based company that is a leading global provider of complex Printed Circuit Boards ("PCBs"). Eltek ~~services, the space, aerospace, medical, defense, radio frequency and microwave industries. The Company~~ was and still is more than 50% owned by Mr. Yitzhak Nissan through personal shares and his Nistec Golan Ltd. company based in Petach Tikva, Israel. ~~All of~~ Mr. Nissan and Nistec Golan Ltd. shares, collectively ("Nistec"), are restricted shares and subject to limits and notification on trading.

29. ~~Company~~The "Float" consists of the Eltek shares~~,~~ not held by Nistec~~,~~ or other Company insiders such as the CEO or CFO~~, are referred to as (the "Trading Float", "Public Float", or the "Float"); The Float is calculated by subtracting shares owned by insiders such as Nistec from the Company's total outstanding shares. The Float differed in size during the Relevant Period. Only the Float shares were available to be traded openly, without insider restrictions, and a varying portion of these shares combined with trading techniques were used for the manipulation activities~~ and is calculated by subtracting insider-held shares from the Company's total outstanding shares.

30. At various times during the Damages Period, the JDMS executed trades in ELTK using a portion of Eltek's Float shares.

31. IBKR's Rule 606(a) routing reports identify IBKR ATS, UBS ATS, and other ATS venues order-routs for transparency reporting. ELTK's weekly ATS Transparency data reflects executions on several of these venues during the Damages Period.

### Form F-3 Eligibility and Market-Capitalization Threshold

32. Eltek's ability to raise capital efficiently depends, in part, on its eligibility to use Form F-3, the streamlined shelf-registration form available to certain foreign private issuers. Under General Instruction I.B.5 of Form F-3, an issuer may use the form only if the "aggregate market value worldwide of the voting and non-voting common equity held by non-affiliates" equals $75 million or more.

### Market-Wide LULD Pauses vs. Unilateral Broker Restrictions for ELTK

33. A LULD trading pause halts all trading in the security, **both buying and selling**, on every U.S. exchange and over the counter, and the pause is disseminated to the entire market through the Nasdaq Unlisted Trading Privileges ("UTP") data feed (Tape C).

34. ELTK has had nine issuer-specific halts, all of which were LULD Pauses, and they are summarized in Table 1 – ELTK Halts.

*Table 1 – ELTK Halts*
*(All entries in this table are Nasdaq LULD Pauses, the issuer-specific halt type applicable to ELTK.)*

| # | Halt Date | Halt Time | Resume Time | Minutes Halted | Damages Period |
|---|---|---|---|---|---|
| 1 | 8/30/2019 | 12:28:54 | 12:33:54 | 5 | Pre |
| 2 | 9/3/2019 | 10:37:56 | 10:42:56 | 5 | Pre |
| 3 | 3/9/2020 | 11:27:48 | 11:32:48 | 5 | During |
| 4 | 10/16/2020 | 10:37:23 | 10:42:23 | 5 | During |
| 5 | 5/14/2021 | 9:44:12 | 9:49:12 | 5 | During |
| 6 | 5/18/2023 | 9:41:58 | 9:46:58 | 5 | During |
| 7 | 6/23/2025 | 13:44:33 | 13:49:33 | 5 | During |
| 8 | 6/23/2025 | 13:55:53 | 14:05:53 | 10 | During |
| 9 | 6/23/2025 | 14:07:00 | 14:12:00 | 5 | During |

35. The P-Trade Policies were discretionary prohibitions on electronic purchases of ELTK that existed only on specific brokerage platforms, without any exchange-level halt, without any regulatory trigger, and without any disclosure to the market.

36. Because the P-Trade Policies operated solely within each broker's internal routing infrastructure rather than at the exchange level, they were never disseminated to Tape C, which continued to disseminate a National Best Bid and Offer ("NBBO") and consolidated volume metrics that appeared unimpeded, masking the absence of broker-originated buy-side access from the broader market.

37. Brokers operated these restrictions without public disclosure, despite the SEC's Regulation Best Interest ("Reg BI") requiring full compliance as of June 30, 2020.[4] Under Reg BI's Disclosure Obligation, broker-dealers must provide retail customers with full and fair written disclosure of all material facts relating to the scope and terms of the relationship, including any material limitations on the securities that may be recommended.

[4] Regulation Best Interest does not provide a private right of action and is not asserted as an independent basis for liability. It is referenced solely to describe the regulatory context governing brokers' disclosure of material limitations on customer access to securities during the Damages Period.

30.38. MSSB's broker-specific P-Trade Policy restricting electronic purchases of ELTK was maintained for approximately nine months without any public announcements, advance customer notifications, or notice to the issuer or competing market centers.

40. During the Relevant Period, only Nistec and McGauley were declared 5 percent or greater shareholders, as filed with SEC.

42. At various times, during the Relevant Period, JDMS owned and conspired to manipulate Eltek's trading using a portion of Eltek's Float shares. The Company Float varied between approximately 25% and 49% of the Company's outstanding shares over the Relevant Period. For this reason, the current legal action is, in part, a shareholder versus shareholder matter.

43. The DTCC, "through its nominee Cede & Co., is the registered holder of eligible securities, routinely processing dividend and interest payments and managing the electronic "book-entry" transfer of interests in securities among participants."

44. Plaintiff believes the JDMS trades Eltek using shares of record held by the nominee company CEDE & Co. Each of these securities are "eligible securities", meaning they are freely tradable pursuant to U.S. securities laws and are otherwise qualified to be held at DTCC and serviced.

The Figure 1 below depicts Plaintiff and Defendants clearing & settlement paths, with the DTCC nominee CEDE & Co. holding ELTK stock shares, on behalf of brokerage firms and their clients

# CHRONOLOGICAL FACTUAL TIMELINE

## Timeline Prior to the Damages Period (Relevant Foundational Facts)

39. On May 16, 2019, McGauley purchased shares of ELTK, and a Fidelity representative who contacted him to confirm the purchase told him, "It trades weird."

## Timeline During the Damages Period

## Start of XDOOD Standing / Damages Period (October 22, 2019)

40. On October 22, 2019, XDOOD purchased 2,500 shares of ELTK on the open market.

41. FINRA Rule 4560 short-interest reporting from November 15, 2019, through February 14, 2020, is summarized in Table 2, including a reported short position of 135,734 shares (approximately 8.9 percent of the public Float) on November 29, 2019.

*Table 2 – Market-Structure Snapshot (Nov 15, 2019 – Feb 14, 2020)*

| Date Event Short Interest Short Interest Change | Short Interest Percentage of Float Effective Float |
|---|---|
| 11/15/2019 44,309 16,856 11/20/2019 Eltek Q3 2019 Earnings | 2.90% N/A 8.90% |
| 11/29/2019 135,734 91,425 12/6/2019 McGauley Filed 13D | |
| 12/13/2019 142,662 6,928 12/31/2019 115,302 -27,360 | 10.50% |
| 1/15/2020 123,431 8,129 1/31/2020 20,906 -102,525 | |
| 2/14/2020 15,681 -5,225 | 9.40% 11.00% |
| | 7.60% 8.90% |
| | 8.10% 9.50% |
| | 1.40% 1.60% |
| | 1.00% 1.20% |

*Source Note: FINRA market-structure data is publicly disseminated on a delayed basis under FINRA Rule 4560.*

**Rights-offering & P-Trade-Policy start, October 14, 2020, through February 8, 2021**

42. On October 14, 2020, after its previous attempt to raise capital directly through the capital markets was conditionally denied, Eltek filed SEC Form F-1 describing its intent to initiate a subscription rights offering.

43. The results of this offering were announced on December 7, 2020, through a press release stating, "Our shareholders purchased 1,460,089 ordinary shares in this offering providing gross proceeds of $5.7 million to the Company."

44. On October 16, daily trading volume surged to 1,072,374 shares, representing 70.65% of the Float, or 82.57% of the Float excluding McGauley's minimum 5% of outstanding shares declared holdings.

45. MSSB's Fraud Operations Unit flagged Eltek trading on October 16, 2020, and instituted the P-Trade Policy. Plaintiff is unaware of any other brokerage firm that took similar action during this time period.

46. Approximately 95% of Eltek's total trading volume for the week of October 12–16, 2020 occurred on October 16, 2020, see Table 3 for ELTK daily trading details.

*Table 3 - NYSE Data for ELTK trading week of October 12-16, 2020*

| **Date** | **Volume** | **Volume % of Week** |
|---|---|---|
| 10/12/2020 | 27,118 | 2.40% |
| 10/13/2020 | 5,578 | 0.49% |
| 10/14/2020 | 8,585 | 0.76% |
| 10/15/2020 | 15,087 | 1.34% |
| 10/16/2020 | 1,072,374 | 95.01% |
| Total | 1,128,742 | 100.00% |

47. On or about October 26, 2020, Stocker attempted to purchase ELTK shares through MSSB's online platform, and MSSB displayed an error message stating: "Opening orders for this security cannot be accepted online at this time."

48. On March 23, 2021, ELTK traded 167,021 shares, 165,061 of them in 1,234 separate trades after 4:00 p.m. No news on March 23, 2021, or the day before, could account for this trading activity.

49. On March 24, 2021, Sert confirmed to McGauley that his ELTK shares held at MSSB were configured to allow borrowing for short selling, and MSSB's Fully Paid Lending report for February 2021 showed that his ELTK shares were borrowed short during that month.

50. MSSB only offered a global account-level setting for enabling or disabling share lending, and it did not allow disabling lending for individual stocks such as ELTK.

**P-Trade policy disclosure period, April 12-August 29, 2021**

51. Between May 3, 2021, and May 12, 2021, ELTK trading volume went from 2,000 shares to 1.6M shares, equating to 92% of the Company Float, and the share price moved up and down more than $2 per share within minutes.

52. No public news or events explain this trading. MSSB was not a primary market participant at this time, due to its P-Trade Policy.

53. Table 4 shows ELTK trading volume, percentage of outstanding and Float shares the volume represents, and the daily open, high, low, and closing price per share between May 6, and May 10, 2021.

*Table 4 - Trading between May 6, 2021, and May 10, 2021*

**Volume of Shares Traded Price Per Share $**

**Date Total Number Percent ofPercent ofOpen High Low Close**
**Outstanding Float**

---

6-May 1,635,697 28.01% 92.18% 6.03 7.92 5.87 6.93 7-May 85,441 1.46% 4.81% 6.86 7.28 6.67 7.25 10-May 1,140,764 19.52% 64.23% 7.16 8.8 6.28 6.55

*Note: The table is based on 5,840,357 outstanding shares, and 1,774,445 Float shares during this period.*

54. On May 10, 2021, Stocker called MSSB and asked whether he could purchase shares electronically. MSSB responded, "no, it has to be done over the phone." The phone process took over one hour while MSSB obtained internal approvals, and the stock price changed in the interim.

**Deep mispricing, August 30, 2021-May 17, 2023**

55. On or about August 31, 2021, Stocker purchased one share of ELTK during pre- market hours and another during regular trading hours; for the first time since October 26, 2020, no error message appeared, leading him to conclude that MSSB had removed its P-Trade Policy for ELTK sometime before August 31, 2021.

56. Beginning in September 2021, Eltek's stock price began to drop.

57. Between September 7, 2021, and December 31, 2021, Eltek lost 40% of its enterprise value, leaving it with a market cap of $21.7 million.

58. For the following 345 consecutive trading days between January 3, 2022, and May 17, 2023, the Eltek's shareholders' average equity as a percentage of the market cap was 89.5%.

59. On or about March 15, 2023, Eltek obtained a Non-Objectionable Beneficial Owners ("NOBO") report showing that the number of non-objectionable shareholders of record accounts for the Float was 1,042 as per record date February 9, 2023.

60. The remaining 749,251 shares, approximately 42 percent of the Float, were held in positions concealed from the Company.

61. Since March 29, 2021, McGauley has had a personal brokerage account at IBKR holding approximately 5,700 shares of Eltek. All of McGauley's Eltek shares held at broker-dealers other than IBKR appear on the NOBO reports obtained by the Company; only the shares he held with IBKR do not.

~~52.~~62. Eltek's stock price and volume remained stable near equity value after an April 4, 2023, analyst report valued the company at ~$9.50/share (see Figure 1 for share price vs. market capitalization during the Damages Period).

*Figure 1* ~~**Overview of Key Relationships and Trading Pathways**~~- Company daily share price, closing market capitalization, and shareholders' equity during the Damages Period




~~46. ELTK is a national market system ("NMS") security listed on Nasdaq but eligible for trading on multiple exchanges and off-exchange venues, including alternative trading systems ("ATS").~~

~~47.1. IBKR owns and operates its own ATS called IATS IBKR ATS.~~

~~48. MSSB's Actions~~

48.1. E*TRADE underwent extraordinary growth immediately prior to and after its announced acquisition by MSSB. In the first quarter of 2020 (ending March 31, 2020), amid the onset of the COVID-19 market volatility, E*TRADE added a record ~329,000 net new retail accounts and $18.3 billion in net new retail assets, increasing total retail & advisor services accounts to approximately 5.64 million. In the second quarter of 2020 (ending June 30, 2020), E*TRADE sustained this momentum with ~327,000 additional net new retail accounts (the second-highest quarter ever) and $13.6 billion in net new retail assets, bringing first-half 2020 retail account growth to ~656,000 and asset inflows to $31.9 billion, exceeding any prior full-year totals and demonstrating extraordinary pre-acquisition organic growth.

48. On July 22, 2021, counsel for MSSB admitted that MSSB's "Fraud Operations Unit" that "made the decision to restrict the trading of ELTK." on or about October 16, 2020 in a formal, out-of-court communication.

49. MSSB implemented its "P-Trade Policy" unannounced and undisclosed to the Company, its customers, and the market. The only time an MSSB customer had any notification about the P-Trade Policy was if they attempted to electronically purchase ELTK stock and observed a message.

50. On December 31, 2020, MSSB customer Heins Karam (“Karam”) attempted to place an order to buy Eltek shares through the MSSB website on that date and received an error message stating “Opening order for this security cannot be accepted online at this time” and provided a phone number to call customer service.

51. On May 10, 2021, Karam received in part the following e-mail from MSSB.

> Currently, all orders on ELTK require that instructions be provided over a recorded line. Reasons for such a requirement vary but may be due to a reorganization or other corporate action that has not been fully disclosed. To inquire if an if an order can be accepted on this security, please call customer service at your convenience. You can then speak with a licensed broker who will review your order for placement. This is a requirement for which we cannot make exceptions.

52. During the entire Relevant Period there has never been a single corporate action involving Eltek, whereby Eltek was responsible or guilty for something that would cause trading restrictions being imposed upon its shares. Eltek met all SEC and Nasdaq obligations.

53. When McGauley, exercising diligence, tried to discover the reason for this P-Trade Policy (e.g., in a 20-question email sent on Dec 21, 2021), MSSB's counsel affirmatively refused to answer per response on Jan 10, 2022.

54. MSSB responded to McGauley’s actions by terminating his account and stonewalled him for five months regarding information about the other-side- of-the-trade.

55. The P-Trade Policy was not just a secret 10b-5(a) deception. The policy affirmatively and simultaneously did two things: a. It suppressed legitimate purchase access by blocking 100% of electronic buy orders from its millions of customers. b. It simultaneously permitted Eltek stock to be borrowed for short-side activity through its share lending program, which actively sourced shares from its clients to lend to short-sellers.

56. This was a primary manipulative act by MSSB. This intentionally created a downward asymmetrical market for Eltek's stock.

58. IBKR's Platform, Policies, and Role in ELTK Trading

59. IBKR's ATS data shows consistent activity during the Relevant Period. A detailed analysis shows IBKRs platform plays a prominent role in trading ELTK shares.

60. Eltek obtained the following nonpublic reports from the Company's stock transfer agent Equiniti: (i) two Non-Objectionable Beneficial Owner reports ("NOBO" reports); (ii) a Bank-Broker Breakdown report; (iii) a Share Range Analysis report; (iv) a Litigation Report / Litigation Search.

61. The NOBO reports showed that the number of non-objectionable shareholders of record accounts for the Float was 1,042 as per record date February 9, 2023, and 1,278 as per record date June 13, 2023. As each Company shareholder may have multiple accounts (positions), these numbers do not provide the number of NOBO owners for the Company.

63. Since March 29, 2021, McGauley has a personal brokerage account at IBKR. The account holds approximately 5,700 shares of Eltek. All of McGauley's Eltek stock shares held at broker-dealers other than IBKR appear on the NOBO reports obtained by the Company. Only the Eltek shares McGauley holds with IBKR do not show up on the NOBO reports obtained by the Company.

63. OBO Default: Unlike peers including Fidelity and Charles Schwab, IBKR affirmatively sets its customer accounts to objecting beneficial owner ("OBO") status. This shields shareholder identities from Eltek's management team. Eltek cannot identify OBO owners without subpoena.

64. IBKR's implementation of the Market Access Rule (15c3-5) is more lax than its peers. Trades that would be blocked by Fidelity's compliance system checks were accepted by IBKR.

IBKR made this thinly traded nanocap stock available for shorting when other brokers, including Fidelity, did not. The ability to short presented an opportunity for JDMS to execute their trading schemes*Source Note: Plaintiff generated chart based on Eltek SEC filings and ELTK daily price.*

## Repricing Period, Beginning May 18, 2023

63. On May 18, 2023, Eltek released its Q1 financial results, and its stock traded 844,758 shares, representing 53.67% of the Float. The closing price rose from $3.95 the day before to $5.41, the first day Eltek traded above its 345-day near-equity pricing, and continued climbing to $6.17 on May 19, 2023, and $7.20 on May 22, 2023 (Table 5).

*Table 5 - May 17-22, 2023, Eltek Trading*

| | Volume of Shares Traded | | Price Per Share $ | | | |
|---|---|---|---|---|---|---|
| **Date** | **Volume** | **Percent of Float** | **Open** | **High** | **Low** | **Close** |
| 5/17/2023 | 10,490 | 0.67% | 3.91 | 4.02 | 3.91 | 3.95 |
| 5/18/2023 | 844,758 | 53.67% | 4.85 | 5.6794 | 4.6 | 5.41 |
| 5/19/2023 | 135,337 | 8.60% | 5.59 | 6.17 | 5.42 | 6.17 |
| 5/22/2023 | 292,129 | 18.56% | 7.15 | 7.82 | 6.5 | 7.2 |

54.64. On or about June 18, 2023, Eltek obtained a second NOBO report, on which 674,892 shares, approximately 35 percent of the Float, remained concealed from the Company. Like the first NOBO report obtained by Eltek, McGauley's shares at IBKR do not show on this second NOBO report.

55.65. During the RelevantDamages Period, only IBKR and a limited number of other broker-dealersbrokers offered trading capability during the earliest pre-market hours (4:00 a.m. to 7:00 a.m. EST)), and trading in ELTK occurred during those hours.

66. On June 26, 2023, Michael McGauley spoke with Katrina Santa Maria, the Chief Executive Officer of broker-dealer M.S. Howells & Co. and former District 3 representative for the FINRA West Region Committee. Katrina Santa Maria stated that M.S. Howells & Co. does not offer trading from 4:00 a.m. to 7:00 a.m. because trade volumes are very low and because its clearing firm, Pershing LLC (a subsidiary of BNY Mellon),

explained to McGauley that her firm does not offer 4:00-to-7:00 a.m. trading because volumes are very low and its clearing firm does not support those hours.

68. During the Relevant Period trading in ELTK occurred during these earliest extended hours times as seen in Figure 2 below.

***Figure 2 Trading between 4 and 7 am, 3/29/2019 to 10/23/2020***




69. The SEC put out a staff bulletin, about "Risks Associated with Omnibus Accounts Transacting in Low-Priced Securities" and "U.S. Broker- Dealer's AML Obligations when Engaging in Transactions in Low-Priced Securities through Omnibus Accounts Maintained for Foreign Financial Institutions".[5]

70. According to IBKR's 2024 Annual Report to Shareholders:

---

[5][3] SEC staff bulletin about risks with omnibus accounts (last reviewed or updated on Oct. 17,2023)https://www.sec.gov/tm/risks-omnibus-accounts-transacting-low-priced-securities

Currently, approximately 83% of our customers reside outside the U.S. in over 200 countries and territories, and over 85% of new customers come from outside the U.S. Approximately 55% of our customers' equity is in institutional accounts such as hedge funds, financial advisors, proprietary trading firms and introducing brokers. Specialized products and services that we have developed successfully attract these accounts. For example, we offer prime brokerage services, including financing and securities lending, to hedge funds; our model portfolio technology and automated share allocation and rebalancing tools are particularly attractive to financial advisors; and our trading platform, global access and low pricing attract introducing brokers.

71. ATS weekly data for Eltek stock during Relevant Period shows high volume and activity from ATS's outside the U.S.

72. In its year ended December 31, 2017, SEC 10-K filing,[6] IBKR stated "The philosophy of the Compliance Department, and our company as a whole, is to build automated systems to try to eliminate manual steps in the compliance process and then to augment these systems with experienced staff members who apply their judgment where needed." Later, 10-K filings modified this statement by replacing the word 'eliminate' with 'minimize'.

73. On March 18, 2025, Plaintiff identified a direct tie to IBKR and trading of a significant number of short shares using Nasdaq Data, tick-data, and IBKR's own platform data.

74. During the Relevant Period IBKR faced penalties, notices of deficiencies and other regulatory issues from the SEC, FINRA, FCA (UK), SFC (Hong Kong), and ASIC (Australia).

77. The constellation of policies and practices described above provided the JDMS with the venue, anonymity, timing flexibility, and mechanics required to execute the trading activity described in Section IV.D ("Trading Activity and Other Events".

78. IBKR received direct financial benefits from this trading activity, including commissions, payment for order flow, ATS execution fees/rebates, and securities-lending revenue.

79. Trading Activity and Other Events

[6] 4 IBKR year ended December 31, 2017, SEC 10-K filinghttps://www.sec.gov/Archives/edgar/data/1381197/000104746918001166/a2234631z10-k.htm

~~80. From November 2019 through the present, JDMS operated, through broker-dealer accounts, executed a continuous campaign to artificially suppress, freeze, and distort the price of ELTK shares.~~

~~81. A summary of this underlying manipulation includes but is not limited to each following event. The most acute example of the trading activity occurred on October 16, 2020.~~

~~82. F-3 Rights Offering~~

~~83. On August 8, 2019, Eltek filed an SEC Form F-3 shelf offering seeking $10,000,000 through the issuance of additional shares. A term in offering stated no securities would be sold with a value of more than one-third of the aggregate market value of our "Ordinary Shares held by non-affiliates in any 12-month period, so long as the aggregate market value of our Ordinary Shares held by non-affiliates is less than $75,000,000."~~

~~84. October 16, 2020, High-Volume Event~~

~~85. On October 14, 2020, Eltek filed a Rights Offering F-1 Registration Statement. According to Nasdaq data, only 8,231 shares traded that day. On October 15, volume rose modestly to 14,465 shares. Then, on October 16, trading volume surged to 1,028,170 shares, representing 67.7% of the Float, or 79.1% of the Float excluding McGauley's holdings.~~

~~86. Of that volume, on October 16, 2020, at least 972,000 shares were traded during regular market hours, accounting for 64% of the Float. From 9:30 AM to 10:37 AM, 132,165 shares changed hands across 267 separate trades, a highly remarkable and unusual concentration of activity for Eltek.~~

~~87. This surge triggered a Nasdaq Limit Up–Limit Down ("LULD") price volatility halt automatically imposed upon algorithmic triggers,[7] at 10:37 AM. The halt lasted five minutes, during which no trading was processed. This was one of nine LULD halts for Eltek during the Relevant Period.~~

~~88. A summary of all trading halts for Eltek including the Relevant Period, with October 16, 2020, highlighted, are detailed in Table 1 below.[8] Seven of these halts are relevant and analyzed in this Complaint; the two oldest halts are excluded from analysis.~~

---

~~[7] [5] See U.S. Sec. & Exch. Comm'n, *Stock Market Circuit Breakers*, Investor.gov, https://www.investor.gov/introduction-investing/investing-basics/glossary/stock-market-circuit-breakers (last visited July 1,2025) (defining the "Limit Up-Limit Down" circuit breaker as a mechanism that "prevents trades in individual securities from occurring outside of a specified price band").~~

~~[8] [6] A true and correct copy of New York Stock Exchange ("NYSE") Historical Trade Halt data for ELTEK Ltd. ("ELTK") found at https://www.nyse.com/trade-halt~~

***~~Table 1 All LULD trading halts for Eltek during the Relevant Period~~***

| ~~Halt~~ | ~~Date~~ | ~~Time~~ | ~~Resume Time~~ | ~~Minutes Halted~~ | ~~Trading Event~~ |
|---|---|---|---|---|---|
| ~~1~~<br>~~2~~<br>~~3~~ | ~~8/30/2019~~<br>~~9/3/2019~~<br>~~3/9/2020~~ | ~~12:28:54~~<br>~~10:37:56~~<br>~~11:27:48~~ | ~~12:33:54~~<br>~~10:42:56~~<br>~~11:32:48~~ | ~~5 5~~<br>~~5~~ | ~~Not Analyzed Not Analyzed Stocktwits Posts~~ |
| ~~4~~ | ~~10/16/2020~~ | ~~10:37:23~~ | ~~10:42:23~~ | ~~5~~ | ~~MSSB / High Volume~~ |
| ~~5~~<br>~~6~~<br>~~7~~<br>~~8~~<br>~~9~~ | ~~5/14/2021~~<br>~~5/18/2023~~<br>~~6/23/2025~~<br>~~6/23/2025~~<br>~~6/23/2025~~ | ~~9:44:12~~<br>~~9:41:58~~<br>~~13:44:33~~<br>~~13:55:53~~<br>~~14:07:00~~ | ~~9:49:12~~<br>~~9:46:58~~<br>~~13:49:33~~<br>~~14:05:53~~<br>~~14:12:00~~ | ~~5 5~~<br>~~5~~<br>~~10 5~~ | ~~Trading Activity~~<br>~~Trading Activity~~<br>~~Trading Activity~~<br>~~Trading Activity~~<br>~~Trading Activity~~ |

~~Trading Event" and Minutes Halted, added by McGauley and Chin for relevant halts. All other data sourced from: https://www.nyse.com/trade-halt~~

~~89. Immediately following the halt, between 10:42 AM and 10:43 AM, 308,000 shares were traded in 1,057 separate transactions, representing 20% of the Float and 7.03% of all outstanding shares.~~

~~90. MSSB flagged the October 16, 2020 trading activity as fraudulent.~~

~~Plaintiff is unaware of any other brokerage firm that took similar actions.~~

~~92. FINRA's ATS Data for the week of October 12–16, 2020, shows multiple MPIDs active in Eltek trading. IBKR's ATS was the most active during that week, both in terms of volume and number of trades.~~

*Table 2 Weekley FNRA ATS Data October 12, 2020*

| Market Participant Name | Weekly Share Quantity | Weekly Trade Count |
|---|---|---|
| CODA CODA | 1933 | |
| CROS CROSSFINDER | 6922 | 20 32 19 |
| DBAX SUPERX ATS EBXL | 2000 | 19 |
| LEVEL ATS | 2966 | |
| IATS IBKR ATS | 784 6 | 11 4 |
| | 400 | |
| INCR INTELLIGENT CROSS LLC JPMX | 700 | |
| JPM-X | 5375 | |
| KCGM VIRTU MATCHIT ATS LATS THE | 1094 | 3 6 14 |
| BARCLAYS ATS MLIX INSTINCT X | 100 | 14 1 16 |
| SGMT SIGMA X2 | 1527 | 64 4 |
| UBSA UBS ATS | 6305 | |
| XSTM CROSSSTREAM | 1000 | |

93. Approximately 95% of Eltek's total trading volume for the week of October 12–16, 2020 occurred on October 16, 2020. See Table 3 below for ELTK daily trading details, for the week of October 2016, 2020.

*Table 3 NYSE Data for ELTK trading week of October 12-16, 2020*

| Date | Open | High | Low | Close | Volume | Volume % of Week |
|---|---|---|---|---|---|---|
| 10/12/2020 | $4.95 | $5.15 | $4.90 | $4.97 | 26,000 | 2.40% |
| 10/13/2020 | $4.90 | $4.94 | $4.80 | $4.80 | 5,348 | 0.49% |
| 10/14/2020 | $4.74 | $4.85 | $4.72 | $4.72 | 8,231 | 0.76% |
| 10/15/2020 | $4.63 | $4.73 | $4.63 | $4.70 | 14,465 | 1.34% |
| 10/16/2020 | $4.75 | $6.93 | $4.70 | $5.31 | 1,028,170 | 95.01% |
| **Total** | | | | | **1,082,214** | **100.00%** |

94. The October 16, 2020, event did not occur in isolation. The trading activity in ELTK shares during the Relevant Period included the following additional events, in chronological order:

95. May 2019 – Initial Trading Surge and Profitability Milestone

96. On May 16, 2019, McGauley purchased 20,000 shares of ELTK at an average price of $2.57, totaling $51,425. That day, Eltek traded 8,788,910 shares, representing

approximately 200% of the outstanding shares. Following the purchase, Fidelity contacted McGauley to confirm the trades were intentional. When he asked why Fidelity was inquiring, the representative responded, "It trades weird."

97. After McGauley's purchase, Eltek's share price initially rose, then declined to a low of $1.42 on May 21, 2019.

98. On May 29, 2019, Eltek reported profitability for the first time in several years. The stock surged to a high of $8.72 on volume of 37,792,528 shares, approximately 827% of the outstanding shares. The following day, May 30, Eltek reached a high of $11.56 on volume of 22,915,110 shares, or 523% of the outstanding shares.

99. Elevated trading activity continued including June 3: 2,167,752 shares traded, June 7: 1,183,229 shares traded, June 10: 1,339,100 shares traded.

- No known brokerage firm implemented a policy comparable to MSSB's P-Trade Policy in response to the trading. No LULD halts occurred, and no known institutional safeguards were triggered.

- Time segment November 20, 2019, to March 9, 2020

- On November 20, 2019, at 7:35 am EST, prior to market open, Eltek released its Q3 2019 earning.[9] The release reported:
- Revenues of $9.3 million versus revenues of $8.5 million in Q3 2018.

- Net profit was $391,000, or $0.09 per fully diluted share in Q3 of 2019 versus a net loss of

  $463,000, or ($0.23) per fully diluted share, in Q3 2018.

- Initially, Eltek's valuation rose however, after the regular trading session market opened, the share price declined sharply. By close, Eltek's market capitalization fell to $14.9 million, a 34.3% drop from the day's high. Trading volume equaled 47.9% of the Float.

A. ATS data for the week of November 18, 2019, shows that IBKR ATS produced the most volume. Additionally, IBKR ATS was tied for the highest trade count, and it was the highest among individual American brokerages.

D. Beginning on the settlement date of November 29, 2019, at least 135,734 shares of Eltek were sold short, representing 8.9% of the public float, or 10.5% when excluding McGauley's holdings. Short interest remained near or above 9% until settlement date January 31, 2020.

[9] 7 A true and correct copy of ELTK's 2019 Third Quarter Financial Results found at https://www.nisteceltek.com/wp-content/uploads/2019/11/ELTEK-PR-Q3-2019-FINAL.pdf

1. Between January 15, 2020 and January 31, 2020, more than 102,000 short shares reportedly closed out. Yet the closing price of Eltek between January 15, 2020 and January 31, 2020 varied by 20 cents, a 6.7% price change; hence, more than 100,000 shares, representing 7.8% of the Effective Float, which would typically need to be purchased in the open market to close out the shorts were traded with minimal price change. This "quiet-close-out" accompanied reported failure to deliver (FTD's) of shares for 7 dates in the time period. See Table 4 below.

***Table 4 Short Interest Report 11/29/2019 to 1/31/2020***

| Settlement Date | Short Interest | Short Interest Outstanding Change Shares | Float | Effective Float |
|---|---|---|---|---|
| | | | **Short Interest Percentage** | |
| 11/29/2019 | 135,734 | 206.30% 3.10% 5.10% 3.30% | 8.90% | 10.50% |
| 12/13/2019 | 142,662 | -19.20% 2.60% | 9.40% | 11.00% |
| 12/31/2019 | 115,302 | | 7.60% | 8.90% |
| 1/15/2020 | 123,431 | 7.10% 2.80% | 8.10% | 9.50% |
| 1/31/2020 | 20,906 | -83.10% 0.50% | 1.40% | 1.60% |

v. March 9, 2020, Stocktwits Posts – Stock Halt

89. On March 9, 2020, eight StockTwits.com posts from Dean Chin led up to and caused a Nasdaq 5-minute LULD trading halt of ELTK at 11:27:48 am with resumption of trading starting at 11:32:48 am. (See All LULD Trading Halts, Table 1).

90. ATS data for the week of March 8, 2020, shows that IBKR ATS produced the most volume, and trading activity, for an American broker-dealer.

vi. ThinkEquity

91. December 29, 2020, McGauley exchanged messages on LinkedIn with Giovanni Valdes who was listed as working at ThinkEquity. McGauley stated he was the second-largest shareholder in Eltek and "how much expertise Eltek along with Nistec, has with PCB's and EMS."

92. McGauley spoke with Giovanni on January 4th, at 2:00 pm. Giovanni agreed the Company was significantly undervalued.

93. On January 10, 2021, McGauley contacted Alon Mualem Eltek's CFO at that time. Alon stated in e-mail: "Since the time we filed the F-3 in 2019, we have been in

contact with several investment banking firms, including with Think Equity [sic] through their rep in Israel."

vii. March 23, 2021 – Post Market Trading

94. On March 23, 2021, Eltek traded 167,021 shares. Prior to 4:00 pm there were 14,958 shares traded in 150 separate trades. After 4:00 pm, there were 1,234 separate trades with a total of 165,061 shares traded.

95. There was no news on March 23, 2021, or the day before that could account for this trading activity.

viii. May 2021 Trading

96. From May 3,2021 to May 12, 2021, the trading volume of Eltek went from 2,000 shares to 1.6M shares, equating to 92% of the Company Float. The Company stock price went up and down more than $2 per share in minutes. No public news or events explain this trading.

97. MSSB was not a primary market participant at this time as MSSB due to its P-Trade Policy. Hence, John JDMS shareholders using other brokers were responsible for the trading activity.

98. The Table 5 below, based on 5,840,357 outstanding shares, and 1,774,445 Float shares. shows Eltek trading between May 6, and May 10, 2021.

***Table 5 Trading between May 6, 2021, and May 10, 2021***

| | Volume of Shares Traded | | | Price Per Share $ | | | |
|---|---|---|---|---|---|---|---|
| **Date** | **Total Number** | **Percent of Outstanding** | **Percent of Float** | **Open** | **High** | **Low** | **Close** |
| 6-May | 1,635,697 | 28.01% | 92.18% | 6.03 | 7.92 | 5.87 | 6.93 |
| 7-May | 85,441 | 1.46% | 4.81% | 6.86 | 7.28 | 6.67 | 7.25 |
| 10-May | 1,140,764 | 19.52% | 64.23% | 7.16 | 8.8 | 6.28 | 6.55 |

ix. Offer to purchase McGauley's shares

> 99. On or around September 6 and 7, 2021, Karl Birkenfeld ("Birkenfeld"), from American Trust, texted McGauley seeking to purchase McGauley's Company ownership for an institutional client.

100. McGauley texted Birkenfeld, "Hey, ELTK is stupidly cheap here. It is simply WAY too undervalued. So, I'm not interested."

101. Following this text message exchange, Eltek's stock price began to drop. By December 31, 2021, Eltek lost 40% of its enterprise value, leaving it with a market cap of $21.7 million.

x. 2022–2023 - Stock priced near equity value

102. For 345 consecutive trading days between 1/3/2022 and 5/17/2023 the Company's shareholders' average equity as a percentage of the market cap was 89.5%. On March 3, 2022, and March 8, 2022, the shareholder equity was greater than the closing price. Additionally, there were 53 trading days where equity as a percentage of market cap was greater than 95%.

> 103. April 4, 2023, Zacks Small-Cap Research ("Zacks SCR") published a report stating Eltek's "valuation target is approximately $9.50 per share. Our target price may be conservative as it does not account for any M&A transactions that would materially increase the company's manufacturing capacity."

104. Eltek stock volume and price did not materially change following Zacks SCR. Eltek continued to trade near equity value. See Figure 3 below for the share price vs market capitalization, during the Relevant Period. The pricing near equity value is seen in the middle of the chart.

***Figure 3 Company daily share price, closing market capitalization, and shareholders' equity during the Relevant Period.***




~~105. Following Zacks SCR, Eltek's website https://www.nisteceltek.com/ was not functioning on April 7, 2023, with a "404 Error" displayed.~~

~~xi. May 18, 2023 – Eltek released Q1 2023 Financial Results~~

~~106. On May 18, 2023, Eltek released its Q1 financial results and Eltek stock traded 844,758 shares representing 53.67% of the Float. This is the first day Eltek traded above its 345-day trading near equity pricing. See Figure 4 below.~~

***~~Figure 4 May 18, 2023, Eltek Trading~~***

| ~~Date~~ | ~~Volume~~ | ~~Percent of Float~~ | ~~Open~~ | ~~High~~ | ~~Low~~ | ~~Close~~ |
|---|---|---|---|---|---|---|
| ~~5/17/2023~~ | ~~10490~~ | ~~0.67%~~ | ~~$3.9100~~ | ~~$4.0200~~ | ~~$3.9100~~ | ~~$3.9500~~ |
| ~~5/18/2023~~ | ~~844,758~~ | ~~53.67%~~ | ~~$4.8500~~ | ~~$5.6794~~ | ~~$4.6000~~ | ~~$5.4100~~ |
| ~~5/19/2023~~ | ~~135,337~~ | ~~8.60%~~ | ~~$5.5900~~ | ~~$6.1700~~ | ~~$5.4200~~ | ~~$6.1700~~ |
| ~~5/22/2023~~ | ~~292,129~~ | ~~18.56%~~ | ~~$7.1500~~ | ~~$7.8200~~ | ~~$6.5000~~ | ~~$7.2000~~ |

~~xii. February 2024 – Trading and $10 million public offering~~

~~107. On February 12, 2024, Eltek traded 556,992 shares, representing approximately 9.4% of its outstanding shares and 25.5% of the public Float. The stock opened at $19.35, reached a high of $22.80, and closed at $22.395, per Nasdaq data.~~

~~108. On February 12, 2024, at 6:37 pm EST, after regular market hours, Eltek issued a press release announcing a $10 million public offering, being offered and sold pursuant the F-3 shelf registration, PR Newswire announcement.[10] The stock declined 10% in after-hours trading following the news release.~~

~~109. February 13, 2024, Eltek made two SEC filings associated with the $10 million public offering. One stated, "ThinkEquity is acting as sole book- running manager for the offering." and "The securities are being offered and sold pursuant to a shelf registration statement on Form F-3 (File No. 333-266346)".~~

~~xiii. March 18, 2025 – Shortable Shares at IBKR~~

~~110. On March 18, 2025, 2:18 pm EST, IBKR, via the proprietary IBKR "Mobile – Invest Worldwide, Trade At The Lowest Cost," app on the Apple Store for IOS showed: a. 71,193 "Shortable Shares at IBKR" and b. Between 1:42 PM and 1:45 pm the number of "Today's Shortable Shares" dropped from 100,168 to 71,193, a difference of 28,975 shares. See Figure 5 below.~~

***~~Figure 5 March 18, 2025, 2:18 pm Shortable Shares at IBKR decreased by 28,975 shares between 1:42 pm and 1:45 pm~~***

---

~~[10][8] A true and correct copy of the February 12, 2024, PR Newswire is at https://www.prnewswire.com/news-releases/eltek-announces-pricing-of-public-offering-of-ordinary-shares-302060057.html~~







111. Tick data for March 18, 2025, between 1:42:28 pm and 1:45:19 pm, a time span of 2 minutes and 51 seconds, shows 34 trades, each between 1 and 10,233 shares, and totaling 33,049 shares traded during the same time segment Shortable Shares at IBKR decreased by 28,975 shares. The price of Eltek before, after, and during these trades During this "quiet-close-out" the price of Eltek varied between $8.355 and $8.443. See Table 6 below.

***Table 6 Selected tick data from short share closeout March 18, 2025***

| Trade Number | Time | Price | Bid | Ask | Size | Total Shares |
|---|---|---|---|---|---|---|
| Prior Trade | 1:32:53 PM | 8.345 | 8.345 | 8.355 | 25 | |

**Public-offering disclosure period, February 12-13, 2024**

67. On February 12, 2024, at 6:37 p.m., after regular market hours, Eltek issued a press release, distributed via PR Newswire, announcing a $10 million public offering, offered and sold pursuant to the F-3 shelf registration. The press release stated: "ThinkEquity is acting as sole book- running manager for the offering."

68. The Underwriting Agreement states ThinkEquity LLC will act "As Representative of the several Underwriters named on Schedule 1 attached hereto." According to Schedule 1, only a single underwriter is listed, not several. ThinkEquity LLC is the only underwriter named. The document also shows 625,000 "Total Number of Firm Shares

to be Purchased" by ThinkEquity LLC.[11] **Multi-broker restriction & trading distortion, March 18-November 2025**

69. On March 18, 2025, at 2:18 p.m., screen captures of the proprietary IBKR mobile application listed in the Apple App Store as "Mobile – Invest Worldwide, Trade at the Lowest Cost" (the "IBKR Mobile App") showed 71,193 "Shortable Shares at IBKR".

70. Between 1:42 and 1:45 p.m., the number of "Today's Shortable Shares" dropped from 100,168 to 71,193, a difference of 28,975 shares.

71. Tick-by-tick data for March 18, 2025, between 1:42:28 and 1:45:19 p.m., a span of 2 minutes and 51 seconds, shows 34 trades ranging from 1 to 10,233 shares, for a total of 33,049 shares executed.

72. During this same interval, Shortable Shares at IBKR declined by 28,975 shares, even though the price of Eltek remained confined to a narrow range between $8.355 and $8.443. Table 6 summarizes selected trades from this sequence.

[11] ThinkEquity's FINRA BrokerCheck Report states under Clearing Arrangements "This firm does not hold or maintain funds or securities or provide clearing services for other broker-dealer(s)," and under Introducing Arrangements, the report shows Axos Clearing LLC (CRD# 117176) as being the only entity listed during the Damages Period until January 9, 2026. Therefore, Axos Clearing LLC, most likely acted as the clearing agent for Eltek's $10 million public offering and was one side of the ledger for trading activities during and after February 12, 2024.

Case 1:25-cv-08536-LAK Document 148 Filed 11/24/25 Page 14 of 76

*Table 6 - Selected tick data from short share closeout March 18, 2025*

**Price Per Share $**

**Trade Number Time Price Bid Ask Size Total Shares** Prior Trade 1:32:53 PM 8.345 8.345 8.355 25

1 1:42:28 PM 8.355 8.345 8.355 41

2 through 33 (not shown)
34 1:45:19 PM 8.443 8.345 8.443 102 33,049 Following ~~Tade~~Trade 1:53:08 PM 8.399 8.345 8.453 33

~~63.~~73. ~~June 23~~On March 21, 2025, ~~Trading Activity~~McGauley attempted to place a series of sell orders for ELTK through his Fidelity brokerage account. McGauley submitted a substantially similar set of sell orders through IBKR, including orders larger in size than those Fidelity had blocked.

74. ~~112.~~ IBKR accepted these orders without restriction.

75. Other Brokerage firms did not accept the same order from McGauley.

~~64.~~76. On June 23, 2025, Eltek traded 278,921 shares according to Nasdaq Data. ~~Eltek's~~'Eltek's stock opened at $10.79, ~~it~~ rose to a high of $12.19, then ~~crashed~~declined to $8.42, before rising again to close the day at $10.13.

~~65.~~77. ~~113. Fidelity Time & Sales Tick Data for the day shows~~On that same day, 278,921 shares traded in 1,508 transactions~~ across four time-segments~~. Three LULD halts occurred, see Table 1.

- ~~Segment 1 (9:30 am–1:20 pm): 14,562 shares in 78 trades; price remained flat.~~
- ~~Segment 2 (1:40:58–1:44:20 pm): 40,289 shares in 312 trades; price rose to $12.20.~~
- ~~Segment 3 (1:49:33–2:12:00 pm): 152,498 shares in 651 trades; price fell from $11.94 to $8.42.~~
- ~~Segment 4 (2:12 pm–4:00 pm): 71,448 shares in 450 trades; price recovered from the day's low to close at $10.13.~~

~~See Table 1 above (summarizing all LULD trading halts)~~

~~Case 1:25-cv-08536-LAK Document 15 Filed 11/24/25 Page 15 of 76~~

~~114. Three LULD halts happened within 22 minutes and 27 seconds. See Figure 6 below.~~

***~~Figure 6 June 23, 2025, Three Halts within 22 Minutes and 27 Seconds~~***




~~xv. Q3 2025 Earning and Subsequent Trading~~

~~115. November 18, 2025, Eltek reported Q3 earnings results. Over the subsequent 4 days of trading the stock lost 29.4% of its value based on 0.82% of the company outstanding shares trading. As of Friday November 21, 2025, Eltek trades at near equity value.~~

~~E. Capital Raising Events~~

~~116. During the Relevant Period, the Company raised capital from a combination of a rights offering registered on Form F-1, proceeds from insider option exercises, and $10 million from its Form F-3 shelf registration. The outstanding and float share count both increased from these events.~~

117. The rights offering registered on Form F-1 completed on December 3, 2020. It provided all Company shareholders with the opportunity to purchase Eltek stock at a discount. Nistec participated in the offer and increased majority ownership from 65.35% to 69.5% of the Company.

118. Nistec and Eltek's CEO made twenty-two separate notices of stock sales, pursuant to Rule 144 under SEA, between June 7, 2023, and February 2, 2024 ("Rule 144 Sales"). For all these SEC Form 144 filings, the single broker listed was Oppenheimer & Co. Inc. 85 Broad St. New York, NY, 10004.

119. All these Rule 144 Sales stated the sellers "did not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed."

120. The Rule 144 Sales increased the Company float by approximately 850,000 shares over the time segment June 7, 2023, to February 2, 2024, meaning these 850,000 shares were sold into the open market during a time segment the stock price rose from approximately $10 to a closing price of $19.68 on February 2, 2024. The additional 850,000 shares increased the Float by approximately 54%.

121. The Form F-3 shelf registration for the $10 million public offering for the issuance of an additional 625,000 shares of Company ordinary stock was made on February 13, 2024. An SEC 6-K Company filing made the offering public knowledge on February 13, 2024, at 08:17:37 am Eastern Standard Time (EST). ThinkEquity LLC, as Representative of Several Underwriters, acted as the sole book-running manager for the $10 million public offering.

122. The SEC 6-K underwriting agreement between Eltek and ThinkEquity shows the date February 12, 2024. The agreement states ThinkEquity LLC acted "As Representative of the

Case 1:25-cv-08536-LAK Document 17 Filed 11/21/25 Page 17 of 76

several Underwriters named on Schedule 1 attached hereto." Schedule 1, lists a single entity for the underwriter, namely ThinkEquity LLC, and states 625,000 "Total Number of Firm Shares to be Purchased."

F. Scienter

123. MSSB acted with scienter, and at a minimum, deliberate recklessness, during the period of its P-Trade Policy.

124. MSSB acted with scienter, and at a minimum, willful misconduct when it cancelled McGauley's account, refused to answer any questions, and continued its P-Trade Policy even after being informed about the investigation of trading activity. MSSB's actively facilitated continued manipulation while concealing its own compliance failures.

125. IBKR acted with scienter, or at a minimum, deliberate recklessness, throughout the Relevant Period. IBKR routed ELTK trading through its ATS and was a lender of shares for shorting purposes, marking the stock as available to borrow at near-zero borrow fees. IBKR supplied short positions despite warning signs.

126. Both brokers received substantial direct financial benefits from the manipulative trading (borrow fees, interest rebates, order flow profits, and payment for order flow).

127. The extreme and prolonged nature of the price distortion, including the 345-day period at 89.5% of book value and "quiet close-outs" of massive short positions, was so obvious that the broker-defendants, as the literal gatekeepers of every share traded, must have known, or were deliberately reckless in not knowing, that their platforms were being used to manipulate stocks like Eltek.

128. JDMS acted with willful misconduct or as masterminds acting with intentional harm toward the company and its investors for their own financial gains or other interests.

129. These facts, taken collectively, give rise to a cogent and compelling inference of scienter that is far stronger than any opposing inference of mere negligence.

## V. METHODOLOGY AND SOURCES FOR ANALYSIS

130. Plaintiff's analysis mirrored methodologies outlined in the SEC Technical Assistance Program Presentation, *Market Manipulation* by Tom Swiers..[12] Key elements from that presentation relevant to this Complaint include:

(i) Trading manipulation techniques: Arbitrary Quotes, Wash Sales, Matched Orders, Marking the Close, Domination and Control of Market, and Layering;

(ii) Market characteristics: Manipulations often target thinly traded shares of lesser-known or startup companies, where low volume makes price distortion easier;

(iii) Deceptive trading activity: Executing trades at specific volumes and times to mislead the market about share value;

131. Plaintiff's analysis relied on and drew from multiple data sources, including but not limited to:

- Nasdaq, ELTK daily historical stock data[13]
- New York Stock Exchange Pricing Data ("NYSE Data")[14]

[12] 9 *See generally* TOM SWIERS, OFFICE OF INT'L AFFS., U.S. SEC. & EXCH. COMM'N, MARKET MANIPULATION, Original Source: https://www.sec.gov/files/Market%20Manipulations%20and%20Case%20 Studies.pdf[https://perma.cc/FPN6-H79P]

[13] 10 Unless otherwise specified, all daily trading data referenced in this Complaint — including volume, high, low, open, and close prices — is derived from Nasdaq's historical pricing data for ELTK. A true and correct copy of Nasdaq volume and pricing data for ELTK, including the entire Relevant Period, found at https://www.nasdaq.com/market-activity/stocks/eltk/historical (last viewed August 1, 2025)

[14] 11 A true and correct copy of NYSE Pricing data for ELTK, including the entire Relevant Period, found athttps://www.nyse.com/quote/XNCM:ELTK

- ~~Fidelity Active Trader Pro, Level 2, and Time & Sales Data ("Fidelity Data")~~[15]
- ~~Intraday Tick Data from a subscription service to Kibot.com ("Kibot Data")~~[16]

~~Continued…~~

- ~~FINRA's weekly ATS OTC Transparency Data ("ATS Data")~~[17]

~~Additional data sources and analytical exhibits are referenced throughout this Complaint.~~

## ~~VI. LEGAL AND PROCEDURAL BASIS FOR DERIVATIVE ACTION STATUS~~

### ~~A. Adequacy of Representation~~

~~132. During the Relevant Period, Plaintiff held, purchased, or sold Company stock shares that were valued, executed, had payments (Company dividends) linked to, or were settled using~~

---

~~[15] 12 Fidelity provides the Active Trader Pro platform to its customers. Plaintiff captured trading information from this platform for specific trading activities detailed later in this Complaint.~~

~~[16] 13 The intraday tick data used in this analysis was sourced from Kibot.com, a reputable provider of historical market data. While minor discrepancies may exist between Kibot's reported trading volumes and those from other sources, these differences are immaterial to the conclusions drawn in this Complaint. Accordingly, the Kibot data provides a valid and sufficiently granular basis for identifying patterns of manipulative trading activity and supports the factual allegations made in this Complaint. Kibot, ELTK Intraday Historical Tick Data (time and sales, bid and ask) for Jan. 2019 to present obtained via subscription/download from Kibot, https://www.kibot.com/ (last visited July 1, 2025).~~

~~[17] 14 The FINRA ATS OTC Transparency Data provides weekly aggregated information on the number of trades and the number of shares traded for each ATS, offering a crucial window into a subset of broker-dealer activity. A true and correct copy of Alternative Trading System (ATS) data sourced from FINRA's OTC Transparency platform found at https://otctransparency.finra.org/otctransparency/AtsDownload (last viewed August 1, 2025)~~

Case 1:25-cv-08536-LAK Document 28 Filed 11/12/25 Page 20 of 76

stock prices that were manipulated by Defendants, and their interests are coincident with and not antagonistic to those of the Company and Lawful Owners. Plaintiff is a Company owner and will fairly and adequately protect the interests of the Company. In addition, the Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust, securities, and shareholder derivative litigation.

B. Fairness to the Corporation.

133. This derivative action is fair and beneficial to Eltek, as it seeks recovery for harms caused by the Defendants' manipulations, including restoration of stock value, injunctive relief against ongoing fraud, and damages that will primarily benefit the Company. A derivative approach is superior to other available methods for the fair and efficient adjudication of this controversy. This will permit the Company and its lawful shareholders to adjudicate their claims in a single forum simultaneously and efficiently, avoiding the duplication of effort and expense that multiple individual actions would engender or be infeasible due to legal hurdles with filing securities claims.

134. Prosecuting derivatively eliminates management difficulties, as the claims involve common facts related to the manipulations.

135. This action poses no undue burden on Eltek, given its cooperation, and is superior to inaction, which would allow the harms and related violations to persist.

136. The damages asserted primarily affect the Company, ensuring that recovery enhances Eltek's value and enables future growth without diluting shareholder interests.

## VII. PLAINTIFF DUE DILIGENCE

137. In November 2019 following McGauley's acquisition of more than 5% of Eltek and the subsequent stock trading, Plaintiff began its scrutinization of Eltek.

138. Tuesday April 14, 2020, McGauley submitted the initial results of their investigation and suspicious Eltek stock trading events to the SEC whistleblower website, case file number: 15868-542-140.

139. On February 9, 2021, McGauley commenced an action in New York States Court, *McGauley v. E*TRADE,* to try to obtain critical information about the JDMS on the "other side of the trade" from MSSB.

140. MSSB, verbally agreed out of court to provide McGauley, with Electronic Blue Sheet ("EBS") data files, pending the filing of a legal case, such as this Shareholder Derivative lawsuit. According to FINRA, the EBS files contain both trading and account holder information and provide regulatory agencies with the ability to analyze a firm's trading activity. The EBS files detail the trading activity which triggered MSSB's "Fraud Operations Unit" into action.

141. Plaintiff obtained all possible public and non-public information regarding Eltek stock shares possible without subpoenas. Plaintiff seeks to serve subpoenas on Defendants and various nonparties including inter alia, ThinkEquity LLC, Oppenheimer & Co., Nasdaq, DTCC, Cede & Co., and FINRA to obtain further information relevant to this case.

## VIII. INJURY TO THE CORPORATION AND CAUSATION

142. Damages to Eltek: As a proximate result of the Defendants' concurrent manipulative schemes during the Relevant Period (or subsets thereof for specific COUNTS), Eltek suffered substantial harm, including suppressed stock value, impaired capital raising, and lost growth opportunities. For example, from January 3, 2022, until May 17, 2023, Eltek was priced practically at equity value. For 345 consecutive trading days the Company's shareholders' average equity as a percentage of the market cap was 89.5 percent. During much of this price fixing period the

Company P/E ratio remained at or below 5 versus industry averages of 22–45, a disparity caused by artificial price suppression that obstructed capital raising and stunted expansion.

143. These injuries are conservatively estimated in the tens of millions of dollars and, under a full-growth scenario using peer multiples and management's stated expansion plans, exceed $150 million, to be proven at trial through expert testimony.

144. Defendants' covert misconduct generated relentless headwinds for Eltek's majority shareholders and management, derailing strategic plans and obstructing growth. By secretly distorting capital markets, they delayed acquisitions, stalled new facility construction, and postponed factory upgrades vital to competitiveness, projects that could have been completed years earlier in a manipulation-free market.

145. Defendants' fraudulent trading activities had both a temporary and long-term adverse effect on the market price of Eltek's securities, as evidenced by the manipulation patterns in Section IV.D ("Trading Activity and Other Events" showing price fixing, wash trading, and price and volume spikes). Further, when manipulative events occur recurringly over a protracted period, the price of a manipulated security will generally not attain a price supported by its fundamentals and industry averages. Thus, the long-term cumulative effect of manipulation places enormous downward pressure on the price of the security.

146. Artificially reduced stock prices resulted in several significant types of harm to Eltek's current and future value.

- Reduced stock prices sent a signal to management to forgo and/or delay investments that otherwise would be productive.

Case 1:25-cv-08536-LAK Document 23 Filed 11/24/25 Page 23 of 76

- Reduced stock prices made investments more expensive. Equity financing was more dilutive, and debt seen as riskier and priced accordingly. The equity financings that did occur were substantially more dilutive than they otherwise would have been.
- Forgone and delayed investments by Eltek allowed industry undercapacity to persist even after the opportunity for investment was identified by Eltek, prompting new, non-Eltek capacity to enter the market. This added competition has been identified on earnings calls as leading to reduced pricing power for some Eltek products. Had Eltek grown and had available capacity, new entrants in the market would have been deterred from making investments.

147. If Eltek had a higher valuation, several things would have been different.

- Eltek would not have been diluted nearly as much during its equity offerings.
- Eltek would have invested in growth earlier and in a less piecemeal manner (possibly an acquisition or a new factory as indicated on earnings calls, rather than the disruptive move it has done recently.) Larger investments would have likely been non-Isreal domiciled acquisitions or factory expansion, likely in the United States. A US manufacturing presence would have insulated Eltek from unfavorable currency shifts and also made the new US tariff system a tailwind rather than a headwind, leading to reduced currency losses, increased sales and increased margins.
- Earlier investments by Eltek would have resulted in sales growth, market share growth, higher margins due to larger operating scale and higher margins due to less non-Eltek capacity being added to the market.
- These factors would have compounded with each other to create substantial value for Eltek. (Increased sales in past, increased sales in the future, increased margins, increased valuation multiple, and increase from reduced dilution)

148. Loss Causation. The manipulative scheme proximately caused Eltek direct harm each time the artificially suppressed price increased the dilutive impact of equity offerings, raised

Case 1:25-cv-08536-LAK Document 28 Filed 11/21/25 Page 24 of 76

the cost of capital, and forced management to delay or abandon accretive investments and acquisitions, injuries that materialized and were acknowledged by management when excess industry capacity entered the market in 2024–2025 and reduced Eltek's pricing power.

149. Under principles of concurrent causation, the conduct of each Defendant was a substantial factor in producing these indivisible injuries to the corporation.

78. 150. Defendants' manipulation deprived Eltek of its right and ability to have its shares trade on U.S. exchanges that were free of manipulation, causing irreparable harm to corporate integrity and shareholder trust, in addition to quantifiable economic lossesOn or about August 12, 2025, Charles Schwab had initiated its own P-Trade Policy, the start date and duration of which are unknown, although XDOOD investigators were again able to trade the stock electronically by approximately October 2025. That same day, XDOOD investigators observed that Merrill Lynch also had a P-Trade policy for ELTK, displaying the message: "The order you have entered cannot be placed online. Standard web trading rates still apply."

## Schwab Undisclosed P-Trade Policy

79. On a December 31, 2025, call, a Schwab representative, Calvin, explained that Schwab's policy blocked new electronic purchases of ELTK while allowing sales ("If you sell it, you've got no problem doing that… It's just opening new, purchasing new shares of that security."), and that securities are added to Schwab's list because of "potential risks," including "outside activity" and people "trying to trade this in a manner that is manipulative" who "own a big enough portion of the shares" to move the price. Schwab did not disclose the policy or its list to customers.

## Summary tables of chronological timeline facts

## Eltek capital raising initiatives

80. Table 7 summarizes Eltek's capital-raising initiatives during the Damages Period, each of which was materially affected by the artificial market conditions described in this Complaint. *Table 7 – Capital-Raising Initiatives During the Damages Period*

| Date Sought | Date Completed | SEC Form | Amount Sought | Outcome |
| --- | --- | --- | --- | --- |
| Feb. 19, 2019 | Apr. 9, 2019 | F-1 | $5,000,000 | Completed (Rights Offering) |
| Aug. 8, 2019 | Not Completed | F-3 | $10,000,000 | Failed to meet eligibility requirements |
| Oct. 14, 2020 | Dec. 7, 2020 | F-1 | $10,000,000 | Completed (Rights Offering) |
| Jul. 27, 2022 | Feb. 15, 2024 | F-3 | $20,000,000 | $10,000,000 raised |

*Source Note: F-1 offerings are subscription rights offerings made to shareholders of record. F-3 offerings are direct offerings made to the capital markets.*

## DEFENDANTS' ROLES AND MANIPULATIVE SCHEMES

### Interactive Brokers (IBKR) - Enterprise-Level Scheme Liability

81. IBKR engaged in a course of conduct, operating its proprietary trading system's as a recurring execution venue for ELTK order flow throughout periods of manipulative trading, defaulting customer accounts to OBO status so that the beneficial owners trading ELTK were concealed from the issuer, and implementing and applying the Market Access Rule, 17 C.F.R. § 240.15c3-5, more permissively than its peers.

82. IBKR made these choices in service of its own objectives per its SEC filings describing: maximizing account growth, automation, and transaction volume, and building and maintaining a dominant market position by replacing manual compliance steps with proprietary automated code.

### Relevant regulatory civil fines and penalties during the Damages Period

83. During the Damages Period, IBKR was willfully blind or deliberately reckless in both its business decision-making and its operational execution.

84. Since 2013, IBKR has been repeatedly sanctioned by U.S. and foreign regulators and a national securities exchange for deficiencies in its trading, surveillance, and supervisory systems yet still chose to permit the manipulation of microcap shares. On July 15, 2025, Office of Foreign Assets Control ("OFAC") announced that IBKR agreed to pay $11,832,136 to settle its potential civil liability for apparent violations of multiple OFAC sanctions programs.

85. From at least April 12, 2021, through August 2023, Nasdaq found that IBKR's surveillance system "frequently detected potentially manipulative activity" from the omnibus accounts of certain foreign introducing brokers, but that IBKR's "supervisory system was not reasonably designed to prevent all additional potentially manipulative activity from the ultimate beneficial owners responsible for the activity," in violation of Nasdaq Rules General 9 Section 20(A) and 1(A). Nasdaq also stated:

> IBKR did not impose adequate restrictions on trading of microcap securities through the omnibus accounts of one foreign introducing broker until May 2023 (And never imposed similar restrictions on omnibus accounts of a second foreign introducing broker that eventually stopped routing U.S. equity orders to IBKR).

86. IBKR was censured and fined $900,000 in civil and administrative penalties, imposed by The Nasdaq Stock Market LLC, with a resolution date of December 3, 2025.

## IBKR's Manipulation of Eltek's Shares

87. IBKR ATS appears throughout the Damages Period and consistently reports ELTK executions during weeks in which JDMS engaged in concentrated trading. While ATS Data is aggregated on a weekly basis and does not identify specific trading days or order-level detail, the repeated presence of IBKR ATS activity across the Damages Period corroborates IBKR's role as a primary execution venue through which the manipulative ELTK trading was executed. For example, ATS Data shows that IBKR ATS executed the highest share volume and the highest number of ELTK trades during the weeks of October 12–16, 2020 and May 3–7, 2021.

88. Unlike other brokers, IBKR affirmatively sets its customer accounts to objecting beneficial owner ("OBO") status.

89. This OBO status shields shareholder identities from Eltek's management team:

roughly 35 to 42 percent of the Float was concealed from the Company on its two NOBO reports, and the ELTK shares McGauley held at IBKR were the only portion of his holdings that did not appear on either report.

90. IBKR also made ELTK available to be sold short when other brokers did not.

91. IBKR, in its SEC 10-K filing for the year ended December 31, 2017, stated, "The philosophy of the Compliance Department, and our company as a whole, is to build automated systems to try to eliminate manual steps in the compliance process and then to augment these systems with experienced staff members who apply their judgment where needed." Later 10-K filings modified this statement by replacing the word 'eliminate' with 'minimize.'

92. Through the constellation of policies and practices described above, IBKR created and maintained the conditions, concealed beneficial ownership, reduced transparency, and off-exchange execution, which characterized the artificial market for ELTK during the trading activity described above.

93. IBKR received direct financial benefits from this trading activity, including commissions, payment for order flow, ATS execution fees/rebates, and securities-lending revenue. **Scienter as to IBKR**

94. IBKR operated its own electronic pipelines, trading platform including its ATS, and surveillance systems, had real-time visibility into the order flow they carried, and could see on those systems the signatures of the manipulative trading in ELTK: substantial volume executing within narrow price bands in concentrated, coordinated bursts, such as the ones on October 16, 2020, and March 18, 2025.

Case 1:25-cv-08536-LAK Document 27 Filed 11/13/25 Page 27 of 76

95. IBKR continued to clear microcap trades through accounts its own surveillance had flagged, and disregarded warnings from its compliance personnel that the group responsible for reviewing those alerts was chronically understaffed.

96. IBKR nevertheless continued to route ELTK order flow through its systems, to default accounts to OBO status, and to apply its market-access controls more permissively than its peers, and its knowledge of the manipulative activity visible on its own platform, combined with its decision to continue that conduct, establishes that IBKR acted with scienter in committing its own primary violation of Section 10(b) and Rule 10b-5.

## MSSB's Policy, Actions and Role in Manipulation

### Overview of MSSB's Role in the Manipulative Scheme

97. In contrast to transparent, market-wide LULD pauses, MSSB engaged in a unilateral, broker-specific intervention: for approximately nine months, MSSB altered its internal routing systems to restrict ELTK to a "sell-only" or "position closing only" status on its respective platform.

### The P-Trade Policy: Design, Asymmetry, and Concealment

98. Eltek is not a party to MSSB's retail customer agreements. Whatever discretion those agreements gave MSSB over individual customer accounts, the P-Trade Policy was not an individual account action: it structurally blocked electronic purchasing demand for a fully compliant NMS security across MSSB's entire platform, without notice to the issuer, and no contract between MSSB and its customers purported to authorize MSSB to alter the market for Eltek's stock.

99. MSSB applied the restriction uniformly to self-directed accounts that had received no individual investment recommendation.

100. MSSB implemented its P-Trade Policy unannounced and undisclosed to the Company, its customers, and the market. The only time an MSSB customer had any notification about the P-Trade Policy was if they attempted to electronically purchase ELTK stock and observed a message.

101. When McGauley, exercising diligence, tried to discover the reason for this P-Trade Policy (e.g., in a 20-question email sent on December 21, 2021), MSSB's counsel affirmatively refused to answer per response on January 10, 2022.

102. The P-Trade Policy was not just a 10b-5(a) deception. The policy affirmatively and simultaneously did two things: a. It suppressed legitimate purchase access by blocking 100% of electronic buy orders from its millions of customers. b. It simultaneously permitted Eltek stock to be borrowed for short-side activity through its share lending program, which actively sourced shares from its clients to lend to short-sellers. c. MSSB simultaneously affected the entire market for ELTK securities for all market participants including customers at other brokerage firms who were unaware of the secretively skewed market created by MSSB. This was a primary manipulative act by MSSB. This intentionally created a downward asymmetrical market for Eltek's stock.

## MSSB's Scienter

103. MSSB's conduct was not accidental or the result of routine risk controls. MSSB knowingly implemented and maintained its P-Trade Policy, a non-public, asymmetric trading restriction on ELTK for approximately nine months, despite understanding that the restriction would distort market activity, suppress natural demand, and create an artificial price for the security.

104. MSSB required a phone call for purchases even after the customer's identity had already been verified and they had previously approved the same customer to buy Eltek shares. This was not a one-time verification measure. It was a continuing, repetitive, and intentionally burdensome barrier to purchasing ELTK, designed and implemented by MSSB's Fraud Operations Unit. No other known brokerage firm in the United States imposed any comparable restriction on ELTK during this period.

105. The timing of the policy also demonstrates MSSB's scienter. MSSB instituted the restriction immediately following the volatile trading in ELTK on October 16, 2020, and its Fraud Operations Unit implemented a policy that directly interfered with price discovery during a period of heightened market sensitivity. MSSB then kept the restriction in place for approximately nine months,

long after any plausible short-term risk justification could have existed, which shows that its conduct was knowing, intentional, and sustained.

106. A broker confronting perceived risk in a security has standard, less market-distorting tools available: requiring all transactions to be 100% cash, making the security non-marginable, imposing position or order-size limits, or restricting the security symmetrically on both the buy side and the sell side.

107. MSSB instead selected the one configuration that blocked every electronic purchase while leaving electronic sales unrestricted and its share-lending program active, and it maintained that configuration for approximately nine months. Whatever gatekeeping justification may have existed on October 16, 2020, the selection and prolonged maintenance of a demand-suppressive tool supports the inference that the restriction functioned as a manipulative device rather than a risk control.

108. MSSB understood that the broader market would interpret ELTK's trading activity as the product of natural supply and demand, when in fact MSSB was restricting demand on its own platform without disclosure. By withholding this information, MSSB knowingly created a false appearance of market conditions, which is the essence of market manipulation under Section 10(b) and Section 9(a)(2).

109. On information and belief, MSSB's continuing phone-call requirement served an identification function.

## JDMS Actions and Role in Manipulation

110. JDMS acted with scienter, conceiving, orchestrating, and executing the manipulative scheme for their own financial gain through brokers as instruments of execution.

Case 1:25-cv-08536-LAK Document 30 Filed 11/24/25 Page 30 of 76

111. The manipulative character of the trading itself supports the inference: repeated episodes of unexplained volume spikes representing a significant portion of the Company's Float during the Damages Period; concentrated bursts of coordinated executions within minutes; trading concentrated at moments critical to Eltek's capital formation, including the surge two days after Eltek filed its rights-offering registration statement; the sustained suppression that held a profitable company at near book value for 345 consecutive trading days; and the use of OBO status and omnibus account structures to conceal the traders' identities.

112. Independent third parties corroborate that the trading in ELTK was not organic: a Fidelity representative remarked, that the stock "trades weird"; MSSB's Fraud Operations Unit flagged the October 16, 2020, trading and restricted the stock; and Charles Schwab and Merrill Lynch later imposed their own purchase restrictions, with Schwab's representative attributing the restriction to possible manipulative trading by persons who "own a big enough portion of the shares" to move the price. The inference that JDMS acted with intent to manipulate is cogent and at least as compelling as any opposing inference of legitimate trading.

**TIMELINESS: ACCRUAL, REPOSE, AND DISCOVERY**

113. Plaintiff incorporates by reference all preceding paragraphs.

114. Each Defendant committed acts within the five-year repose period of 28 U.S.C. § 1658(b)(2).

115. MSSB maintained and enforced its P-Trade Policy through approximately July 2021 within five years of the October 15, 2025, filing, and each day of that continued enforcement was a discrete, independently actionable act. IBKR's platform conduct within the repose period includes the March 18, 2025, platform activity and the June 23, 2025, trading activity described herein. The JDMS

Case 1:25-cv-08536-LAK Document 31 Filed 11/12/25 Page 31 of 76

trading that distorted ELTK's market likewise continued throughout the Damages Period and within the repose period.

116. The two-year period of § 1658(b)(1) is satisfied by accrual. Eltek did not sell shares into the open market until February 2024, when it completed an underwritten public offering of 625,000 ordinary shares at $16.00 per share for gross proceeds of $10 million, as a takedown off its Form F-3 shelf registration. That sale was the first occasion on which Eltek sold its shares at a market-determined price, and thus the first occasion on which it suffered a Section 10(b) injury as a seller in a market distorted by the manipulative and deceptive conduct alleged herein, so no limitations period could run before that claim existed.

*Fraudulent Concealment by IBKR*

117. IBKR concealed material facts necessary for Plaintiff to discover its role in the violation, including:

- its own decision to default customer accounts to OBO status, which IBKR selected and controlled, and which prevented issuers from identifying the beneficial owners whose trading affected ELTK's market;
- non-public, platform-specific trading information, including real-time metrics observable only through IBKR's proprietary systems;
- supervisory and compliance deficiencies, later corroborated by the United States Department of the Treasury's July 15, 2025, settlement.
- The publicly available market-structure data available to Plaintiff before 2025 did not supply particularized facts tying IBKR's own conduct to the manipulation of ELTK, as distinct from lawful venue activity.

*Market Opacity and the Inability to Identify JDMS*

118. The market opacity described above, including OBO status and omnibus account structures that conceal the traders' identities, has prevented Plaintiff from identifying the JDMS, whose identities remain undiscoverable now.

**Timeliness of New York Common Law Fraud Claims (Counts VI and VII)**

119. The New York common-law fraud claims are timely under CPLR § 213(8), which provides a limitations period of six years from the fraud or two years from discovery of the fraud, whichever is later. As to MSSB (Count VII), the six-year period alone establishes timeliness: the P- Trade Policy was implemented in October 2020 and maintained into 2021, and this action was filed on October 15, 2025. As to IBKR (Count VI), the claim is timely under both prongs: Plaintiff discovered the concealed facts constituting IBKR's fraud between March 2025 and July 2025 and filed suit within two years of that discovery.

**CPLR § 202 - Borrowing Statute**

120. Although Plaintiff is domiciled in Massachusetts, CPLR § 202 does not shorten the limitations period because the injury occurred in New York, where ELTK's stock is listed on Nasdaq, the manipulative trading was directed, the market distortion occurred, and Eltek's capital-formation injury was realized. Accordingly, New York's six-year limitations period applies.

**LEGAL AND PROCEDURAL BASIS FOR DERIVATIVE ACTION STATUS**

**Facts Supporting this Derivative Action**

121. This action is properly maintained as a derivative action. Plaintiff satisfies the requirements of Federal Rule of Civil Procedure 23.1 and, to the extent the substantive law of Eltek's

place of incorporation governs derivative capacity under the internal-affairs doctrine, the requirements of Israel Companies Law, 5759-1999 §§ 194–198.

122. Israel Companies Law § 194(b) requires a shareholder to demand that the company itself pursue the claim before proceeding derivatively. Plaintiff made that demand. Section 197 permits a shareholder to bring the derivative action, with the court's permission, where the company has declined the demand or its decision has not eliminated the grounds for the action. Both conditions are satisfied here. Section 198(a) provides that the court shall approve the derivative action where it is satisfied that the action is, a priori, to the benefit of the company and that the plaintiff is not acting otherwise than in good faith, findings the facts below compel. And Section 198(c) defines the approving "Court" as "the Court qualified to hear the action." Because no Israeli court is qualified to adjudicate a claim arising under Section 10(b) of the Securities Exchange Act concerning securities listed and traded on Nasdaq, this Court is the court qualified to hear the action, and this Court may make the Section 198 findings.

123. In the week of May 22, 2023, McGauley discussed the investigation and the claims with Eltek's Chairman, Yitzhak Nissan, by telephone. On May 26, 2023, McGauley wrote to Chairman Nissan, CEO Yaffe, and CFO Freund, attaching an executive summary of the investigation that specified the facts discovered, the laws and regulations violated, the entities responsible, and the group's assessment of the substantial damages to the Company, and requested that Eltek act on the claims, including by pursuing recovery from the brokerage firms involved.

124. The Company declined. On May 29, 2023, following a further call with Chairman Nissan, McGauley confirmed the Company's position in a written communication addressed to the Chairman, CEO, and CFO: "We understand the company prefers not to sue. The company wants to focus on

Case 1:25-cv-08536-LAK Document 34 Filed 11/24/25 Page 34 of 76

running the primary business of making circuit boards." On May 30, 2023, CFO Freund responded in writing, copying the Company's outside counsel, that the Company preferred that XDOOD "talk directly with our legal advisors — Steven J. Glusband, Esq." The Company simultaneously agreed to request the NOBO and OBO reports XDOOD sought.

125. On September 22, 2025, Plaintiff's counsel sent the Company's counsel a written memorandum expressly invoking Israel Companies Law, 5759-1999 § 194(b), recounting the May 2023 demand and declination, and renewing the demand that Eltek pursue the claims or confirm its authorization of their derivative pursuit. On September 29, 2025, the Board, through its counsel, responded in writing that it did not believe the proposed memorandum of agreement was "necessary or appropriate" and that "[y]our clients (XDOOD) are free to pursue the derivative claims if they wish to do so and the court would determine the appropriateness and merits of those claims as well as any claims for damages or attorneys' fees."

126. Eltek thus twice declined to prosecute the claims in its own name, in May 2023 and again in September 2025, while cooperating with the investigation and not opposing XDOOD's derivative pursuit. XDOOD proceeded derivatively and bears the full cost and risk of the action. The Company's decision did not eliminate the grounds for the action, the manipulation of ELTK being ongoing. The conditions of Israel Companies Law §§ 197(1) and 197(2) are therefore satisfied.

127. This Court may approve the action under Israel Companies Law § 198(a), and the facts compel approval: the action is, a priori, to the benefit of Eltek, and XDOOD acts in good faith. Eltek's controlling shareholder, Nistec, through Yitzhak Nissan, has held a majority of Eltek's shares continuously since 2013 and throughout the Damages Period, and the Company, so informed, did not oppose this action.

## Adequacy of Representation for Eltek

128. During the Damages Period, Plaintiff held, purchased, or sold Company stock shares that were valued, executed, had payments (Company dividends) linked to, or were settled using stock prices that were manipulated by Defendants, and their interests are coincident with and not antagonistic to those of the Company and Lawful Owners. Plaintiff is a Company owner and will fairly and adequately protect the interests of the Company.

129. The Plaintiff is represented by counsel who are competent and experienced in the prosecution of securities, and shareholder derivative litigation.

## Fairness to the Corporation

130. This derivative action is fair and beneficial to Eltek. It seeks recovery for harms caused by Defendants' manipulation, including restoration of stock value, injunctive relief against ongoing fraud, and damages that will primarily benefit the Company, and it permits the Company's claims, which arise from common facts, to be adjudicated in a single action.

## INJURY TO THE CORPORATION, CAUSATION AND DAMAGES

### Overview of Indivisible Corporate Harm

131. As a proximate result of the Defendants' concurrent manipulative schemes during the Damages Period, Eltek suffered substantial, quantifiable harm to the corporation. The manipulation suppressed the market price of Eltek's stock below the price a fair and efficient market would have produced and did so continuously over a period of years. Because Eltek is a public company whose only currency for raising equity capital is its own stock, the sustained suppression of that stock's value directly harmed the corporation when it was compelled to access the capital markets.

Case 1:25-cv-08535-LAK Document 36 Filed 11/24/25 Page 36 of 76

132. The magnitude and persistence of the suppression are demonstrated by Eltek's own market metrics. From January 3, 2022, through May 17, 2023, (345 consecutive trading days) Eltek's shareholders' equity averaged 89.5% of its market capitalization, and its price-to-earnings ratio remained anchored at or below 5 against an industry average of 22 to 45. A profitable, growing manufacturer does not trade at these levels in an unmanipulated market.

**Damages Under Federal Claims: Sections 10(b) and 9 of the Exchange Act**

133. Transactional injury and forced dilution. Eltek's cognizable injury under Section 10(b) was realized when it sold shares into the manipulated market. On February 13, 2024, Eltek completed a $10 million Form F-3 offering, selling 625,000 shares at $16.00 per share through a book-running underwriter. Because the Defendants' manipulation had suppressed Eltek's stock below the value a fair and efficient market would have produced, Eltek was compelled to sell more shares, and to relinquish a greater portion of the Company, than it would have had to in an honest market to raise the same $10 million. That excess dilution is a direct, quantifiable transactional loss to the corporation, actionable under Section 10(b) and Rule 10b-5.

134. The measure of that loss is the difference between the price at which Eltek was forced to sell and the price its shares would have commanded in a market free of the Defendants' manipulation, a but-for value established by the years of documented suppression described above and provable at trial through expert testimony.

135. Eltek's status as an issuer sharpens this injury rather than attenuating it. Unlike an investor, who may decline to transact and wait for a fairer price, Eltek, a public company since 1997, with no alternative venue through which to raise equity capital, had no practical choice but to access the only market available to it. The Defendants' manipulation thus forced Eltek to spend an artificially

cheapened currency, and the resulting dilution was compelled, not chosen. This same structural reality underlies Eltek's reliance: as an issuer bound to the market for its own securities, Eltek necessarily transacted at the price the Defendants' manipulation produced.

136. Continuing suppression and loss causation. The manipulation was a continuous course of conduct that suppressed Eltek's price throughout the Damages Period and did not abate before the 2024 sale. Each manipulative act flowed into the consolidated Tape C feed that sets the reference price for ELTK, so the suppressed baseline persisted through the February 2024 offering; but for that sustained suppression, Eltek would have raised the same capital at a higher price and with materially less dilution.

137. Eltek's injuries are substantial and, to be proven at trial through expert economic testimony and but-for valuation modeling, are estimated in the tens of millions of dollars.

**Damages Under State Claims: New York Common Law Fraud**

138. Out-of-Pocket Losses: Separate and apart from the dilution of its equity, the Defendants' manipulation inflicted actual, out-of-pocket pecuniary losses on Eltek actionable under New York Common Law Fraud. Eltek continuously paid an All-Inclusive Annual Listing Fee to Nasdaq and incurred significant compliance costs to maintain its status as an NMS stock. Eltek paid these tangible financial premiums in justifiable, actual reliance on the integrity of the market metrics provided by the NMS and broker-dealers, including IBKR and MSSB. Eltek suffered a direct out-of- pocket loss when the Defendants fraudulently delivered a corrupted, manipulated market ecosystem instead of a reliable, non-manipulated market baseline.

139. Punitive Damages: Because the Defendants' common-law fraud was aimed directly at corrupting Tape C, the single consolidated data feed relied upon by the investing public and the

institutional market, their conduct demonstrated a high degree of moral culpability aimed at the public generally, entitling Plaintiff to seek punitive damages on behalf of Eltek.

**Causation and Proportionate Liability**

140. Concurrent causation. Under principles of concurrent causation, the conduct of each Defendant was a substantial factor in producing these indivisible injuries to the corporation.

**CLAIMS FOR RELIEF**

**COUNT I**

**Violation of Section 10(b) ~~of the SEA~~ and Rule 10b-5(a) and (c) ~~Thereunder~~**

**(against Defendant ~~MSSB~~IBKR)**

~~151~~141. Plaintiff incorporates by reference all preceding paragraphs.

~~152~~142. Defendant ~~MSSB~~IBKR is primarily liable as a protagonist in a ~~fraudulent~~manipulative scheme. Its own course of conduct ~~after its "Fraud Operations Unit" detected the "classic pump and dump" on October 16, 2020, constituted a new, independent, and primary "device, scheme, or artifice to defraud" in violation of Rule 10b-5(a) and (c)~~, as applied to Eltek, created and maintained artificial conditions in the market for ELTK, constituting IBKR's own primary violation.

143. In the alternative, and independent of the enterprise allegations, Defendant IB LLC is primarily liable for the course of conduct alleged in this Count. IB LLC is the registered broker-dealer that executed and cleared the ELTK order flow described herein under its Market Participant Identifiers and DTCC participant accounts 0017 and 0534, operated the IBKR ATS on which ELTK executions recurred throughout the Damages Period, set customer accounts to Objecting Beneficial Owner status by default, and designed and applied the market-access controls described herein.

153144. The Deceptive and Manipulative ActActs: The "device" was MSSB's implementation and nine-month maintenance of the secret, one-sided "P-Trade Policy." This policy was an affirmative act that: a. Operated as a fraud on the market by deceptively concealing a material fact (that MSSB, a major broker, was unilaterally barring all electronic purchases of Eltek stock). b. Created a false appearance of weak market demand, artificially suppressing Eltek's share priceIBKR engaged in a course of manipulative conduct consisting of its own affirmative business decisions, no single one of which need be independently unlawful, but which in combination created and maintained artificial conditions in the market for ELTK, an effect IBKR knew of or consciously disregarded:

- Concealment of manipulator identities. IBKR affirmatively defaulted all customer accounts to Objecting Beneficial Owner (OBO) status, a default IBKR itself selected and controlled, obscuring from Eltek the identities of the beneficial owners whose trading affected ELTK's market.

154. Scienter (Intent): MSSB acted with actual knowledge and fraudulent intent as alleged in Section IV.B ("MSSB Actions". MSSB's motive for this scheme was not to protect the market, but to clean up its institutional KYC failures. MSSB knew its acquisition of E*TRADE had imported massive, undisclosed regulatory liabilities (institutional KYC failures). The Oct 16 fraud was proof of this liability. MSSB implemented the secret "P-Trade Policy" as a "Cover-Up Scheme" to buy time to quietly investigate and purge its own systems of the toxic accounts and evidence of its prior misconduct, all while deceiving Eltek and the marketplace.

155. As a direct and proximate result of MSSB's own "Cover-Up Scheme," which actively suppressed Eltek's stock price and deceived the market, the Company was damaged.

- Permissive market access. IBKR affirmatively implemented and applied the Market Access Rule, 17 C.F.R. § 240.15c3-5, more permissively than its peers, as evidenced by a comparison in which Fidelity blocked orders that IBKR accepted. The allocation of risk-control

functions permitted by SEC Rule 15c3-5(d)(1) does not immunize the manipulative use to which IBKR put its own controls.

- Early-hours trading window. IBKR offered trading in ELTK during the earliest pre-market hours (4:00 to 7:00 a.m.), a window most brokers decline to support because volumes are very low.
- Recurring execution venue. IBKR operated its alternative trading system as a recurring venue for ELTK executions throughout the Damages Period, including during periods of concentrated manipulative trading, as shown by multi-year ATS data.

145. Undertaken together and with knowledge of their combined effect, these decisions constitute IBKR's own participation in the manipulation of ELTK, a primary violation, distinct from and additional to the trading of the JDMS, and not the provision of assistance to any other person.

146. Scienter (Intent): IBKR acted with deliberate recklessness or, at a minimum, willful blindness. While any one of its acts above, the OBO default, the permissive Market Access controls, and its role as a recurring ATS execution venue during manipulative periods, might be explained in isolation, whatever business purposes those decisions served did not require maintaining their combination unchanged after its effect on the market for ELTK was visible on IBKR's own systems. IBKR knew, or was reckless in not knowing, that its own course of conduct created and sustained the artificial market conditions alleged, and it continued that conduct because it was profitable to IBKR.

147. As a direct and proximate result of IBKR's own manipulative course of conduct, which created and sustained artificial conditions in the market for ELTK, Eltek was damaged.

Case 1:25-cv-08536-LAK Document 41 Filed 11/24/25 Page 41 of 76

## COUNT II

### Violation of Section 1020(ba) SEA and Rule 10b-5(a) and (c) Thereunder (against Defendant IBKRof the Exchange Act, 15 U.S.C. § 78t(a) (Against Defendants IBG, Inc. and IBG LLC, in the Alternative to Count I)

156148. Plaintiff incorporates by reference all preceding paragraphs.

157. Defendant IBKR is primarily liable as a protagonist in a fraudulent scheme. Its entire business model, as applied to Eltek, constituted a "Deceptive Business Model Scheme" designed to attract, facilitate, and profit from manipulation by JDMS.

158. The Deceptive and Manipulative Acts: The "device, scheme, or artifice to defraud" was the combination of IBKR's own affirmative business decisions which, taken together, formed a "black box" designed to facilitate fraud: a. Active Concealment: IBKR's affirmative decision to default all customer accounts to "Objecting Beneficial Owner" (OBO) status, an act that affirmatively conceals manipulator identities from Eltek. b. Lax Access: IBKR's affirmative decision to implement a laxer version of the Market Access Rule (15c3-5) than its peers (as evidenced by Fidelity blocking trades that IBKR accepted). c. Providing the means of manipulation: IBKR's affirmative decision to (i) make a thin, volatile microcap stock available for shorting (when reputable brokers refused) and (ii) offer economically illogical, near-zero borrow rates as an incentive.

159. IBKR acted with Deliberate Recklessness or Willful Blindness. While any one of the acts above (OBO, lax rules, shorting) might be explained away in isolation, their combination makes no legitimate business sense. IBKR intentionally or recklessly created the mechanisms for fraud because it was profitable. IBKR knew or was willfully blind to the fact that this constellation

of features was attracting and facilitating the very fraud its compliance department was supposed to prevent.

160. As a direct and proximate result of IBKR's own "Deceptive Business Model Scheme," which facilitated the suppression of Eltek's stock price, the Company was damagedThis Count is pleaded in the alternative pursuant to Fed. R. Civ. P. 8(d)(2): to the extent the Court determines that the primary violation alleged in Count I was committed by IB LLC rather than by the IBKR Enterprise collectively, Defendants IBG, Inc. and IBG LLC are liable as controlling persons of IB LLC under Section 20(a).

149. Primary violation. As alleged in Count I, IB LLC committed a primary violation of Section 10(b) and Rule 10b-5(a) and (c).

150. Control. IBG LLC is the direct managing member and 99.9% owner of IB LLC. IBG, Inc. is the sole managing member of IBG LLC and states in its SEC filings that it "operate[s] and control[s] all of the business and affairs of IBG LLC and its subsidiaries." The same individuals serve as executive officers across all three entities: Milan Galik as Chief Executive Officer of both IBG, Inc. and IB LLC; Paul Jonathan Brody as CFO, Treasurer, and Secretary of IBG, Inc. and Secretary and Principal Operations Officer of IB LLC. IBG, Inc. and IBG LLC accordingly possessed, and exercised, actual power to direct the management and policies of IB LLC, including the specific policies at issue in Count I.

151. Culpable participation. The policies constituting the course of conduct alleged in Count I, the OBO default, the design and calibration of IB LLC's market-access controls, the operation of the IBKR ATS, and the compliance-automation philosophy applied to each, were designed, mandated, and coded at the direction of the shared executive management of IBG, Inc. and IBG LLC, whose

"management team participate[s] in algorithm design and supervise[s] the creation of detailed specifications for new applications," and whose "risk management policies are developed and implemented by [a] Steering Committee ... chaired by [the] Chief Executive Officer." IBG, Inc. and IBG LLC participated in the conduct alleged with the knowledge and state of mind alleged, which are incorporated here.

152. By reason of the foregoing, IBG, Inc. and IBG LLC are jointly and severally liable with, and to the same extent as, IB LLC pursuant to 15 U.S.C. § 78t(a), and bear the burden of establishing that they acted in good faith and did not directly or indirectly induce the acts constituting the violation. Eltek was damaged as alleged herein.

## COUNT III

**Violation of Section 10(b) ~~of the SEA~~ and Rule 10b-5(a) and (c) ~~Thereunder~~ (against Defendant ~~JDMS~~MSSB)**

~~161~~153. Plaintiff incorporates by reference all preceding paragraphs. ~~JDMS are~~

154. Defendant MSSB is primarily liable ~~for affirmatively and knowingly participating in a "device, scheme, or artifice to defraud" to manipulate the market for Eltek stock. Their actions, in concert with the named Defendants, constituted deceptive devices or contrivances that manipulated Eltek's stock price during the Relevant Period~~as a protagonist in a fraudulent scheme. Its conduct after its "Fraud Operations Unit" flagged manipulative trading in ELTK on October 16, 2020, constituted a new, independent, and primary "device, scheme, or artifice to defraud" in violation of Rule 10b-5(a) and (c).

~~162~~155. The ~~deceptive acts included as alleged in ¶9 above. These acts created a false appearance of market activity and depressed Eltek's price.~~

~~163. JDMS, as masterminds, are primary violators and liable for conceiving, executing, and orchestrating the underlying fraud, using broker- dealers.~~

~~164. JDMS acted with intent, willful blindness, or deliberate recklessness, as the trading patterns deviate from legitimate trading and were designed to profit from distortion.~~

~~165. Based on the foregoing, Plaintiffs have been damaged in an amount to be determined at trial~~Deceptive and Manipulative Act: The "device" was MSSB's implementation and nine-month maintenance of the one-sided non-publicly disclosed "P-Trade Policy." This policy was an affirmative act that: a. Operated as a fraud on the market by deceptively concealing a material fact (that MSSB, a major broker, was unilaterally barring all electronic purchases of Eltek stock). b. Created a false appearance of weak market demand, artificially suppressing Eltek's share price.

156. Scienter (Intent): MSSB acted with actual knowledge and fraudulent intent as alleged above. The strong inference of scienter rests on the allegations of that Section, including the deliberate, undisclosed, and asymmetric design of the P-Trade Policy, its maintenance for approximately nine months, and MSSB's refusal to provide any explanation.

157. As a direct and proximate result of MSSB's own scheme, which actively suppressed Eltek's stock price and deceived the market, the Company was damaged.

**COUNT IV**

**Violation of Section ~~9~~10(~~a)(1) & (2) of the SEA~~b) and Rule 10b-5(a) and (c) (against Defendant**

**~~JDMSs~~JDMS)**

~~166~~158. Plaintiff incorporates by reference all preceding paragraphs.

~~167~~159. ~~The~~ JDMS ~~Defendants~~ are primarily liable for ~~market manipulation under Section 9(a)(1) of the SEA, as their actions created a "false or misleading appearance of active trading" (9(a)(1)).~~

~~168. JDMS are primarily liable for violating Section 9(a)(1) by directly effecting wash trades and matched orders, creating a "false or misleading appearance of active trading."~~

~~169. JDMS are primarily liable for violating Section 9(a)(2) by directly affecting a "series of transactions... for the purpose of inducing" others to trade.~~

~~170. JDMS are primarily liable under Section 9(a)(2) as they created actual or apparent active trading- to induce others to buy or sell by misleading them about genuine market demand or supply.~~

~~171. Based on the foregoing, Plaintiffs have been damaged~~affirmatively and knowingly participating in a "device, scheme, or artifice to defraud" to manipulate the market for Eltek stock. Their actions, in concert with the named Defendants, constituted deceptive devices or contrivances that manipulated Eltek's stock price during the Damages Period.

160. The deceptive acts included the alleged manipulative trading detailed above. These acts created a false appearance of market activity and artificially manipulated Eltek's price and market metrics.

161. Scienter: JDMS acted with intent, willful blindness, or deliberate recklessness, as the trading patterns deviate from legitimate trading and were designed to profit from distortion.

162. Eltek has suffered damages in an amount to be determined at trial.

**COUNT V**

~~**NEW YORK STATE COMMON LAW FRAUD (Against All Defendants)**~~

Case 1:25-cv-08536-LAK Document 48 Filed 11/21/25 Page 46 of 76

172. Plaintiff incorporates by reference all preceding paragraphs.

173. Defendants engaged in fraudulent and deceptive schemes to manipulate the market for Eltek stock.

174. This conduct constituted material misrepresentations and omissions of fact to Eltek and the public market, namely, the false representation that the market for Eltek stock was free, fair, and not subject to manipulation.

175. Defendants acted knowingly, with fraudulent intent, and with the intent that Eltek and the market rely upon this false appearance.

176. Eltek justifiably relied on the integrity of the market when making capital-raising and strategic decisions.

177. As a direct and proximate result of Defendants' fraudulent scheme, the Company was damaged in an amount to be determined at trial.

178. Defendants' conduct was reckless, willful, intentional, and malicious, warranting punitive damages.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiff respectfully requests that This Court enter a judgement**Violation of Section 9(a)(1) & (2) of the Exchange Act (against Defendant JDMS)**

163. Plaintiff incorporates by reference all preceding paragraphs.

164. JDMS are primarily liable for violating Section 9(a)(1) by directly effecting wash trades and matched orders, creating a "false or misleading appearance of active trading," and Section 9(a)(2) by directly effecting a "series of transactions... for the purpose of inducing" others to trade.

165. Based on the foregoing, Eltek has been damaged in an amount to be determined at trial.

**STATE LAW CLAIMS**

**Non-Preemption and Timeliness of New York Common-Law Fraud Claims**

166. The New York common-law fraud claims asserted in Counts VI and VII rest on independent state-law duties and distinct injuries, as alleged in those Counts, and are not preempted by federal securities law. Each Defendant's conduct is alleged independently; no inter-broker coordination or conspiracy is alleged.

**COUNT VI**

**Common Law Fraud (Against IBKR)**

167. Plaintiff incorporates by reference all preceding paragraphs.

*Overview of Fraud Theory*

168. Defendant Interactive Brokers Group, Inc., IBG LLC, and Interactive Brokers LLC (collectively, "IBKR") engaged in intentional concealment and deceptive business practices that misrepresented and omitted material facts concerning IBKR's internal policies, compliance controls, and market-access mechanisms. These concealed facts created a false appearance of a fair and properly functioning market for Eltek's stock, upon which Eltek reasonably relied in planning and executing capital-formation initiatives.

*Material Misrepresentations and Omissions*

169. IBKR knowingly and intentionally concealed material facts, including:

- Default OBO Status: IBKR defaulted all customer accounts to "Objecting Beneficial Owner" status, concealing the identities of traders whose activity materially affected ELTK's market.
- Non-Public Platform-Specific Trading Information: IBKR concealed real-time trading metrics and platform-specific information observable only through its proprietary systems, preventing issuers from understanding market behavior affecting ELTK.

- Supervisory and Compliance Deficiencies: IBKR concealed supervisory failures and compliance weaknesses later corroborated by the United States Department of the Treasury's July 15, 2025, settlement.
- Enterprise-Level Opacity: IBKR concealed that its vertically integrated enterprise structure allowed trading activity to flow through affiliated entities without proper oversight or review.

These omissions were material because they directly affected the integrity of the market for Eltek's stock and its ability to raise capital.

*Duty*

170. Under New York law, IBKR owed a duty not to conceal internal policies and practices that it knew would distort market integrity, mislead issuers, or create false market signals. This duty arises independently of federal securities law.

*Scienter*

171. IBKR acted with actual knowledge, deliberate recklessness, or willful blindness. IBKR knew the facts it concealed and intentionally concealed them because its business model profited from trading activity that harmed Eltek.

*Reliance*

172. Eltek actually and justifiably relied on the integrity of the market for its own shares. As an NMS issuer, Eltek paid Nasdaq's All-Inclusive Annual Listing Fee and incurred continuing compliance costs in each year of the Damages Period in reliance on the market for ELTK operating free of undisclosed broker interventions. Eltek's board and management timed, priced, and sized the Company's capital-formation decisions, including the October 2020 rights offering and the February 2024 underwritten offering, on the basis of the price, volume, and demand signals disseminated

Case 1:25-cv-08536-LAK Document 49 Filed 11/24/25 Page 49 of 76

through Tape C. Those signals were corrupted by IBKR's concealed conduct: its OBO default, its permissive market-access settings, and the off-exchange execution of ELTK order flow on its ATS, facts exclusively within IBKR's knowledge and undiscoverable by Eltek. Given IBKR's superior knowledge of these undisclosed practices, Eltek's reliance on those market signals was justifiable.

*Causation and Damages*

173. As a direct and proximate result of IBKR's fraudulent concealment and deceptive business practices, Eltek suffered distorted stock prices, artificial suppression of demand, distorted market signals, an impaired ability to raise capital on fair terms, and delayed financing and strategic losses.

**COUNT VII**

**Common Law Fraud (Against MSSB)**

174. Plaintiff incorporates by reference all preceding paragraphs.

*Overview of Fraud Theory*

175. Defendant Morgan Stanley Smith Barney LLC ("MSSB") engaged in intentional concealment and deceptive conduct by implementing and maintaining a unilateral non-publicly disclosed "P-Trade Policy" that barred electronic purchases of ELTK stock for approximately nine months. MSSB concealed this policy from its customers, Eltek, and the market, creating a false appearance of weak demand and artificially suppressing ELTK's stock price.

*Material Misrepresentations and Omissions*

176. MSSB knowingly and intentionally concealed:

- Existence of the P-Trade Policy: MSSB barred electronic purchases of ELTK, requiring customers to place purchase orders by telephone.

- Market-Wide Impact: MSSB concealed that its policy materially distorted market demand for ELTK's stock, creating false signals affecting all market participants.
- Undisclosed Purpose: MSSB concealed the purpose of the restriction, including the identification function as alleged here.

These omissions were material because they directly affected market demand and Eltek's ability to raise capital.

*Duty*

177. Under New York law, MSSB owed a duty to not distort market access and not to conceal internal policies that materially affect public market demand. This duty arises independently of federal securities law.

*Scienter*

178. MSSB acted with actual knowledge and fraudulent intent. MSSB knew its P-Trade Policy suppressed demand, knew its customers were unaware of the restriction, and knew the market would interpret the suppressed demand as genuine, and it maintained the policy while concealing its own compliance failures.

*Reliance*

179. Eltek actually and justifiably relied on the false appearance of organic market demand that MSSB's concealed restriction created. Eltek paid Nasdaq's All-Inclusive Annual Listing Fee and incurred continuing NMS compliance costs in reliance on a market free of non-publicly disclosed broker-imposed purchase restrictions. Eltek's board and management planned, timed, and priced the Company's capital raises, including the October 2020 rights offering conducted while the undisclosed P-Trade Policy was suppressing electronic purchases of ELTK, on the basis of the price, volume, and

demand signals disseminated through Tape C. MSSB alone knew that it had severed electronic buy-side access for its millions of customers while leaving sales unrestricted and share lending active, and it never disclosed that fact to Eltek, its customers, or the market. Given MSSB's exclusive knowledge of the restriction, Eltek's reliance on the apparent state of demand for its shares was justifiable.

*Causation and Damages*

180. As a direct and proximate result of MSSB's fraudulent concealment, Eltek suffered an artificially depressed stock price, distorted market demand, an impaired ability to raise capital, delayed financing, and strategic losses.

**COUNT VIII**

**Declaratory Judgment**

181. Plaintiff incorporates by reference all preceding paragraphs.

182. Plaintiff has satisfied the requirements of Israel Companies Law §§ 194–198, as set forth in Section VII. Under § 198(c), this Court is the court qualified to hear the action and is empowered to make the § 198(a) findings. Plaintiff seeks a declaration that this derivative action and its conduct are, a priori, to the benefit of Eltek and that Plaintiff is not acting otherwise than in good faith. In the alternative, and only to the extent any question is raised as to whether §§ 197–198 govern or are satisfied, a case and controversy exists warranting declaratory relief.

183. XDOOD has commenced this derivative action on behalf of Eltek in good faith, not in bad faith seeking a quick private settlement for the purpose of maximizing legal fees, but to eliminate stock manipulation of Eltek shares, which benefits the Company as a whole.

184. The U.S. Southern District Court, in and for the State of New York is "the court qualified to hear the action" under Israel Companies Law § 198(c).

185. The Plaintiff is entitled to a declaratory judgment that this action and its conduct are to the benefit of Eltek and that the Plaintiff is not acting otherwise than in good faith.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:

86.A. Declaring that DefendantsIBKR and MSSB defendants violated the federal securities laws and New York state laws as alleged in this Complaint;

86.B. Ordering Defendants to pay compensatory damages, together with prejudgment interest, for their unlawful conduct in an amount to be determined at trial;

86.C. Ordering Defendants to pay punitive damages to Eltek on Counts VI and VII for their malicious, oppressive, and/or reckless disregard for Plaintiff'sEltek's rights, in an amount to be determined at trial;

87.D. Permanently enjoining and restraining Defendants from continuing and maintaining the unlawful conduct and conspiracies alleged in the, pursuant to the Court's equitable powers and New York law (Counts VI and VII), from continuing the unlawful conduct alleged in this Complaint;

A. Awarding Plaintiff reasonable attorneys' fees and costs;

B. Awarding McGauley, Chin, and XDOOD fees and costs associated with the five-year investigation of manipulative Eltek stock trading;

E. andTo the extent required by Israel Companies Law, as determined by this Court, declaratory judgment that XDOOD's action and its conduct are to the benefit of Eltek and that XDOOD, is not acting otherwise than in good faith.

~~87.~~F. Awarding Plaintiff reasonable attorneys' fees and costs;

~~87.~~G. Granting such other and further relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

~~Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the~~ Plaintiff ~~demands trial by~~Demands a jury ~~in this action of all issues so triable~~trial on all claims.

Dated: 23 November ~~24, 2025~~2026
New York, New York

Respectfully submitted, ~~Goldberg Segalla~~



~~By:~~
~~Adam S. Katz~~

~~711 3rd Avenue, Suite 1900~~/s/ T. Edward Williams, Esq.
WILLIAMS LLP
420 Lexington Avenue Suite 875
New York, ~~Newy~~New York ~~10017-4013 Telephone: (646) 292-8787 Fax: (646) 292-8700akatz@goldbergsegalla.com~~10170
212.417.0430
212.417.0433 (Fax) edward@williamsllp.com
Attorneys for Plaintiff, XDOOD

## VERIFICATION OF COMPLAINT

**MICHAEL MCGAULEY**, being duly sworn, deposes and says as follows:

1. I am of lawful age and of sound mind, and I supply this Verification pursuant to Fed. R. Civ. P. 23.1(b).

88.2. I am the managing member and sole owner of Plaintiff, XDOOD LLC.

CAMARA & SIBLEY L.L.P.
Joe Sibley, Esq. (Pro Hac Vice Forthcoming)
1108 Lavaca Street, Suite 110263 Austin, Texas 78701
Telephone: (713) 966-6789
Fax: (713) 583-1131sibley@camarasibley.com

3. *Attorneys for Petitioners*I am authorized to speak for and make declarations for XDOOD LLC.
4. I make this verification based on personal knowledge unless I otherwise state that I make a statement upon information and belief.
5. I read the foregoing Second Amended Complaint before it was filed with this Court.
6. The facts alleged in the foregoing Second Amended Complaint are true and correct to the best of my knowledge, information, and belief.
7. I make this Verification pursuant to 28 U.S.C. § 1746, and I certify, verify, and declare under pains and penalty of perjury that this Verification is true and correct.

Dated: 23 November 2026 */s/ Michael McGauley*

Michael McGauley
As authorized agent and Managing Member for XDOOD LLC